**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DENNIS HUNT,

                Plaintiff,                    Case No:  8:07-CV-1168-T-30TBM
                                                **Partially Dispositive Motion**

vs.

LAW LIBRARY BOARD, NORMA J. WISE,
and DAVID L. PILVER,

                Defendants.

_____/

**<u>DEFENDANT DAVID L. PILVER'S MOTION FOR SUMMARY JUDGMENT
(QUALIFIED IMMUNITY) AND MEMORANDUM OF LAW IN SUPPORT</u>**

       COMES NOW Defendant David L. Pilver (herein, "Pilver") through his undersigned counsel and files his Motion for Summary Judgment (qualified immunity). Pilver asserts he is entitled to summary judgment on the basis of the doctrine of qualified immunity.

**<u>Factual Background</u>**

       Plaintiff (herein, "Hunt") was a patron of the Hillsborough County Law Library (herein, "Library") in 2003.  Pilver was and is an employee of the Library.  This lawsuit involves the interactions in the Library between Hunt and Pilver in early- to mid-2003.

       In Count III of his Complaint, Hunt claims that Pilver is liable to him under 42 U.S.C. §1983 for violating "Plaintiff's First Amendment rights by barring him from the law library, …" (¶ 73 of the Complaint).

**<u>Summary of Arguments</u>**

       Pilver is protected by the doctrine of qualified immunity.  Plaintiff's only claim against Pilver is that Pilver barred him from the Library after Plaintiff exhibited what

1

Pilver construed as threatening behavior. Pilver acted well within his discretionary authority, explicitly delegated to him by the Law Library Board Chairperson before Pilver acted to remove Plaintiff from the Library. Plaintiff has no clearly established constitutional right to remain in a Library after causing what Library officials reasonably might construe as threatening behavior. Finally, even if Plaintiff had such a right, under such circumstances a reasonable person could not have known of the existence of a clearly established right to remain in the Library, regardless of Plaintiff's behavior.

**Undisputed Facts**

This lawsuit follows Hunt's arrest for and conviction of trespassing in July 2003 after he was instructed to leave the Library by police. When asked to leave the Library, Hunt admits he told Tampa Police Officer Charles Hathcox that he would not leave the Library but that he intended to "stay until closing". (**Exh. 1**, Hunt Depo. at 32). Having disobeyed Hathcox's instructions to leave, Hunt was then arrested for trespassing.

Hunt's first criminal trespass trial, before Judge Nicholas Nazaretian, was mistried. His second trespass trial, held before Judge Thomas Barber, was held on June 8, 2005 and resulted in a guilty verdict. That verdict was and remains the subject of an appeal[1]. Hunt conceded in his deposition at bar (Hunt Depo. at 21) that his testimony at that trial remains unchanged. For that reason, the trial transcript is provided as **Exh. 2** to this Motion.

---

[1] The Law Library believes this lawsuit is "*Heck*-barred", referring to the holding of Heck v. Humphries, 512 U.S. 477, 114 S.Ct. 2364 (1994), because a positive outcome for Hunt in the case at bar would "necessarily imply the invalidity of his conviction". Hunt testified he agrees with this assessment, testifying that he believes if he wins the instant lawsuit, it will imply that the result in his criminal case was wrong. (Hunt Depo. at 22-23). This argument will be presented separately in the Law Library's Motion for Summary Judgment.

It is notable that because the verdict of the jury in the criminal case was guilty, it may reasonably be inferred that the jury believed Pilver's testimony and not Hunt's testimony, about the events leading up to Hunt's trespass.

Now 5 ½ years later, Hunt has never asked the Library Board for permission to return to the Library. (Hunt Depo. at 29-30).

## Hunt's Disputed Facts

Regarding the incidents leading up to and including Hunt's altercation with law enforcement in early July 2003, Hunt's testimony differs in some respects from Pilver's testimony. The difference in testimony involves the nature and severity of Hunt's behavior during several interactions between the two of men starting in April 2003 and ending with Hunt's arrest in early July 2003.

Hunt's trial testimony before Judge Barber appears at **Exh. 2**, Trial Transcript at pp. 109 through 139. Hunt testifies that prior to the incident which resulted in his arrest, he had been doing legal research at the Library for "nearly one year" and encountered Pilver "many times". (Trial Transcript at p. 110). Hunt's "complaints started" after Hunt brought a personal copy machine into the Library on April 30, 2003, after which Pilver instructed Hunt not to use the machine in the Library. (Trial Transcript at pp. 110, 113). From then on, Hunt made "several complaints" against Pilver, notably including one complaint that Pilver was "handing me books in a very aggressive manner". (Trial Transcript at p. 111).

Hunt later made a complaint "of the aggressiveness of Mr. Pilver towards me and accusations that I was refusing to leave the library after closing time," on July 1, 2003. (Trial Transcript at p. 113). On July 1, 2003, Pilver had given "a 15 minute

announcement prior to closing...but he did not give a five minute announcement." (Trial Transcript at 114). Afterwards, at about one minute before closing (according to Hunt) Pilver confronted Hunt about being in the Library after closing time. (Trial Transcript at 117). Pilver responded that he did not have to give him a 5 minute warning in advance of closing. (Trial Transcript at 117-118). Hunt testified that "the first thing I said to him" was "You know, it's obvious that I'm on my way out." (Trial Transcript at 130). Hunt then states that Pilver stated: "Well, it doesn't matter. It's after closing time and you're trespassing." (Trial Transcript at 118). Then Pilver said "over and over again, 'Mr. Hunt, are you refusing to leave the law library?" (Trial Transcript at 121). Hunt, not answering the question, then states he said, "Now move aside. You're blocking my egress." (Trial Transcript at 118). Hunt denies cursing, getting angry, raising his voice or threatening Pilver in any way. (Trial Transcript at 118-119, 129, 132). Hunt says Pilver was "very aggressive and threatening towards me." Then Hunt left the Library. (Trial Transcript at 119).

On July 5, 2003, Hunt returned to the Library. (Trial Transcript at 119). Hunt never spoke to Pilver on that date. (Trial Transcript at 120). Pilver never walked up to Hunt on that date. (Trial Transcript at 133). Pilver never told Hunt that he had to leave the Library. (Trial Transcript at 133). Officer Hathcox of the TPD told Hunt to leave. (Trial Transcript at 134). In response to Officer Hathcox's request, Hunt stated "I made the decision that it just was not right and it was too important for me to be there, as I had an upcoming trial that I was preparing myself for...[a]nd they were violating my rights" so he decided not to leave the Library. (Trial Transcript at 134). The Officer told him more than once to leave. (Trial Transcript at 135). Hunt responded: "Now I'm going to

sit down and I'm going to stay here until 5:00 p.m. closing". (Trial Transcript at 136).

Hunt was then placed under arrest. (Trial Transcript at 136).

**Pilver's Version**

Pilver testified that there were several incidents leading up to the July 1, 2003 incident, which to him suggested an increasing level of adversarial behavior by Hunt directed towards Pilver.

The first incident was the photocopier incident mentioned by Hunt, where Hunt brought his own photocopier into the Library, after which Pilver asked him not to use the photocopier because (1) it made a loud beeping noise and (2) it was against Library policy to bring in a personal photocopier. Pilver testified that during this exchange, Pilver did not feel Hunt was inappropriate, and that Hunt did not yell, use profanity or refuse to comply with Pilver's directive to stop using his personal copy machine. (Pilver Depo. at 71-72). However, after Hunt complained to Pilver's supervisor about this incident, Pilver began to think of Hunt as someone who seemed to "thrive on conflict" and was "always in...make-a-complaint-mode". (**Exh. 3**, Pilver Depo. at 74). Pilver's supervisor warned him at that point that Hunt seemed focused on Pilver personally and to be "wary" of Hunt. (Pilver Depo. at 80).

At a later date, Hunt complained to Pilver's supervisor about the manner in which Pilver was handing books to Hunt over the resource desk. (Pilver Depo. at 84, Exh. 4 to Pilver Depo.). Pilver testified the allegation had "no relation to reality" and that it was "a preposterous allegation" that made him "wonder about the mind set of" Hunt. (Pilver Depo. at 85). Pilver began to wonder if Hunt was "out to get me." (Pilver Depo. at 93).

Also at some point before July 2003, Hunt approached Pilver about Hunt's dissatisfaction with the quality of copies made on the Library copy machine. (Pilver Depo. at 94-95). Pilver charged Hunt for the copies, but Hunt complained that 2-3 of the copies were unreadable. Pilver agreed and credited Hunt for 2 of the copies. Then Hunt abruptly said "I don't want 'em !" and threw the copies across the desk. (Pilver Depo. at 95-96).

The next noteworthy interaction was the July 1 incident. This next incident occurred after Hunt had previously tarried in the Library after closing "5 or 6 times". (Pilver Depo. at 100). Pilver had warned Hunt once previously about staying in the Library after closing. (Pilver Depo.at 100). Pilver was worried about giving warnings to Hunt at this point, concerned it might result in a conflict with Hunt or more complaints by Hunt against Pilver. (Pilver Depo. at 103). After waiting until 7 or 8 minutes after closing time, Pilver went back to talk to Hunt. (Pilver Depo. at 103). Hunt was the only patron left in the Library. (Pilver Depo. at 103). Pilver stated to Hunt that "It's well after closing time." (Pilver Depo. at 104). Hunt responded: "You didn't make an announcement." Pilver responded that he had made an announcement but that even if he hadn't Hunt was responsible for leaving before closing time. (Pilver Depo. at 104). Hunt then "exploded," was "very angry," "irate," "yelling," "cursing," startling Pilver. Hunt stated: "God dammit. What the fuck do you think you're doing? You don't know who you're fucking messing with. You're messing with the wrong guy." (Pilver Depo. at 104). Pilver responded by saying that was "completely unacceptable" and that Hunt needed to leave. (Pilver Depo. at 105). Hunt stated several times in succession: "What are you going to do if I don't? What are you going to do about it?" (Pilver Depo. at

105). In Pilver's view, Hunt "seemed to be really agitating for a physical confrontation." (Pilver Depo. at 105). In light of this, Pilver "took my glasses off just to be safe". (Pilver Depo. at 105). After Hunt again asked, "What if I don't go," Pilver said, "Well, if you're in the library deliberately after operating hours and you know that we're closed then I think that's trespassing." (Pilver Depo. at 105). After more exchanges Hunt said to Pilver, "you're blocking me" even though Pilver was "nowhere near him"; Pilver then backed away further. (Pilver Depo. at 106-107). Hunt finally started to leave, stating: "Next time will you lead me out at gunpoint?" (or some remark about a gun), and began ringing the call bell repeatedly at the front desk, saying "someone get this ding-a-ling out of here" and "laughed crazily". Finally, Hunt left. (Pilver Depo. at 107-108).

Next, Hunt came to the library on July 5. Pilver immediately called security when he saw Hunt approaching the Library, because he "was not comfortable with him being around after his explosion of anger and,…violent demeanor a couple of days before." (Pilver Depo. at 121). Pilver testified that at this point he was afraid of Hunt based on his "continuing pattern of escalational confrontational attitude" and based on Pilver's "previous experiences in totality". (Pilver Depo. at 123-124). Further, "based on the interactions [Pilver had] had with Mr. Hunt in the immediate past, [Pilver] didn't think that it was safe for him [Hunt] to be in the building." (Pilver Depo. at 129). From that point, security arrived and took over from there, ultimately calling TPD when Hunt refused to leave. (Pilver Depo. at 127-129).

**Pilver's Authority**

One key to the resolution of the qualified immunity issue is the nature of Pilver's authority to take the actions he took. There is no dispute of fact about this issue. After

the July 1 incident, Pilver was contacted by Law Library Board Chair, Sandra Kellaher, via phone. After Pilver told Kellaher what had happened with Hunt on July 1, Kellaher told Pilver he was authorized to use his best judgment about the safety concerns posed by Mr. Hunt or anybody else and to handle things as he saw fit to protect himself or patrons from potentially violent behavior. (Pilver Depo. at 117-119, 129-130; **Exh. 4**, Wise Depo. at 26). Pilver understood from this conversation that he had authority to take action that he thought was necessary based on his sense of safety and any perceived threat that Hunt posed. (Pilver Depo. at 119). It was Pilver's position of responsibility over the premises that gave him the authority to tell the police that Hunt was not welcome and to have the police remove Hunt. (Pilver Depo. at 135-136).

There is no evidence that Pilver intended to remove Hunt from the Library permanently; he "had not gone so far as to formulate that expression that way in [his] head of the way things were going to be". (Pilver Depo. at 123). Pilver, when asked if he construed Hunt's removal as a permanent removal, stated that this was "not necessarily" so, and that he "didn't try to ponder what was going to happen in the future" at that point. (Pilver Depo. at 123-124). As Hunt was leaving the Library on July 5, the police told Pilver that he "needed to express to Mr. Hunt that [he] didn't want him there at that time" and Pilver did so. (Pilver Depo. at 134). However, Pilver "never really asked specifically for a trespass." (Pilver Depo. at 135). The issuance of a trespass was "a police matter". (Wise Depo. at 27).

**Qualified Immunity Law**

Public officials, like Pilver, are protected from "undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S.

800, 806 (1982). Qualified immunity protects "government officials...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." _Id._ at 818. "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206 (2001). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Afton Callahan, 555 U.S. ____ (slip opinion); 2009 U.S. LEXIS 591, *14; 21 Fla.L.Weekly Fed. S588a, Section IIA (2009), citing to Groh v. Ramirez, 540 U.S. 551, 567 (2004) (*Kennedy, J.*, dissenting)(citing Butz v. Economou, 438 U.S. 478, 507 (1978)(noting that qualified immunity covers "***mere mistakes in judgment,*** whether the mistake is one of fact or one of law")(emphasis supplied)).

As this Court noted in its Order of September 22, 2008 (Doc. 21, at p. 8), in an analysis of qualified immunity, "the presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity." Bogle v. McClure, 332 F.3d 1347, 1353 (11th Cir. 2003). A "defendant is entitled to qualified immunity

under the *Foy* rationale only where, among other things, the record *indisputably* establishes that the defendant in fact was motivated *at least in part*, by lawful considerations." Bogle, 332 F.3d at 1356 (quoting Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1296 (11th Cir. 2000) (emphasis in original). Further elaborating the law in this area, the court requires that the evidence "undisputably indicate that [defendants] were motivated, at least in part, by objectively valid reasons." Bogle, 332 F.3d at 1356.

**Discretionary Job Function**

Where, as at bar, a government official is sued under 42 U.S.C. § 1983 under a theory of direct liability, the official may seek summary judgment if he was engaged in a "discretionary function." Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004). A "discretionary function" is determined by assessing whether the activities are of a type that fell within the employee's job responsibilities. This inquiry is two-fold. First, the Court asks whether the employee was performing a legitimate job-related function. Second, the Court asks whether the function was accomplished through the means that were within his authority to utilize. *Id.*

At bar, there is no question that Pilver acted well within his discretionary authority. The Law Library Board Chairperson told Pilver specifically how she wanted Pilver to handle the problems with Hunt: he had full discretion to handle the situation as he saw fit, but was reminded to protect himself and the patrons. As the only staff person in the Library, this obligation or duty was an inherent part of his legitimate job functions. Moreover, Pilver reasonably had to construe Kellaher's instructions as part of his job duties.

Pilver was placed by the Library Board Chair into a position where his clear mandate was to protect not only patrons but himself from potentially violent or threatening behavior. Pilver's actions in response to that mandate can be second-guessed, but the actions he took were not objectively unreasonable actions and did not go beyond his mandate.

## Plaintiff's Burden to Show that Qualified Immunity is Not Appropriate

Once it is established that Pilver was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate.[cite omitted] To do so, the plaintiff must first demonstrate that the defendant violated his constitutional rights. [cite omitted] The plaintiff then must demonstrate that the 'right was clearly established.'" Grimes v. Yoos, 2008 U.S. App. LEXIS 22697 (11th Cir. 2008) (unreported), citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Finally, Plaintiff must prove that a reasonable government official would have been aware of a clearly established right. Saucier, 533 U.S. at 201; Tindal v. Montgomery County Comm'n., 32 F.3d 1535, 1539 (11th Cir. 1994).

In the Supreme Court's recent (January 21, 2009) decision in Pearson, 555 U.S. ____ (slip opinion); 2009 U.S. LEXIS 591, *14; 21 Fla.L.Weekly Fed. S588a, Section IIA (2009), the Court withdrew from the strict adherence to the sequence of the two-part test in Saucier (requiring the plaintiff *first* demonstrate a violation of rights and *then* demonstrate the right was clearly established) and held that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts...should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed

first in light of the circumstances in the particular case at hand." *Id.* at Section IIIA. Thus, as in Pearson, this Court may elect not to decide whether a constitutional right was violated (the first prong of Saucier), instead deciding the case on the issue of whether Pilver was reasonably aware of a clearly established right (the second prong of Saucier).

In establishing the "clearly established right", Plaintiff must prove that it was clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202. The "clearly established" test is met if "in light of the pre-existing law the unlawfulness [is] apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002). In construing this issue, the inquiry is whether a reasonable officer in Pilver's position could believe that his conduct was lawful. The "appropriate inquiry is particularized and *fact-specific.*" Stewart v. Baldwin County Board of Education, 908 F.2d 1499, 1504 (11th Cir. 1990) (emphasis supplied), citing to Anderson v. Creighton, 483 U.S. 635, 641 (1987). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

Hunt alleges that Pilver violated his First Amendment rights by barring him from the Library. This allegation presupposes that Hunt had an absolute right to be in the Library, regardless of Hunt's behavior. Nothing in the law confers such a right. A library is "a place dedicated to quiet, to knowledge, and to beauty." Brown v. Louisiana, 383 U.S. 131, 142 (1966). It is a legitimate government interest to preserve a library as a "sanctuary for reading, writing and quiet contemplation." Faith Center Church Evangelistic Ministries v. Glover, 480 F.3d 891, 908 (9th Cir. 2007). To preserve that legitimate interest, "the right to free speech in a library is subject to curtailment."

Heffron v. Int'l. Soc'y. for Krishna Consciousness, 452 U.S. 640, 647 (1981). "...[T]he right to receive information [in a library] is not unfettered and may give way to significant countervailing interests." Kreimer v. Bureau of Police, 958 F.2d 1242, 1255 (3rd Cir. 1992) (holding that removing a homeless man from the library because he smelled bad was a reasonable restriction on his First Amendment rights). "Prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum Library use." Id. at 1263.

Hunt certainly has a qualified right to go to a library and to receive information from that library. However, just as in a courtroom, Hunt's right is conditioned somewhat upon his behavior. The Library can certainly constitutionally remove Hunt for threatening behavior. Id. at 1263; Galiano v. Institute of Governmental Studies, 2008 U.S. Dist. LEXIS 68527 (N.D. Cal. 2008). And that is precisely what Pilver did at bar.


## Pilver was Motivated *at Least in Part*, by *Objectively* Valid Reasons

Applying the holding in Bogle, the evidence reflects Pilver was afraid Hunt posed a threat to his safety and the safety of patrons. The "clearly established" inquiry turns on "the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken'", Pearson, 555 U.S. at _____, citing to Wilson v. Layne, 526 U.S. 603, 614 (1999). In light of the facts as presented by Pilver, it was objectively reasonable for Pilver to believe Hunt posed a threat to his safety and the safety of others. This reasonable belief factor has formed the basis for qualified immunity in use-of-force cases, wherein the essential question was whether the use of force was reasonable in light of the apparent threat. E.g., Pace v. City of Palmetto, 489

F.Supp. 2d 1325, 1335 (M.D. Fla. 2007) (police officer's use of non-deadly K-9 force after failing to give a verbal warning was not enough to establish that use of force was objectively unreasonable); <u>Mongeau v. Jacksonville Sheriff's Office</u>, 197 Fed. Appx. 847, 849-850 (11th Cir. 2006) (no constitutional violation occurred where officers stopped a suspect by releasing a K-9 on the suspect, spraying the suspect with pepper spray, slamming the suspect on the ground, beating his head and back, then placing a knee on the suspect's back and neck as he was handcuffed).

In a case that is close factually to the case at bar, qualified immunity protected library staff from the claims of patrons whose actions were much less egregious than Hunt's behavior at bar. In <u>Galiano v. Institute of Governmental Studies</u>, 2008 U.S. Dist. LEXIS 68527 (N.D. Cal. 2008), Galiano was busily reading at a library when he was disturbed by a conversation between another patron and the librarian. Galiano asked the other patron to lower her voice, after which the librarian informed Galiano that patrons were required by an unwritten rule to address concerns involving other patrons with library staff. Galiano then commenced to argue with the librarian that the rule was unreasonable, after which the librarian told Galiano that he had to leave the library. Galiano uttered an epithet and left. <u>Id.</u> at *3. The librarian later reported Galiano to campus police as a trespasser. <u>Id.</u> at *29. After Galiano filed suit against the librarian, the Court dismissed the librarian on qualified immunity grounds, finding that the librarian did not violate clearly established law. <u>Id.</u> at *31.

<u>Galiano</u> and <u>Kreimer</u> are notable not only for their holdings on facts similar to those at bar, but for what Pilver *could reasonably have believed the law required* under the circumstances Pilver faced. If a federal judge, in <u>Galiano</u>, holds that it is not illegal

for a library patron to be thrown out and trespassed for simply arguing about an unwritten library rule, then there is *no way* Pilver should *reasonably* have believed his actions were illegal. Likewise, if a patron in Kreimer could be lawfully removed from the library for smelling bad, Pilver could reasonably have assumed his removal of Hunt from the library was perfectly legal. This being the case, Pilver acted in a manner that was reasonably consistent with those lawful actions taken in Kreimer and Galiano and consequently, qualified immunity protects Pilver.

**Other than *Galiano* and *Kreimer*, there is No "Well-Developed" Law Governing this Fact Situation**

In this Circuit, in order to deny qualified immunity, "the law must be so well-developed as to make it obvious to reasonable public officials that their conduct would violate federal law." Rowe v. City of Cocoa, 2003 U.S. Dist. LEXIS 25578 (M.D. Fla. 2003), citing to Braddy v. Dept. of Labor & Employment Sec., 133 F.3d 797, 801 (11th Cir. 1998). As in the facts of the case involving officer who cut loose his K-9 without giving advance warning, Pace, 489 F.Supp. 2d 1335, this case involved a judgment call; there is no "obvious" rule at bar. Rather than a bright-line rule, this case turns on a weighing of relative interests: Hunt's interest in remaining in the Library, juxtaposed against Pilver's mandate to protect himself and patrons from a person whom he reasonably believed might be a security concern. It is difficult for even law enforcement to determine at what point reasonable suspicion exists, or at what point an arrest is appropriate.

