1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENNIS HUNT,

    Plaintiff,
                      Case No. 8:07-cv-1168-T-30TBM
vs.

LAW LIBRARY BOARD,
a Board created by
Hillsborough County,
Florida,

NORMA J. WISE,
in her official capacity
as Director of the James L.
Lunsford Law Library, and
individually, and,

DAVID L. PILVER,
individually,

    Defendants.
_____/


DEPOSITION OF:    DENNIS HUNT

TAKEN BY:    Counsel for the Defendants

DATE:    November 26, 2008

TIME:    9:43 a.m. to 10:54 a.m.

PLACE:    Richard Lee Reporting
                Suite 2060
                100 North Tampa Street
                Tampa, Florida

REPORTED BY:    Kimberly Himes
                Notary Public
                State of Florida at Large

**RICHARD LEE REPORTING**
(813) 229-1588
email: rlr@richardleereporting.com

**TAMPA:**
100 North Tampa Street, Suite 2060
Tampa, Florida 33602

**ST. PETERSBURG:**
535 Central Avenue
St. Petersburg, Florida 33701

APPEARANCES:

    RYAN CHRISTOPHER RODEMS, ESQUIRE
    Barker, Rodems & Cook, P.A.
    Suite 2100
    400 North Ashley Drive
    Tampa, Florida  33602
        Appeared for Plaintiff;

    STEPHEN M. TODD, ESQUIRE
    Hillsborough County Attorney's Office
    Post Office Box 1110
    Tampa, Florida  33601-1110
        Appeared for Defendants.

ALSO PRESENT:

    Norma J. Wise
    David L. Pilver

**I N D E X**

**PAGE**

Examination by Mr. Todd      3

1    The deposition, upon oral examination, of

2  DENNIS HUNT, taken on the 26th day of November,

3  2008, at Richard Lee Reporting, Suite 2060, 100

4  North Tampa Street, Tampa, Florida, beginning at

5  9:43 a.m., before Kimberly Himes, Notary Public in

6  and for the State of Florida at Large.

7                   *  *  *  *  *  *

8                   DENNIS HUNT,

9  being first duly sworn to testify the truth, the

10  whole truth, and nothing but the truth, was examined

11  and testified as follows:

12                   EXAMINATION

13  BY MR. TODD:

14    Q    Well, good morning again, Mr. Hunt.  My

15  name is Stephen Todd.  I'm an attorney for the

16  Defendants in this case, and we're going to have an

17  opportunity to ask you some questions about your

18  lawsuit today.  Let's start with your name -- your

19  full name for the record, please?

20    A    Dennis Brice Hunt.

21    Q    Brice is with a Y?

22    A    No, it's with a -- B-r-i-c-e.

23    Q    Okay.  Thank you.

24         And what's your current address?

25    A    My address is 2319 Nantucket Drive, Sun

1  City Center, Florida 33573-8005.

2       Q     All right.  Thank you.

3       Have you ever had your deposition taken

4  before, Mr. Hunt?

5       A     No.  This is my first deposition.

6       Q     All right.  Well, let me go through some

7  of the basic ground rules.  You may have already

8  discussed them with your attorney, which leads to

9  the first ground rule, and that is don't reveal any

10 discussions that you -- you've had with your

11 lawyer.  Those are privileged, and your attorney

12 will make the appropriate objections, if -- if that

13 issue does come up.  Okay?

14      A     Okay.

15      Q     All right.  The second instruction is --

16 I don't think we're going to have a problem with

17 this, but I'll ask a question, and if you could give

18 your answer after I'm finished with my question,

19 I'll likewise attempt the best I can to wait for

20 your answer to conclude before I ask the next

21 question.  That way we have a very clean record of

22 what's being typed up.  Okay?

23      A     Okay.

24      Q     And, lastly, it's very important that you

25 enunciate an answer to a question.  "Uh-huh,

1    huh-uh," shaking of your head and answers of that

2    nature do not come across on a transcript.  So it's

3    important that you say, "Yes," "No," "Maybe," "I

4    don't know" -- whatever your answer is -- so that

5    it's very clear for the record.  Okay?

6         A    Yes.

7         Q    If you need a break -- I don't

8    contemplate us being here in a marathon session, but

9    if you do need one, that's always fair game.  Just

10   ask and we'll take a break.  Okay?

11        A    Okay.

12        Q    Thank you, sir.

13             Now, who have you talked to in

14   preparation for this deposition today?