In order to assess what Pilver should reasonably have done under the circumstances, the Court could ask any number of questions: Should Pilver have

reasonably waited before calling law enforcement until Hunt acted *again* or *escalated*?

Should Pilver have specified to law enforcement that Hunt should be removed *today only*

but allowed back tomorrow (or *this week only* but allowed back next week)? Should

Pilver have taken the issue to the Board before taking any action in spite of his direction

from his management? There is no clear answer, in terms of case law, to these questions.

They all turn on Pilver's judgment as a lone employee responsible for the safety of the

Library. Pilver should not be penalized for erring in that judgment call, because a mere

mistake of judgment (to the extent that Pilver's actions may be construed as a mistake)

are protected by qualified immunity. See <u>Pearson</u>, citing to <u>Groh</u> and <u>Butz</u>, supra. For

that reason, all of these questions suggest the absence of a clear guide for what Pilver

should do. Like in the use-of-force cases, this case turns on a judgment call, requiring

that a "reasonableness inquiry 'must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight.'" <u>Mongeau</u>, 197 Fed.

Appx. at 850, citing to <u>Graham v. Connor</u>, 490 U.S. 386 (1989). In light of Pilver's

difficult judgment call, 20/20 hindsight should not govern the case at bar. Pilver should

not be subjected further to the challenges of being a Defendant in federal litigation.

Qualified immunity is appropriate as a matter of law.

**Epilogue**

It bears noting that at the conclusion of Hunt's first criminal trial for trespass,

Judge Nazaretian stated to Hunt:

> "maybe we need to quit fighting the system and just get along and then
> maybe if you can talk to the Board of Directors at this place – at the library, if you
> all can get together and apologize and everything, you can go back and study
> some more. I mean, it seems a shame to keep you out of the library, but that's
> what I have to do right now because of the ongoing problem. I hope you can

work something out with the Board of Directors which would allow you to go back and do that."

**Exh. 5**, Transcript of Trial, October 15, 2003, at 50.

Library Director Norma Wise confirms that only the Law Library Board, not herself or Pilver, has authority to address the question of whether Hunt is still barred from the Law Library. (Wise Depo. at 10, 33-34). The official position of the Library is that trespass warnings are "criminal matters…handled by law enforcement." (Wise Depo. at 23).

Rather than taking Judge Nazaretian's advice of over 5 years ago, Hunt has yet to approach the Board of Directors about apologizing and returning to the Library.

## Conclusion

After two criminal jury trials, this case is now the third in which Pilver's reputation and livelihood have been scrutinized regarding the same facts and the same individual. Qualified immunity is intended to prevent Pilver from being subjected to litigation. Pilver made a clear judgment call to remove a patron whom he reasonably perceived was a threat to himself and possibly to others. Pilver made this judgment call with clear authority to take action. Pilver could not have had knowledge of a clear legal reason not to take such action. His actions were reasonable in light of the circumstances. Pilver should be dismissed from this case.

Respectfully,

Stephen M. Todd
Senior Assistant County Attorney
Florida Bar No. 0886203
Hillsborough County Attorney's Office

Post Office Box 1110
Tampa, Florida 33601-1110
(813) 272-5670
Fax (813) 272-5758
todds@hillsboroughcounty.org
Attorney for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served to **Ryan Christopher Rodems, Esq.**, Barker, Rodems & Cook, P.A., via the Clerk's CM/ECF electronic filing system, on this 23rd day of January 2009.

Stephen M. Todd

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENNIS HUNT,                          )
                                      )        Case No. 8:07-cv-1168-T-30TBM
            Plaintiff,                )
                                      )
vs.                                   )
                                      )
LAW LIBRARY BOARD,                    )
a Board created by Hillsborough       )
County, Florida,                      )
                                      )
NORMA J. WISE,                        )
in her official capacity as Director  )
of the James J. Lunsford Law          )
Library, and individually, and,       )
                                      )
DAVID L. PILVER,                      )
individually,                         )
                                      )
            Defendants.               )
_____ )

## INDEX OF EXHIBITS
### (to Defendant, Hillsborough County's Motion for Summary Judgment)

1.    Deposition Transcript of Dennis Hunt taken on November 26, 2008

2.    Transcript of Proceedings taken on June 8, 2005 before the Honorable Tom
      Barber

3.    Deposition Transcript of David Pilver taken on January 8, 2009

4.    Deposition Transcript of Norma Wise taken on January 8, 2009

5.    Transcript of Proceedings taken on October 15, 2003 before the Honorable Nick
      Nazaretian

EXHIBIT 2

IN THE COUNTY COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
MISDEMEANOR DIVISION

STATE OF FLORIDA,

      Plaintiff.

                           CASE NO: 03-CM-018502

vs.

                           DIVISION: E

DENNIS HUNT,

      Defendant.

_____/


## TRANSCRIPT OF PROCEEDINGS


      BEFORE:             **HONORABLE TOM BARBER**

      TAKEN AT:          Courtroom 20
                          Courthouse Annex
                          Tampa, Florida

      DATE AND TIME:     June 8, 2005
                          1:30 p.m. docket

      RECORDED BY:       Joshua Johnson
                          Electronic Court Reporter

      TRANSCRIBED BY:    Catherine Tomasi
                          Electronic Court Reporter

                                 (ORIGINAL _____)
                                 (COPY     )

*Record Transcripts Incorporated*
*501 East Kennedy Boulevard, Suite 1230*
*Tampa, Florida 33602*
*(813) 514-5100*

SCANNED

# A P P E A R A N C E S

REPRESENTING THE STATE:

       Dustin DUBOSE, Esquire
       Shauna HALE, Esquire
       Assistant State Attorney
       Office of the State Attorney
       County Courthouse Annex
       Tampa, Florida  33602

REPRESENTING THE DEFENDANT:

       Pedro AMADOR, Esquire
       Assistant Public Defender
       Office of the Public Defender
       700 East Twiggs Street
       Tampa, Florida  33602

3

**I N D E X**

PAGE

PROCEEDINGS . . . . . . . . . . . . . . . . . . 4

DAVID PILVER

     Direct Examination by Mr. Dubose . . . . . . . . . . . . . 67
     Cross Examination by Mr. Amador . . . . . . . . . . . 81
     Redirect Examination by Mr. Dubose . . . . . . . . . . . 86

SANDRA KELLAHER

     Direct Examination by Mr. Dubose . . . . . . . . . . . . 88
     Cross Examination by Mr. Amador . . . . . . . . . . . 94
     Redirect Examination by Mr. Dubose . . . . . . . . . . . 98

OFFICER CHARLES HATHCOX

     Direct Examination by Ms. Hale . . . . . . . . . . . . . 99
     Cross Examination by Mr. Amador . . . . . . . . . . . 102

DENNIS HUNT

     Direct Examination by Mr. Amador . . . . . . . . . . . . 110
     Cross Examination by Ms. Hale . . . . . . . . . . . . . 121
     Redirect Examination by Mr. Amador . . . . . . . . . . . 138

CERTIFICATE OF COURT REPORTER . . . . . . . . . . . . . . . . . 193

PROCEEDINGS

1

2    THE COURT: Okay, did you have a chance to read that,

3  Mr. Amador?

4    MR. AMADOR: I have, Judge.

5    THE COURT: Okay, I am happy to have some discussions on

6  that if you want to and note any objections before we get

7  started but once we get started I want to make sure we know

8  what the grounds rules are for both sides. I also have here,

9  Deputy Dixie, do you want to hand this out, please?

10    MR. AMADOR: Mr. Hunt, can you come forward, please?

11    THE COURT: Just hand those -- give two to Mr. Amador

12  and the other one to the State. This is what I'm thinking of

13  giving as a jury instruction. Mr. McFadden, I like that suit.

14    MR. MCFADDEN: Thank you, sir.

15    THE COURT: Are you here just for a -- do you have

16  something we need to take care of?

17    MR. MCFADDEN: No, sir. You're very kind to ask. Mr.

18  Dubose has signed a stipulation. I want to give the order and

19  the stipulations to your JA.

20    MR. MCFADDEN: (Indiscernible).

21    THE COURT: Okay. I handed this out at 9:00 this

22  morning so you could read it.

23    MR. AMADOR: I didn't have this. I read --

24    THE COURT: Okay, so you have read that? Yes, I'm not -

25  - the instruction I'm set in stone on, I'm just handing it out

as a draft. If we want to talk more about it we can. We can have a charge conference at some point. I just wanted, before we pick the jury, to give both of you all kind of an idea of where I was coming from on this and what I was thinking. If you want to suggest revisions, whatever, we can do that. That's not -- that's just a draft, all right?

MR. DUBOSE: Your proposed an order -- I mean, your proposed jury instruction?

THE COURT: Yeah. Now, the order, I think is -- it is what it is. If I'm missing something we need to talk about it or if anybody wants to note any objections. I mean, the State may, for example, want to object to there being any such right as a constitutional right to access to a library. You may want to object that, you know I haven't described it with it's proper -- you note any objections that you want.

MR. AMADOR: If I may, I would, knowing what the Court is ruling I just want to put my objections on the record concerning the Court's ruling --

THE COURT: Right.

MR. AMADOR: -- while I understand that the Court has ruled that I can't argue that the constitution prohibits the library from trespassing him all together, I would argue to the Court and, based on what the Court has indicated in its reasoning and the order, I would argue that the State has the burden to establish, based on even the citations as you have

and the authority that you said in your order, that the State
has to establish that there was a disturbance on the day that
Mr. Hunt was trespassed from the library. I think that that's
what the government's burden is.

THE COURT: Okay, and that's noted for the record. I
would just say in response to that, just taking a hypothetical
situation -- and I don't want to get into a long discussion
but just so you know my reasoning and you can do what you want
with it as far appeal if you should lose. If you win then
there's nothing to appeal. But I don't believe that if
someone goes into a public library and does something
completely outrageous say on January the 1st, completely --
they go in with spray paint and they deface the books and they
vandalize the books that when that person comes back on, say,
January the 3rd, they have a fresh new start and it's improper
to trespass them on the 3rd for what they did on the 1st. And
I understand Mr. Hunt's actions didn't rise to that level but
I think just as a principle there is no problem if the jury
were to conclude that the library acted reasonably. That's
where you would argue that. You would say it would be
unreasonable for the library to have trespassed out, you know,
forever based on what he did three days earlier or whatever.
So, that's my rationale.

MR. DUBOSE: Just for clarification, I'm reading your
order and this instruction and it appears that what you are

allowing is an argument from the defense, and from the State,
on the reasonableness of the trespass and whether or not his -
- the trespassing of Mr. Hunt was reasonable on that --

THE COURT: Right, it's an element of the State's case
to be proven beyond a reasonable doubt.

MR. DUBOSE: Okay, an additional -- okay, but you're not
allowing any argument saying that there's a constitutional
right not to be trespassed?

THE COURT: Yes, no one should be arguing that there's
an absolute right to have access to a public library, no
matter what and --

MR. DUBOSE: I'm still afraid that there might be some
legal argument involved in closing that's not relevant to this
case because these are the four elements that the Court has
decided that the State needs to prove. I just ask that we
stick to these four elements and avoid a mistrial situation.

THE COURT: Well, those are the four elements and any
argument that goes outside of those I think -- I think there
can be an argument that, you know, there's a constitutional
right and what that means. What that constitutional right
means. Does it mean a person can do whatever they want, they
can come and go as they please, they can never be trespassed?
That is an incorrect legal argument, that cannot be argued.
What can be argued is there is a constitutional right not to
be unreasonably trespassed out of a public library and what

the library did here was unreasonable for whatever.  So there
will be discussions of constitutional rights but it has to be
characterizing that right as I've tried to define it here and
I think as it's defined by the Courts and their opinions.  It
is not an absolute right.  There is no opinion anywhere in
American law, in any jurisdiction, that states that a person
has an absolut, unbridled free right to be in a public
building and cannot be trespassed from the public building for
actions that they take in a public building.  No such opinion
that I've seen.  So, that's where we are.

MR. DUBOSE:  Judge, in addition, Mr. Amador addressed a
minute ago that he wanted to argue -- or he objected he wanted
to argue that he needs to be causing a disturbance on the
actual day.

THE COURT:  I think he can argue that within the context
of the reasonableness of the library's actions.

MR. DUBOSE:  Not that that's the law.

THE COURT:  Right, he can't -- he couldn't say the law
is that they must have had an action take place on the day
that they trespassed them or they were not allowed to trespass
them.  He can't argue that.  He could say that it was
completely unreasonable and the State can't prove element four
because what they did was three days prior and they should
have been -- to be reasonable they should have had some action
on the day in question.

1    MR. DUBOSE:  I understand.

2    THE COURT:  So, he'll be able to argue it he just won't

3    be able to characterize it as some sort absolute legal

4    requirement that the library must have an action on the day in

5    question to do the trespass.

6    MR. AMADOR:  Well, I respectfully disagree, Judge, with

7    element number 4 of your instruction because I think that,

8    yes, the Hillsborough County Law Library acted reasonably in

9    trespassing Dennis Hunt from the property and did not trespass

10   him, Dennis Hunt, because of opposition to his views.  I think

11   that in the cases that we have discussed previously, a lot of

12   attention -- the Court's gave a lot of attention to whatever

13   rules they had.  I'm thinking of Kramer or Kreimer, however

14   you pronounce it, where the gentleman violated rules --

15   THE COURT:  Right.

16   MR. AMADOR:  -- concerning conduct at the library.  I

17   don't believe that there's any rules for conduct at the

18   library and I think that the issue is that -- not so much that

19   the library is opposed to Mr. Hunt's views and therefore

20   trespass him but the argument that we're making is that they

21   didn't have a right to trespass him because he did nothing

22   wrong to be trespassed and this instruction suggestS to the

23   core -- suggests to the jury, in my opinion, that the

24   government does in fact have a right to trespass someone from

25   the law library as long as the reason for the trespass has

1  nothing to do with their opposition to the person's view.

2  THE COURT: If it's reasonable and that's what the jury

3  has to decide. And I think that's right. What you're point

4  is on the rules, those are civil cases, 1983 cases, that's

5  when the first time we talked about this I asked you if you

6  had anything that wasn't a 1983 case because what they're

7  doing in those cases is challenging rules and saying before,

8  you know, the libraries can do this or that they have to have

9  these rules in place. That may be a valid 1983 case that Mr.

10  Hunt may want to pursue but that doesn't stop -- and you may

11  want to argue that it's unreasonable to trespass anybody ever

12  because there's no rules. How does anybody know what they can

13  be trespassed from? You can get that in under number 4 also

14  but I don't think that the criminal prosecution from the State

15  is precluded by the existence of rules or not. And here's

16  why. We can imagine a situation where the library has no

17  rules, back to my prior analogy, somebody goes into the

18  library with spray paint, defaces everything, acts completely

19  improperly, which we would all agree is improper, and the fact

20  that the library doesn't have a rule that says you're not

21  allowed to paint graffiti on the books, wouldn't stop a

22  successful, in my opinion, trespass case. So, you can argue

23  what you want just as under 4 and I understand your objection.

24  MR. AMADOR: Perhaps if I may clarify what I'm saying

25  because I don't think that -- I think we're on two different

wavelengths.

THE COURT:  Okay.

MR. AMADOR:  What I'm saying is that from reading this it seems that the Court is saying that the library can trespass anyone for any reason, except for if the library opposes their views.

THE COURT:  No, it says that the Hillsborough County Law Library acted reasonably in trespassing Dennis Hunt from the property, okay?  That's where if the library just said, "We want him out because we don't like the fact he's wearing a blue suit."  You would argue that's completely unreasonable. It's not that they can kick him out for any reason as long as it's not related to opposition to his views.  And I'll be happy, by the way, to take this whole piece of opposition to his views out of this case, if you want.  I just put it in there because that's what the Third Circuit -- that's how they characterized it.  So, you can think about that.  I understand your objections are noted for the record and we don't have to settle on the instruction right now but you can think about that.  If you want me to take out the piece about opposition to the views because you think it clouds the issue and that's really not what this case is about.  This case is just about the reasonableness piece, we can do that.  But I think what we need to do now -- I've done the best I could reading all the law on this, I know you've spent a lot of time reading law and

1   I've tried to come up with what I think is the right answer.

2   It may not be.  It's a case of first impression in many ways

3   in Florida and whether I think this is -- if Mr. Hunt wants to

4   continue to fight this if he loses, and maybe he wont, and if

5   he wins it's all over, as you know.  But if he should lose

6   then these are the kinds of the debates to have at the

7   Appellate Court level.  But now, at least, there's something

8   in writing with some sort of rationale, perhaps wrong, but

9   there's something that can be a basis for going forward and

10  getting this stage taken care of.  All right?

11         MR. AMADOR:  Judge, if I can just let the Court know

12  that I'm going to -- just as a warning, I'm going to be

13  objecting to relevance, as irrelevant, any actions that

14  occurred on July 1 because of my argument that that doesn't

15  apply to this instance.

16         THE COURT:  Right.

17         MR. AMADOR:  So, it might get a little cumbersome but I

18  want the Court to know that that's why I'm doing it.

19         THE COURT:  I understand.  So, when you make those

20  objections on relevance I can tell you right now that I think

21  that everything that led up to -- I think the State is

22  entitled to talk about everything that happened between the

23  librarian and Mr. Hunt because that goes to their element.

24  They have to prove beyond a reasonable doubt that the library

25  acted reasonably.  And if the librarian wants to say that, you

know, three days before Mr. Hunt, you know, used foul language and made fun of me or whatever, I think that's all fair game because it goes to whether they were reasonable when they trespassed him. And when you want to object to that say, "Objection, relevance" and I'll say, you know, "Yes" or, "Overruled, noted for the record" something like that. But I understand why you're doing that. I think you should do it and we'll go from there.

MR. AMADOR: I want to be clear that I'm -- my -- what I'm going to be arguing here is that he has a constitutional right to be in that library and I'm going to argue that they had no right to trespass him because they didn't -- I guess based on your ruling, you know, I'm limited to arguing that because it was unreasonable -- because what they did was unreasonable.

THE COURT: Yes. They -- there is no question in my mind that a person has no absolute constitutional right to be in any law library that is completely unfettered, if that's the word. So, we may have to have a lot of objections, I put in the last sentence there that counsel are encouraged to make objections but I intend to keep this on the straight and narrow as to what these elements are. That's why I tried to hand them out in the beginning. We may tinker with the wording of them but I think the overall structure is probably going to remain about what it is. So that will govern how you

pick the jury, that will govern how you make your opening

arguments, that will govern everything including how I rule on

objections.  So, that having been said are we ready -- is

there any other reason we can't --

MR. DUBOSE:  One last point, Judge.  I just want to say

that if there is any discussion of rules in the library and

their rules and policies, you know, that has to be elicited

from testimony and if Mr. Pilver gets into the rules -- I

mean, he's going to -- I'm sure he -- if there's going to be -

- there's no rule -- Mr. Amador has just argued there was no

rules set forth to be broken and so if he gets into that in an

argument it's going to have to be --

THE COURT:  That's fair game.

MR. DUBOSE:  He must have a factual basis for it.

THE COURT:  That's fair game.

MR. DUBOSE:  And for that to happen Mr. Pilver is going

to have to go into -- in case we give his recollection of

those rules and guidelines.

THE COURT:  I would think the State -- if there were

rules and guidelines that Mr. Hunt violated I would think the

State would want to bring that out for Mr. Pilver, if they

even exist.  That may be -- it may come down to an argument at

the end of the day --

MR. DUBOSE:  Well, we have the chairman of the board of

directors so maybe she can help us out with that.

1    THE COURT: Yeah, it may come down to the end of the day

2 of Mr. Amador up there arguing that the fact that there were

3 no rules stating when it was fair game to trespass somebody

4 means that the library acted unreasonably and the State can't

5 prove it's case. I mean, it may get down to that. And

6 whether that's -- you know, that may be --

7    MR. DUBOSE: I don't know what the facts are, Your

8 Honor, I was just pointing that out.

9    THE COURT: I think that's a fair legal argument, by the

10 way.

11    MR. DUBOSE: If he's going to argue it, it needs to come

12 out factually that's all I'm saying.

13    THE COURT: Well, I understand but if he asks the

14 librarian, "Are there any rules?" and the librarian says, "No"

15 then he's -- at the end of the day the stands up in front of

16 the jury with an absolutely factual basis to make that

17 argument.

18    MR. DUBOSE: Absolutely.

19    THE COURT: And I think it might work, I don't know,

20 we'll have to see if that's where this goes. So is there any

21 other reason we can't get the jurors over here and ready to

22 go. Any other --

23    MR. AMADOR: No, the only thing that -- there are a few

24 documents that were introduced by the Defense in the last

25 trial --

1    THE COURT:  Are they in here?

2    MR. AMADOR:  I assume that they are, I don't know.

3    THE COURT:  I don't know, I didn't go through every -- I

4    mean, this was thick I just -- by the way there's a transcript

5    in there which somebody's put a bunch of stickers on and

6    that's not -- I didn't put those on, I don't know who put --

7    MR. AMADOR:  I assume it's Justice Nazaretian who was

8    reviewing it for the motion for retrial.

9    THE COURT:  I guess.

10    MR. DUBOSE:  Can I get copies of these documents

11    sometime before trial today?

12    THE COURT:  I don't know if they're even in the Court

13    file but I guess we can have jurors brought over while you're

14    looking through the Court file.  Greg, go bring 18, and when

15    they're lined up and ready to go we'll start.  If there's any

16    other thing we need to talk about, any issue, anything come

17    get me because when I come out I want to pick the jury.

18    MR. AMADOR:  Is it all right for me to take these out of

19    here?

20    THE COURT:  Take them out of the court file, that's fine.

21    We'll say that on the record.  Mr. Amador is taking out of the

22    Court file documents which were introduced as exhibits in the

23    prior trial of this case.  Has there been more than one trial

24    or just one trial?