15        A    My attorney, Chris Rodems.

16        Q    Anybody else?

17        A    No.

18        Q    And what have you reviewed in preparation

19   for this deposition?

20        A    The transcript of the trial -- the

21   criminal trial transcript.

22        Q    Would that be the Judge Nazaretian trial

23   or the Judge Barber trial?

24        A    The Judge Barber trial.

25        Q    Did you review the entire transcript in

1    preparation for the deposition today?

2         A     No.

3         Q     Which part did you review?

4         A     I reviewed the testimony.

5         Q     Whose testimony?

6         A     It would be my testimony, Ms. Kala Herr's

7    testimony, and -- those two I know I read.  I'm

8    wondering -- now, I must have -- I think Mr. Pilver

9    testified, so I must have -- must have -- I'm not

10   sure whether I read his testimony now or not.  I'm a

11   little unsure.

12        And then the police officer, I think,

13   testified, too, and I think I did read the police

14   officer.  Those are not as fresh in my mind as my

15   testimony and Kala Herr's.

16        Q     Okay.

17        A     But I believe I must have went through

18   them.

19        Q     All right.  Let's start with a little bit

20   of background, Mr. Hunt.  Where were you born?

21        A     I was born in the State of Connecticut.

22        Q     All right.  And when did you move out of

23   the State of Connecticut?

24        A     In the year 2000 -- or about 2000, or it

25   was around there.

1   Q    Okay.  Where is the last city you lived

2  in in Connecticut?

3   A    Newtown.

4   Q    And from there did you move to Florida?

5   A    Yes.

6   Q    Why did you move from Newtown,

7  Connecticut to Florida?

8   A    Climate.

9   Q    Okay.  About how old were you when you

10  moved in 2000?

11   A    45.

12   Q    45 years old.  Tell me a little bit about

13  your educational background.  What's the highest

14  level of education that you've achieved in life?

15   A    A four-year university degree,

16  bachelor's.

17   Q    Bachelor of Arts or Science?

18   A    Bachelor of Business Administration.

19   Q    Where did you get your degree?

20   A    Western Connecticut State University.

21   Q    Do you have any minors besides the

22  business administration degree?

23   A    It was a concentration in management

24  information systems.

25   Q    So you're -- would you characterize

1    yourself as a computer science expert?

2       A      That was my schooling, yes.

3       Q      Okay.

4       A      It wasn't specifically computer science,

5    but it was very close.  Management information

6    systems is very close to computer science, but that

7    is a different degree.

8       Q      All right.  Are you a qualified -- in

9    your view, a qualified computer programmer?

10      A      Yes.

11      Q      In what languages do you program?

12      A      Primarily the dBASE languages, database.

13      Q      Okay.  And are you one of the group of

14   people who would have a strong opinion one way or

15   the other about Microsoft products?

16      A      No.

17      Q      All right.  Do you have any other area of

18   expertise besides your management information system

19   background?

20      A      Professionally, I don't -- I wouldn't say

21   expertise, no.

22      Q      All right.

23      A      Just general business, you know, related

24   things.

25      Q      Now, prior to moving to Florida, did you

1   have any interest in legal research?

2       A    Not -- not in -- no.  No.

3       Q    When is the first time that you had an

4   interest in going to the library to do legal

5   research?

6       A    It was after I had lost title to an

7   automobile that I owned, and I wanted to recover the

8   value of the automobile.

9       Q    When did that happen?

10      A    It happened in the first year that I

11  moved here.  Sometime during the first year.  So

12  that would be around 2000.

13      Q    And what was your goal when you were

14  trying to do legal research?

15      A    My goal was to educate myself in the

16  legal process and procedures, and to enable myself

17  to file a claim against the correct parties.

18      Q    Were you successful in achieving your

19  goal?

20      A    Yes.

21      Q    How did you -- how did you fare?  Did you

22  get the vehicle back or the value of the vehicle?

23      A    I got the value of the vehicle.

24      Q    You did so without hiring an attorney?

25      A    Yes.

1    Q    All right.  Is Mr. Rodems the first

2  attorney you've ever hired?

3    A    I think so, yes.

4    Q    Now, when you did your legal research in

5  2000 or 2001, where did you do that research?

6    A    I did it at the James J. Lunsford Law

7  Library.  I believe it's on Kennedy Avenue here in

8  Tampa, Florida, Hillsborough County.

9    Q    How often did you go to the library to do

10  research for that project?

11    A    Two to four times a week, I'd say, about.

12  It varied.  At least a couple times a week, but

13  usually more.