25    MR. AMADOR:  No, sir, just one.

1    THE COURT:  Just one, all right.

2    (There was a recess after which the proceedings resumed.)

3    THE COURT:  Well, as you're coming in let me just

4    welcome everyone, just take a seat when you get into your row,

5    everybody else can have a seat, we're about ready.  Thank you

6    for being here.  My name is Tom Barber, I'm the Judge in this

7    case.  This is County Court.  This is going to be a trial in a

8    criminal case involving trespassing.  It's about all I can

9    tell you right now.  You will learn more about the case as we

10   go through this. Before I go any further I want to do one

11   thing is have you be sworn again.  Now, you're being sworn not

12   to be the jury in this case but just to answer truthfully

13   during the question and answer session we're going to have in

14   a moment, okay?  So raise your right hand and the clerk will

15   swear you.

16   THE CLERK:  Do you each of you swear and affirm that you

17   will answer truthfully each question (indiscernible) to you by

18   the Court or the Court's authority touching upon your

19   qualifications to serve as jurors.

20   (The jurors answered in the affirmative.)

21   THE COURT:  All right, thank you.  I want to introduce

22   everyone in the Courtroom so you know who we're talking about.

23   As I go through these names, it's a courtesy so we want to do

24   that but we also want you to think if you know anybody here.

25   Last time we did jury trials two weeks ago, three weeks ago,

there was somebody right in the front row who used to work in
the law firm I worked in before I became a Judge. So we do
see people we know all the time. So just pay close attention.
I've already introduced myself. We have Pedro Amador and
Dennis Hunt. Over there is Deputy Dixie, excuse me, Deputy
Fraser with the Sheriff's office. Deputy Dixie's in the back.
This is Kim Medeiros who is our Court clerk. Our Court
reporter is Felicia Young back here and you'll notice that
she's using not one of these stenographic machines like you've
seen but everything is actually being recorded and she's just
sort of keeping track of the recording. And then over on this
side we have Mr. Dubose and Ms. Hale, they're the assistant
State attorneys in this case. All right, anybody see anybody
that they know so far? All right, I'm going to ask the
lawyers to give me the names of their witnesses in the case so
listen to the these names and see if you recognize anybody.
Mr. Dubose?

MR. DUBOSE: Thank you, Judge. David Pilver, Sam
Kelleher and Officer Charles Hathcott from the tampa Police
Department.

THE COURT: Anybody recognize those names? Mr. Amador,
do you have names?

MR. AMADOR: No, Your Honor.

THE COURT: Okay. What are we doing here today? This
is the part that they don't show you on the law shows usually,

the jury selection. Frankly because it's not the most
interesting but it's maybe the most important depending on who
you ask. What's going to happen is I'm going to sit down here
shortly and then the lawyers are going to come up here and
they're going to ask questions, all right? Their goal is to
pick the best jury for this kind of case. We're looking for a
jury of seven people in this case. So of the 18 of you all, 7
will remain as jurors in this case. And we do this through a
question and answer format. They may go right down the row
and ask everybody the same question, they may bounce around,
they may, you know, be looking at the person in the front row
and then say, "What do you think about that in the back row?"
 So, just pay close attention, people are usually nervous
during this and they don't need to be. There are no wrong or
right answers. All right, this -- you know, and it's not an
auction where if you raise your hand like this, you know,
you're going to be called on and somebody's going to try to
make you look bad. Believe me, the last thing these lawyers
want to do is ask you a question that embarrasses you because
if you're then on the jury and you don't like them because
they've said something that made you look bad then you might
not come out there way. So, they're not going to do anything
improper, they're not going to embarrass you, they're going to
ask you questions. If you don't understand their questions or
whatever, you're not sure what they're asking say, "I don't

understand, can you explain?"

As I said before there are no wrong or right answers and frequently people say things that they think might either get them kicked off the jury or get them put on the jury and it works out exactly the opposite, all right? So, that's what's going to happen. The good news here so far is that this process will take us in the neighborhood of an hour or a little more than that and then what we'll do is we'll pick our seven people, we'll break for lunch and we'll commence the trial this afternoon and then you'll be done.

The trial should not go any longer than today. It could possibly go into tomorrow morning but it won't be any more than that. This is not the Elorian(?) trial that's happening down the street where the jurors are empanelled for several months or the Michael Jackson case where the jurors have been empanelled for several months. This one will be done in a good time period. What that means is you can pay close attention the whole time knowing you're not going to be here forever. And we sometimes have the Dentist Office effect here. When you hear this drilling sound. If it gets out of hand I'll ask Deputy Dixie to put a stop to it. This is your tax dollars at work, we're renovating the Courthouse and sometimes they actually work right above us or right below us. If that disturbs anybody and you can't hear let me know and we'll shut it down.

All right, keep in mind this, there's going to be -- the
seven people that are picked we may see you later in the day
out in the halls or something like that will probably ignore
you. That doesn't mean that we don't like you or we're trying
to be rude, we can't have any communications with jurors and
the lawyers really want to avoid that because even if they see
you at the water fountain and they're in front -- you're in
front of them in line, they'll sort of look over your head and
pretend they didn't see you. Don't take that personally,
they're doing that because they're supposed.

And, lastly, before I sit down you're going to hear some
questions that you might find are personal, I don't know,
sometimes that happens, sometimes it doesn't. Just to give an
example sometimes a question is asked, "Has anyone here been
convicted of a crime?" Well, you may not want to say, "Yeah,
me". That may be personal, maybe not, it just depends on who
you are. If you have something that's personal you can say,
"I'd rather answer that personally" and what will happen is
you'll come up to the front here where I'm going to be sitting
in a moment with the two lawyers and we'll handle that just
amongst the three of us so you don't have to share your
business with everyone else in the room.

Okay, I do need to mention a few other things, keep in
mind when you answer your questions, all right, do not
equivocate unless you mean to equivocate. What does that

mean?  Law talk, right?  What I'm saying is when you're asked
a question and the answer is yes or the answer is no, give a
yes or no answer.  Somebody might ask the question, "Do you
think you could be a fair and impartial juror?"  All right,
what do most people say, "Yeah, I think to think I can" or, "I
hope I could" or "Probably".  No, that's an equivocal answer.
An equivocal answer is not a good answer unless you mean to
equivocate.

Now, you may be asked something you're just not sure
about.  If you're just not sure then you should equivocate.
You should say, "I think so but I'm not sure".  But don't give
an answer that's mean to be sort of polite and humble when the
real answer is either yes or no.  Okay, so don't equivocate
and then listen carefully also.  That's another -- can
everybody hear me all right.  Is there anybody -- sometimes we
have a deaf person or whatever or I ask that question to and
they don't raise their hand because they're deaf and they
can't hear.  That happens.

Let me just touch on one thing and then I'm done.  This
is a criminal case.  How many people here have been on a jury
before?  Anybody, keep those hands up.  All right, civil or
criminal?

UNIDENTIFIED SPEAKER:  Civil.

THE COURT:  Civil jury.  What kind of case?

UNIDENTIFIED SPEAKER:  Criminal.

THE COURT:  Okay, Criminal.  What kind of case was yours?

UNIDENTIFIED SPEAKER:  I don't recall it's been many, many years.

THE COURT:  How about you, ma'am?

UNIDENTIFIED SPEAKER:  It's in terms of child being runned over by a truck.

THE COURT:  Okay, right, I see we make a great impression on people when they come for jury duty.  They don't even remember what the case is about sometimes but that's okay.  It's important that you pay attention while you're attention and if you don't remember later that's fine too. A criminal case is different from a civil case in many respects but here's the important one I want you to know about.  In a criminal case, all right, you may not necessarily hear both sides of the story.  All right, in other words the state may just put on its case the defendant has a right to remain silent and what that means when you get into a criminal case is the defendant doesn't have to testify.  The defendant doesn't have to disprove what the state is saying.  The state has all of the burden of proof.  So, you may get asked a question during jury selection, something like, well what would your verdict be if you had to decide the case right now. Well, the answer to that question is my verdict would be not guilty because the State hasn't proven anything.  All right?

Or you might get asked a question, do you need to hear both
sides of at story? Most of us on jury duty would want to be
fair, we want to be impartial, of course we want to hear both
sides of a story before -- how else can we make a decision.
No, no, no. A criminal case you may only hear the State's
side of the story and then you've got to judge at that point
whether the State has proven the case beyond a reasonable
doubt. All right, that's an important distinction to keep in
mind. That having been said I'm going to sit down. I
appreciate your attention and I ask that you focus on and give
the lawyers the same good attention you've just given me.
Thank you. Mr. Dubose, you're up first.

MR. DUBOSE: Good morning, everyone. My name is Dustin
Dubose, as the Judge said and along with my co-counsel, Shauna
Hale, we represent the State of Florida in this case. This is
my one and only opportunity to talk to you on this informal
level. We can ask questions, if you have questions please
feel free to raise your hand. If you forget at my name just
point at me, or just call me Hey, whatever you want to say.
It's good that we talk to each other because what my job today
is is to make sure that we have -- that I select or do my job
to select the best jury panel for this particular case. I'm
sure all of you are great jurors but maybe not all of you are
best suited for this particular case. So, if I say something
and maybe ask something of Ms. Beatty, is that right?

1          MS. BEATTY:  Beatty.

2          MR. DUBOSE:  Beatty, and someone else things of an

3     answer, please raise your hand because it's important that we

4     hear as much information as possible about each of you.  I'm

5     going to do this a little bit differently than I usually do.

6     I'm going to kind of go row and row and then I'm going to go

7     through everyone.  I know you're -- I don't want to lose your

8     focus, I'm going to go as fast as I can.  I am going to start

9     of generally and if you could just -- I'll start with the

10    front row, if you could tell me if you own any property.  I

11    guess you're all from Hillsborough County so if you own any

12    property in Hillsborough County.  If you do on the front row

13    if you just raise your hand.  Okay, Mr. Mattson, is that a

14    home or --

15         MR. MATTSON:  Yes.

16         MR. DUBOSE:  Okay, and Mr. Holmes?

17         MR. HOLMES:  Home.

18         MR. DUBOSE:  Home, same Ms. Beatty?  Okay.  All right,

19    now let's do that on the second row.  Everyone who is a

20    property owner, okay.  All right, you can put your hands down,

21    thank you.  And in anyone who raised their hand is there

22    anyone it's not a home?  Is it something else like a business

23    property or lakefront something or other.  It's all their

24    home?  Okay.  Now, on the third row.  Okay.  Now, is there

25    anyone in the third row - you can put your hands down thank

you - that it's not their home, any other kind of property?
Now, for the back row. Okay. And is that also your home as
well? Okay. Now, I want to just talk briefly -- I'm going to
the row thing again about previous experience with law
enforcement and with the State Attorney's Office. Okay, so
what I want to know is if you, a family member, or a close
friend or maybe even a neighbor has been involved with Tampa
Police Department, Hillsborough County Sheriff's Office or the
State Attorney's office. Maybe you were a witness, maybe
someone you know was accused of crime, convicted of a crime,
anything like that if you -- if that applies to any of you
please raise your hand and we'll talk about it briefly just to
see how you're involved. Okay, so going on the front row, if
you know of someone or you were personally. And, again, as
the Judge said, if I ask you this question and you raise your
hand you don't want to talk about it front of the whole open
Court we can approach and talk about it in front of the Judge
so only the Judge and Mr. Amador and I will hear, okay? All
right, Mr. Larose? You were the victim of a crime, okay. Did
you have that reported --

            MR. LAROSE:  I didn't report it.

            MR. DUBOSE:  -- you didn't report it, okay.  Mr. Larose,
I had a blank spot I couldn't -- what is your job?

            MR. LAROSE:  I -- I drive a forklift.

            MR. DUBOSE:  Okay.  For a particular company or --

1          MR. LAROSE:  Super Transport.

2          MR. DUBOSE:  Super Transport, okay.

3          MR. LAROSE:  And my truck has been broken into also.

4          MR. DUBOSE:  We get a lot of that in Hillsborough County.

5     Okay.  That's Mr. Mattson.  Okay, so did that go to a trial I

6     notice you wrote witness down here.

7          MR. MATTSON:  I reported it but there was nothing they

8     could do, just (indiscernible).

9          MR. DUBOSE:  Did you also serve as a witness in a trial

10    at some point?  No?  Okay, anyone else in the front row?  Okay.

11    How about the second row, same question.  All right, let's

12    start from the left on there.  Ms. Farmer?  Oh yes, yes,

13    please.

14    (There was a sidebar conference as follows.)

15         MS. FARMER:  (Indiscernible).

16         THE COURT:  Is it a pending case or --

17         MS. FARMER:  No, (indiscernible).

18         THE COURT:  Okay, if you want to ask her about that right

19    now, go ahead.  Her children were victims of a sexual assault

20    and the person who did it is in prison.  The case is over with

21    now.

22         MS. FARMER:  Yes, Your Honor, it happened two years ago.

23         THE COURT:  Two years ago.  Do you have any questions?

24         MR. DUBOSE:  (Indiscernible) as a result of this

25    (indiscernible)?

MS. FARMER: It was in (indiscernible).

MR. DUBOSE: Here in Hillsborough county?

MS. FARMER: Yes, (indiscernible).

MR. DUBOSE: Thank you. That's all I have.

THE COURT: (Indiscernible).

MS. FARMER: (Indiscernible).

(Sidebar conference ends.)

MR. DUBOSE: Ms. Lee?

MS. LEE: My son's car was stolen.

MR. DUBOSE: Okay, twice. In Hillsborough County?

MS. LEE: (Indiscernible).

MR. DUBOSE: Mr. Lee.

MR. LEE: My house was an attempted burglary.

MR. DUBOSE: Did that go to a trial or? No? Have you ever been a witness for the State in any -- okay. Okay, so I believe that takes us to the fourth row -- or third row.

UNIDENTIFIED SPEAKER: I have a question.

MR. DUBOSE: Sure.

UNIDENTIFIED SPEAKER: (Indiscernible) in a law office?

MR. DUBOSE: We'll get to that next. Right now I just want to talk about -- well you can talk about it if you'd like -- I guess we sort of were talking about previous experience of being accused of a crime or witnessing to a crime or if personally or if you knew someone who had done that. But if you want we can back up, if anyone -- does anyone work in law

1    enforcement here?  I didn't see any check that on the first two

2    rows.  No one works in law enforcement or has any children or

3    spouse that works in law enforcement, right?  Okay.  Previous

4    experience in law enforcement?  Okay.  We'll add that one in

5    now.  So the only person who has any experience with any

6    crimes, family is Ms. Herndon?

7        MS. THOMAS:  I had my car broken into.

8        MR. DUBOSE:  Okay, Ms. Thomas.  Told you guys we had a

9    bunch of that here in Hillsborough, it's like four or five now.

10   Okay, Ms. Herndon, what was that about the law enforcement?

11       MS. HERNDON:  (Indiscernible).

12       MR. DUBOSE:  Okay, is that a civil law office or you don't

13   know?  Okay.  Is she an attorney?

14       MS. HERNDON:  No, she's a (indiscernible).

15       MR. DUBOSE:  Okay.  Okay, and to the back row, anyone?

16   Mr. White?

17       MR. WHITE:  (Indiscernible).

18       MR. DUBOSE:  Okay.  Okay.  And Ms. Hughes?  Yes, please.

19   Your Honor, may we approach?

20       THE COURT:  That's fine.

21  (There was a sidebar conference as follows.)

22       THE COURT:  I don't have my chart here.  I want to make

23   sure --  Your Belinda Hughes?

24       MS. HUGHES:  Yes.

25       THE COURT:  Okay, go ahead.

1     MS. HUGHES:  Yes, I was (indiscernible).

2     THE COURT:  And when was that?

3     MS. HUGHES:  1976 or '76.

4     THE COURT:  Was it Federal Court?  Where did you go for

5  it, was it here in town?

6     MS. HUGHES:  Yes.

7     THE COURT:  Did you go over to Florida Avenue, the

8  Courthouse over there?

9     MS. HUGHES:  (Indiscernible).

10     THE COURT:  Okay, but was it a Federal Court case, do you

11  know?  Okay, 1972?

12     MS. HUGHES:  '75 or '76

13     THE COURT:  Okay, if you want to ask her questions, go

14  ahead.  She said she was convicted (indiscernible).

15     MR. DUBOSE:  (Indiscernible).

16     THE COURT:  (Indiscernible).  You didn't vote?  Have you

17  voted since then?

18     MS. HUGHES:  No.

19     THE COURT:  Okay.  Any other questions?

20     MR. DUBOSE:  (Indiscernible).

21     THE COURT:  All right.  Thanks.

22 (Sidebar conference ends.)

23     MR. DUBOSE:  Okay, now it's going to slow down a little

24  bit because I'm going to all the way down the rows, very

25  systematically.  We're going to start with Mr. Larose and what

I want you to say, Mr. Larose, is tell us -- you've already told what you do. You drive a forklift for Super Transport. Tell us a little bit more about what you do? Like who you come into contact with. Do you work in a warehouse or --

MR. LAROSE: Yes, I work in a warehouse.

MR. DUBOSE: Okay, and can you tell us a bit about your education?

MR. LAROSE: I graduated from high school.

MR. DUBOSE: Okay. Now, Ms. Vernon, same thing. Same thing - I'm going to do the same thing for everyone.

MS. VERNON: I work in a (indiscernible) or for a builder.

MR. DUBOSE: Okay.

MS. VERNON: (Indiscernible) and I went to a four year college and graduated (indiscernible).

MR. DUBOSE: All right, Mr. Mattson.

MR. MATTSON: I work for a wholesale plant nursery. I deal with shipping and receiving and I (indiscernible) high school and did a technical course for two years.

MR. DUBOSE: Excellent, all right, thank you. Mr. Holmes?

MR. HOLMES: (Indiscernible) company.

MR. DUBOSE: Okay.

MR. HOLMES: (Indiscernible).

MR. DUBOSE: Excellent. And could you also tell us what your education is?

MR. HOLMES: Oh, some college.

1    MR. DUBOSE:  Okay, and Ms. Beatty?

2    MS. BEATTY:  Housewife, retired.

3    MR. DUBOSE:  Yes, ma'am.  Okay.

4    MS. BEATTY:  And a high school graduate.

5    MR. DUBOSE:  Okay.  Can you tell us, if you don't mind,

6    what you did before you retired?

7    MS. BEATTY:  (Indiscernible).

8    MR. DUBOSE:  Oh, that sounds interesting.  All right, Ms.

9    Farmer?

10   MS. FARMER:  (Indiscernible).

11   MR. DUBOSE:  Okay.

12   MS. FARMER:  (Indiscernible).  I also work as an OR tech

13   and I also work for a doctor here in Hillsborough county.  I

14   graduated high school and also graduated college.

15   (Indiscernible).

16   MR. DUBOSE:  Okay.  All right, Ms. Lee?

17   MS. LEE:  (Indiscernible).

18   MR. DUBOSE:  With a congregation?

19   MS. LEE:  (Indiscernible)..

20   MR. DUBOSE:  Okay.  Can you tell me -- I'm just curious,

21   what are some of the job duties or like what would you do as an

22   administrative minister?

23   MS. LEE:  Um, well, let's see, (Indiscernible).

24   MR. DUBOSE:  Okay, excellent.

25   MS. LEE:  (Indiscernible).

MR. DUBOSE: Okay, I have a better understanding now, thank you. Mr. Lee?

MR. LEE: (Indiscernible).

MR. DUBOSE: Yes, sir.

MR. LEE: (Indiscernible) and I see a lot of people on a daily basis (indiscernible).

MR. DUBOSE: Okay, thank you. Ms. Almeida?

MS. ALMEIDA: High school graduate, I work in the social security division (indiscernible).

MR. DUBOSE: What is a contact route for -- like I mean to you deal with -- I don't really know much about how that works.

MS. ALMEIDA: Well, I work the windows, like, (indiscernible) applying for social security cards and then I go with them to (indiscernible).

MR. DUBOSE: I understand. Okay. Mr. Erikson?

MR. ERIKSON: I'm retired from the military.

MR. DUBOSE: Okay.

MR. ERICKSON: I'm currently working for the Florida Department of Revenue in the child support enforcement. And I have a Master's degree.

MR. DUBOSE: Do you mind if ask what you -- what type of work you did in the military?

MR. ERIKSON: Logistics.

MR. DUBOSE: Okay. All right, Ms. Chester?

MS. CHESTER: I'm a department supervisor (indiscernible)

at Home Depot and I have a (indiscernible). I help everybody.

MR. DUBOSE: Yeah, I know, I -- I have to come in and look for someone when I'm in that store, I'm lost. All right, Ms. Herndon.

MS. HERNDON: I'm (indiscernible).

MR. DUBOSE: Okay, that's right you're currently in school.

MS. HERNDON: No. (Indiscernible).

MR. DUBOSE: Okay, okay. So, you work part time for an interior designer. All right. Ms. Thomas?

MS. THOMAS: I volunteer at (indiscernible) and I also volunteer at the shelter and the elderly and (indiscernible) children and I was a high school graduate.

MR. DUBOSE: Okay. So you come into contact at the daycare with a lot of little people every day?

MS. THOMAS: Yes.

MR. DUBOSE: All right. I'm going to try this, Rutishauser.

MS. RUTISHAUSER: Very good.

MR. DUBOSE: Okay.

MS. RUTISHAUSER: I'm recently retired but I (indiscernible).

MR. DUBOSE: Okay, did you say Time, Time Warner or --

MS. RUTISHAUSER: Time customer service. It's the affiliate of Time Warner.

1    MR. DUBOSE:  Okay.

2    MS. RUTISHAUSER:  I had two years of college

3    (indiscernible).

4    MR. DUBOSE:  All right, thank you.  Mr. Schwarzen?

5    MR. SCHWARZEN:  Correct.

6    MR. DUBOSE:  All right, batting a thousand today.

7    MR. SCHWARZEN:  I have my own -- my own business, I buy

8    and sell antiques and things --

9    MR. DUBOSE:  All right.

10   MR. SCHWARZEN:  -- a lot on Ebay.  I am a beverage

11   consultant and the vice president for Hops, (indiscernible).