14    Q    All right.  And in your experience

15  working at the law library in 2000, 2001, did you

16  seek the assistance of any of the staff members at

17  the library?

18    A    Yes.

19    Q    Do you remember if Mr. Pilver was one of

20  those people?

21    A    Yes.

22    Q    Okay.  What types of assistance would you

23  have requested of Mr. Pilver back in 2000, 2001?

24    A    Requesting material that was held behind

25  the desk, on the bookshelf behind the desk, manuals.

1    Procedure manuals.  Primarily Florida procedure

2    manuals.

3        Q     All right.  How would you characterize

4    the level of assistance that you received from

5    Mr. Pilver in 2000 and 2001?

6        A     I'm not sure that -- that those years are

7    correct.  I think you're mistaken on those years.

8    You're assuming another answer is -- an answer to a

9    different question is -- are those years.

10       Q     Well, let's back up a little bit just to

11   get it correct.  You testified that you first did

12   legal research at the Lunsford Library in around

13   2000, 2001.

14       A     Wait a minute.  I'm not sure that I said

15   during those years that I was -- did legal research

16   during those years.  That's what I mean.  I -- you

17   asked me when I had the difficulty with the car, and

18   I believe that was around 2000.

19            And I know I had been going to the

20   library for a couple years prior to the incident

21   that -- my being denied access, so -- but 2001.  I'm

22   not sure 2000 I was there.  I didn't immediately go

23   to the library, but I know I had been going for some

24   time, but I don't believe I went there in 2000.  I

25   may have stopped in just to view the -- because I

1    looked around town.

2    Q    All right.  So we'll say 2001 is when you

3    started going to the Lunsford Library.  Is that

4    correct?  Which would have been two years before the

5    July '03 incident.

6    A    No.  I think I was going -- I think it

7    had been about a year prior to the incident, so that

8    would be -- would make it 2002 when I was regularly

9    going to the library.  Now, I may have visited the

10   library prior to that, but in reference to legal

11   research regarding the car, specifically, it would

12   have been sometime a year -- within a year prior to

13   July of 2003.

14   Q    2002, basically, is when you would have

15   done the research about the car title at the

16   Lunsford Library?

17   A    From 2002 to 2003, yes.

18   Q    All right.  Now, prior to July of '03,

19   did you have occasion to do research regarding any

20   other subject at the Lunsford Library?

21   A    I'm not sure.  I may -- like I say, I may

22   have stopped in and browsed the library.

23   Q    All right.

24   A    You know, it's -- I don't recall a

25   specific instance.

1   Q    Did you have a custody or a family-law-

2   oriented issue that you addressed in the Tampa

3   courts prior to July of '03?

4   A    No.

5   Q    Okay.  So no family -- what I would

6   characterize as family-law issue of any kind prior

7   to July of 2003 that involved you?

8   A    In the Tampa court?

9   Q    In the Tampa court?

10  A    No.

11  Q    Did you ever have a custody issue that

12  involved you in any other court besides Tampa prior

13  to July of '03?

14  A    Yes.

15  Q    All right.  Where was that court?

16  A    Danbury, Connecticut.

17  Q    How do you spell the name of the town?

18  A    D-a-n-b-u-r-y.

19  Q    Okay.  Thank you.

20       Did that issue somehow involve the Tampa

21  courts in any way after you moved down here?

22  A    No.

23  Q    Did you ever have occasion to do legal

24  research at the Lunsford Library regarding that

25  issue that was being addressed in Danbury,

1    Connecticut?

2    A    No.

3    Q    All right.  Prior to your being

4 trespassed in July of '03 from the Lunsford Library,

5 did you ever research any other issue besides the

6 title -- vehicle title issue that you have

7 described?

8    A    No.

9    Q    All right.  In July of '03, you went to

10 the Lunsford Library, I presume, to do legal

11 research.  Correct?

12    A    Yes.

13    Q    All right.  And what were you -- what was

14 the subject matter of your research generally?

15    A    It was small claims, civil liability.

16 Something to do with condominium associations and

17 board of directors and the responsibility --

18 liability and responsibility --

19    Q    Were you --

20    A    -- of towing companies.  The -- all the

21 laws concerning that issue of towing.

22    Q    Did your condo association tow your

23 vehicle?

24    A    They had it towed, yes.

25    Q    What was the name of the condo

association?

    A    I believe the name is The Oaks Phase II Condominium Association.

    Q    What's the first name?  I'm sorry.

    A    The Oaks.

    Q    Oaks.