12   MR. DUBOSE:  I saw that.  That's interesting.  So, can you

13   tell us -- this is going to be interesting, what kind of -- I

14   mean, how did you get to that, is there some training involved

15   or did is it just school or --

16   MR. SCHWARZEN:  I worked for -- I actually worked for a

17   two big breweries, I worked for Falstaff and I worked for

18   Annheuser Busch.

19   MR. DUBOSE:  Okay so they --

20   MR. SCHWARZEN:  I've had 50 years in brewing so --

21   MR. DUBOSE:  Oh wow, all right.  All right.

22   MR. SCHWARZEN:  So I know how to make beer.  I can tell

23   you that.  And I have a high school diploma.

24   MR. DUBOSE:  Okay.  Mr. White?

25   MR. WHITE:  (Indiscernible).

1    MR. DUBOSE: And Ms. Lawrence?

2    MS. LAWRENCE: (Indiscernible).

3    MR. DUBOSE: Okay. And Ms. Muse?

4    MS. MUSE: (Indiscernible).

5    MR. DUBOSE: What was that, I'm sorry, your last part?

6    MS. MUSE: Degree in police science.

7    MR. DUBOSE: Political science?

8    MS. MUSE: Police science.

9    MR. DUBOSE: Oh, police science. I saw that you put HCC.

10   Was that previous to that you worked at HCC or --

11   MS. MUSE: (Indiscernible).

12   MR. DUBOSE: Okay. Your Honor, may I have a moment?

13   (There was a brief discussion, off the record.)

14   MR. DUBOSE: I'm going to turn it over to Mr. Amador now.

15   So thank you very much for your time.

16   THE COURT: Okay, Mr. Amador you're up next.

17   MR. AMADOR: Thank you, Your Honor. Good morning, ladies

18   and gentlemen, my name is Pedro Amador and I have the privilege

19   of representing Dennis Hunt. Now, there are a few concepts

20   that we have in the criminal justice system in the United

21   States and I want to go through a couple of those with you to

22   make sure that you guys understand it and/or if you have any

23   questions so that we perhaps can correct and misunderstandings.

24   Does everyone understand that Mr. Hunt is presumed innocent of

25   the charge of trespass against him as he sits there today?

Does anybody not agree with that? Does anyone feel that -- Mr. Hunt has the right to remain silent. Does anyone feel that they cannot make a decision here today without hearing from Mr. Hunt? Raise your hand. Okay. Also the burden of proof, in other words the person who has to prove that Mr. Hunt did something wrong, is the State of Florida through its evidence and witnesses. Is anyone here going to require Mr. Hunt to prove that he is innocent of the charges? Does anyone here feel that Mr. Hunt has to show proof of him not doing any wrong? Okay, the Judge is going to read you some instructions later on, those of you who are selected for jury service. He's going to read you some instructions and you're going to need to listen to those instructions because then those are the rules that you have to decide whether Mr. Hunt is innocent or if he's guilty. Now, I know that a number of you said that owned property but none of you said that you owned property that was open to the public, is that right? Okay. In this country and in this State, we have first amendment rights. Basically, we have the right to freedom of speech and expression and part of that is that we have the right to have access to information and what goes along with that is everyone has the right to have access to a library. Does anyone have any disagreement or concerns or problems with that concept? Okay.

Has anyone here ever been trespassed from any place? Does anyone here have anybody that has had a friend that has

1    been kicked out of any place, whether -- yes, sir, Mr. White?

2        MR. WHITE:   (Indiscernible).

3        MR. AMADOR:   Could you please speak up, I can barely hear

4    you.

5        MR. WHITE:   It was just once that I was at a nightclub

6    where this -- I was working for another nightclub and there was

7    some differences and I was in their nightclub so I went to talk

8    to the manager and for some reason, I wasn't doing anything

9    wrong, he just said, "Leave please, we just don't want you

10   here".   I said, "I just want to speak to someone" and they just

11   said, "If you don't leave we're going to have you arrested for

12   trespassing".   So I left.   Even though I didn't do anything.

13       MR. AMADOR:   Okay, and that was in a nightclub?   Had you

14   paid your entrance fee?

15       MR. WHITE:   Yes.

16       MR. AMADOR:   Okay, and had you caused any disturbance

17   whatever?

18       MR. WHITE:   No, they actually had some of our logo

19   displayed in their club so (indiscernible).

20       MR. AMADOR:   Well, why did they -- why did they kick you

21   out?

22       MR. WHITE:   I have no idea.   They wouldn't explain, they

23   just asked me to leave.   I wanted to speak to manager about it

24   because they actually stole our logo (indiscernible).

25       MR. AMADOR:   Did you think it was right that they kicked

you out?

MR. WHITE: No, but I understood why.

MR. AMADOR: Okay. Did anyone else here have a similar experience or knows someone who got kicked out of a place?

UNIDENTIFIED SPEAKER: Well, I've got a friend that was arrested, now that I think about it. A friend that was arrested for trespassing (indiscernible). He was just on someone's property that (indiscernible).

MR. AMADOR: Private property?

UNIDENTIFIED SPEAKER: Yes.

MR. AMADOR: Okay, not enough. Yes, ma'am.

MS. VERNON: (Indiscernible).

MR. AMADOR: For using the bathroom stall?

MS. VERNON: Yeah, (indiscernible). My friend and I went in together --

MR. AMADOR: Were there rules for that?

MS. VERNON: Yeah, there was a rule.

MR. AMADOR: Was it posted?

MS. VERNON: Yeah, but I mean -- yeah, it wasn't on the door it was just like on the side.

MR. AMADOR: Okay. And did you feel that was fair that they did that?

MS. VERNON: Pardon?

MR. AMADOR: Did you feel that it was fair that they did that to you?

1    MS. VERNON:  No, but I understood.

2    MR. AMADOR:  Okay.  What if -- you said that you knew that

3    rule existed?

4    MS. VERNON:  No, I didn't.  I just -- I saw the sign after

5    -- when I walked out of the stall with my friend.

6    MR. AMADOR:  Okay.

7    MS. VERNON:  But no one gave us fair warning when we

8    walked in.

9    MR. AMADOR:  Okay.  And is this a public place, like, a

10   restaurant or --

11   MS. VERNON:  No, it was a nightclub, a club.

12   MR. AMADOR:  Okay.  Has anyone ever been kicked out of a

13   public government sponsored place?  Do you think, Ms. Vernon

14   you would feel differently if you were in, say, say a public

15   library and that occurred?

16   MS. VERNON:  Yeah, I suppose.

17   MR. AMADOR:  Okay, why so?

18   MS. VERNON:  Just because --

19   MR. DUBOSE:  Judge, may we approach?

20   THE COURT:  Yes.

21   (There was a sidebar conference as follows.)

22   MR. DUBOSE:  (Indiscernible) public library

23   (indiscernible) in this case.

24   THE COURT:  All right.

25   (Sidebar conference ends.)

MS. VERNON: (Indiscernible).

MR. AMADOR: Well, in the --

THE COURT: Hold it, hold it. Mr. Amador will ask the questions.

MS. VERNON: Okay.

MR. AMADOR: Would you feel the same way as you did when you got kicked out of that nightclub if you were in a public building?

MS. VERNON: I would say -- I don't know (indiscernible) but if it was signposted I guess I would understand the reasoning behind it. But, I guess it would probably -- it would probably feel the same.

MR. AMADOR: Okay. Ms. Almeida, you indicate on your jury questionnaire that you have a friend or family that's in law enforcement?

MS. ALMEIDA: Yes, back in Illinois (indiscernible).

MR. AMADOR: What part of Illinois?

MS. ALMEIDA: I don't know. I really don't know (indiscernible).

MR. AMADOR: Okay, have you ever talked to him about his work? There's going to be a law enforcement officer that testifies here today and part of the instructions that I discussed with you a little earlier -- those instructions say that you, as the jury - individually, can determine credibility of witnesses and you use certain things that are listed in that

instruction to determine whether you believe or disbelieve a particular witness. Now, Ms. Almeida, because a law enforcement officer gets up here and testifies, are you going to give that person more weight simply because he's a law enforcement officer than if it was a lay person?

MS. ALMEIDA: No.

MR. AMADOR: Okay, does anyone -- would anyone give a law enforcement officer -- his testimony more weight simply because they are a law enforcement officer? No? Mr. Holmes? The answer to my question -- are you saying yes or --

MR. WHITE: The answer is no.

MR. AMADOR: Okay, thank you. Mr. Holmes, you've indicated that you were a victim or witness to a crime and I don't --

MR. HOLMES: It was my wife was a witness to a crime.

MR. AMADOR: Was it in the nature of trespass?

MR. HOLMES: No.

MR. AMADOR: Have you -- so when you marked that down it was just your wife not yourself?

MR. HOLMES: Yes, sir.

MR. AMADOR: Okay. Mr. Mattson, you've indicated the same thing. I know that we discussed the fact about your car, it seems like everybody's cars gets broken into these days.

MR. MATTSON: It's that and when I think back also my -- when I (indiscernible).

1    MR. AMADOR:  Okay, when you -- I'm sorry.

2    MR. MATTSON:  (Indiscernible).

3    MR. AMADOR:  Okay, when you say you were witness to a

4    crime is that what you're talking about also?

5    MR. MATTSON:  I would say yes.

6    MR. AMADOR:  Ms. Farmer, I think we've already discussed

7    that issue.  Ms. Herndon, you also indicated that you both had

8    friends and family that was in law enforcement?  And who is

9    that?

10    MS. HERNDON:  (Indiscernible).

11    MR. AMADOR:  Okay, and the -- I'm sorry, if you could

12    speak just a little louder.

13    MS. HERNDON:  Her brother and nephew are both sheriffs.

14    MR. AMADOR:  Here in Hillsborough County?  Is that a yes?

15    Okay, we have to say -- answer out loud because otherwise the

16    microphones don't pick up your responses.  Ms. Herndon, do you

17    have a relationship with those people or you just happen -- is

18    it casual or --

19    MS. HERNDON:  It's casual.

20    MR. AMADOR:  And you speak with them about their job?

21    MS. HERNDON:  No.

22    MR. AMADOR:  It indicates here that you were a victim and

23    a witness to a crime.

24    MS. HERNDON:  (Indiscernible).

25    MR. AMADOR:  Yes, ma'am, it does, it says friends or

family. What type crime if you don't mind me asking?

MS. HERNDON: He was shot.

MR. AMADOR: Okay, and is that the same crime that he was a witness to?

MS. HERNDON: Yes.

MR. AMADOR: Mr. White, you've indicated that you were or someone you know was a victim of a crime?

MR. WHITE: Yes

MR. AMADOR: What was that -- was it yourself?

MR. WHITE: Well, I was witness to the dog (indiscernible).

MR. AMADOR: Okay, is that what -- is that what you were discussing.

MR. WHITE: (Indiscernible).

MR. AMADOR: Okay. I have -- does anybody here like to cook? Cook. Okay. Mr. Mattson, what's one of your favorite recipes?

MR. MATTSON: (Indiscernible) barbecue sauces, things like that.

MR. AMADOR: Okay, so you like to grill, presumably, meat? Okay, is there any particular ingredient that you put you in your barbecue sauce, any special ingredient that you put in your barbecue sauce?

MR. MATTSON: Garlic powder (indiscernible).

MR. AMADOR: Do you make your own barbecue sauce?

1      MR. MATTSON: I try.

2      MR. AMADOR: Okay, well when we're -- I'm trying to

3      analogize a recipe to what the elements of a crime are and the

4      recipe, for example, and your barbecue sauce probably have

5      ketchup, vinegar, salt and you're secret ingredient, garlic

6      powder. Okay, well in a crime the State has to prove certain

7      elements to the crime and they have to prove all of the

8      elements of the crime or else they have not proved it. So, if

9      I told you that I had all the ingredients in your barbecue

10     sauce except for that garlic powder, would we have your

11     barbecue sauce?

12     MR. MATTSON: Probably not, because I never do it the

13     same way twice.

14     MR. AMADOR: Okay. Well, let's say the four ingredients

15     in your barbecue sauce are ketchup, vinegar, salt and your

16     garlic powder, that's the ingredients. If we don't have the

17     garlic powder will we have --

18     MR. MATTSON: No.

19     MR. AMADOR: So, if the State doesn't prove one of the

20     elements of the crime with which Mr. Hunt is charged then they

21     haven't proven the case, right? Let's say they have proven

22     three of the four elements that they must prove beyond a

23     reasonable doubt but they haven't proven the fourth one, have

24     they proven their case?

25     MR. MATTSON: I would say yes.

1    MR. AMADOR:  Okay, because they got three out of four.

2  What if the --

3    MR. MATTSON:  It's yes or no, I guess it would be

4  depending on how -- the weight of the evidence.

5    MR. AMADOR:  Okay, well what if the Judge tells you that

6  in order for you to find Mr. Hunt guilty the State has to prove

7  all four elements beyond a reasonable doubt and you determine

8  that the State has proven three of the four.  What would your

9  verdict be?

10    MR. MATTSON:  It would be not guilty (indiscernible).

11    MR. AMADOR:  Okay, does anyone -- well, let's ask some

12  other people.  Mr. Lee, the same question to you if the

13  government's only proven three of the four elements what would

14  your verdict be?

15    MR. LEE:  Not guilty.

16    MR. AMADOR:  Okay, thank you.  Mr. Schwarzen, same

17  question.

18    MR. SCHWARZEN:  Sure, if the Judge says you have to prove

19  all four it would be not guilty.

20    MR. AMADOR:  Okay, does anyone disagree with those three

21  people.  Thank you very much for your time.

22    THE COURT:  Okay, folks, sometimes when this process

23  happens there's questions that people are sort of expecting

24  they were going to be asked about something they feel is very

25  important bearing on their impartiality or lack of impartiality

but they don't get asked the question but they really want to
reveal something. Does anybody have anything like that out
there, anything about what you haven't been asked that would
keep you from being a fair and impartial juror in this case?
Anybody have anything? Yes, ma'am. You are Ms. Beatty?

MS. BEATTY: Yes, when I look at Mr. Hunt, I don't know
if it was in the Tampa Tribune but I --

THE COURT: Hold it. Why don't you come up and talk
about that?

(There was a sidebar conference as follows.)

MS. BEATTY: I don't think it was that long ago that Mr.
Hunt was in the paper (indiscernible) maybe it isn't him.

THE COURT: Was there something in paper?

MR. AMADOR: What was it (indiscernible) in the paper.
What is it that you read?

MS. BEATTY: Well, I remember the face.

MR. AMADOR: But you don't remember anything about the --

MS. BEATTY: No, it was just (indiscernible).

MR. DUBOSE: Yeah, it must have been somebody else
because there's nothing --

THE COURT: Okay.

MR. AMADOR: Ms. Beatty, based on that do you feel that
you couldn't be fair and impartial in listening to the evidence
in this case?

MS. BEATTY: No, I can be fair because it's not coming

1 back to me, I'm just remembering the picture (indiscernible).

2   MR. AMADOR: And if --

3 (Sidebar conference ends)

4   THE COURT: Okay, I thank you, Ms. Beatty. Anybody have

5 anything else that comes to mind that they feel they should

6 mention? Okay, thank you. Thank you very much for your

7 attention, folks. This is the part now where we are going to

8 ask you to go out in the hall so we can talk about you, all

9 right. We're going to say nice things about you, at least

10 hopefully. And what will happen is you'll be out there in the

11 neighborhood of about ten minutes and then we're going to call

12 the whole group back and then I'm going to announce the seven

13 people who are going to stay with us for the trial this

14 afternoon. Everybody else at that point goes where, Deputy

15 Dixie to --

16   DEPUTY DIXIE: You will report back to (indiscernible)

17 released for the day.

18   THE COURT: Okay, so after we've finished this you have

19 to go back to the room but then you can go home after that. So

20 I know that puts smiles on some people's faces but I know the

21 people who are picked on the jury are going to be even happier

22 because they'll be doing their civic duty and helping us out.

23 And if I don't say thank you again it's my fault but you all

24 need to be thanked. We do recognize that you have lives and

25 you have jobs and you're here really at no real compensation

and we appreciate that. Take this time to go to the restroom
or whatever and get a drink and we'll see you back in about ten
minutes. Thank you. All right, the jury is out of the
Courtroom, we will reconvene in about ten minutes.

(There was a recess after which the proceedings resumed.)

THE COURT: All right, any State challenges for cause?

MR. DUBOSE: Judge, the State (indiscernible) Ms.
Lawrence, the only thing I can say -- I'm not even sure if
this is proper but I don't know if she really understands
English at all, given what she was saying. I don't really want
to embarrass her, though so (indiscernible). She was in the
back row.

THE COURT: I don't think that was well enough developed
to make it a challenge for cause unless Mr. Amador wants to
agree to it.

MR. AMADOR: No, I think she answered the question,
Judge.

THE COURT: Okay, so that's denied. Mr. Amador, any
challenges for cause?

MR. AMADOR: Susan Beatty. Based on her statements that
she believed that she recognized Mr. Hunt and some articles
that related to Mr. Hunt and that she -- while she says she
could be fair and impartial she also made mention of the fact
that, you know, depending on whether she remembered what she
had read about.

THE COURT: She also said she couldn't remember but I guess she could at some point remember later. What says the State?

MR. DUBOSE: She said she could be fair and impartial on whoever was up there said he was never in the paper anyway. So, I doubt that she'll remember.

THE COURT: Yes, she did say she could be fair and impartial. I guess if she'd been asked the question, "Well, if you were to remember more about this?" So, I'll deny that one. How about -- now, is that the only one you have? Okay. Let me get my pen here. Let me ask this, I might change my ruling based on this. Was there an article? I mean, was there something?

MR. AMADOR: I don't know.

THE COURT: Yeah.

MR. AMADOR: My concern, Judge, is that if she starts remembering somebody --

THE COURT: Somebody else, right, I understand but she did say she could be fair and impartial and anybody could remember something -- you know, confusing somebody with somebody else. Okay, let's start with juror 1, what says the State -- and everybody has -- you know the rules, right? Everybody has three strikes, you can't use any of your three strikes on the alternate. Once we get to the alternate selection all the strikes, if they're out there, are gone and

we just start with one strike for the alternate.  But I don't
think we'll have an issue with that, okay?

What says State to juror 1?

MR. DUBOSE:  Accept.

THE COURT:  Defense?

MR. AMADOR:  Same.

THE COURT:  Defense, juror 2?

MR. AMADOR:  Accept.

MR. DUBOSE:  Accept.

THE COURT:  What says the State to juror 3?

MR. DUBOSE:  Accept.

THE COURT:  Defense?

MR. AMADOR:  Accept.

THE COURT:  What says Defense to juror 4?

MR. AMADOR:  Accept.

THE COURT:  State?

MR. DUBOSE:  Accept.

THE COURT:  What says the State to juror 5?

MR. DUBOSE:  Accept.

THE COURT:  Defense?

MR. AMADOR:  Strike.

THE COURT:  Okay.  Defense strikes number 5.  What says
Defense to juror number 6?

MR. AMADOR:  Accept.

THE COURT:  State?

MR. DUBOSE:  Accept.

THE COURT:  What says the State to juror 7?

MR. DUBOSE:  Accept.

THE COURT:  Defense?

MR. AMADOR:  Strike.

THE COURT:  Okay, Defense strikes juror number 7.
Defense has one more strike left.  What says Defense to juror
8?

MR. AMADOR:  Accept.

THE COURT:  State?

MR. DUBOSE:  Accept.

THE COURT:  So, right now we have a jury of juror numbers
1, 2, 3, 4, 6, and 8.  That's six people.  What says the State
to that panel?

MR. DUBOSE:  To clarify, Judge, the State would
backstrike juror number 3.

THE COURT:  All right, so number 3 is gone.  That brings
us to having juror number 9.  What says the State to juror
number 9?

MR. DUBOSE:  Accept.

THE COURT:  Defense.

MR. AMADOR:  Accept.

THE COURT:  All right, so now we have a panel of juror
numbers 1, 2, 4, 6, 8 and 9.  I think last time I asked the
State what they thought of that panel.  What says the Defense

of that panel?  It's 1, 2, 4, 6, 8 and 9.  Defense has one

strike, State has 2.

MR. AMADOR:  We're fine.

THE COURT:  Okay, Defense accepts that panel, what says

the State to panel 1, 2, 4, 6, 8 and 9?

MR. DUBOSE:  The State accepts.

THE COURT:  Okay, so the jury in this case will be jurors

1, Mr. Larose, 2, Ms. Vernon, 4, Mr. Holmes, 6, Ms. Farmer, 8,

Mr. Lee, 9, Ms. Almeida.  Now we should pick an alternate.

That's the jury.

Now, we're up -- each side has one strike.  Start with

the Defense on the alternate.  What says the Defense to juror

number 10?

MR. AMADOR:  Strike.

THE COURT:  Okay, Defense has used it's strike and got

rid of juror number 10.  What's says the State to juror 11?  If

you strike him then 12 is the alternate.  Or strike her, excuse

me.

MR. DUBOSE:   State accepts.

THE COURT:  Okay, so 11 is the alternate.  Okay, let's

bring them back.  Anybody have objections or anything they want

to note for the record?  Okay, bring them back in.  That's 1,

2, 4, 6, 8, 9 and 11.

Okay, have a seat everyone.  If I call out your number --

well, you don't know your numbers so I'll call out your name.

1    If I call out your name you are on the jury, all right?  What's

2    going to happen is I'm going to call out the names of the

3    people on the jury and then everybody else is going to get up

4    and leave, go back to the room and, I guess, be dismissed.  So,

5    listen up for your name.  You are on the jury if I call your

6    name.

7         Mr. Larose, Ms. Vernon, Mr. Holmes, Ms. Farmer, Mr. Lee,

8    Ms. Almeida, did I say it right?  And Ms. Chester, where's Ms.

9    Chester?

10        So I'll give the last names again; Larose, Vernon,

11   Holmes, Farmer, Lee, Almeida and Chester.  I messed that up

12   again.

13        Okay, everyone else thank you very much.  Hopefully

14   you've found this to be somewhat interesting and you don't have

15   to be called for jury service for another year.  Thank you.

16        Everybody else stay put.  Okay, Mr. Mattson, yes, you go.

17   Thank you.  Have a good day.  See we're lawyers, not

18   mathematicians we always have to make sure we have the right

19   number of people.  Okay.  Everybody else is out of the room

20   now.

21        We're going to start this trial -- since we're ending at

22   11:45 can we start the trial right at 1 p.m. instead of 1:30?