    A    Like the oak tree.  The Oaks Phase II Condominium Association.

    Q    And what was your goal in your legal research in July of '03?

    A    To enable myself to file a claim -- a small claims to recover the value of the vehicle that was towed off the condominium property.

    Q    Were you successful in achieving your goal?

    A    Yes.

    Q    So you got your -- the value of your vehicle from the condo association?

    A    No.  I got it from the insurer of the condominium association board of directors for wrongdoing.

    Q    Okay.  Were you gainfully employed in early July of 2003?

    A    No.

    Q    Were you unemployed at that time?

1    A    Yes.

2    Q    All right.  Did you have anything that

3    occupied your time during the days besides legal

4    research in early July of 2003?

5    A    Yes.

6    Q    And what was that?

7    A    I would visit the courthouse and sit in

8    the courtrooms.

9    Q    What types of cases would you find

10   interesting?

11   A    My interest was in civil cases, civil

12   liability.

13   Q    When did you first start doing the

14   observation of civil cases in the Hillsborough

15   courts?

16   A    That would be during the same period that

17   I went to the James J. Lunsford Law Library and

18   probably prior to my going to the Lunsford Library.

19   So it may be a couple years there.

20   Q    Is there a particular case that kind of

21   piqued your interest in watching civil trials a

22   couple years before the middle of '03?

23   A    No.

24   Q    What precipitated your interest in

25   watching civil trials?

1    A    I wanted to learn the court process and

2   procedures to be able to recover the value of my

3   car, and I became interested in law and the study of

4   law.

5    Q    Since July of '03, have you continued

6   with your interest in watching civil trials?

7    A    Yes, but not to the same degree.

8    Q    A little bit less than -- less frequently

9   than previously?

10    A    Yes.  Quite -- quite less frequently,

11   especially now that I have moved out of Tampa.

12    Q    Are you employed today?

13    A    No.

14    Q    When is the last time you have held

15   gainful employment?

16    A    June of 2008.

17    Q    Where were you employed?

18    A    I was employed by a company called

19   Eyeshot.

20    Q    Can you spell that, please?

21    A    E-y-e-s-h-o-t.

22    Q    What did Eyeshot do?

23    A    They're an advertising promotional

24   company.

25    Q    What did you do for Eyeshot?

1    A    I did sign holding.

2    Q    I see that a lot on the rights-of-way.

3    Is that what you're referring to?

4    A    No.

5    Q    Can you describe the nature of your work

6    for Eyeshot?

7    A    It was real estate sales and business

8    promotions.

9    Q    What was your specific duty and job with

10   Eyeshot?

11   A    Sign holder; sometimes referred to as a

12   sign spinner.

13   Q    So you would be standing in a certain

14   place with a sign advertising a business?  Is that

15   generally what you would do?

16   A    Yes.

17   Q    Okay.  When did you start that job?

18   A    I think roughly within a two-year

19   period.  It's been about -- I think more than a

20   year, and maybe between one and two years.

21   Q    So about '06?  Thereabouts?

22   A    Maybe.  Maybe '07.

23   Q    Okay.  And you said that you stopped

24   working for them in June.  Why did you leave?

25   A    I didn't leave.  I just didn't get

1    any more assignments.

2        Q       They didn't have any more work for you?

3        A       I didn't receive any more assignments

4    after then.

5        Q       Okay.  So were you working as an

6    independent contractor for them or as an employee?

7        A       As an employee.

8        Q       Are you still on their payroll?

9        A       I'm not receiving any pay from them, but

10   I -- I'm still in contact with them and requesting

11   assignments.

12       Q       So if you don't work on a specific job,

13   are you paid by Eyeshot?

14       A       No.

15       Q       So it's on a per-job basis?

16       A       Yes.

17       Q       Did you work for any other entity,

18   including yourself, at any time while you were

19   working for Eyeshot?

20       A       No.

21       Q       Have you ever provided computer

22   consultation services of any kind professionally?

23       A       Yes.

24       Q       When is the last time that you did so?

25       A       It would be in the early 1990s; early to

1    middle 1990s.

2        Q        What is the most recent job that you held

3    prior to the Eyeshot position?

4        A        I'm not sure if I remember the title, but

5    it was, you know, programming related.   It was

6    database programming.

7        Q        Do you know the name of the company?

8        A        The name of the company was Forecast

9    International.

10       Q        Where are they located?

11       A        They're located in Newtown, Connecticut.

12       Q        Did you perform work for them on site in

13   Newtown, Connecticut?

14       A        Yes.

15       Q        During what period of time did you work

16   for them?