23   Is that -- will the witness be here then?

24        MR. DUBOSE:  Judge, I'd ask that we start at 1:30, I have

25   to have a conference with them.

THE COURT: Okay, all right. So, we'll start the trial
promptly at 1:30, what that means is you all are to be back
here, right outside these doors, ready to go at about 1:15.
That gives you an hour and a half, I think.

In the meantime, don't talk about the case. If you see
some of us over at Subway or whatever don't talk to us about
the case. Don't talk to each other about the case. You
shouldn't -- and don't go out and, you know, try to do some
research on the trespass law real quick or whatever. You
should come back here this afternoon knowing as much or as
little as you know right now. Okay? I haven't talked to no
one really about the case. If you have to make arrangements or
whatever with people you tell them, "I'm on the jury I should
be done by the end of the day, it may go into tomorrow" but
don't discuss the case, all right?

You can talk about it all you want when it's over with.
Anybody have any questions? The deputies will help you with
parking or letters for employers or anything like that. Other
than that we'll see you back -- you'll be out here at 1:15,
you'll be over here in the jury box at 1:30 and we'll start the
trial. Okay? Thank you.

MR. AMADOR: Judge, at this time I ask that the rule be
invoked.

THE COURT: Okay. And what does that mean, there's no
witnesses here.

1      MR. AMADOR:  I know, but -- well okay.

2      MR. DUBOSE:  Then we wouldn't be able to talk to the

3   witnesses.

4      THE COURT:  The State can talk to the witnesses before we

5   start the trial.  All right?  They can't talk to them

6   afterwards.  I think that's it.

7  (There was a break after which the proceedings resumed.)

8      THE COURT:  Okay, everybody ready?

9      MR. DUBOSE:  Yes, sir.

10     THE COURT:  All right.  As you know, Mr. Amador, I like to

11  let the jury take notes.  If you'd like to persuade me

12  otherwise, I'll be happy to listen.  Otherwise I'll hand out

13  the tablets when I give the introductory instruction.  I

14  collect them at the end, destroy the notes.  Nobody sees the

15  notes.  They don't become part of the public record.  They're

16  destroyed.  So, okay.  We're invoking the rule so any who's

17  going to be a witness in this case, wait outside.  We'll call

18  you back when we need yoou.  Don't alke about the case amongst

19  yourselves when you're out there.  After one witness testifies,

20  they're not allowed to go tell  the other witness what they

21  just said or what the lawyers asked them  Pretty much don't

22  even talk aout anything with each other, if you can avoid it,

23  until the case is over.  All right?  Thank you.

24  (The witnesses exited the courtroom.)

25     THE COURT:  All right.  Ready to bring the jury in?  Oh

1    let me just give a couple -- couple of preliminary things.

2    I think everybody knows this.  If you have to make an

3    objection, just say "Objection."  State the reason.  Don't

4    give a -- you know, monologue.  We'll approach and talk

5    about the reasons, unless it's obvious, and then I'll just

6    rule at that point.  I doubt there's going to be any

7    impeachment with prior convictions, but if there were,

8    you'd have a certified copy of the conviction to do that.

9    I guess that's it.

10    MR. DUBOSE:  Judge, I just want to put out.  Mr. Hunt -

11    - you do read the statement of the charge at the beginning;

12    correct?  When do you read your statement of the charge?

13    THE COURT:  At the beginning I say, you know, the

14    defendant is charged with trespassing.  That's what I'm

15    going to say.

16    MR. DUBOSE:  Okay, because we're -- we're discussing

17    that.

18    THE COURT:  I'll just keep it generic.  Not trespass

19    after warning or conveyance or structure; is that all right

20    with everybody?

21    MR. AMADOR:  Yes, sir.

22    MR. DUBOSE:  Yes.

23    THE COURT:  Okay.  All right, so let's bring the jury

24    in then.  While he's getting them, Mr. Hunt, let me just

25    ask you.  You participate with your lawyer in this jury

1   selection earlier this morning; right?  And you had input?

2          MR. HUNT:  (There was no audible answer.)

3          MR. AMADOR:  You can answer.

4          MR. HUNT:  Yes.

5          THE COURT:  Okay, just need to make sure.  Some people

6   after the fact want to say that, you know, the lawyer

7   didn't give them a chance to participate or whatever.

8          MR. HUNT:  Yes, I did.

9          MR. AMADOR:  And for the record, he was in -- at the

10  bench for any conferences we've had with any of the

11  prospective jurors, to hear their responses to the

12  questions that they had.

13         THE COURT:  Right, thank you.  Get the tablets, Deputy.

14  Keep them there and then -- put them right down there and

15  then you can just go --

16 (The Jury entered the courtroom.)

17         THE COURT:  All right, have a seat everyone.  Welcome

18  back.  Hope you all had a good lunch.  We're going to begin

19  the trial now.  First thing we need to do is have you sworn

20  again.  This time you're being sworn to be the jury to try

21  this particular case.  All right, so if you'd raise your

22  right hands and be sworn by the Clerk.

23         CLERK:  Do you and each of you swear or affirm that you

24  will well and truly try the issues between the State of

25  Florida and the defendant and render a true verdict

1    according to the law and the evidence?

2    (The Jurors answered in unison.)

3             CLERK:   Thank you.

4             THE COURT:   Okay.   Ladies and gentlemen of the jury,

5        you have been selected and sworn as a jury to try the case

6        of the State of Florida versus Dennis Hunt.   This is a

7        criminal case.   Mr. Hunt is charged with trespassing.   The

8        definition of the elements of that crime will be explained

9        to you later.

10            It is your solemn responsibility to determine if the

11       State has proved it's accusations beyond a reasonable doubt

12       against Mr. Hunt.   Your verdict must be based solely on the

13       evidence or lack of evidence and the law.   It is my

14       responsibility to decide which laws apply to this case and

15       to explain those laws to you.   It is your responsibility to

16       decide what the facts of the case may be and apply the law

17       to those facts.   Thus, the province of the jury and the

18       province of the judge are well-defined and they do not

19       overlap.   This is one of the fundamental principles of our

20       system of justice.        Before proceeding further, it would

21       be helpful if you understand how a trial is conducted.   At

22       the beginning of the trial, the attorneys will have an

23       opportunity, if they wish, to make an opening statement.

24       The opening statement gives the attorneys a chance to tell

25       you what evidence they believe will be presented during the

trial. What the lawyers say is not evidence and you are
not to consider it as such. Following the opening
statements, witnesses will be called to testify under oath.
They will be examined and cross examined by the attorneys.
Documents and other exhibits also may be produced as
evidence. After the evidence has been presented, the
attorneys will have the opportunity to make their final
arguments. Following the arguments by the attorneys, I
will instruct you on the law applicable to the case. After
the instructions are given, you will then retire to
consider your verdict.

You should not form any definite or fixed opinion on
the merits of this case until you have heard all the
evidence, the argument of the lawyers, and the instructions
on the law that I will give you. Until that time, you
should not discuss the case amongst yourselves.

During the course of the trial, we may take recesses
during which you will be permitted to separate and go about
your personal affairs. During these recesses, you will not
discuss the case with anyone, nor permit anyone to say
anything to you or in your presence about the case. If
anyone attempts to say anything to you or in your presence
about the case, tell them that you're on the jury trying
the case and ask them to stop. If they persist, leave then
at once and immediately report the matter to the bailiff

who will advise me.

In every criminal proceeding, a defendant has the absolute right to remain silent. At no time do defendants have a duty to prove their innocence. From the exercise of the defendant's right to remain silent, a jury is not permitted to draw any inference of guilt and the fact that a defendant did not take the witness stand must not influence your verdict in any manner whatsoever.

The attorneys are trained in the rules of evidence and trial procedure and it is their duty to make all objections they feel are proper. When an objection is made, you should not speculate on the reason why it's made. Likewise, when an objection is sustained or upheld by me, you must not speculate on what might have occurred had the objection not been sustained, nor what a witness might have said had he or she been permitted to answer the question.

All right, if you would like to take notes during the trial, you may do so. On the other hand, of course, you are not required to take notes if you do not want to. That is up to you individually. You will be provided with a notepad and a pen for use, if you wish to take notes. Any notes that you take will be for your personal use, however you should not take them with you from the courtroom. During recesses, either the bailiff will take possession of your notes and return them to you when we reconvene or

1  we'll just ask you to leave them right on your chair, if

2  it's not going to be a lengthy recess. And I don't think

3  we will have many lengthy recesses, if any, this afternoon.

4

5  After you have completed your deliberations, the

6  bailiff will deliver your notes to me. They will be

7  destroyed. Noone will ever read your notes including me.

8  If you take notes, do not get so involved in note-taking

9  that you become distracted from the proceedings. Your

10  notes should be used only as aids to your memory. Whether

11  or not you take notes, you should rely on your memory of

12  the evidence and you should not be unduly influenced by the

13  notes of other jurors. Notes are not entitled to any

14  greater weight than each juror's memory of the evidence.

15  Okay, Deputy Frazier, you want to hand out the pads? I

16  ask that you write your name on the first sheet of this.

17  That way, sometimes, when people come back and they get

18  their seat mixed up, they won't end up with somebody else's

19  notepad. And when you take notes, if you choose to take

20  notes, you should do that on the second page. That way

21  nobody can read over your shoulder, copy your paper so to

22  speak. It will be your private notes. And again, this is

23  purely optional, not required. The only requirement I'm

24  asking you to do is your name on the front. After that,

25  it's completely up to you.

1    All right, does the State have an opening statement?

2    MS. HALE: Yes, Your Honor.

3    THE COURT: Okay, go ahead.

4    MS. HALE: Thank you. May it please the Court;

5    Counsel? Good afternoon, ladies and gentlemen. My name is

6    Shauna Hale and myself, along with my co-counsel, Mr.

7    Dustin Dubose, we represent the State in this matter. I

8    just want to say thank you in advance for you attentiveness

9    and for your time today. We all really appreciate it.

10   Today we're here about the State versus Dennis Hunt.

11   This case, ladies and gentlemen, is about right and wrong.

12   On July 1, 2003, at the Hillsborough County law library,

13   Mr. David -- Mr. David Pilver was set to close up. It was

14   about 8:00. However, as -- as Mr. Pilver went to close up,

15   he found that he could not close up because the defendant

16   was still in the library after closing time. On this date,

17   Mr. Pilver asked the defendant, "What are you doing here?

18   It's after closing hours, it's time for you to go." The

19   defendant didn't want to leave. As a matter of fact, he

20   became belligerent. He began to cuss and he began to make

21   physical gestures towards the victim, Mr. Pilver, that Mr.

22   Pilver felt threatened him and he felt unsafe.

23   Between July 1st and July 5th of 2003, Mr. Pilver spoke

24   with his boss, Ms. Kellaher. And Ms. Kellaher told him

25   that if you feel unsafe by this -- by this man, Mr. Hunt;

1    if he's threatened you in any way or if you feel unsafe,

2    the next time he comes into the library you trespass him

3    and you tell him to leave.

4        On July 5th, ladies and gentlemen, Mr. Pilver did in

5    fact see Mr. Hunt once again. What he did, because he saw

6    him again, based on what happened on July 1st, he didn't

7    feel safe after what happened on July 1st. He felt

8    threatened by the defendant's actions from July 1st and

9    what he did, ladies and gentlemen, was he called security

10   and eventually the Tampa Police Department showed up. Mr.

11   Pilver, along with Tampa Police Department, approached the

12   defendant. Mr. Pilver told the defendant, "Sir, you're not

13   longer welcome here. You have to leave." Mr. Hunt, the

14   defendant, didn't want to leave. Again, he didn't leave.

15   The officer, Officer Hathcox, said, "Sir, you're no longer

16   welcome here. You have to leave." Mr. Pilver said, "No" -

17   - Mr. Hunt said, "No, I'm not leaving." And in fact he

18   didn't leave. It took the officer, Officer Hathcox, to

19   physically escort the defendant out of the building for him

20   to leave.

21       Right and wrong, ladies and gentlemen. Mr. Pilver has

22   a right to work in an unsafe -- in a safe, non-threatening

23   environment. It was wrong of the defendant to not obey

24   what Mr. Pilver and what the officer said on July 5th. And

25   because of that, ladies and gentlemen, the defendant is

1   guilty of trespass in this case.  The State is confident

2   that once you've heard all of the evidence, once you've

3   deliberated, you will have -- you will be able to render

4   the only fair and just verdict in this case and that is

5   that the defendant is guilty of trespass beyond all

6   reasonable doubt.  Thank you.

7          THE COURT:  Okay, Mr. Amador?

8          MR. AMADOR:  Thank you, Your Honor.  Ladies and

9   gentlemen, please when you are listening to the witnesses

10  on that stand, listen to the cross examination of those

11  witnesses and think about, as the judge will instruct you

12  about, their motives.  Because the evidence is going to

13  show that there's bias in this case; that Mr. Pilver -- in

14  fact, probably most of the staff at the county law library

15  doesn't like -- but in particular Mr. Pilver, doesn't like

16  Mr. Hunt.  Why don't they like Mr. Hunt?

17         Well, the evidence is going to show that Mr. Hunt is

18  not a wealthy man and the county law library charges twenty

19  cents per page to make copies of the books.  And because he

20  is not a wealthy man, Mr. Hunt brought his own copier and

21  he was told by Mr. Pilver that he could not use that

22  copier.  So he packed it up and didn't use that copier.

23  And then the board of the Hillsborough County law library

24  told Mr. Hunt that he had permission to use his copier

25  because in fact the laws of this state prohibit them from

1    prohibiting him from brining in his own copier.  And so Mr.

2    Hunt was given permission to use the copier.

3        Mr. Pilver, you're going to hear, was not exactly the

4    best clerk at the law library, especially when it concerns

5    Mr. Hunt.  Mr. Hunt in fact has to file at least two

6    complaints with the supervisor of Mr. Pilver because of Mr.

7    Pilver's conduct towards Mr. Hunt.  In fact, one of the

8    complaints was the day or day -- and day or two after the

9    incident that the State alleges Mr. Hunt was abusive or

10    threatening to Mr. Pilver.  And you will have evidence

11    showing that Mr. Hunt in fact did files these letters of

12    complaint against Mr. Pilver.  So I suggest that you listen

13    to the evidence and that the evidence is going to show that

14    Mr. Pilver is not a credible witness.

15        You're also going to hear about the fact that the law

16    library has violated Mr. Hunt's constitutional right to be

17    at that law library.  Because in trespassing Mr. Hunt, the

18    law library committed a -- did so unreasonably.  Ladies and

19    gentlemen, you're going to hear from Mr. Hunt.  He's going

20    to tell you what happened.  He's going to tell you the

21    abuse that he's suffered from Mr. Pilver and you're going

22    to have to make a decision about what you believe.  And I'm

23    confident that at the end of all the testimony, you're

24    going to find that Mr. Hunt's constitutional rights were

25    violated and that he is not guilt of the charge of

1    trespassing.  Thank you.

2            THE COURT:  All right, call your first witness, please.

3            MR. DUBOSE:  Thank you, Judge.  Judge, I wanted to

4    point out.  I wasn't sure, did we plan on --

5            THE COURT:  What's -- what's the problem?  Oh, okay.

6            MR. DUBOSE:  Thank you.  State calls David Pilver.

7            THE COURT:  Okay, Deputy Dixie, will you get Mr.

8    Pilver, please?  All right, raise your right hand.  Do you

9    swear to tell the truth, the whole truth, and nothing but

10    the truth so help you God?

11            MR. PILVER:  Yes, I do.

12            THE COURT:  Okay, have a seat up here on the witness

13    stand and adjust the mic. so it picks up what you're

14    saying, please.

15            MR. PILVER:  Can you hear me okay?

16            MR. DUBOSE:  Yes.

17                            **DAVID PILVER**

18    having been duly **sworn was examined and testified as follows.**

19                          **DIRECT EXAMINATION**

20    BY MR. DUBOSE:

21       Q    All right, will you just state your name for the

22    record, spelling it for the Court Reporter?

23       A    David Pilver.  That's P, like Paul, I-L-V-E-R.

24       Q    Okay, Mr. Pilver, I know it's very common for us --

25    we're having a conversation, it seems like, and it's very

1   natural to look at me and talk.  If you would, try to direct

2   your attention to the jury so that they can better observe you.

3       A    Yes, sir.

4       Q    Okay, Mr. Pilver, if you would just take a moment and

5   introduce yourself to the jury?  Tell them a little bit about

6   yourself and your background?

7       A    Well, I work for the county at the law library.  I've

8   been working --

9            MR. AMADOR:  Objection, calls for a narrative.

10           THE COURT:  Overruled.

11      A    I've been working there for almost nine years now.

12  Before that, I worked for a bookstore; retail sales.  I've been

13  living in Tampa for about 12 years now.

14      Q    Okay, now you said you work at the library; which

15  library is that?

16      A    The Hillsborough County law library, also known as the

17  James J. Lunsford Law Library.

18      Q    Okay, and where is that located?

19      A    That's at 501 East Kennedy, which is just a couple of

20  blocks away from us.

21      Q    Okay, is that in Hillsborough County?

22      A    Yes, sir.

23      Q    All right, now you said you've worked there for nine

24  years; that's as of today's date?

25      A    Almost nine.  At the end of this month, it will be nine

1    years.

2        Q    Okay, now can you tell us what your duties are there at
3    the library?

4        A    My job title is senior library assistant.  The duties
5    include taking care of the library on the weekends, by myself,
6    as well as three days a week during the evenings.  I do a lot of
7    shelving and clerical-type jobs.  And assisting the patrons with
8    their research requests; things like that.

9        Q    Okay, who is it that's in charge of opening the library
10   in the mornings?

11       A    That would be Bill and Norma.

12       Q    Okay, now who is it that's in charge of opening the
13   library whenever you're working?

14       A    When I'm working --

15       Q    I'm sorry, closing the library whenever you're working?

16       A    Closing when I'm working is me, I have a key to the
17   door.

18       Q    Okay, and how is it that you go about this procedure of
19   closing at night?

20       A    As closing time approaches, I go around the library;
21   straighten up a bit.

22       Q    Mm-hmm?

23       A    Make sure that all the books are put away.  Make sure
24   that if any patrons are still in the library, that I know where
25   they are so I can make sure the building is empty when I do lock

1  the door and leave.  It usually takes me ten minutes or so after

2  the closing time and after everyone has left to clean up and go

3  home.

4      Q    Okay, now I'm going to take you back a couple of years;

5  all right?  I'm going to take you back to July 1, 2003; do you

6  remember that day?

7      A    Yes, sir.

8      Q    Okay, now what is it about that day that you remember

9  that stands out in your mind?

10     A    July 1st?  As we got close to closing time, which is

11  8:00 on weekdays, I know that there was a person in the back of

12  the library --

13         MR. AMADOR:  Objection, (indiscernible).

14         THE COURT:  Overruled.

15     A    And I waited for that person to leave.  And 8:00 came

16  and went and he didn't leave, so I waited as long as I could,

17  counting off a couple of minutes on my watch.  Just, you know,

18  hopefully he was going to leave on his own.  He didn't so I went

19  back, looked for him.  I found him back by the study curls, near

20  our copy machines.  I asked him why he was still in the library

21  after closing time?  And the -- the man went --

22     Q    Let me stop you right there, before you get into what

23  happened after that.  Do you see the man that you came into

24  contact with that night here today?

25     A    Yes, sir.

1    Q    And could you identify him for the Court and jury?

2    A    He's the gentleman sitting at that table in the dark

3 cloak.  Glasses and grey hair.

4          MR. DUBOSE:  Judge, may the record reflect the

5        witnesses has identified the defendant?

6          THE COURT:  Yes.

7          MR. DUBOSE:  Thank you.

8    Q    Okay, now you're talking about July 1st; right?  Now

9 this individual you just identified; have you come into contact

10 with him before?

11    A    Yes, sir.

12    Q    Can you tell the jury about that?

13    A    Many times --

14          MR. AMADOR:  Objection, relevance.

15          THE COURT:  Overruled based on a prior discussion.

16

17    A    Many times prior to that evening I had seen that

18 gentleman in the -- in the library, doing research.  He had had

19 several issues with the way the library was being run and he had

20 made complaints to me personally and to other staff members that

21 worked there on various other occasions.  So I knew who he was

22 as soon as I saw him.

23    Q    So you -- is this -- have you come into contact with

24 him before or you just know of him?

25    A    I knew him because I had dealt with him personally on

1  many occasions; him asking for books at the front desk, for

2  example.

3       Q    Okay, so you knew this individual?

4       A    Yes, sir.

5       Q    All right, now let's go back to that night we were

6  talking about, July 1, 2003; you -- pick up where you left off

7  on that, if you would?

8       A    So when I -- when I asked why --

9            MR. AMADOR:  Objection, non-responsive.  It's not the

10       question asked.

11           THE COURT:  Why don't you ask a different question.

12           MR. DUBOSE:  Oh.

13      Q    Would you continue telling the story?

14      A    Yes, sir.

15           MR. AMADOR:  Same objection, Judge.

16           THE COURT:  Yeah, it's -- sustained.

17      Q    All right, now what happened that night?

18      A    Um --

19           MR. AMADOR:  Objection, relevance.

20           THE COURT:  Overruled.

21      A    When I went back to see why this person who was still

22  in the library had not left yet after closing time, I asked Mr.

23  Hunt, "Why are you still in the library after 8:00?"  And at

24  that point, he -- he became furious and he started raising his

25  voice and shouting at me.  He said something about, "You didn't

1    give the proper announcement," or something like that.  I said,
2    "Well, it's your responsibility to know when the library's
3    closing and to be out of the building by closing time."  He said
4    to me, "What if I don't?  What are you going to do about it?"
5    And he was shouting and he was waiving his arms all around.  He
6    was taking a very aggressive posture.  I thought he was possibly
7    going to attack me right then and there.

8        Q    You said "announcement;" what do you mean announcement?
9    What was that referring to?

10       A    I think he's referring to when we occasionally make a
11   public address announcement saying that there's 15 minutes or
12   some amount of time before closing, which I had done that night
13   at 15 minutes till.

14       Q    Okay, so at this point, you -- after what you just
15   said, you thought there was going to be a -- an altercation or
16   something; what was the next thing that happened?

17       A    Mr. Hunt and I had some words.  He -- he used a lot of
18   foul language.  He basically stood there, just yelling at me for
19   a couple of minutes.  Then he said that I was in his way and
20   that's why he couldn't leave.