17       A        It was a short period of time.   I believe

18   it was four months.

19       Q        What year was that?

20       A        In the period that I told you: the middle

21   '90s, middle to early '90s.   I'm not sure of the --

22   I don't recall the year specifically.

23       Q        All right.   So in the period between 2000

24   -- approximately when you moved to Florida -- and

25   the time that you obtained work with Eyeshot, how

did you make ends meet? How were you able to

survive? Through what means of income?

    A      Social Security Disability --

    Q      Okay.

    A      -- income.

    Q      When did you first start receiving Social

Security Disability?

    A      I believe it was in the middle 1990s.

The specific year I don't have in my mind.

    Q      Did you have any other source of income

besides Social Security Disability between 2000 and

2005?

    A      No.

    Q      Okay. Now, you had testified previously

that you have reviewed your transcript of the trial

before Judge Barber in your criminal case. Is there

any part of your testimony from that trial that you

would change sitting here today?

    A      No.

    Q      I noticed from the court docket that

there appears to be an appeal that's still going on

regarding that case. Is that correct?

    A      I'm unsure.

    Q      Do you have counsel who is representing

you in an appeal of this particular case?

1      A     I'm unsure.

2      Q     You're unsure --

3      A     I don't --

4      Q     -- if you have counsel?

5      A     That's correct.

6      Q     Have you ever had counsel who represented

7 you in this case in an appeal?

8      A     I had a couple -- a couple of attorneys

9 that dropped out, withdrew.

10      Q     All right.  So as far as you know today,

11 you don't know if there is an appeal going on, and

12 you don't know if you have a lawyer in that case?

13      A     That's correct, yes.

14      Q     Okay.  Have you ever been informed that

15 there was a disposition of the appeal of your

16 criminal case?

17      A     No.

18      Q     Is it your current intent to continue to

19 pursue an appeal of the criminal case from 2005?

20      A     Yes.

21      Q     Okay.  If you win your appeal -- I'm

22 sorry.  Strike that.

23         If you win this case, do you believe that

24 that would imply that you should not have been

25 convicted of trespassing in 2005?

1    A    Yes.

2    Q    Why is that?

3    A    Because it says it's wrong.  Otherwise,

4  you wouldn't win it.

5    Q    It says that the criminal conviction was

6  wrong in your view?

7    A    Yes.

8    Q    Okay.  So in other words, if you win this

9  case -- this case we're here about -- then that

10  would imply that the result in the criminal case was

11  wrong in your view?

12    A    Yes.

13    Q    Now, since July of 2003 have you had any

14  contact of any kind with Mr. Pilver, besides your

15  presence here today and his appearance and your

16  appearance at the criminal trial?

17    A    No.

18    Q    So you haven't had any discussions,

19  conversations, emails, letters, nothing with

20  Mr. Pilver since July of '03 about any subject?

21    A    That's correct.

22    Q    Now, likewise, have you had any

23  conversations or exchanges of any kind with Ms. Wise

24  from July of '03 to the present date about anything?

25    A    I can't recall any.

1       Q     Okay.  Have you had any conversations or

2 correspondence or emails with respect to any

3 employees of the law library -- the Lunsford Law

4 Library since July of 2003?

5       A     I believe so.  I think I did receive a

6 court -- a letter.

7       Q     Was it related to your criminal case?

8       A     Yes, I think so.

9       Q     What was it about generally, the letter?

10      A     It was in response to a public

11 information request.

12      Q     A Public Records Act request?

13      A     Yes.

14      Q     And what generally was the nature of your

15 request?

16      A     Specifically, I do not recall off the top

17 of my head what that was in reference to.

18      Q     Have you had any other contact with any

19 employee of the law library that you knew of since

20 July of '03 besides that letter?

21      A     No.

22      Q     All right.  Have you attempted to contact

23 the library board at any time since July of 2003 for

24 any reason?

25      A     Yes, I believe I have.

1    Q    All right.  Can you describe the first

2 such time that you did so after July of '03?

3    A    No, I cannot.

4    Q    You don't remember?

5    A    Specifically what -- the first time what

6 it was, no.

7    Q    All right.  Have you contacted the

8 library board or attempted to contact the library

9 board more than once between July of '03 and today?

10   A    Yes.

11   Q    Have you attempted to contact the library

12 board more than five times between July '03 and the

13 present date?