21       Q    All right, Mr. Pilver, as awkward as this may be for
22   today -- but for today's purposes, I need you to do it.  Those
23   particular words and exactly what was exchanged is going to be
24   relevant because it is part of this case.  So I know it may feel
25   awkward to discuss that with people you don't know, but if you

1  would, tell us as much as you can recall about what exactly what

2  happened that night?

3      A    Okay.

4      Q    His exact words.

5           MR. AMADOR:  Objection.

6           THE COURT:  Overruled.

7      A    Mr. Hunt said something along the lines of "God dammit,

8  what do you fucking think you're doing?  You don't know who

9  you're messing with.  You're messing with the wrong guy."  And

10 that's when I said, "Well, you're in the library after hours.

11 You need to leave, we're closed.  Are you refusing to leave?"

12 And that's when he went into the bit about "What are you going

13 to do about it if I don't leave?"  That kind of thing.

14 Eventually, after he made the statement that I was blocking his

15 exit, I stood three or four steps aside to make sure he had a

16 big space to walk by.  And at that point, he did start to go

17 towards the front of the building and he finally did exit.

18     Q    And what happened after he exited?

19     A    As soon as he left the building, I went across the

20 street -- across Morgan Street to the County Center, where

21 county security officers have a post, and I spoke to the county

22 security officers about what I could do if -- if I had trouble

23 with patrons who didn't want to leave at closing time.  And they

24 said --

25          MR. AMADOR:  Objection, hearsay.

1          THE COURT:  Sustained.

2          MR. DUBOSE:  Your Honor, may I approach?

3  (There was a bench conference as follows.)

4          MR. DUBOSE:  This -- the defendant was in a state of

5     mind when he (indiscernible).

6          THE COURT:  (Indiscernible).

7          MR. DUBOSE:  (Indiscernible).  It's not hearsay.

8     (Indiscernible).

9          THE COURT:  What do you think?

10          MR. AMADOR:  I think it's hearsay.  (Indiscernible).

11     Anything that someone else is going to say -- I'm assuming

12     that's what the response was going to be; that they told

13     him to do something or to affirm that this the rule or what

14     have you.  But --

15          MR. DUBOSE:  (Indiscernible) conduct.

16          THE COURT:  Okay.  Overruled.

17  (The bench conference was concluded.)

18     Q    Okay, Mr. Pilver, you can answer the question.  You can

19  continue with what you were saying about the security officers?

20     A    The security officers told me that they would be happy

21  to help me escort anyone out of the building that was refusing

22  to leave or that I didn't feel comfortable with being there.

23     Q    Okay, now what other actions did you take in regards to

24  Mr. Hunt after the 1st?

25     A    After the 1st, I spoke to my colleagues about the

1    incident that had occurred.  I told them I really didn't feel
2    safe with --
3              MR. AMADOR:  Objection, hearsay.
4              THE COURT:  Sustained.
5         Q    What other action did you take?
6         A    I typed up a --
7              MR. AMADOR:  Objection, relevance.
8              THE COURT:  Overruled.
9         A    I typed up a note to my boss, telling her that there
10   had been an incident with a patron who was very upset and got
11   very aggressive and that I didn't feel comfortable with that
12   person coming into the library anymore.
13        Q    Who is your boss?  I'm sorry.
14        A    My boss is Norma Wise, but at that point she was out on
15   leave so I was dealing mostly with Bill Spradlin --
16        Q    Okay.
17        A    -- who was acting director during that time.
18        Q    I understand.  Please continue.
19        A    So I had some discussions with -- with Bill about the
20   situation.  He consulted with the chairman of the library board
21   about what we could possibly do about the situation.  There was
22   discussions about, you know, should we change my work schedule
23   to accommodate this guy being there when I didn't feel safe with
24   him around.  Ultimately I said I really think it's --
25             MR. AMADOR:  Objection, hearsay.

1         THE COURT: Overruled.

2   A   I said I think it's a really bad idea to let this guy

3 come in because he's not just a danger to me, he could be a

4 danger to the other staff members who work there. There is a --

5 at the time, there was a part time employee working Thursday

6 nights who's a female, who closes up the place all by herself.

7 I didn't think it was a good idea for Mr. Hunt to be allowed

8 back in the library.

9         MR. AMADOR: Objection, relevance.

10         THE COURT: Overruled.

11   A   I was told eventually that I could use my own judgement

12 to determine what level threat Mr. Hunt posed and whether I felt

13 comfortable with him being in the library. And then if I did

14 not feel comfortable with him being there, I could ask to have

15 him removed.

16   Q   Okay, now you sort of ran through a bunch of things

17 right there. You said you were told eventually you could use

18 your own judgement; who told you that?

19   A   Bill Spradlin --

20   Q   Mm-hmm?

21   A   -- relayed the information to me that --

22         MR. AMADOR: Objection, hearsay.

23         THE COURT: Sustained.

24         MR. DUBOSE: I -- I just asked who told him.

25   A   Bill Spradlin.

1    Q    Okay, and without saying exactly what Mr. Spradlin told

2 you, what was the essence of the message; what impression did

3 you get from it?

4    A    That --

5         MR. AMADOR:  Objection, hearsay.

6         THE COURT:  Let's see how he answers the question.

7    Overruled, temporarily.

8    A    The discussions with the library board had resulted in

9 my being given permission to make that decision on my own about

10 that safety.

11   Q    Okay, now when was the next day that you worked after

12 July 1st; do you remember?  It was -- what day was that; do you

13 remember?

14   A    July 1st was probably a Tuesday or a Wednesday.

15   Q    Mm-hmm?

16   A    I think it was a Tuesday.  I worked the very next day,

17 which was Wednesday.

18   Q    Okay.

19   A    And then I had two days off, Thursday and Friday, and

20 then the next day I worked was Saturday.

21   Q    Okay, now Saturday would be the 5th?

22   A    Saturday the 5th, that sounds right.

23   Q    Okay, can you tell us how work went that night?

24   A    Started -- the library opens at 12:00 noon and closes

25 at 5:00 on Saturdays.  Most of the day went smooth.  Around

1 3:00, 3:30 -- somewhere around in there -- Mr. Hunt came into
2 the library. After all the discussions that I had had with my
3 coworkers about how to handle the situation, I knew that I had
4 permission to have him removed. And so I didn't even have any
5 interactions with him at all. I didn't say a word to him. I
6 just immediately got on the phone and called county security in
7 the building next door. They sent some officers over.

8    Q    Okay, and what happened at that point?

9    A    The officers told him that he would need to leave the
10 building. He refused to leave at that point. They tried to
11 tell him that, you know, he didn't have any choice; that if he
12 didn't leave voluntarily, they were going to have to --

13         MR. AMADOR: Objection, hearsay.

14         THE COURT: Overruled. Not offered for the truth of
15    the matter asserted.

16    A    They indicated that they would call TPD if he didn't
17 leave. He still refused so they did call TPD.

18    Q    Okay, at what point did you actually get involved with
19 any of these law enforcement, security?

20    A    I was there, observing most of what was going on.

21    Q    Mm-hmm?

22    A    I was also dealing with some of the patrons in the
23 library and taking care of other duties at the time. So I
24 wasn't watching every single aspect of their interaction with
25 Mr. Hunt. But I was there and I heard when they decided they

1    needed to call Tampa Police in to take care of the situation.
2    And eventually a TPD officer did arrive.

3        Q    And were you able to talk with that officer?

4        A    Yes, the officer came in, he got a briefing from the
5    county security guys, and then he talked to me and asked me what
6    was going on.  I told him the situation.  That based on a
7    previous altercation, that I just didn't feel that this
8    individual was a good idea to have in the library; that he was
9    likely to explode and become violent.  And, you know, that we
10   had asked him to leave.

11       Q    Did you -- did the officer approach Mr. Hunt?

12       A    Yes, sir.

13       Q    Did you accompany the officer?

14       A    I don't remember if I walked back to where Mr. Hunt was
15   at -- at that moment, --

16       Q    Mm-hmm?

17       A    -- but eventually I was present at some of the
18   discussions between the officer and Mr. Hunt.

19       Q    Okay, did the officer ask you to do anything while you
20   were there in Mr. Hunt's presence that night?

21       A    Yes, Officer Hathcox asked me to make it very clear to
22   Mr. Hunt that he was not welcome in the building; that I wanted
23   him to leave; the reason that I wanted him to leave.  And that's
24   what I did.  Told Mr Hunt exactly those things; that I didn't
25   feel that he was a safe person to have around based on the

1  previous altercations, that I felt very comfortable with him

2  being in the building, and that I needed him to leave.

3      Q    Okay, now at that point, what took place?

4      A    At that point, Mr. Hunt went back towards the back

5  where he had some of his belongings.  And I guess some of his

6  research materials.  The officer went back there with him.  I

7  did not follow him back there.  They had some further discussion

8  about whether or not Mr. Hunt was going to leave, I think.  And

9  the next thing that I saw was that Mr. Hunt was being escorted

10 out of the building by a Tampa Police Officer.

11     Q    When you say "escorted," what does that mean?

12     A    I -- I don't recall if he was in handcuffs or not, but

13 he was led out by the officer to the patrol car and put in the

14 back of the patrol car.

15     Q    Okay, that's -- that's -- and that's the last time you

16 saw Mr. Hunt that night?

17     A    Yes, sir.

18     Q    Okay.

19          MR. DUBOSE:  Judge, may I have a moment?

20          THE COURT:  Yes.

21          MR. DUBOSE:  Judge, the State passes the witness.

22          THE COURT:  Okay, cross examination?

23          MR. AMADOR:  Thank you, Judge.

24                    **CROSS EXAMINATION**

25 BY MR. AMADOR:

1    Q    Mr. Pilver, Mr. Hunt has been using that library before

2  the day of this incident for several months; right?

3    A    Two or three months at least; yes, sir.

4    Q    Okay, and during those two or three months Mr. Hunt --

5  before the incident -- I want to focus on before the incident

6  that you alleged that Mr. Hunt was violent towards you.  Never,

7  before July 1st, did Mr. Hunt do anything violent towards you;

8  correct?

9    A    Not overtly violent.  Somewhat aggressive, but not

10  violent.

11   Q    Okay, like what?

12   A    There was an occasion where he disputed the cost on

13  some of the copies he had made and he seemed to disgusted at --

14  at the fact that we wanted to charge him the twenty cents per

15  page and he threw several copies across the desk at me.

16   Q    Mr. Pilver, how many times has Mr. Hunt complained

17  about you?

18   A    Many times.  More than I can count.  More than five or

19  six.

20   Q    And he's complained about you and the way you pass

21  books to him; right?

22   A    I believe that was one of the complaints; yes, sir.

23   Q    Okay, and in fact he complained about your behavior on

24  -- on July 1st; did he not?

25   A    I think so, but I'm -- I don't remember if I read the

1 letter that he sent or if someone just told me. So I don't know

2 for sure all the details about that complaint.

3     Q    Well you know that he sent a letter, complaining about

4 you and your behavior on July 1st; right?

5     A    I think he did; yes, sir.

6     Q    Okay, and you are the person who told Mr. Hunt that he

7 couldn't bring in his persona copier; right?

8     A    Yes, sir.

9     Q    And when you told him that, Mr. Hunt stopped using it;

10 correct?

11     A    Yes.

12     Q    Until the board said that he could use it; right?

13     A    Yes, sir.

14     Q    Then Mr. Hunt brought in his copier?

15     A    I think so. I don't recall witnessing him making

16 copies after that, but I know he had permission to do so.

17     Q    Now do you recall on July 1st when Mr. Hunt came in?

18     A    What time of day? No, I don't recall.

19     Q    The entire time that he was there, he was minding his

20 own business; correct? Doing his research?

21     A    As far as I know. It's a fairly large office space. I

22 can't see the whole library from the front desk area where I

23 sit. So I assume that he didn't have any other interactions

24 with other patrons or anything.

25     Q    Did anybody complain to you?

1    A    No, sir.

2    Q    On the day, July 5th, when you called security; was Mr.

3  Hunt minding his own business, doing his research?

4    A    As far as I know, he was.

5    Q    Okay, he didn't come up to you and put his finger in

6  your face and say, "I'm going to get you," or whatever it is

7  that you said that he said to you; right?

8    A    Not on the 5th, no.

9    Q    You testified -- when Mr. Dubose was questioning you,

10  you testified that from July 1st, when this incident supposedly

11  occurred, the board gave you -- between July 1st and July 5th,

12  the board gave you permission to trespass Mr. Hunt; is that my

13  understanding of your testimony?

14    A    Yes, sir.

15    Q    So it's your testimony here that the board met and gave

16  you that permission?

17    A    I don't know if the whole board convened.  The chairmen

18  of the board was in consultation with Bill Spradlin.

19    Q    So you're saying that Bill Spradlin told you something

20  that someone else may have or may not have told him?

21    A    Bill originally was the person who told me that and

22  then it was later verified by the chairman of the board to me.

23    Q    Okay, was that verified before July 5th?

24    A    Yes, sir.

25    Q    By whom?

1    A    Sandra Kellaher, the chairman of the board.

2    Q    She spoke with you before July 5th, giving you

3 permission to trespass him?

4    A    Yes, sir.

5    Q    But you don't know if the board, in its entirety, met?

6    A    I do not know.

7    Q    Now you said that several -- Mr. Hunt had been there

8 for several months; to your knowledge, had Mr. Hunt been there

9 when you don't work?

10    A    There would really be not way for me to know unless I

11 quizzed all the other staff members and I'm not even sure all of

12 them know what he looks like.

13    Q    Is it fair to say that on -- well, you didn't mention

14 what time you left on July 1st.  Did -- is it like Mr. Hunt

15 stayed there an hour and said, "No, I'm not leaving.  I'm going

16 to stay here for an hour;" is that what happened?

17    A    I guess it was probably six or seven minutes after 8:00

18 when I first went back to see why he was still in the building.

19 The altercation itself took probably another five minutes.  So I

20 guess it was about a --

21    Q    So by 8:15, Mr. Hunt has left the library after you ask

22 him to leave because it's closing time; right?

23    A    Yes.

24    Q    And it's your responsibility -- your duties to assist

25 patrons; right?

1      A     Yes, sir.

2      Q     Is it fair to say that it's not your duties to throw

3 books at patrons or hand it to them in an aggressive manner?  Is

4 that fair to say?

5      A     I would think, yeah.  That sounds fair.

6      Q     Okay, and is it fair to say that you shouldn't hand --

7 your duties aren't to hand the patrons books in a manner that

8 may be injurious to them?  Maybe putting it towards their

9 forehead, things like that.

10     A     Well, I don't -- I don't have a list of duties not to

11 do, I just have a list of duties of what -- what I am supposed

12 to do.

13            MR. AMADOR:  If I may have a moment, Judge?

14            THE COURT:  Okay.

15            MR. AMADOR:  Nothing further.

16            THE COURT:  Okay, any necessary redirect?

17            MR. DUBOSE:  Yes, sir.  Briefly.

18                      REDIRECT EXAMINATION

19 BY MR. DUBOSE:

20     Q     Mr. Pilver, who's going to close the library on July 5,

21 2003?

22     A     Okay, I'm sorry.  Could you --

23     Q     Who's going to close it?

24     A     Who is going to --

25            MR. AMADOR:  Objection, relevance.

1    Q    Who is going to close it?

2    THE COURT: What was it -- July --

3    Q    Who was going to close the library on the night in

4 question, July 5, 2003?

5    THE COURT: Overruled.

6    Q    Who's going to close it?

7    MR. AMADOR: Objection, beyond the scope of cross.

8    THE COURT: Overruled.

9    A    Since I was the employee working there that day, it was

10 going to be me that closed the library on July 5th.

11    Q    Okay, and how many people have you trespassed in the

12 library before July 5, 2003?

13    MR. AMADOR: Objection, relevance.

14    THE COURT: Overruled.

15    A    Did you trespassed?

16    Q    Yes?

17    A    None where a police officer actually issued a trespass

18 warning.

19    Q    Okay, have you ever thrown a book at a patron?

20    A    No, sir.

21    Q    Have you ever given a book to a patron in an aggressive

22 manner?

23    A    No, sir.

24    Q    Have you ever done any of those things to Mr. Hunt?

25    A    No.

1  occasions and observing him at the meetings, you -- you advised

2  Mr. Pilver as you said you did; correct?

3       A    Yeah, it wasn't because of Mr. Hunt.  It's because I

4  didn't think any -- anybody working should be afraid of having

5  violence in the workplace.

6       Q    All right, thank you.

7            MR. DUBOSE:  Nothing further, Judge.

8            THE COURT:  Cross exam?

9                    **CROSS EXAMINATION**

10 BY MR. AMADOR:

11      Q    Ms. Kellaher, are you aware of Mr. Hunt filing

12 complaints against David Pilver?

13      A    Filing -- I'm not on the board anymore.  I don't know

14 what -- when would they have --

15      Q    In July -- who about in May of 2003?

16      A    I received a copy of a letter -- I had received not

17 only phone calls from the complainant but I would receive any

18 correspondence to the library directly.  So I would have been

19 faxed a copy.

20      Q    Okay, and Mr. Pilver found about that; right?  That Mr.

21 Hunt complained about him; right?

22      A    I never saw Mr. Pilver very frequently so I wouldn't --

23 I wouldn't have known anything about that.  The only time I

24 talked to Mr. Pilver was just before this incident, I think.

25      Q    That's the only time you've talked to Mr. Pilver?

1    MR. DUBOSE:  Nothing further, Judge.

2    THE COURT:  You want to cross him on that?

3    MR. AMADOR:  No.

4    THE COURT:  All right.  Okay, you may step down.  Go

5    out in the hallway.  Don't talk to any other witnesses

6    about the case.  Call your next witness, please?

7    MR. DUBOSE:  Sandra Kellaher.

8    THE COURT:  All right.  Deputy Dixie, would you get

9    Sandra Kellaher, please?  Raise your right hand.  Do you

10   solemnly swear to tell the truth, the whole truth, and

11   nothing but the truth so help you God?

12   MS. KELLAHER:  I do.

13   THE COURT:  Okay, have a seat right up here.  Make sure

14   the mic. is where it's picking up what you're saying.

**SANDRA KELLAHER**

16   having been duly sworn was examined and testified as follows.

**DIRECT EXAMINATION**

18   BY MR. DUBOSE:

19   Q    Hi.

20   A    Hi.

21   Q    Would you please say your name and --

22   A    Sandra --

23   Q    Spell your last name for the Court Reporter?

24   A    Sandra M. Kellaher, K-E-L-L-A-H-E-R.

25   Q    Thank you.  Okay, now I know it's our natural

1  interaction to look at each other, but if you would, respond to

2  the questions by looking towards the jury.  Okay, Ms. Kellaher,

3  if you would just take a minute and introduce yourself to the

4  jury.  Tell them a little bit about yourself; just what you do

5  for a living and how you're involved -- well just stop right

6  there.  What do you do for a living?

7        A    Okay.  My name is Sandra Kellaher.  I'm an attorney

8  here in Hillsborough County.  I've practicing for over twenty

9  years and I was the chair of the law library board for 15 plus

10  years -- or 14 plus years.

11       Q    Okay, you said that you were the chair of the law

12  library board; which law library would that be?

13       A    For Hillsborough County law library.

14       Q    Okay, and do you know -- by chance know where that's

15  located, do you?

16       A    Yes, it's on Kennedy Boulevard.

17       Q    Okay, here in --

18       A    Suite 100.

19       Q    Okay, gotcha.

20       A    I can't remember the exact street address.

21       Q    Now were you employed in that capacity on the date of

22  July 1, 2003?

23       A    No, it's a voluntary thing.  I was appointed by a

24  governor, Governor Martinez.  I was never paid for anything I

25  did with the law library board.

1     Q   Oh, okay.  All right, well were you working in that

2  capacity as a volunteer --

3     A   Yes.

4     Q   -- on July 1, 2003?

5     A   Yes.

6     Q   And how about July 5, 2003?

7     A   Yes.

8     Q   Okay, now sometime in between those two dates, do you

9  remember coming into contact with someone who's named David

10  Pilver?

11     A   I called David Pilver on the telephone.

12     Q   Why did you call David Pilver?

13     A   I had -- one of my duties as the chair -- it's a law

14  library board, we're a county agency.  And it's a board that

15  oversees the function of the law library for lawyers and for the

16  public.  And -- but as the chair, if there was any complaints

17  about the law library or what books they were getting or if

18  there were any personnel problems or any problems within the

19  library, I handled them individually because it was impossible

20  to get the board together.  And we're under the Sunshine Act so

21  we can't just call each other and discuss things.  We have to

22  have a open, public meeting.  So during that time, I called Dave

23  because I had received a call from Director Norma Wise and she

24  said that --

25         MR. AMADOR:  Objection, hearsay.

1            MR. DUBOSE:  State of mind, Judge.

2            THE COURT:  Sustained.

3     Q    Well you received a call from Norma Wise?

4     A    Right.

5     Q    Okay, now what did you do after you received that phone

6 call?

7     A    I called David.

8     Q    Okay.

9     A    Based on the conversation that I had with the director.

10    Q    Okay, and what was the substance of that conversation,

11 without going into what was said?

12    A    There -- David is -- David Pilver is an employee of the

13 law library.  He has been for, gosh, eight or nine years at

14 least.  I can't remember the exact year that he came on board.

15 He was very anxious about -- he works alone at night, at the law

16 library.  We have only a staff of four.  It's a small library.

17 And so they break it up where sometimes they times overlap, but

18 Dave would be the one that would wind up in the evening then

19 close the library.  And he had been growing anxious about --

20           MR. AMADOR:  Objection, hearsay.

21           MR. DUBOSE:  (Indiscernible) statement, Judge.

22           THE COURT:  Overruled.

23           MS. KELLAHER:  Okay.

24           THE COURT:  Overruled.

25    A    He had been growing anxious because there had been some

1   conflict between him and Mr. Hunt.  And I called him for the

2   purpose of advising him that if he grew fearful about any

3   physical encounters, that I wanted him to -- wait, I have to

4   explain a little bit something.  There's a counter, like any

5   library has, where you check books out and, you know you can

6   talk to the people and take money for Xeroxing and whatnot.  And

7   there's a door located behind the counter at the front library.