14   A    I believe so, yes.

15   Q    All right.  More than 10 times between

16 July '03 and the present date?

17   A    Might be more than 10 times.

18   Q    Okay.  More than 15?

19   A    I'm not sure if it would be more than 15.

20   Q    Of those 10-plus times, we'll say, did

21 you ever contact them or attempt to contact the

22 library board in writing?

23        MR. RODEMS:  Object to the form.

24   A    Yes.

25   Q    How many of those 10-plus times was a

1    written attempt?

2              MR. RODEMS:   Object to the form.

3        A     Most.

4        Q     Did you keep copies of all of your

5    written attempts to contact the library board

6    subsequent to July of '03?

7        A     I believe so, yes.  Yes.

8        Q     Were your attempts to contact the library

9    board about one subject or about multiple subjects?

10       A     Multiple subjects.

11       Q     I see.  What were the multiple subjects?

12       A     Rules, regulations, library rules,

13   library regulations, library holdings, procedures,

14   equipment, other things.  Likely other things.

15       Q     All right.  And did you receive responses

16   to your queries -- your written and verbal queries?

17       A     Most of them.

18       Q     When you received responses, who would

19   send the responses?

20       A     I'm at a loss for her name at this

21   moment.  She's an attorney with the -- she's a

22   county -- with the county attorney's office.  And

23   her name was Campbell, but I think she got married.

24       Q     Mary Helen Ferris?

25       A     And now she's, yeah, Mary Helen Ferris.

1     Q     And Ms. Ferris responded to most of your

2    queries to the library board?

3     A     Yes.

4     Q     Between '03 and the present date?

5     A     Yes.

6     Q     Do you keep copies of her responses?

7     A     Yes.

8     Q     Did you ever attend a library board

9    meeting subsequent to July of '03?

10     A     No.

11     Q     Did you ever attempt to attend a library

12    board meeting subsequent to July of '03?

13     A     No.

14     Q     It's my understanding that you've

15    attended one library board meeting, and that was

16    prior to July of '03.  Is that correct?

17     A     Yes.

18     Q     Was the subject matter of your attendance

19    at that meeting involved with the copier issue

20    that's discussed in your lawsuit?

21     A     Yes.

22     Q     All right.  And describe to me how that

23    meeting went in your view.

24     A     Fine.

25     Q     Did you perceive that you had any

1    problems with the board?

2        A    No.

3        Q    Did you get the relief that you were

4    requesting from the board on that date?

5        A    Yes.

6        Q    What relief was that?

7        A    To not prevent me from using my own self-

8    copy device -- or copying device to receive the

9    information within the law library.

10       Q    So they allowed you -- the board allowed

11   you to bring your own copy machine to the library to

12   make copies of the materials at the library?

13       A    At that meeting it was decided that

14   Florida Law provided that I had the right to do

15   that.

16       Q    It's my understanding that the board also

17   waived any fees associated with your making copies

18   from your personal copier.  Is that your

19   understanding?

20       A    No.

21       Q    What was your understanding regarding the

22   fees associated with your making copies from your

23   own copy machine?

24       A    There were -- there are none.

25       Q    There are none, because they were waived,

1   or there are none by law?   Which was your

2   understanding?

3       A       There are -- they're never -- they never

4   had any set fees for that.   There was never any --

5   it never existed.   The law provides for it, but they

6   never had any fees for that.

7       Q       So in your --

8       A       That's -- I requested records.   I have no

9   -- nothing that indicates that they ever charged

10  a fee for that.

11      Q       So if there was a fee, you were never

12  charged a fee to the best of your knowledge for

13  copying from your own personal copy machine?

14      A       After the -- after that meeting when they

15  said it was okay, no.

16      Q       Now --

17      A       Prior to that I could not use my -- I

18  abided by the -- Mr. Pilver's request that I not use

19  my copier, though I disagreed with the policy.

20      Q       You had discussed communications of

21  possibly more than 10 times with the library board

22  after July of '03 in which you discussed multiple

23  subjects.   Did you ever make a request to the

24  library board that you be reinstated to allow you to

25  go back to the library subsequent to July of '03?

1     A     No.

2     Q     Why not?

3     A     Because there is no procedure to do so.

4     Q     Was there a procedure to allow you to

5 bring your copier into the library?

6     A     I don't know whether that -- what they

7 did.  There was -- I was not able to bring it in,

8 and that was the issue I had with -- regarding the

9 copier.  There was -- they didn't allow it.

10          The -- Mr. Pilver expressed, you know,

11 the finances that they needed on money, and that's

12 all they had.  And the -- Ms. Wise expressed the

13 same in a letter.