8   And I told Dave that if any time that he thought there was going

9   to be any physical encounters -- it was going to go past, you

10  know, verbalization, that I wanted him to go in, behind the

11  door, and close the door and call security for his own

12  protection.  We don't have any -- anything to protect us.  We

13  used to be in -- our library used to be located in one of the

14  courthouses where we also had security from the courthouse

15  security.  But now that we were off the premises because of all

16  the new construction, the building of the new courthouse --

17  excuse me -- we don't have any security.  So I told Bill to -- I

18  mean, Bill -- David to call the courthouse security.  They also

19  give us security if we need it.

20      Q    Okay, now have you ever had an opportunity to meet Mr.

21  Hunt?

22      A    Yes, I have.  He -- we first contacted each other

23  telephonically and I don't know if he called me or I called him.

24  I think he called me.  My name and number was always given to

25  anybody that had a complaint against the law library.

1    Q    Okay, can you tell us what were the nature of these

2  interactions?

3    A    That was much prior -- months before --

4    Q    Mm-hmm?

5    A    -- July.  I can't remember exactly when it was.  I'd

6  say maybe six months because we had the conversation and then

7  eventually we had a special board meeting for Mr. Hunt, for the

8  issue that was before us.  Mr. Hunt called.  He had two

9  complaints; once he -- one, he said that the law library staff

10  wouldn't allow him to bring equipment into the library to copy -

11  - photocopy the books -- I think it was a scanner.  I don't know

12  much about that.  And the other one was at one point -- this may

13  have been later in time that he called me again -- was that he

14  said one night when Dave was giving him his books, he put the

15  books down -- you know, slammed them down on the counter in

16  front of him.

17    Q    Okay, and you actually personally spoke with Mr. Hunt -

18  -

19    A    Yes.

20    Q    -- about both of these?

21    A    Yes, I spoke with Mr. Hunt about it.  And then we had a

22  law library meeting that was properly noticed -- because it has

23  to be an open, public meeting.  And Mr. Hunt in fact did attend

24  our meeting.

25    Q    Okay, and after speaking with Mr. Hunt on these

1     A    During that period of time. He works at night and I'd

2 usually go to the library during the day or we would have board

3 meetings but we didn't hold them at the library, we held them at

4 another location in that building.

5     Q    Do you recall receiving a complaint dated July 3rd from

6 Mr. Hunt, complaining about Mr. Pilver?

7     A    I -- I wouldn't remember the date, but I -- if you tell

8 me the contents, I'll tell you if I remember it. I can't

9 honestly --

10     Q    Would looking at a copy of it refresh your

11 recollection?

12     A    Yeah.

13     MR. AMADOR: May I approach?

14     THE COURT: Sure.

15     A    I can't remember if it's the same letter I got. No,

16 I've never seen this before.

17     Q    Okay, have you seen any other complaint?

18     A    There was a letter from Mr. Hunt that I received before

19 -- about the time we had our telephone conversation.

20     Q    Was that complaining about Mr. Pilver?

21     A    No, I think it was more about the -- the scanner.

22     Q    The copier?

23     A    Yeah, the -- oh, is it a copier? Okay, the copier and

24 also about maybe slamming down the books.

25     Q    Are you aware of any other complaints that Mr. Hunt

1  made about David Pilver?

2      A    No.

3      Q    Okay, now when -- yes, ma'am?

4      A    Mr. Ginsberg was another member on the board.  It looks

5  like it went to Mr. Ginsberg.

6      Q    Okay, thank you.

7      A    Okay.

8      Q    Now you said -- you said that you spoke with Mr. Pilver

9  in July of 2003; when was that?

10     A    I couldn't give you an exact date.

11     Q    Okay.

12     A    I don't have any recollection of that.

13     Q    Do you know if it was before July 5, 2003?

14     A    I know it was before the incident that we're here for -

15 -

16     Q    Okay.

17     A    -- because I told him if he needed to call security --

18 the director asked me specifically if he could.

19     Q    So what you told him was that if he felt that he was in

20 danger -- in physical danger, that he should go into the room

21 and call security?

22     A    Yes.

23     Q    That's what you told him?

24     A    Yes.

25     Q    Did you tell him anything else?

1    A    I don't know what about.

2    Q    Well, I'm asking you?

3    A    No -- No, I just discussed -- he told me that he was,

4 you know, kind of anxious about coming to work at night by

5 himself.  And we couldn't put another staff member -- I actually

6 suggested in the beginning to the director, "Let's get another

7 staff member so that we won't encounter a problem here," and we

8 couldn't do it because our staff is so limited in size.  And

9 with their schedules, we couldn't afford to have two people at

10 night.

11    Q    Well --

12    A    So that's when I told Dave, if he needed to, if he was

13 afraid then I didn't want him to be in danger.

14    Q    Well, Ms. Kellaher, if -- did that mean that if Mr. --

15 you're giving this instruction to Mr. Pilver; correct?  So does

16 that mean that if Mr. Hunt would have come into the law library,

17 gone to a cubicle, minded his own business, did research, that

18 he should be kicked out of the law library?

19    A    No.

20         MR. AMADOR:  Nothing --

21    A    It was -- all right.

22         MR. AMADOR:  Nothing further.

23         THE COURT:  Okay, any redirect?

24         MR. DUBOSE:  (There was no audible answer.)

25         THE COURT:  Are you going to ask this witness any

1    questions?

2         MR. DUBOSE:  Could I just have one moment, please?

3         THE COURT:  All right, well --

4         MR. DUBOSE:  Briefly, Judge.

5                    **REDIRECT EXAMINATION**

6    BY MR. DUBOSE:

7    Q    Ms. Kellaher, when you spoke with Mr. Pilver, did you

8    get the impression that he indeed did have fear?

9         MR. AMADOR:  Objection, relevance.

10        THE COURT:  Overruled.

11   A    Yes.

12   Q    That was your impression?

13   A    And I told him to use good common sense --

14   Q    Mm-hmm?

15   A    -- before he made any phone calls.

16   Q    Okay, but your impression from him was that he felt

17   threatened?

18   A    Yes.

19   Q    Okay.

20        MR. DUBOSE:  Nothing further, Judge.

21        THE COURT:  You want to ask her anything else?

22   MR. AMADOR:  No.

23        THE COURT:  Okay.  Thank you.

24        MS. KELLAHER:  Thank you, Your Honor.

25        THE COURT:  You may be excused.  Any other witnesses

from the State?

    MS. HALE:  Yes, Your Honor.  The State would call

Officer Hathcox.

    THE COURT:  Okay.  Deputy Dixie, would you get Officer

Hathcox to come in, please?  Okay, raise your right hand.

Do you swear to tell the truth, the whole truth, and

nothing but the truth so help you God?

    OFFICER HATHCOX:  Yes, I do.

    THE COURT:  Okay, have a seat here.  You can adjust the

mic. if you need to, make sure it gets picked up.  That's

how we record things in here.  We don't have a

stenographer.

**OFFICER CHARLES HATHCOX**

having been duly sworn was examined and testified as follows.

**DIRECT EXAMINATION**

BY MS. HALE:

    Q    Good afternoon, Officer.

    A    Good afternoon.

    Q    Would you please say your name and spell your last name

for the record, please?

    A    Officer Charles Hathcox, H-A-T-H-C-O-X.

    Q    And Officer Hathcox, who are you employed with?

    A    With the Tampa Police Department.

    Q    How long have you been employed with the Tampa Police

Department?

1     A     Two and a half years.

2     Q     On July 5, 2003, were you on duty with the Tampa Police

3 Department?

4     A     Yes.

5     Q     And at some point on July 5, 2003, did you come into

6 contact with someone later known to you as Dennis Hunt?

7     A     Yes.

8     Q     And do you see Mr. Hunt in the courtroom today?

9     A     Yes, I do.

10     Q     Can you identify him for me?

11     A     He's wearing a blue jacket and a white shirt

12 underneath.

13     Q     Okay.

14     A     Wearing glasses.

15        MS. HALE: Your Honor, may the reflect that the witness

16     has identified the defendant?

17        THE COURT: Yes.

18     Q     And you came into contact with Mr. Hunt in Hillsborough

19 County?

20     A     Yes.

21     Q     What brought you into contact with Mr. Hunt on July

22 5th?

23     A     On that date, I was dispatched to the James Lunsford

24 library at 501 East Kennedy, reference someone trespassing.

25     Q     Okay, so you get to the law library?

1    A    Correct.

2    Q    What happened when you got there?

3    A    Upon my arrival, I met with the librarian, Mr. Pilver -
4  - David Pilver and he informed me that he had someone in the
5  library that causing a disturbance a few days prior and he did
6  not want to approach this individual; that he feared that he
7  would become verbally abusive towards him and he wanted him
8  trespassed from the property.

9    Q    Once Mr. Pilver said that, did you approach the
10  defendant?

11    A    Yes, Mr. Pilver and I walked over to the defendant and
12  the defendant was sitting at a table.  And Mr. Pilver, in my
13  presence, advised the defendant that he was no longer welcome in
14  the library and that he would have to leave.

15    Q    Okay, and once Mr. Pilver advised the defendant that he
16  was no longer welcome, that he should leave, what did Mr. --
17  what -- what did the defendant do?

18    A    The defendant didn't leave.  He said he was going to
19  stay till 5:00, which was closing time, because he was working
20  on a case.

21    Q    At some point, did you tell the defendant that he
22  needed to leave?

23    A    Yes, after he was trespassed by Mr. Pilver and he
24  refused to leave, I advised the defendant -- I told him, I said,
25  "Since you've been trespassed in my presence, you need to leave

1  the library or you're subject to arrest."

2      Q      And when you told him that, what did he say?

3      A      When I told him that, he threatened to sue the Tampa

4  Police Department and sue the library if he was arrested.  And

5  he refused to leave the library.  And I told him numerous times

6  that he would be arrested if he did not leave.

7      Q      About how many times did you tell him that he would be

8  arrested if he -- if he did not leave?

9      A      Probably two or three times.

10      Q      So at what point did you decide to escort the defendant

11  out of the library?

12      A      When I saw I was getting nowhere with him, that I

13  couldn't get anywhere with him to get his cooperation just to

14  leave the library without him being arrested, I went ahead and

15  took him into custody and escorted him out of the library.

16      Q      Okay.

17          MS. HALE:  Your Honor, may I have a moment?

18          THE COURT:  All right.

19          MS. HALE:  Your Honor, the State will pass this

20      witness.

21          THE COURT:  Okay, cross examination?

22                     **CROSS EXAMINATION**

23  BY MR. AMADOR:

24      Q      Officer, when Mr. Hunt was first told that he needed to

25  leave, he started packing up his things; correct?

1    A    I don't remember.

2    Q    Okay, do you remember him being belligerent towards

3 you?

4    A    No.

5    Q    Do you recall being informed that that day he did

6 anything belligerent toward anyone?

7    A    No.

8    Q    Did Mr. Hunt refuse, in the sense of, you know,

9 physically say "Get off of me," or did -- when you told him he

10 needed to go with you, he went with you to the patrol car?

11    A    Right.

12    Q    And you didn't have to drag him out?

13    A    No, I didn't have to drag him out.

14    Q    He wasn't kicking and screaming?

15    A    No.

16         MR. AMADOR:  Nothing further.

17         THE COURT:  Okay, any necessary redirect?

18         MS. HALE:  No, Your Honor.

19         THE COURT:  Okay, thank you.

20         OFFICER HATHCOX:  Thank you.

21         THE COURT:  You can step down.  Call your next witness.

22         MR. DUBOSE:  Your Honor, at this time the State rests.

23         THE COURT:  All right, the State rests.  This is a good

24    time to take a quick break.  So we'll ask you to go out in

25    the hall.  It's a good time to use the restroom or get a

1   drink. We've only been working here less than an hour, but
2   we need to discuss some matters outside of your presence.
3 (The Jury exited the courtroom.)
4       THE COURT: Defense have a motion?
5       MR. AMADOR: Yes, Judge. I'd move for a judgement of
6   acquittal. The State has failed to establish a prima facie
7   case.
8       THE COURT: Why don't you -- yeah, say for the record
9   the basis of it.
10      MR. AMADOR: Well, my basis is that they were -- when
11  the issued a trespass warning on Mr. Hunt on a day that he
12  did nothing wrong, his right is -- First Amendment right to
13  be in the library was violated. And on that basis, this
14  Court should grant the judgement of acquittal.
15      Secondly, even if the Court doesn't find that it's
16  because he didn't do anything wrong on that particular
17  date, the Court is going to take into account what occurred
18  on July 1 as a basis for the trespass warning. The
19  evidence here regarding authority to trespass came from the
20  witness stand, from the witness Kellaher, and when I asked
21  her that if what she meant was if Mr. Hunt came in and
22  minded his own business, was he supposed to be kicked out,
23  and she said, "No." I think it's -- clearer than that, we
24  can't any testimony. And based on that, this Court should
25  grant the judgement of acquittal.

THE COURT: All right, but that's a conflict in the evidence because the other guy on -- the librarian said that he had the authority. I agree. I mean, it's a -- they said two different things. But -- as I'm required to do pursuant to the Florida rules of criminal procedure, view the light in the -- view the evidence in the most favorable light to the State. At this point, the jury could choose to believe the librarian and feel that the -- what Ms. Kellaher was -- you know --

MR. AMADOR: The one that's giving the authority?

THE COURT: Yeah, that means -- the jury could -- the jury could believe she forgot, she was confused. I mean, I've got to view the evidence most favorable to the State on that. As to the first point, I understand the legal argument about nothing being done on the day that he was trespassed and that's -- pursuant to my prior rulings on this, I would deny that basis because I don't believe the law would require, including the First Amendment, someone to actually do something on the day in -- that they were trespassed. I think -- like I've said many times, if somebody came in and did something a week before that was really over the line, then they could trespass him when they came back a week later. Now whether what Mr. Hunt did that was so totally over the line, that's really for the jury to call.

1     MR. AMADOR:   Judge --

2     THE COURT:   Not me.

3     MR. AMADOR:   I'm sorry, Judge.

4     THE COURT:   Yeah, go ahead.

5     MR. AMADOR:   If I can please put a couple of citations

6     on the record?

7     THE COURT:   Yeah, go right ahead.

8     MR. AMADOR:   I'm making my motion based on Article I,

9     section 4, 5, and 9 of the Florida Constitution and the

10    First Amendment to the Constitution of the United States.

11    Wood v. State, 2003 Westlaw, 1955433, which is a Florida

12    Circuit Court case.   Brinkmeier v. City of Freeport, 1993

13    Westlaw, 248201, which is the Northern District of Illinois

14    case.   In addition, I would cite Dugan(ph) v. City of

15    Owaso(ph), 206 Fed. 3d, 711, it is a 6th Circuit case.   And

16    I would argue that -- that these cases certainly stand for

17    the proposition that the library -- that the State has not

18    established that the library acted reasonably when it

19    trespassed Mr. Hunt on July 5, 2003.

20    THE COURT:   Okay.

21    MR. AMADOR:   And based on that, I'm going to ask that

22    the Court -- I'm basing my objections or my motion on the

23    cases I've just sighted, but my third reason for asking for

24    a motion for judgement of acquittal is that, looking at the

25    light -- at the evidence in the light most favorable to the

1    State as a matter of law, the law library towit Mr. Pilver

2    did not act reasonably when he trespassed Mr. Hunt on the

3    day -- on July 5, 2003.

4        THE COURT:  Okay, as to the legal authorities you've

5    cited; I've read all of them a couple of different times

6    and I've also found some other cases that I have put in my

7    order that I thought also beared on the question.  So

8    denied on that basis.  And that last point that you just

9    made about whether he acted reasonably; that's denied

10   because Mr. Pilver said at one point, quote, "I thought he

11   was going to attack me right there and then."  I think a

12   reasonable -- a jury could find, in the light most

13   favorable to the State, that that was a reasonable basis to

14   trespass him out of the library on a later date.  Whether -

15   - whether they will find that or not, I don't know.  But

16   viewing the light most favorable to the State, the motion

17   is denied.  Okay, any reason not to go right -- right into

18   your case?  You want to take a break or --

19       MR. AMADOR:  No, we're good to go.

20       THE COURT:  Okay.

21       MR. DUBOSE:  Judge, if we may, we have a need to have a

22   charge conference sometime because I know that there's at

23   least something that Mr. Amador wanted me to amend.

24       THE COURT:  Yeah, we'll do that.  We'll do that.  I

25   have the -- this trespass jury instruction up on my

1    computer. I'll handle that. Is there something with the

2    rest of the instructions?

3         MR. AMADOR: It's the verdict form, I think, is the --

4         THE COURT: I have a verdict form up, too.

5         MR. AMADOR: Okay.

6         THE COURT: So what I think we'll do is we'll do the

7    Defense case, then we'll dismiss the jury for a little

8    lengthier break and we'll get the verdict form and the jury

9    instructions in order. Just make sure, Mr. Dubose, you

10   have all the other boiler plate stuff on --

11        MR. DUBOSE: Judge, I have it on -- on my computer.

12        THE COURT: Okay.

13        MR. DUBOSE: You know, it's not up right now, but it

14   can be, Your Honor. I've done (indiscernible).

15        THE COURT: Okay, all right. So let's bring the jury

16   back in and when they bring the jury in -- did you say

17   "State rests" already? Did you say that?

18        MR. DUBOSE: Yes, we did.

19        THE COURT: Okay, so I'll just say "Mr. Amador, call

20   your first witness." By the way, are there any witnesses

21   besides Mr. Hunt?

22        MR. AMADOR: No, sir. No.

23        THE COURT: Okay, all right.

24  (The Jury entered the courtroom.)

25        THE COURT: All right, have a seat everyone. Mr.

1    Amador, call your first witness, please.

2         MR. AMADOR:  Defense calls Dennis Hunt.

3         THE COURT:  Okay.  Mr. Hunt, come up here.  Have a seat

4    and get the mic. adjusted so you get picked up on the --

5    the recording we're making.

6         MR. AMADOR:  Judge, could we approach a second?

7         THE COURT:  Sure.

8  (There was a bench conference as follows.)

9         MR. AMADOR:  Do you want (indiscernible)?

10        THE COURT:  Let's see -- let's see what it looks like.

11        MR. AMADOR:  It has the date (indiscernible).

12        THE COURT:  Why don't we just put another sticker over

13   it?  Do you need these (indiscernible)?  Yeah, I will.  I

14   see.  The stickers on these -- new stickers with the -- is

15   this 1 and 2?

16        MR. AMADOR:  Yeah.  I mean, that's fine.  This one's 1,

17   I think.  And 2.

18        THE COURT:  1 and 2.

19        CLERK:  (Indiscernible)?

20        THE COURT:  Yeah, that's fine.

21  (The bench conference was concluded.)

22        THE COURT:  Okay.  Mr. Hunt, raise your right hand. Do

23   you swear to tell the truth, the whole truth, and nothing

24   but the truth so help you God?

25        MR. HUNT:  Yes, I do.

1    THE COURT: Okay, have a seat right there. And as soon

2    as your ready, your attorney will ask you some questions.

3                              **DENNIS HUNT**

4    having been duly sworn was examined and testified as follows.

5                         **DIRECT EXAMINATION**

6    BY MR. AMADOR:

7    Q    Could you state your full name?

8    A    Dennis B. Hunt.

9    Q    Mr. Hunt, do you recall being at the law library a

10   couple of years ago?

11   A    Yes.

12   Q    Why were you there?

13   A    I was doing legal research in preparation for a civil

14   trial that I had before the Court here in Hillsborough County.

15   Q    And how long had you been going, before the date that

16   you -- that the officer escorted you out, how long had you been

17   going to the law library in Hillsborough County?

18   A    For -- for nearly a year. One -- for nearly one year.

19   Q    Okay, and during that year, did you encounter Mr.

20   Pilver?

21   A    Oh, yes. He was there many times in there during the

22   evening hours and sometimes on the weekends.

23   Q    Okay, and did you have any complaints about Mr. Pilver?

24   A    Well, my complaints started after the issue of the --

25   my brining in the copier.

1    Q    Why did you bring in a copier?

2    A    Well, I didn't have the funds to make copies at twenty

3 cents a page. It became very costly for me and so I had my own

4 copy device and paper and supplies and thought that I would do -

5 - make my own copies.

6    Q    Okay, and were you told at some point that you could

7 not?

8    A    Yes, Mr. Pilver indicated to me that I could not do

9 that. I asked if the -- for a copy of a policy, which he could

10 not produce. But I did abide by that -- by his indicating to me

11 that I can't do that.

12    Q    Had you had any problems with Mr. Pilver before that

13 time?

14    A    Not really, other than -- I wouldn't say that he's the

15 most people-oriented person. You know, he's kind of cold and

16 just not, you know, very friendly.

17    Q    When did you -- did you make a complaint against him?

18    A    Yes, I made several complaints.

19    Q    Why?

20    A    Well, he -- he became kind of abusive towards me.

21    Q    How so?

22    A    Disrespectful. He was handing me books in a very

23 aggressive manner, which -- high up like this, which I had to

24 reach up like this to -- to grab the books and they're big books

25 -- big binder books and they're quite heavy. And I was having

1    shoulder pains and -- from -- from doing that.  And I made a

2    complaint to the library director in reference to that.  I did

3    complain about the copier -- also not being able to bring in a

4    copier.

5         Q    Were you eventually allowed to bring in a copier?

6         A    Yes.  The board of directors were advised by the county

7    attorneys -- Hillsborough County attorneys that I had the legal

8    right to make my own copies pursuant to Florida law.

9         Q    Okay, and did you begin to make your own copies?

10        A    Yes, I -- I actually had to wait about a month and a

11   half before I got board approval and in fact, that was a

12   violation of state law by preventing me from doing that a month

13   and a --

14             MS. HALE:  Objection, Your Honor.  Hearsay.

15             THE COURT:  Overruled.

16        Q    Finish your response?

17        A    It was in fact violating state law because as they were

18   advised --

19             MS. HALE:  Objection, Your Honor.

20             THE COURT:  Overruled.

21        A    -- by the county attorneys that I had the right to do

22   so and I had to wait a month and a half before I could start

23   using my copier.

24        Q    And when you got that approval, you decided to use your

25   copier at the law library?