14     Q     Now, I'd like to turn for just a minute

15 to the events of July 5th of 2003.  Do you recall

16 that that was the date when you received from law

17 enforcement -- actually, I think that you were

18 arrested on that date.  Correct?

19          MR. RODEMS:  If we're going to change

20      topics, would this be a good time to take a

21      break?

22          MR. TODD:  I don't have that much

23      longer, Chris, if you want to --

24          MR. RODEMS:  Oh, okay.

25          MR. TODD:  Okay.  If you want to take a

1    break, of course, it's not a problem.

2         MR. RODEMS:  I just need a minute.

3         (Recess from 10:33 a.m. to 10:45 a.m.)

4    BY MR. TODD:

5         Q    All right.  I was starting to ask you

6    about the incident on July the 5th of '03.  Do you

7    recall that incident, sir?

8         A    Yes.

9         Q    All right.  Can you describe what

10   happened?

11        A    I went to the James J. Lunsford Law

12   Library to, as I regularly do -- had been doing to

13   do legal -- my legal research and make copies and

14   was arrested for trespassing.

15        Q    Who arrested you?

16        A    Um, a Tampa police officer.  I believe

17   his name was Charles Hathcox.

18        Q    Can you spell Hathcox, please?

19        A    H-a-t-h-c-o-x.

20        Q    Prior to your being arrested for

21   trespassing, did you refuse to leave the law library

22   on two different occasions?

23        A    No.

24        Q    Prior to being arrested for trespassing,

25   did you refuse to leave the law library on one

1  occasion?

2      A      No.

3      Q      Did you indicate to TPD Officer Hathcox

4  prior to your being arrested for trespassing that

5  you were going to stay in the law library until it

6  closed that day?

7      A      Yes.

8      Q      But your testimony is that by saying that

9  you intended to stay in the law library, that was

10  not a refusal to leave the law library?

11      A      I don't understand the question.

12      Q      Okay.  Mr. Pilver had a legal proceeding

13  of his own in approximately 2005 involving a

14  landlord-tenant matter.  Do you recall attending

15  such a hearing in the gallery of the courthouse --

16  of the courtroom involving Mr. Pilver?

17      A      Oh, you know, there was a day that I was

18  in the courthouse, and I think there was a -- I was

19  -- I think there was a hearing with Mr. Pilver,

20  yes.

21      Q      Was this before the July '03 incident?

22      A      No, I think it was afterwards.

23      Q      Was it before your trial before Judge

24  Nazaretian?

25      A      I'm not sure.  I'm not sure.

1       Q     Was it before your trial before Judge

2  Barber?

3       A     I'm not sure.  I don't know.

4       Q     Were you a witness in that proceeding?

5       A     No.

6       Q     Why were you there?

7       A     I believe it was in the afternoon or

8  morning.  I don't even know whether it was morning

9  or afternoon.  It was a day that I was at the

10  courthouse sitting in on court cases, as I regularly

11  do -- had done.

12       Q     As you sat there in the courtroom, this

13  was certainly after you had been arrested for

14  trespassing.  Correct?

15       A     Yes, I believe it -- I believe so.  I

16  think it was.

17       Q     At the time that you were sitting in the

18  courthouse on that day, in your own mind did you

19  blame Mr. Pilver for your arrest on July 5th of '03?

20       A     How so?

21       Q     In any way?  Did you bear any animus at

22  all with regard to Mr. Pilver as you sat there in

23  his legal proceeding?

24             MR. RODEMS:  Object to the form.

25       A     I'm not sure -- are you -- I'm not

1  catching what -- how to respond to this answer.

2      Q      Well, the question -- I'll try to

3  rephrase it.

4          You're sitting in the courthouse at a

5  specific courtroom where you see Mr. Pilver.

6  Correct?

7      A      Yes.

8      Q      And this is after you had been arrested

9  for trespassing on July 5th, '03.  Correct?

10     A      I believe it was, yes.

11     Q      Okay.  And as you're sitting there in the

12  courtroom watching Mr. Pilver's proceeding, what is

13  your feeling towards Mr. Pilver?

14     A      I don't know.  I know he was the cause of

15  a problem -- the cause of a -- my problems with the

16  library.

17     Q      All right.  So as you're sitting --

18     A      But --

19     Q      Go ahead.  Finish your answer.

20     A      I don't know what else to say.  I didn't

21  say anything to him or --

22     Q      Would it be fair to say that you did

23  not --

24     A      He came in -- I was sitting there when he

25  came in.