1    A    Yes.

2    Q    Now do you recall the first time you complained about

3 Mr. Pilver?

4    A    It started with -- with the copier issue.

5    Q    Do you know when that was?

6    A    It was, I believe, April 30th.

7    Q    Okay, do you recall when the board gave you approval?

8    A    It was mid-June.

9    Q    Of what year?

10    A    2003.

11    Q    So a few weeks before this incident occurred?

12    A    Yes.

13    Q    Had you complained by letter to the law library

14 concerning Mr. Pilver's behavior towards you?

15    A    Yes, I had.  I also made verbal complaints to the

16 library director.

17    Q    Did you make a complaint about the day, July 1, 2003?

18    A    I most certainly did, yes.

19    Q    And what was that complaint?

20    A    It was a complaint of the aggressiveness of Mr. Pilver

21 towards me and accusations that I was refusing to leave the

22 library after closing time.

23    Q    Could you tell the jury, when you were there at night,

24 what your experience was concerning closing time?

25    A    Well normally -- or my experience was that Mr. Pilver

1  gave an announcement over the PA system at 15 minutes prior to

2  closing and then at five minutes prior to closing and he

3  consistently was doing that every night.  And on this particular

4  evening --

5      Q    When you say "this particular evening," what evening

6  are you speaking of?

7      A    July 1, 2003.

8      Q    Okay, was something different that day?

9      A    Well he gave a 15 minute announcement prior to closing

10  and -- but he did not give a five minute announcement.

11     Q    Okay, and what did you do?  Did you have a watch?

12     A    I did not have a watch at that time.  There's only one

13  clock in the library and that's up front of the library and I am

14  usually work -- had a work station by the copiers, in a cubicle.

15  And I had gotten into a conversation with another patron who was

16  using -- finishing up some copies on the -- the library copy

17  machines.  It in fact was an attorney patron.

18     Q    Now you were -- you were in the copy -- in the section

19  where the copiers are, but you were using your own copier?

20     A    That's correct.

21     Q    On July 1, 2003, after the 15 minute announcement is

22  made, what happened?

23     A    Well I was -- we were discussing the library and the

24  usage of the library, myself and this other patron.  And we

25  concluded our conversation and he strolled over to the -- around

1  to the bulletin board and was reading the bulletin board in the

2  back of the library.  And I kind of felt that there should be a

3  five minute announcement, time enough had passed.  I said, "It's

4  strange, I haven't heard the five minute announcement.  I better

5  go check the clock and see what time it is."  And so I started

6  walking up towards the front of the library to check the clock

7  and Mr. Pilver was passing by me --

8     Q  And what did he do?

9     A  He was going -- he walked back to the bulletin board

10  and asked if he could assist the attorney patron to check out

11  because they have a counter -- copy counter.

12     Q  Did he say anything to you when he did -- before he

13  went to the attorney patron?

14     A  No.

15       MR. DUBOSE:  Objection, Your Honor.  Hearsay.

16     A  No, he did not.

17       THE COURT:  Hold it.  Hold it, Mr. Hunt.  Let me -- I

18     haven't ruled on that yet.

19  (There was a bench conference as follows.)

20       MR. AMADOR:  (Indiscernible).

21       THE COURT:  Overruled.

22  (The bench conference was concluded.)

23     Q  Did Mr. Pilver say anything to you when he passed you

24  as he was going to the attorney patron?

25     A  No, he did not.

1     Q    Okay, where did -- did you at some point see what time
2  it was?

3     A    Yes, I looked at the clock shortly -- right after I
4  passed him, I came in view of the clock and saw the time.

5     Q    And what time was it?

6     A    It was, like, two minutes before 8:00.

7     Q    And what did you do?

8     A    I immediately turned around, went to my cubicle, and
9  started packing up my copy machine and case files.

10     Q    Mr. Hunt, could you explain to the jury what you would
11  bring into the law library?

12     A    Yes, it was a -- an HP fax/copier, all-in-one machine.
13  And I had a couple of brief cases -- soft brief cases; one that
14  I had all my case files in and another I carried the copy
15  supplies in.  I had a 500 pack of paper and some ink cartridges
16  and the electric cord to plug it in.  And I also -- on that
17  particular -- let's see, this was July of --

18     Q    1st?

19     A    Oh, on July 1st?  Okay, and that -- and that's what I
20  had on that day.  I had the copy machine and I had my case files
21  and I had my copy supplies.  And I had a little luggage cart
22  that I could set down on -- the copier down on and strap it on
23  and my two cases on top of it and bungee cord them on it, so I
24  could just wheel it out.

25     Q    And was that what you were attempting to do?

1    A    On -- on -- when I was approached by Mr. --

2    Q    Yes?

3    A    -- Mr. Pilver?  Yes.  I was just finishing up.  He had

4    helped this attorney patron out and escorted him up to the front

5    desk and helped him out.  And I was just finishing up bungee

6    cording my material -- case material on top of the copier on my

7    luggage cart.

8    Q    And what did Mr. Pilver tell you?

9    A    Well he was very -- came very aggressively towards me

10   and -- and his tone was -- was very aggressive and you know,

11   "Mr. Hunt, what are you doing in the library after closing

12   time?"  And I -- I looked up and I says, "Well you didn't give a

13   five minute announcement."  He says, "Well I don't have to give

14   any five minute announcement."

15        MR. DUBOSE:  Objection, Your Honor.  Hearsay.

16        THE COURT:  Overruled.

17   A    He says, "As a matter of fact, I don't have to give any

18   announcement."  And, you know, it just -- he -- he didn't make

19   any sense to me.  You know, I --

20   Q    Did you make any response to him?

21   A    I said to him -- I said to him, "Well you just saw me

22   walk past you" --

23        MR. DUBOSE:  Objection, Your Honor.

24   A    -- "to check the time" --

25        MR. DUBOSE:  Hearsay.

1    THE COURT:  Overruled.  Go ahead and answer that.

2    A    I said to him, "Well you just saw me walk past you to

3    check the time up front."  And --

4    Q    Did he not make any response to that?

5    A    He said, "Well, it doesn't matter.  It's after closing

6    time and you're trespassing."

7    Q    And what did you do?

8    A    I just -- I -- at that point, I just kind of -- well,

9    so I just finished my bungee cord and I -- I told him, I says --

10   and I motioned with my hand, I says, "Now move aside.  You're

11   blocking my egress," because he was standing in a very

12   aggressive manner during this whole time.  I says, "Now move

13   aside.  You're blocking my egress."

14   Q    Now Mr. Hunt, you're moving your hand and moving it in

15   front of you like --

16   A    To motion him to move aside.  Not -- not -- I never

17   touched him.  It wasn't -- it was just, "Now move aside.  You're

18   blocking my" -- because he started to accuse me of trespassing.

19   Q    Did you -- did you leave?

20   A    Yes.

21   Q    Okay.

22   A    Yes.

23   Q    Did you tell Mr. Pilver -- well, did you use the words

24   "God dammit?"

25   A    No.

1    Q    Did you use -- I believe that he said something to the

2 effect of, "You don't know who you're messing with," or "You

3 don't fucking know who you're messing with;" --

4    A    No.

5    Q    -- did you use those words?

6    A    No, I did not.

7    Q    Did you threaten him in any way?

8    A    No.  No, he was -- he was very aggressive and

9 threatening towards me.

10    Q    Okay, and you -- once you observed that you were -- it

11 was closing time, you packed your equipment?

12    A    Yeah.

13    Q    And you left?

14    A    Yes.

15    Q    Now Mr. Hunt, did you return to the law library after

16 July 1?

17    A    Yes, I did.

18    Q    When?

19    A    Well I was there on July 3rd, the evening before the

20 4th.

21    Q    Were you asked to leave that day?

22    A    No.

23    Q    Okay, did you go at any other day?

24    A    I then on -- after the 4th, on July 5th, about 3:00 I

25 arrived at the library again.

1    Q    Okay, and did you even -- did you speak with Mr. Pilver

2  on July 5, 2003?

3    A    Never even spoke to him, no.

4    Q    Okay, did you do anything towards him on July 5, --

5    A    No.

6    Q    -- 2003?

7    A    No, I -- I had made a decision just to ignore him

8  because he was being a problem and my work was too important to

9  me.

10    Q    Did -- did you write a letter to the board concerning

11  Mr. Pilver's conduct on July 1, 2003?

12    A    Yes, I did.  And I explained how -- how he -- he kept

13  repeating to me, after I told him --

14          MR. DUBOSE:  Objection, Your Honor.  Non-responsive.

15          THE COURT:  Ask --

16    Q    What was your complaint?

17    A    Excuse me?

18    Q    Your complaint about his conduct on July 1, 2003?

19    A    Well I complained of his aggressiveness and he was

20  acting in a -- in a -- in a readiness for some type of physical

21  confrontation.  And also --

22    Q    Did you give him reason to act that way?

23    A    Well apparently he was upset with the complaints I had

24  been making about him.

25    Q    Okay, but did you do anything -- did you act aggressive

1  towards to him, did you put your finger in his face?

2      A    No.

3      Q    Did you threaten him in any way?

4      A    I tried to reason with him.  I said, "Well, you know,

5  you didn't give a five minute announcement.  You always give a

6  five minute announcement, you know."  And how I -- "I just

7  walked past you.  You saw me just walk past you and check the

8  time."  And he kept on accusing me of trespassing on the way

9  out.  He kept on saying to me, "Mr. Hunt" -- and he said this

10 over and over again, "Mr. Hunt, are you refusing to leave the

11 law library?"

12     Q    And what were you doing when he was saying that?

13     A    I'm walking out.  I'm walking from the back of the

14 library towards the front of the library to exit.  And he keeps

15 repeating that all -- over and over again to me.

16     Q    Is it fair to say that Mr. Pilver doesn't like you?

17     A    That -- it's -- yes, it's more than fair to say that.

18          MR. AMADOR:  Nothing further.

19     A    That he doesn't care for me.

20          THE COURT:  All right, cross examination?

21          MS. HALE:  Yes, Your Honor.

22                    **CROSS EXAMINATION**

23 BY MS. HALE:

24     Q    Good afternoon, sir.

25     A    Good afternoon.

1    Q    So you're at the law library on the night of July --

2    July 1st, researching a lawsuit you had going; correct?

3    A    That's correct.

4    Q    It was a lawsuit that you were filing?

5    A    It was -- it was already -- it had already been filed -

6    -

7    Q    Okay.

8    A    -- in the court, yes.

9    Q    And so is this the only lawsuit that you filed; the one

10   that you were in the law library for that night?

11        MR. AMADOR:  Objection, relevance.

12        THE COURT:  Overruled, but see where this goes because

13        --

14   A    At that particular time, that was -- yes, I only had

15   that one lawsuit.  It was a civil -- it was actually a small

16   claims.

17   Q    Okay, and since then you've filed some more?

18        MR. AMADOR:  Objection, relevance.

19   (There was a bench conference as follows.)

20        THE COURT:  What's the relevance?

21        MS. HALE:  Your Honor, I think that this goes to -- I

22        think that this goes to he -- I don't want to call him a

23        troublemaker, but I think it goes to his actions and

24        (indiscernible) and it's (indiscernible) a pattern of

25        behavior.

1    MR. AMADOR:   And --

2    THE COURT:   I know why you want to ask the question,

3    but I don't think it's relevant.

4  (The bench conference was concluded.)

5    Q    Okay, so on July 1st, you were at the library working

6  on a lawsuit.  And you mentioned on direct testimony that you

7  had come into contact previously with Mr. -- with Mr. Pilver;

8  correct?

9    A    Yes.

10   Q    And before July 1st, you had made complaints about him;

11 correct?

12   A    Numerous times, yes.

13   Q    Numerous times?  So on the night of July 1st, when you

14 heard the 15 minute announcement and you were doing whatever it

15 was that you were doing with the attorney.  When he came over to

16 you, according to you, you didn't know why he was approaching

17 you at that point?

18   A    I knew because he said to me -- he walked up on me and

19 "Mr. Hunt, what are you doing in the library after closing

20 time?"

21   Q    Okay, so when he walked up on you and said, "Mr. Hunt,

22 what are you doing here past closing time," do you disagree that

23 it was past closing time?  Are you saying that you should have

24 still been in there; that it wasn't 8:00?

25   A    No, I'm not saying that.

1    Q    Okay, so when he walked up on you and said, "Mr. Hunt,

2  what are you doing here past closing time," it was past closing

3  time; correct?

4    A    I would say -- I had -- I had -- I would say it was

5  around 8:00.  I know when I exited it was, like, two or three

6  minutes after 8:00.  So I gather it was maybe 8:00 or 8:01,

7  somewheres around there.

8    Q    But it wasn't the 8:15 that Mr. Pilver contends?

9    A    No.

10    Q    Okay, so on July 1st you had had some -- by that time,

11  you had had some interactions with Mr. Pilver.  Defense Counsel

12  asked you on direct examination, is it fair to say whether or

13  not Mr. Pilver liked you; is it fair to say, Mr. Hunt, that you

14  didn't like Mr. Pilver?

15    A    I don't think he was (indiscernible) he wants to watch

16  his television programs and don't want to be disturbed --

17    Q    Mr. Hunt, did you -- you didn't like Mr. Pilver on July

18  1st?

19        MR. AMADOR:  Objection, Judge.  I'd ask that the

20        witness be allowed to answer the question.

21        THE COURT:  Well, yes, he needs to answer the question

22        that was asked.  Why don't you ask the question again, --

23        MS. HALE:  Yes, Your Honor.

24        THE COURT:  -- so Mr. Hunt can answer the question.

25    Q    It's fair to say, Mr. Hunt, that you didn't like Mr.

1    Pilver; correct?

2        A    I had nothing against him personally.

3        Q    Okay, Mr. Pilver at some point had told you that you

4    couldn't bring your copy machine into the library; correct?

5        A    That's correct, yes.

6        Q    And at some point, you had made complaints that he held

7    the books up to high for you and it caused your shoulders to

8    have pain; correct?

9        A    That's correct.

10       Q    And, like you said, he -- you didn't consider him a

11   people person; correct?

12       A    Right.

13       Q    But you had no -- you had nothing against him?

14       A    Not him, personally.  You know, I don't even know the

15   person other than my experiences in the library.

16       Q    So let's -- turning your attention back to July 2nd --

17   July 1st.  Mr. Pilver walks up on you and he says, "Mr. Hunt,

18   what are you doing here, it's after closing time;" correct?

19   That's what you testified to?

20       A    Yes.

21       Q    Okay, and at that point, you tell him that he didn't

22   make a five minute announcement; correct?

23       A    I indicated to him that -- I said, "Well you didn't

24   make a five minute announcement."

25       Q    Okay, so because he didn't make a five minute

1 announcement, did that mean that you shouldn't leave the
2 library?

3     A    No, it's --

4     MR. AMADOR:  Objection, argumentative.

5     THE COURT:  Overruled.

6     A    It was an indication that -- why I was delayed in my
7 departure.

8     Q    When Mr. Pilver made the 15 minute announcement, you
9 said you were engaged in conversation with someone who's an
10 attorney and you all were taking care of some -- you all were
11 doing something else?

12     A    Well he came over and -- to finish up his copying and
13 he noticed me working on -- with my HP and --

14     Q    So -- let me just stop you.  So you all were engaged --

15     THE COURT:  Well, wait a minute.  Wait a minute.  Are
16     you finished answering that question, Mr. Hunt?

17     MR. HUNT:  No, I wasn't.

18     THE COURT:  Okay, go ahead.

19     A    Well he got interested in what I was doing there and he
20 -- he said, "Oh, well I didn't realize that we had a fax machine
21 here at the library."  And I says, "Well I'm not sure that they
22 do."  I says -- and I was telling him about my copy -- my own --
23 making my own copies and he was inquiring what I was, you know,
24 doing and we talked about the library and the usage of the
25 library.  And the obsolescence of the library without any

1    electronic look-ups and things of that sort.

2        Q    So you all were engaged in a conversation?

3        A    Yeah.

4        Q    And then was after Mr. Pilver had made the 15 minute

5    announcement?

6        A    Yeah.

7        Q    Okay, so you all talked for awhile and then you went

8    back to your study hole -- your cubby hole?

9        A    Well he -- when we finished up the conversation, he

10   kind of strolled over to the -- to the bulletin board and I -- I

11   said to myself, "Well, you know, it feels like as though there

12   should have been a five minute announcement.  It feels like" --

13   you know, because I was expecting --

14       THE COURT:  Wait a minute.  Hold on.  Hold on, Mr.

15       Hunt.  She asked you did you go back to your cubby hole

16       after this?

17       MR. HUNT:  I was always there.  I was always right

18       there.

19       THE COURT:  All right.

20       Q    Okay, okay.  So at some point, it felt longer than 15

21   minutes to you?  You said you noted to yourself, "Wait, there

22   should have been a five minute announcement?"  So it felt, at

23   some point, longer than the 15 minutes or about the 15 minutes?

24       A    Well -- it felt like ten minutes or more had passed.

25       Q    So you knew it was close to closing time, within a five

1  -- maybe about five minutes until closing?

2       A    Well, I went -- I went to check the time to see.

3       Q    So when -- when Mr. Pilver approached you, you said

4  that he approached you in an aggressive manner?

5       A    Mm-hmm.

6       Q    That he -- did you say he raised his voice?

7       A    Yeah, he was very belligerent, aggressive.

8       Q    He was very belligerent and aggressive?

9       A    Yeah.

10       Q    And at some point, you -- you asked him to move aside

11  with your hands; correct?

12       A    That's correct.

13       Q    But you never touched him?

14       A    That's correct.

15       Q    And all you did was say, "You're blocking my egress.

16  Please move out of the way?"

17       A    I said, "Now move aside," and I motioned like this

18  because he was -- I couldn't -- I couldn't exit.  When I

19  realized I wasn't getting anywhere's with him in trying to

20  reason with him and he was just being argumentative towards me,

21  then no matter what I said to him, he responded in a very

22  argumentative way and was accusing -- started accusing me of

23  trespassing.

24       Q    Okay, let me ask you this, Mr. --

25       A    So --

1    Q    -- Hunt, did you raise your voice at all?

2    A    No.

3    Q    So when Mr. Pilver comes to you in an aggressive

4 manner, this man who you had filed at least two complaints on, -

5 -

6    A    Yes.

7    Q    -- when he approached you in an aggressive manner, you

8 never raised your voice?

9    A    No.

10    Q    You never got angry with him?

11    A    No.  I tried to reason with him.

12    Q    You tried to reason with -- with Mr. Pilver?

13    A    Mm-hmm.

14    Q    And you asked him nicely to just move aside because he

15 was blocking your way?

16    A    Well I didn't say, "Well please move aside."  After not

17 getting anywhere's with him and realizing that my conversation

18 with him was going nowhere's, I finished my bungee cord and I

19 told him, "Now move aside."  Just like that.  "Now move aside.

20 You're blocking my egress."  I wanted to exit.

21    Q    So on that night, Mr. Pilver told you you were

22 trespassing?  He told you on July 1st, "It's time for you to

23 leave.  You're trespassing?"

24    A    He accused --

25    Q    Is that what your testimony is?

1      A      He accused me of trespassing, yes.

2      Q      Okay, so --

3      A      And then continuously -- and then he kept on asking me

4 -- kept on repeating to me over and over again, after I passed -

5 - after I told him, "Move aside," he moved aside. I then

6 started to exit. He kept repeating over and over again. "Mr.

7 Hunt, are you refusing to leave the law library?" And I'm --

8 I'm on my way out and he keeps on repeating that over and over

9 to me on my way out.

10      Q      Okay, so as you're leaving, he's asking you, "Are you

11 refusing to leave," as you're walking out; that's your

12 testimony?

13      A      Yes.

14      Q      Okay, and as you're leaving, he's telling you that

15 you're

16 trespassing?

17      A      No.

18      Q      When does -- when does he tell you that you're

19 trespassing or accuse you of trespassing?

20      A      I think -- I think I had indicated that to you when

21 after trying to reason with him about why I was delayed and not

22 getting a five minute announcement, my having to go up and check

23 the clock and he was witness to this, that I also told him, "You

24 know, it's obvious that I'm on my way out." That's the first

25 thing I said to him. "Well I think it's obvious I'm on my way

1 out." I'm a little bit lost on what exactly the question was
2 again?

3    Q    I'm trying to figure out if, as you were walking -- you
4 said it was obvious that you were walking out; you said earlier
5 on cross examination that as you were walking out, he was asking
6 you -- as you were walking out, "Are you refusing to leave?"
7 I'm trying to figure out if (indiscernible) you were leaving,
8 was that when he was telling you that you were trespassing?  At
9 what point --

10          MR. AMADOR:  Asked and asked -- answered.

11          THE COURT:  Overruled.

12    Q    At what point did Mr. Pilver did tell you that you were
13 trespassing?

14    A    He told -- he accused me of trespassing after my
15 indicating to him that he didn't make a five minute
16 announcement.  And he said that he didn't have to make any -- he
17 didn't have to make a five minute announcement and in fact he
18 didn't have to make any announcement.  And -- and it was at that
19 point that he accused me of trespassing.  He said, "You're
20 trespassing."

21    Q    Mr. Hunt, let me ask you a question and maybe -- I
22 apologize if it's rude.  About how tall are you?

23    A    I'm 5'8".

24    Q    About 5'8"?  About how much do you weigh?

25    A    I think around 200 pounds.

1     Q     Okay.

2     A     I'm a little heavier right now than -- I've actually

3 gained some weight since -- in the past two years.

4     Q     Okay, so you were, what, like plus or minus ten or so

5 about two years ago?

6     A     Yeah.

7     Q     Okay, so close to 200 pounds about two years ago?

8     A     Yeah.

9     Q     5'8", 200 pounds?

10    A     Yes.

11    Q     And it's your testimony that while all this was going

12 on, while Mr. Pilver was getting upset and agitated, you -- you

13 didn't get angry?

14    A     No.

15    Q     You didn't raise your voice?

16    A     No, I -- well, my -- I made all proper complaints

17 through the board and -- and they library director.  They were -

18 - I didn't confront Mr. Pilver directly on any of them.  I made

19 them properly through the channels that I should have.

20    Q     Okay, and so let me turn your attention now to July

21 5th.  So you show up at the library; correct, about 3:00?

22    A     Yes.

23    Q     And you're sitting there when, I guess, is it

24 Hillsborough County security approaches you and asks you to

25 leave?