1     Q    You did not despise Mr. Pilver as you sat

2 there in the courtroom that day?

3     MR. RODEMS: Object to the form.

4     A    I -- I really don't understand what --

5 how I'm supposed to respond to these questions.

6     Q    Well, you have an opportunity to say

7 "yes" or "no." You did despise him or you did not

8 despise him?

9     A    Can you define despise?

10     Q    Whatever you think that word means.

11     MR. RODEMS: Object to the form.

12     A    Well, I -- I don't know what it means.

13 I'm asking you to tell me what it means. I don't

14 understand the meaning of the word --

15     Q    Well, I'm going to --

16     A    -- and how you're using it.

17     Q    I'm going to construe that as a refusal

18 to answer my question. I'll give you another

19 opportunity to answer it.

20     On the day that you sat there in the

21 courtroom watching Mr. Pilver's proceedings, did you

22 have a feeling in your heart that you hated this guy

23 -- Mr. Pilver?

24     MR. RODEMS: Object to the form.

25     A    No.

1      Q     Did you dislike Mr. Pilver as you sat in

2 the courtroom that day?

3          MR. RODEMS:  Object to the form.

4      A     I suppose I would say, yes.

5      Q     Why?

6      A     He has caused great difficulty for me;

7 denied me of my constitutional rights; prevented me

8 from receiving the information that I sought to

9 receive; and I know he was -- he's one of the -- one

10 of the parties.  But to me it was nothing other than

11 I was there, and he happened to have a case on that

12 day, some type of hearing.  I don't think -- I think

13 it was a very short hearing.  I'm not even sure that

14 the other party showed up.

15      Q     Why did you stay?  Why didn't you get up

16 and walk out?

17      A     Because that's what I was there for.

18      Q     Which was what?

19      A     To see court proceedings.

20      Q     Weren't there other --

21      A     I --

22      Q     Go ahead.

23      A     I regularly did that.

24      Q     Weren't there other court proceedings

25 going on that day in the massive courthouse

somewhere?

    A     I suppose so, yes.

    Q     Did it occur to you "Maybe I better walk out of the courtroom and go watch a different hearing today"?

    A     No, that did not occur to me.

    Q     So you were very comfortable sitting there watching Mr. Pilver's legal proceedings?

    A     Just as I would anyone else, yes.

    Q     Did you attempt to greet Mr. Pilver at any point during the proceedings or before or after the proceedings?

    A     No, I did not.

    Q     Why not?

    A     No reason to.

    Q     Did it occur to you --

    A     And I didn't want any problems with him.

    Q     Did it occur to you that maybe Mr. Pilver, if he had seen you in the gallery that day, might have been uncomfortable with your presence in his legal proceeding?

    A     No.

    MR. TODD:  Chris, I'm done.

    MR. RODEMS:  Okay.  We'll read.

    MR. TODD:  Thank you, sir.

1          (At 10:54 a.m., no further questions

2     were propounded to this witness.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:


    I, Kimberly Himes, Notary Public in and for the State of Florida at Large, do hereby certify that I reported in shorthand the foregoing proceedings at the time and place therein designated; that the witness herein was duly sworn by me; that my shorthand notes were thereafter reduced to typewriting under my supervision; and that the foregoing pages are a true and correct, verbatim record of the aforesaid proceedings.

    Witness my hand and seal December 11, 2008, in the City of Tampa, County of Hillsborough, State of Florida.



Kimberly Himes
Notary Public
State of Florida at Large

KIMBERLY HIMES
MY COMMISSION # DD 480851
EXPIRES: November 16, 2009
Bonded Thru Notary Public Underwriters

# SIGNATURE PAGE/ERRATA SHEET

**WITNESS:** DENNIS HUNT
**RE:** HUNT VS. LAW LIBRARY BOARD

## INSTRUCTIONS TO WITNESS

Please note any errors or amendments on this page, indicating the reason for any change you wish to make. Do not mark on the transcript itself. Please sign and date this sheet as indicated below. If additional lines are required for corrections, attach additional sheets.

| PAGE | LINE | ERROR OR AMENDMENT/REASON FOR CHANGE | REPORTER'S INITIALS |
|------|------|--------------------------------------|---------------------|
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |
|      |      |                                      |                     |

I have read my transcript and subscribe to its accuracy, to include the corrections or amendments noted above or hereto attached.

_____
**Signature of Witness**          **Date**

RICHARD LEE REPORTING • Post Office Box 1157 • Tampa, FL 33601 • (813) 229-1588