1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DENNIS HUNT,

        Plaintiff,           Case No.
v.                        8:07-cv-1168-T-30TBM

LAW LIBRARY BOARD,
  a Board created by
  Hillsborough County, Florida;

NORMA J. WISE,
  in her official capacity as
  Director of the James J.
  Lunsford Law Library, and
  individually; and,

DAVID L. PILVER,
  individually,

        Defendants.
_____/


DEPOSITION OF:    DAVID L. PILVER

TAKEN BY:       Counsel for Plaintiff

DATE:           January 8, 2009

TIME:           9:12 a.m. to 12:29 p.m.

PLACE:         Richard Lee Reporting
                 100 North Tampa Street
                 Tampa, Florida

REPORTED BY:    Karen Kay Skeen, RPR
                 Notary Public
                 State of Florida at Large

ORIGINAL

**RICHARD LEE REPORTING**
(813) 229-1588
email: rlr@richardleereporting.com

**TAMPA:**
100 North Tampa Street, Suite 2060
Tampa, Florida 33602

**ST. PETERSBURG:**
535 Central Avenue
St. Petersburg, Florida 33701

Dockets.Justia.com

APPEARANCES:

> RYAN CHRISTOPHER RODEMS, ESQUIRE
> Barker, Rodems & Cook, P.A.
> 400 North Ashley Drive, Suite 2100
> Tampa, Florida 33602
>     Appeared for Plaintiff

> STEPHEN M. TODD, ESQUIRE
> Hillsborough County Attorney's Office
> Post Office Box 1110
> Tampa, Florida 33601-1110
>     Appeared for Defendants

## I N D E X

|                                   | PAGE |
|-----------------------------------|------|
| Examination by Mr. Rodems         | 3    |

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Library Assistant Job Description | 26 |
| 2 | Letter dated 4-30-03 from Hunt to Wise | 72 |
| 3 | Letter dated 5-5-03 from Hunt to Wise | 79 |
| 4 | Letter dated 5-19-03 from Hunt to Wise | 83 |
| 5 | Email dated 7-7-03 from Pilver to Spradlin | 98 |
| 6 | Letter dated 7-3-03 from Hunt to Wise | 111 |
| 7 | Summary of events by David Pilver | 130 |
| 8 | Letter from Pilver to Ober | 132 |
| 9 | Trespass Warning | 136 |

1      The deposition, upon oral examination, of

2   DAVID L. PILVER, taken on the 8th day of January,

3   2009, at the offices of Richard Lee Reporting, 100

4   North Tampa Street, Suite 2060, Tampa, Florida,

5   beginning at 9:12 a.m., before Karen Kay Skeen,

6   Registered Professional Reporter and Notary Public

7   in and for the State of Florida at Large.

8                    *  *  *  *  *  *

9                    DAVID L. PILVER,

10  being first duly sworn to testify the truth, the

11  whole truth, and nothing but the truth, was examined

12  and testified as follows:

13                    EXAMINATION

14  BY MR. RODEMS:

15      Q     All right, sir.  Will you tell me your

16  name, please.

17      A     David Pilver.

18      Q     And what is your address?

19            MR. TODD:  Can we get that off the

20      record, Chris?

21            MR. RODEMS:  Yeah.  I'm going to want

22      address, date of birth, and social security

23      number.  Date of birth and social security

24      will be attorney's eyes only, address will be

25      attorney's eyes only.

1    MR. TODD:  Can I call you with that?

2    MR. RODEMS:  You can call me with that.

3    MR. TODD:  We'll get that for you.

4  BY MR. RODEMS:

5    Q    What that means, Mr. Pilver, is that if

6  you provide that information to your attorney and he

7  provides it to me, that information will be looked

8  at only by attorneys in my office.

9    A    Right.

10   Q    You may be wondering why we would ask for

11 that information, and there's sometimes a need for

12 it, usually when you need to find a witness or

13 somebody has a common name or any number of reasons

14 like that.

15   A    Okay.

16   Q    But rest assured that if that information

17 is provided to me, it will be seen only by me.  And,

18 of course, at the conclusion of the case, it will go

19 into a vault somewhere.

20   A    Good.  Thank you.

21   Q    Okay.  What's your age?

22   A    39.

23   Q    Are you married or single?

24   A    I am single.

25   Q    Okay.  Have you ever been married?

1     A     No.

2     Q     All right.  Do you have any children?

3     A     No children.

4     Q     Can you tell me what your education level

5     is?

6     A     I have an associate's degree.

7     Q     And where is that from?

8     A     Hillsborough Community College.

9     Q     And what is that in?

10     A     It was a basic liberal arts associate's

11     degree.

12     Q     And what year did you obtain that?

13     A     1995.

14     Q     And did you graduate from high school?

15     A     Yes.

16     Q     What year?

17     A     1987.

18     Q     What high school?

19     A     Bishop Kenny.

20     THE REPORTER:  What is it?

21     THE WITNESS:  Bishop Kenny, K-e-n-n-y.

22     Q     And who is Bishop Kenny?

23     A     That's a high school in Jacksonville,

24     Florida.

25     Q     Okay.  K-e-n-n-e-y?

1    A    No second E, K-e-n-n-y.

2    Q    Okay.  Is this a religious school?

3    A    Catholic school, yes.

4    Q    Catholic school.  All right.  Member of

5    the Catholic Church?

6    A    No.

7    Q    Is it a private school?

8    A    Yes.

9    Q    Did your family have to pay tuition?

10   A    I think so.

11   Q    Okay.  You got your associate's degree in

12   1995 and graduated from high school in 1987.  So

13   tell me what happened between the years of '87 and

14   '95, careerwise, educationwise.

15   A    I took two years at the University of

16   Florida, then worked and returned to school on a

17   part-time basis until I got the degree.

18   Q    So you actually attended the University

19   of Florida?

20   A    For a couple of years, yes.

21   Q    What years were those?

22   A    '87, eighty -- through '89, the first

23   semester of '89.

24   Q    And what were you studying at the

25   University of Florida?

1    A    I was just undergrad, undeclared major.

2    Q    And while you were in Gainesville in

3    those years, did you work?

4    A    Only after I stopped school.

5    Q    Okay.  How long did you stay in the

6    Gainesville area after you stopped school?

7    A    Between -- let's see, I finished that

8    school in the beginning of '89.  I stayed there from

9    '89 through '92.  Left in August of '92.

10    Q    And what types of jobs did you hold from

11    '89 to '92?

12    A    Worked in a comic book store and as a

13    pizza delivery driver and as a library page.

14    Q    What is a library page?

15    A    Library page is essentially the lowest

16    job level in the library hierarchy.  It's the person

17    who pretty much only takes care of re-shelving books

18    and stuff like that.

19    Q    And what library was it that you worked

20    at as a library page in the Gainesville area?

21    A    That was the Gainesville Public Library.

22    I think that's the correct name.  It's been a long

23    time ago.

24    Q    Okay.  Were you a full-time employee at

25    the Gainesville Public Library?

1     A     I think that I was, yes.

2     Q     And you understood that the Gainesville

3     Public Library employment was government employment

4     that you worked for the government?

5     A     Yes.

6     Q     Okay.  How long did you work for the

7     Gainesville Public Library?

8     A     Let's see.  I'd say about a year.

9     Q     Okay.  What reason did you not finish

10     your studies at the University of Florida?

11     A     I was academically disqualified.

12     Q     Okay.  Can you explain what that means?

13     A     My grades were too low for their

14     standards, and I was suspended and/or booted.  But

15     I've taken care of that since then, so I can go back

16     if I want to.

17     Q     You're eligible to return to the

18     University of Florida?

19     A     Yes.

20     Q     Would you have to reapply?

21     A     I don't know.  I haven't looked into it

22     in that much detail.

23     Q     Okay.  So you don't presently have any

24     plans to return to the University of Florida for

25     study?

A    No, sir.

Q    And if I understood it correctly, you attended the University of Florida from 1987 to 1989 or thereabouts, and then you remained in the Gainesville area until 1992 or thereabouts.  And during that time period that you remained in the Gainesville area after ceasing your studies at the University of Florida, you worked in a comic book store, worked as a pizza delivery driver and as a library page?

A    Yes, sir.

Q    I understood all of that correctly?

A    Uh-huh.

Q    Okay.  And did you have any other jobs while you were in the Gainesville area?

A    I worked for a staffing agency who sent me to what was supposed to be a temporary job, but it was a temporary job that kept getting renewed, so I did quite a bit of it.

Q    What kind of job?

A    Editing and computer typography.

Q    Computer?

A    Typography.

Q    Typ like t-y-p?

A    Yes, sir, like laying out stuff that

1    would eventually be printed for instruction manuals

2    for a recycling course.

3         Q      Do you remember the --

4         A      It was --

5         Q      I'm sorry.

6         A      It was a grant project.

7         Q      Okay.  When you say it was a grant

8    project, was this -- who was the employer?

9         A      Well, I reported to a William Gauge as my

10   immediate supervisor.  But they were paying a

11   contract fee to the staffing agency, so the staffing

12   agency was my employer.

13        Q      I understand what you're saying.  Who

14   were you assigned to by the staffing agency?  What

15   company or entity?

16        A      I don't entirely remember.  It was hosted

17   at the Santa Fe Community College, but I'm not sure

18   if it was their project or if they were just letting

19   them use the office space.

20        Q      All right.  Any other jobs you can think

21   about while you were in the Gainesville area?

22        A      I can't remember anything else.  I think

23   that's all of them.

24        Q      All right.  And when you left

25   Gainesville, where did you move to next?

1    A    Tampa.

2    Q    And would that have been immediately

3 after leaving Gainesville?

4    A    Yes.

5    Q    And what was your connection to the Tampa

6 area?

7    A    The comic book store that I was working

8 for in Gainesville opened a new branch location in

9 Tampa, and I moved here to help run that.

10    Q    What was the name of that store, by the

11 way?

12    A    The local branch was called Absolute

13 Comics and Cards.

14    Q    That was the name of the store in

15 Gainesville?

16    A    The one in Gainesville was called

17 originally Comics Plus and changed its name to

18 something else for a little while, but I can't

19 remember what the other name was.

20    Q    Okay.  So when you left Gainesville and

21 came to Tampa, you worked for Absolute Comic and

22 Cards?

23    A    Yes.

24    Q    Where was that located?

25    A    It was on Fowler Avenue at a little plaza

called People's Plaza. It would have been almost across the street from the University of South Florida, but I don't remember the exact address.

Q    Do you know if that business is still in operation?

A    I'm pretty sure that it's not.

Q    Okay. How long did you work at the Absolute Comic and Cards store when you moved to Tampa?

A    I worked there from August through November.

Q    Would that be of 1992?

A    Yes, sir.

Q    And what happened in November of 1992 so that your employment with Absolute Comic and Cards ended?

A    I had a difference of opinion, let's say, with the manager about the shifts that I was going to be working and ultimately decided -- we both decided simultaneously that it would be best if I looked for a different employment.

Q    When you say you had a difference of opinion, what exactly do you mean?

A    Well, he -- the person at the local store that I was working for wanted me to work some

specific weekends that I had understood were going

to be free.  And we couldn't come to any kind of

agreement on that, so we went separate ways.

Q      Did you have a specific job title or

position with Absolute Comic and Cards?

A      It wasn't that structured.  So no job

title really.

Q      Okay.  What did you do for Absolute Comic

and Cards?

A      Mainly took care of the inventory, made

sure everything was sorted out properly.  Since it

was a new location, we had a lot of sorting to do

with getting everything in its place.  And I took

care of the shop while the manager was away, so I

was running the cash register and helping the

customers.

Q      So this was a retail operation?

A      Yes, sir.

Q      And the one that you worked for in

Gainesville was also a retail operation?

A      Yes, sir.

Q      Okay.  Prior to working for the comic

store in Gainesville, did you have any retail

experience?

A      I don't believe so, not unless you count

the pizza.

Q    Okay.  You never worked at JC Penney's or Sears or Publix or Target or Wal-Mart or any of those places?

A    No, sir.

Q    Anything like that?

A    No.

Q    So after November of 1992, what did you do for employment?

A    I applied for a job at Book Stop, which is a retail book store branch of the Barnes & Noble Corporation.

Q    Okay.  Was that here in Tampa?

A    Yes, sir.

Q    And did you get that job?

A    Yeah, I was hired on as seasonal employment, and it eventually became permanent.

Q    How long after ending your employment with Absolute Comic and Cards did you start the employment with Book Stop?  A period of days, weeks, months?

A    I don't think it was longer than two weeks.  I can't remember exactly, but it wasn't very long.

Q    Now, at that time, did you have any other

1  employment?

2      A      I did go to a local staffing agency and

3  worked some odd jobs.  I can really only remember

4  one for sure at a chemical warehouse in South Tampa.

5      Q      And did that staffing agency job coincide

6  with your employment with Absolute Comic and Cards,

7  or did it start after?

8      A      I'm pretty sure it started after.

9      Q      Okay.  And when you began working at Book

10  Stop, what was your title or position?

11      A      Initially, I was hired on as book seller.

12      Q      And what does a book seller do?  That's

13  probably the most absurd question I'll ask all day,

14  I hope.

15      A      Main duties were restocking the shelves

16  with the new arrivals, making sure everything was

17  neat and tidy, helping customers find what they

18  needed, and working the registers.

19      Q      Okay.  So it was more than just selling

20  books?

21      A      Yes, sir.

22      Q      Okay.  And was it a comparable set of

23  duties that you had at Book Stop as you had at

24  Absolute Comic and Cards?

25      A      I'd say very comparable.  A much larger

1    scale, but very similar.

2            Q       Was the pay better?

3            A       Yes.  I don't know exactly how much more

4    than minimum wage it was, but it was better.

5            Q       And did you have to work weekends?

6            A       Yes, I did.

7            Q       So in comparison of the job at Book Stop

8    to Absolute Comic and Cards, if I understood your

9    testimony earlier, one of the things that caused you

10   to leave was a dispute with your supervisor over

11   whether you should have to work weekends?

12           A       That's correct.

13           Q       So when you took the job at Book Stop,

14   you did have to work weekends?

15           A       Yes.

16           Q       Okay.  And at some point in this -- well,

17   how long did you work at the Book Stop?

18           A       I worked from 1992 through roughly 1995,

19   late '95 or early '96, at which point I transferred

20   to a different branch of the same company.

21           Q       Was it also called Book Stop?

22           A       No, it was Barnes & Noble proper.

23           Q       And which Barnes & Noble?

24           A       It was the one on Dale Mabry at Kennedy.

25           Q       Okay.  Did your actual employer change or

1    just where you --

2         A     Just the location.  They were -- it was a

3    completely wholly owned subsidiary, the Book Stop

4    was.  So the paychecks looked exactly the same,

5    nothing else changed.

6         Q     Okay. So there was no interruption in

7    your employment then between Book Stop and Barnes &

8    Noble?

9         A     No.  It was just a transfer of location.

10        Q     All right.  And then how long did you

11   remain employed at Barnes & Noble?

12        A     I'm trying to recall exactly how long,

13   but I think it was less than a year before I --

14   before I got the job working for the County here.

15   So some number of months.

16        Q     All right.  Now, you must have been

17   attending Hillsborough Community College during this

18   time period as well, because you told me earlier

19   that you got your associate's degree in 1995?

20        A     Right.

21        Q     Okay.  So when did you start at

22   Hillsborough Community College?

23        A     I don't remember when I took my first

24   class.

25        Q     Would it have been after November of

1  1992?

2      A      Yes, sir.

3      Q      Okay.  And was there a particular campus

4  that you took your course work at?

5      A      No, I spread it out over whichever one

6  was the most convenient at the time.

7      Q      Okay.  For the work that you performed at

8  the comic store in Gainesville and then the comic

9  store in Tampa, were you trained for the work

10 formally?

11     A      Well, I suppose I was trained, but I

12 wouldn't call it formal.  The atmosphere in that

13 store was so relaxed and casual that everything was

14 casual.  So, you know, I was shown how to work the

15 register.  But other than that, it was pretty

16 self-explanatory.

17     Q      All right.  I understand from how you've

18 described it that these were small operations?

19     A      Very small.

20     Q      Okay.  So they wouldn't have sent you out

21 to things like seminars related to the book

22 industry?

23     A      Well, actually, we went to some comic

24 book conventions to set up a booth and sell some

25 stuff.  But other than that, no.

1    Q      That wasn't for the purpose of education,

2    it was for the purpose of making money?

3    A      Correct.

4    Q      Okay.  When you got to Barnes & Noble,

5    did they have training for you?

6    A      Yes.

7    Q      Describe the training that you had at

8    Barnes & Noble.  And when I say "Barnes & Noble," I

9    mean Book Stop as well.

10    A      Got you.  The training would have

11    consisted of a supervisor position employee usually

12    or someone who had been there a lot longer as a book

13    seller spending a couple of days with us showing us

14    where the different sections, topical sections, were

15    in the bookstore, how they expected things to be

16    done as far as cleanup routines and customer service

17    protocols.  And then the most intensive training

18    would have been how to use the specifics of that

19    register system that they had there.

20    Q      Okay.  What do you recall about the

21    training that you received for customer service

22    protocols?

23    A      One thing that stands out from that time

24    is in that retail environment, they really were big

25    on place the product in the customer's hand, don't

1  just point to it, don't just wave which direction it

2  is.   Make sure they've got something in their hand

3  they can take to the register and pay for.   That was

4  one example.

5      Q      Okay.   Did they give you any specific

6  training on how to interact with customers and

7  things like that?

8      A      I'd say the basic principles of courtesy

9  were emphasized, things like that, be as helpful as

10  possible, you know, because it helps the sales.   If

11  there was a question for which we couldn't supply an

12  answer immediately, to find someone who could supply

13  the answer, that kind of thing.

14      Q      Okay.   And your course work at

15  Hillsborough Community College, is there any of it

16  that you relate or connect to your current job with

17  the James J. Lunsford Law Library?

18      A      Well, I took at least one English

19  course.   That's always helpful with communication

20  skills.   Everything else was pretty specific topic

21  areas that wouldn't really have any bearing on my

22  current employment.

23      Q      Would that be true for your schooling at

24  the University of Florida as well?   Would it have

25  any bearing on your current employment?

1    A    I can't think of any specific class,

2 other than English again, that would have had

3 anything to do with my employment.

4    Q    And during the time that you were

5 attending Hillsborough Community College, were you

6 considered a full-time student or a part-time

7 student?

8    A    Some semesters I was taking a full course

9 load.  Others I took only a couple of classes.

10    Q    Okay.  Did you have to make adjustments

11 in your work schedule when you were a full-time

12 student versus when you were a part-time student?

13    A    No, I did everything simultaneously.

14    Q    Okay.  And other than the employment at

15 Barnes & Noble which you've just discussed and

16 perhaps the staffing, was there any other employment

17 that you might have had that you can think of during

18 the time that you were a student at Hillsborough

19 Community College?

20    A    I think school and working at the

21 bookstore and eventually working for the County are

22 the only things that overlapped.

23    Q    All right.  And when you left Barnes &

24 Noble, what was your next employment?

25    A    Very next employment was working for the

County as an employee at the Hillsborough Law
Library.

Q     Now, when you were -- well, let me ask it
this way:  What year were you hired by the County?

A     1996.

Q     Okay.  At the time that you were hired,
was there a law library in existence?

A     Yes.

Q     Okay.  What was the name of it at that
time?

A     Hillsborough County Law Library was the
name.  That was before it got dedicated.

Q     Right.  When did it -- when you say
"dedicated," you mean renamed in the name of James
J. Lunsford?

A     Exactly.

Q     When did that occur, approximately?

A     I believe it was October of 2000.

Q     Okay.  How did you hear about the opening
for the position that you ultimately obtained with
the Hillsborough County Law Library in 1996?

A     I was on jury duty at the local
courthouse, and they have a civil service job board
in the courthouse, ground floor somewhere -- or they
did at that time.  And during one of the breaks or

1  recesses of the trial, I was perusing the job

2  openings there and happened to see one for a law

3  librarian.

4  Q    And so once you saw the opening, what was

5  the next step in getting this job?

6  A    I followed the instructions that were on

7  there for getting in touch with the County Civil

8  Service Department, got the full application packet,

9  many pages long, with some requirements to supply

10  documentation of education and things like that,

11  filled all of that stuff out and turned it in.

12  Q    Then what was the next step in the

13  process?

14  A    I think they gave me some tests.    A

15  typing test was one of them.    There may have been

16  other basic stuff like alphabet and basic math.    And

17  then I guess they sent the paperwork on to the

18  individual agency.

19  Q    And what position do you recall that you

20  were applying for?

21  A    Senior library assistant.

22  Q    So after you completed the testing and

23  after the paperwork was transferred over to the

24  individual agency, what was the next step in the

25  process?

1     A     At that point, I'm assuming that Norma

2    Wise was the person who had that paperwork.  But

3    they did not contact me right away.  I have heard

4    that they interviewed some other potential employees

5    and it didn't work out, for whatever reason.  So it

6    was some number of weeks between when I supplied all

7    the information and when I was actually contacted by

8    the library.  But eventually I was contacted by

9    Ms. Wise.

10     Q     And then what happened?

11     A     She called me in for an interview.  I

12    went in and was hired almost immediately, in the

13    next couple of days after the interview.

14     Q     Do you recall the interview?

15     A     A little bit.

16     Q     Who was it with?

17     A     Norma.

18     Q     Just Norma?

19     A     Just Norma.

20     Q     Okay.  What do you recall about the

21    interview?

22     A     We used one of the upstairs conference

23    rooms, and the curtains had been open all day, and

24    it was really hot in there.

25     Q     All right.  Where was the law library

1   located at that time?

2           A       That was at 725 Jefferson Street.  Wait,

3   725 -- no, I guess it was 725 East Kennedy, but the

4   entrance was on Jefferson Street.

5           Q       What was the name of the building?

6           A       That was the Fred Karl Legal Center.

7           Q       Okay.  And that's not where the law

8   library is located today, is it?

9           A       Correct.

10          Q       Where is it located today?

11          A       We are now at 701 East Twiggs in what

12  they used to call the main courthouse.

13          Q       And prior to that, where was the law

14  library located?

15          A       In between those two locations, it was at

16  501 East Kennedy in the Mack building.

17          Q       In the time period of 2003 when the

18  events with Mr. Hunt were occurring, where was the

19  law library located?

20          A       At the 501 address.

21          Q       And is that a freestanding building that

22  the library was in, or is it part of an over --

23          A       It is a large office building, and we

24  were taking up just one suite on the ground floor.

25          Q       All right.  And so when did you

officially begin working for the Hillsborough County

Law Library?

A      June of 1996.

Q      When you saw the job posting for senior

library assistant, did it describe the duties and

responsibilities?

A      Yes, it did.

Q      Okay.  Let me show you what we'll mark as

Exhibit 1.

(Exhibit 1 marked for identification.)

Q      This is a document that somehow or other

I acquired, and I'm not sure exactly how, but it

describes library assistant.  And what I would like

for you to do is take a look at it and tell me if

you've ever seen anything like this before.

A      This format is very familiar and is the

kind of thing that I saw when looking through the

civil service job titles.  I'm not sure this is the

exact one.  I think there might be one that

specifies senior library assistant as opposed to

just library assistant, but they're very similar

anyway.

Q      Okay.  Are there -- well, at the time

that you were hired, were there library assistants?

A      With a job title other than "senior"?

1    Q    Yes, sir.

2    A    No, sir.

3    Q    Okay.  If you could just take a look at

4    the major duties for library assistant for just a

5    moment and tell me, do these describe the major

6    duties that you have as the senior library

7    assistant?

8    A    Yeah, that seems pretty accurate.  A law

9    library is a little different from other libraries

10   in the sense that like, for instance, we don't have

11   checkout of library books, and we don't collect

12   fines.  I mean, we don't issue library cards and

13   have very many fines.  So it's got some differences

14   based on the nature of the library.  But other than

15   that, yeah, it applies.

16   Q    So you're not able to say that this

17   document was specifically created for the James J.

18   Lunsford Law Library?

19   A    I'm sure that it was not.

20   Q    And why are you sure that it was not?

21   A    The County Civil Service does things by

22   job category or job title, and they use these codes

23   which are consistent throughout the whole County.

24   And it's just one category.

25   Q    Okay.  Once you were officially hired,

1  what was the next step in the process when you began

2  your employment?  Were you given an orientation or

3  training?  Just tell me about your first day and

4  what happened from that point.

5       A    Yes.  It's hard to remember my first day

6  precisely, but in the first few weeks that I worked

7  there, I was given training.  A lot of it had to do

8  with the legal materials, because I had had no

9  experience with legal stuff before.  And in addition

10 to helping people to find materials by title or

11 author or stuff like that like at a normal library,

12 at a law library you're expected to have some sort

13 of basic rudimentary knowledge at least of the

14 concepts that the people are talking about when

15 they're asking for stuff.

16          So I was given a brief overview on the

17 law, the court structure, that kind of stuff.  That

18 helped me understand which resources were best for

19 which purpose.  And I learned all about the

20 library's methods for handling petty cash and CLE

21 audiotapes for attorneys and things like that.

22       Q    Who conducted your training?

23       A    Mostly Norma, but the whole staff

24 contributed a little bit at various times of the

25 day.

Q    And you understood that you were working for Hillsborough County?

A    Yes.

Q    You understood this was a government position?

A    Exactly.

Q    How long did your training period last?

A    Well, I mean, informally I'd say it lasted several years in the sense that I was always learning new things. And to this day, I still learn new stuff, you know, that I can apply. When someone needs something specific and I manage to find it on one day, I can use that the next time somebody asks for something similar. But as far as the more formalized aspects, I'd say probably a period of several weeks or a couple of months until I felt comfortable like I knew enough to come in on a daily basis and just get to work and not need any specific supervision.

Q    As far as the training goes, did you have a set number of training seminars or tasks that you needed to complete? Did somebody give you a check list and say, "You have to be trained in how to run the front desk. You have to be trained in how to restock the books. You have to be trained in how to

1 do this," and then they would check these things off

2 one by one as the training occurred?  Or was it not

3 that formal?

4     A    I don't think it was that formal, at

5 least not as it was expressed to me.  If there was

6 any such checklist, I never saw it.

7     Q    I guess I should have asked you up front,

8 have you ever been deposed before?

9     A    No, sir, unless you count being on the

10 witness stand.

11     Q    Okay.  So you've testified as a witness

12 before?

13     A    Yes, sir.

14     Q    I don't think there's any need to go over

15 a bunch of rules.  If you need a break at any time,

16 just let me know.

17     A    Okay.  Thanks.

18     Q    If you don't understand my question, if

19 there's anything about the question that you need

20 clarified, just let me know.

21     A    Okay.

22     Q    Have you ever taken any formal college

23 classes in the area of the law?

24     A    I took an American Federal Government

25 class, but that was high school.

1     Q     Okay.  Anything in college?

2     A     I don't think so.

3     Q     All right.  Did you ever take any classes

4  in college in psychology?

5     A     Yes.

6     Q     How many classes?

7     A     I took one for credit, and I audited one.

8     Q     You took one for a full credit, did you

9  say?

10     A     Yeah, I took one where it counted.  And

11  another one I sat in on that didn't count.  So two

12  total.

13     Q     Do you remember the names of those

14  courses?

15     A     It would have been something like

16  Introduction to Psychology or Basic Psychology or

17  something like that.

18     Q     And how about the one that you audited?

19     A     It would have been the same.  But, you

20  know, I have to correct that.  I'm sorry.  The class

21  I audited was philosophy, not psychology.

22     Q     Okay.

23     A     I'm still under the impression that I

24  took psychology more than once, though, more than

25  one class of psychology.  It might have been that I

1  took one and the grade I received was not what I

2  wanted, and I might have taken it again under the

3  forgiveness policy.  Or maybe I took it once at one

4  school and again at the other school.  I'm not sure.

5      Q      Okay.  But you wouldn't hold yourself out

6  to have any specialized knowledge in psychology,

7  would you?

8      A      Not above what I picked up in those

9  classes, no.

10     Q      Okay.  Now, of course through your

11 employment, you've become somewhat familiar with the

12 law, I gather, from what you said earlier about

13 needing to know something in order to be able to

14 help the patrons?

15     A      Yes, sir.

16     Q      How would you describe your level of

17 knowledge of the law?

18     A      I'd say I'm an advanced beginner.

19     Q      Have you ever taken any classes offered

20 by Westlaw or Lexis for people in the library field?

21     A      Yes.

22     Q      Give me some examples of those types of

23 classes that you've taken.

24     A      They offered a training session, mainly

25 on how to use their service, not so much in the law.

Q    I'm sorry.  I said Westlaw and Lexis.  I guess I should ask you which one you're talking about.

A    Westlaw.

Q    Okay.

A    They used to have special classes up in one of these buildings -- I can't remember which one exactly.  I think it was the Barnett Bank building, the Bank of America building -- where they had a computer lab set up, and the classes were very specific on how to use their service, not so much on general law principles.  But for what it was, yeah, I took that once.

Q    Okay.  Have you ever been arrested?

A    Yes.

Q    When was that?

A    It would have been roughly 1991, I think.

Q    What was the nature of the charge?

A    Driving with license suspended.

Q    Do you know what the reason was that your license was suspended?

A    Yes.  It was because I did not pay my fine on time for a traffic ticket.

Q    Okay.  And where did the arrest take place?

1    A    Near Ocala or in Ocala.  I'm not sure

2    exactly the town that it was.

3    Q    All right.  Have you ever been charged

4    with a crime that involved dishonesty?

5    A    No.

6    Q    Have you ever been convicted of a felony?

7    A    No.

8    Q    Any other arrests?

9    A    No.

10   Q    Have you ever filed a lawsuit against

11   anyone?

12   A    Yes.

13   Q    Who have you sued?

14   A    I sued a former landlord.

15   Q    What year?

16   A    2004, I think.

17   Q    And what County?

18   A    Hillsborough County.

19   Q    And what was the name of the defendant in

20   that case?

21   A    Lenox Realty Associates, Limited, doing

22   business as Lenox Place Apartments.

23   Q    L-e-n-n-o-x or e-x?

24   A    I think it was just one n, L-e-n-o-x.

25   Q    And where are these apartments located?

1    A    That was at 11311 North 22nd Street.

2    Q    11311 North --

3    A    22nd Street.

4    Q    What was the nature of the lawsuit?

5    A    I was suing to get my security deposit

6 back.

7    Q    And has that case concluded?

8    A    Yes.

9    Q    Did you get your security deposit back?

10    A    I did.  We settled out of court.

11    Q    Okay.  Did you have an attorney for that?

12    A    No.

13    Q    Did the apartment complex?

14    A    Yes.

15    Q    Okay.  Have you filed a lawsuit against

16 anyone else?

17    A    Not an initial suit, no.

18    Q    What does that mean?

19    A    I counter-claimed once.

20    Q    All right.  I'll come back to that in a

21 moment.  But is there any other situation in which

22 you were the initiating plaintiff, if you will, or

23 filer of a lawsuit against anyone?

24    A    No, sir.

25    Q    Okay.  The follow-up question is have you

1    ever been sued by anyone?

2        A      Yes.

3        Q      Now, of course, obviously we're here

4    today because Mr. Hunt has filed a lawsuit against

5    you.  But not including this lawsuit, have you been

6    sued by anyone else?

7        A      Yes.

8        Q      When?

9        A      In May, roughly, of 2003.

10       Q      And who filed suit against you?

11       A      Lenox Place Apartments.  Same party as

12   the other case.

13       Q      And what was the nature of their lawsuit

14   against you?

15       A      It was a suit for eviction.

16       Q      Okay.  And you filed a counterclaim?

17       A      In my rough sort of way, I did file one

18   in that case.  It was not really pursued in that

19   particular case.  Another counterclaim on a related

20   suit, I'd say, was the one that actually was a real

21   counterclaim.  It was actually followed up on.

22       Q      So I'm aware of the lawsuit that you

23   filed against Lenox Place, and now you've described

24   one in May of 2003 where Lenox Place had sued you.

25   Was there yet a third one?

1     A     Yes, sir.

2     Q     And the one that was filed in May of

3 2003, was that here in Hillsborough County as well?

4     A     Yes, sir.

5     Q     And it had a separate case number than

6 the one that you described a moment ago that you

7 filed to get your security deposit back?

8     A     Yes, sir.

9     Q     How did the May 2003 eviction case

10 resolve?

11     A     It resolved ultimately in a victory for

12 the defendant, me, after a long process, including

13 an appeal.

14     Q     And did you have an attorney representing

15 you in that action?

16     A     No, sir.

17     Q     What was the basis that Lenox Place was

18 using for the eviction?

19     A     Non-payment of rent is what they claimed.

20     Q     Okay. And what was the third lawsuit in

21 this saga with Lenox?

22     A     It was the same party filed in late

23 November or December of 2003.

24     Q     So Lenox Place filed a second lawsuit

25 against you in November or December of 2003?

1    A    Yes, sir.

2    Q    Again in Hillsborough County?

3    A    Yes, sir.

4    Q    Okay.  And what was the nature of that

5    lawsuit?

6    A    It was a suit for eviction, holdover

7    tenant.

8         THE REPORTER:  I'm sorry.  Repeat that.

9         THE WITNESS:  Eviction for holdover

10        tenant.

11   Q    In other words, Lenox Place was

12   contending that you stayed longer than your lease?

13   A    Yes.

14   Q    What was the outcome of that case?

15   A    Again, after a very lengthy process,

16   which just finished in October, a victory for the

17   defendant, me.

18   Q    And did you have an attorney in that

19   case?

20   A    No, sir.

21   Q    All right.  Other than those three

22   matters, have you ever been involved in litigation,

23   either suing or being sued?

24   A    Yes, sir.

25   Q    Okay.  Before I leave the third lawsuit

1  with Lenox, I believe the third lawsuit, which was

2  filed in November or December of 2003, you indicated

3  there was a counterclaim?

4      A      Yes.

5      Q      What was your counterclaim for?

6      A      Unlawful eviction and damages stemming

7  from that whole concept.

8      Q      Did you recover damages?

9      A      On paper, I did, yes.

10     Q      What does that mean?

11     A      I received a judgment in my favor for

12 damages, compensatory and punitive, but I have yet

13 to see a cent from that judgment.

14     Q      How much is the judgment for?

15     A      Five thousand and some odd dollars.

16     Q      But that judgment is final?

17     A      Yes, sir.

18     Q      So you're now going to get an

19 introduction into my favorite part of my practice,

20 which is collection.

21     A      Absolutely.  Yes.

22     Q      Well, at least you know where their

23 assets are.  Okay.  What other litigation have you

24 been involved in, besides this one that we're here

25 on today?

1    A     I was sued for collections.

2    Q     By lenders of some sort?

3    A     Yes, sir.

4    Q     Okay.  On how many occasions?

5    A     Twice.

6    Q     And were those both in Hillsborough

7  County?

8    A     Yes, sir.

9    Q     Are either one of those cases still

10 pending?

11   A     No, sir.

12   Q     What years were those filed, if you

13 recall?

14   A     I don't know for sure, but I'm going to

15 say roughly 2004 and 2006.

16   Q     Same defendant -- or I'm sorry -- same

17 plaintiff in both cases?

18   A     No, sir, two different plaintiffs.

19   Q     Would you tell me who the plaintiffs

20 were?

21   A     I don't recall the names.  They were long

22 names that had very little resemblance to the

23 original creditor.

24   Q     Okay.  But the style of the case was

25 whoever the plaintiff was versus David Pilver?

1     A     Yes, sir.

2     Q     Any middle initial used or anything like

3 that?

4     A     Potentially, yeah, my middle initial L

5 might have been used.

6     Q     Okay.  And what does the L stand for?

7     A     Lindsey.

8     Q     L-i-n-d-s-e-y?

9     A     Yes, sir.

10     Q     All right.  Any other litigation besides

11 those two collection cases, the three cases with

12 Lenox and the one we're here on today?

13     A     I think that's all.

14     Q     Okay.  Have you ever signed a request

15 that a person be prosecuted for a crime?

16     A     Yes.

17     Q     How many occasions?

18     A     Once that I can recall.

19     Q     And what was that occasion?

20     A     That was against Mr. Hunt in 2003.

21     Q     Okay.  Have you ever been terminated from

22 a job?

23     A     Let's see.  The comic book store I

24 mentioned earlier where we had a parting of the ways

25 or a disagreement, I suppose you could call that a

1  termination.  It was somewhat mutual, but on the

2  part of the manager, he would maybe have considered

3  it a termination.

4      Q  Okay.  Any other things?  Any other jobs?

5      A  I don't think so.

6      Q  Your title when you were hired at the

7  James -- or the then called the Hillsborough County

8  Law Library was senior library assistant?

9      A  Yes, sir.

10      Q  Okay.  Has that title ever changed?

11      A  No, sir.

12      Q  Is there any upward career path for you

13  through the Hillsborough County Law Library?  In

14  other words, if you wanted to advance yourself to a

15  higher paying or a position with more

16  responsibility, is there a process for doing that?

17      A  Well, people can be reclassified into

18  different jobs.  So potentially the other specialty

19  positions at the library, if they were to open up, I

20  could be considered for those if I applied for

21  them.  However, the people who work at the library

22  now are the same people who worked there when I

23  started, and it's very -- it's all about longevity.

24  It's a very secure job, people like their job, so

25  they stay.

Q    Okay.  Assuming that somebody left, for whatever reason, in a position that would be either a higher-paying position or involved more responsibility, what would those titles be that you might envision yourself one day qualifying for?

A    Paralegal specialist is one.

Q    Anything else?

A    I suppose you could consider the directorship one, but that's not a civil service job.

Q    Do you have any knowledge of what the qualifications are to be the director?

A    I've never seen a formal list, but it's very similar to what we all do there every day with the increased responsibilities of handling accounting and payroll and stuff like that.

Q    But you would agree with me, though, that if that position ever did come open, for whatever reason, and it required, for instance, a master's degree, you wouldn't be qualified for that?

A    If it did require a master's, I would not.  However, I'm pretty sure that it currently does not require that.

Q    Okay.  And I'll find out from Ms. Wise later when we depose her what a director does.  But

1  what's your understanding of what a paralegal

2  specialist does?

3       A     Well, I was under the impression that it

4  did have some specific meaning up until quite

5  recently, the last two or three years, but I've

6  since learned that it really does not differentiate

7  at all from my job position.  So --

8       Q     Have you ever seen a job description for

9  paralegal specialist?

10      A     I may have, but I don't recall what was

11  on it.

12      Q     All right.  Do you know if the paralegal

13  specialist position pays more than the position you

14  have?

15      A     I think that it does.

16      Q     Okay.  Does it have more official

17 responsibility than the position you have?

18      A     Not in our library.

19      Q     Okay.  Other than those two positions, is

20 there anything else within the James J. Lunsford Law

21 Library that would be a position that either paid

22 more or had more responsibility that you would

23 envision yourself applying for at some time in the

24 future, should such a position open up?

25      A     The only other position is the librarian,

1  and the librarian job title can only go to people

2  who hold a Master's Degree in Library Science, which

3  I do not have, so I'm not currently qualified.  But

4  I think maybe some day I might get that master's

5  degree in that area, so it's potentially possible.

6      Q    Okay.  Who is currently the librarian?

7      A    Donna Barnes.

8      Q    And Ms. Barnes has been in that position

9  since you started?

10      A    Yes, sir.

11      Q    And she was in that position for a length

12  of time before that?

13      A    Yes.

14      Q    Okay.  When is the first time that you

15  learned how the chain of command worked at the law

16  library?  And by that, I mean the fact that there

17  was actually a board of directors.  Was that

18  something that you knew when you applied, or is that

19  something that you knew or learned of when you got

20  hired?

21      A    It would have been at some point after I

22  got hired and not necessarily immediately, because

23  they meet so infrequently that it's not an

24  overriding concern in day-to-day operations.  So --

25      Q    Who's your direct supervisor now?

1    A    Norma Wise.

2    Q    And has she always been your direct

3 supervisor?

4    A    Yes.

5    Q    Is there anyone else that ever has a

6 supervisory role over you?

7    A    Before she was director, there was a

8 different director, and he would have been

9 considered top dog and had supervisory position over

10 all the rest of us.  But he was mostly a hands-off

11 director and let Norma take care of all the

12 day-to-day operations.

13    Q    Do you remember that gentleman's name?

14    A    That was Bill Bailey, William Bailey.

15    Q    And when did Mr. Bailey cease being the

16 director with the Hillsborough County Law Library or

17 James J. Lunsford Law Library, however it was

18 known?

19    A    I'd say roughly 1998, maybe '99.

20    Q    When you were hired then, what was

21 Ms. Wise's position?

22    A    I don't know her job title at that point.

23 I think I knew it at one point, but I don't remember

24 it now.

25    Q    But in any event, she was your direct

1  supervisor when you were hired?

2      A    Yes.

3      Q    And when Ms. Wise assumed Mr. Bailey's

4  position, was someone hired to fulfill the role that

5  Ms. Wise had previously held?

6      A    No.

7      Q    All right.  Now, tell me the chain of

8  command.  If Ms. Wise is your direct supervisor, who

9  does she report to?

10     A    She would report to the library board,

11 which consists of a handful of members and a

12 director.

13     Q    Okay.  Now, is there anyone at the law

14 library that you supervise?

15     A    Not on a day-to-day basis.  However, when

16 we have contracted -- or I should say subcontracted

17 temporary employees, occasionally they require

18 initial training, and I help with that.  So I guess

19 you'd call that a bit of supervision.

20     Q    Okay.  In and around the time period of

21 2003 when the events with Mr. Hunt were going on --

22 and by the way, when I say the events with Mr. Hunt,

23 you understand what I'm talking about?

24     A    Yes.

25     Q    Those things that are reflected in the

1  lawsuit but basically covering his usage of the

2  library, disputes between you and him, and his

3  arrest for trespass.

4      A    Okay.

5      Q    Okay.  During that time period, how many

6  hours -- or what were the hours of operation of the

7  law library, if you recall?

8      A    There's only been two sets of hours.  I'm

9  not sure exactly the time period when they changed,

10  so I'm not sure if the 2003 period was before or

11  after they changed.  Before they changed, hours of

12  operation were 8:00 a.m. to 10:00 p.m. Monday

13  through Thursday, 8:00 to 5:00 Friday and 12:00 to

14  5:00 Saturday and Sunday.  Oh, wait.  10:00 to 5:00

15  on Saturday and 12:00 to 5:00 Sunday.

16          Then eventually they changed to what they

17  are now, which is 8:00 to 8:00 Monday through

18  Thursday, 8:00 to 5:00 on Friday, and 12:00 to 5:00

19  Saturday and Sunday.

20          I am leaning towards saying that they had

21  changed prior to the 2003 stuff.

22      Q    That makes sense, because a lot of the

23  documents I've seen talk about a dispute between you

24  and Mr. Hunt about him being in the library past

25  closing time, which was identified as 8:00 p.m.

1    A    That sounds right.

2    Q    All right.  In and around that time

3    period of 2003, did you have a regular schedule that

4    you worked?

5    A    Yes.

6    Q    What was that?

7    A    I worked Saturday through Wednesday.  I

8    worked the full Saturday and Sunday shift.  And

9    Monday through Wednesday, I would work roughly noon

10   to 8:00, noon to closing time.

11   Q    So during that time period, you were

12   responsible for opening the library and closing the

13   library -- well, let me ask it this way:  Were you

14   responsible for opening and closing the library on

15   Saturdays and Sundays during this time period?

16   A    Yes.

17   Q    Okay.  And on Mondays through Wednesdays,

18   were you responsible for closing the library?

19   A    Yes.

20   Q    But because it opened before noon, you

21   didn't open the library on the Mondays through

22   Wednesdays?

23   A    Correct.

24   Q    All right.  Now, if you came in at noon

25   and left at 8:00 p.m. Mondays through Wednesdays

1 during this time frame, would there be any other

2 employees that would be there at closing time with

3 you?

4     A    No.

5     Q    Okay.  If you came in at noon, would your

6 employment for the day overlap with other employees

7 on the Monday through Wednesday period that you

8 worked?

9     A    Yes.

10     Q    Who else worked there Monday through

11 Wednesday?

12     A    On a typical week, it would have been all

13 the other employees, Donna, Bill Spradlin and Norma

14 Wise.

15     Q    And do I understand correctly then that

16 Bill Spradlin, Norma Wise, Donna Barnes and you were

17 the only employees that worked for the law library

18 in this time around 2003?

19     A    There is one subcontracted temporary

20 employee who works one day a week currently and may

21 have worked more than that back then but not on the

22 days when I worked.

23     Q    Okay.

24     A    As far as I can remember.

25     Q    When you worked at the library on your

1    own, were you responsible for assisting customers at

2    the front desk?

3         A     Yes.

4         Q     What types of things -- and I say

5    "customers."  I don't know if that's the right

6    term -- patrons.  What types of things would you be

7    responsible for assisting the patrons with in this

8    2003 time frame?

9         A     If someone came to the front desk and

10   asked for a book that they knew about specifically

11   and knew that it was behind the desk and asked for

12   it, I would fetch it for them.  If they came and

13   asked for a book, they didn't know whether we had it

14   or not or they needed to know if such a book

15   existed, I would find out and tell them where it was

16   in the library, if we had it.

17              If they had to return some CLE

18   audiotapes, I would take those.

19              THE REPORTER:  I'm sorry.  What kind of

20        audiotapes?

21              THE WITNESS:  CLE.

22              THE REPORTER:  Oh, CLE.

23         A     If they needed to check out any of those

24   things, I would handle that.  If they needed to pay

25   fines for bringing back CLE tapes late, I would take

care of the cash transaction. If people needed
change for dollar bills to use the copy machines, I
would take care of that.

     Q     Did any of your duties require you to
leave the front desk?

     A     Yes.

     Q     Okay. How would the front desk duties be
fulfilled during times when you were away from the
desk helping patrons? For instance, let's say one
patron needed a book and you had to help them go
find it, and at the same time somebody was at the
front desk trying to get change for copies or
something like that, how did you handle that?

     A     They would just wait until I got back to
the front desk. And to make that a lot more
convenient, I left a call bell on the front desk so
that if I was away from it and someone needed some
assistance, they could ring the bell, and I would
know there was someone waiting for me up there.

     Q     In this 2003 time frame, were there
periods of time during your work shifts where you
were not called upon to assist patrons and merely
had to sit at the desk or find other things to
occupy your time?

     A     Yes.

1    Q    Okay.  What percentage of a typical shift

2  would be that that I've just described, which I'll

3  call down time or non-patron and counter time?

4    A    I'd say maybe 20 percent.

5    Q    And what would you do during those

6  periods of time?

7    A    It varies.  I have plenty of reading

8  material available.  I have a laptop computer that I

9  usually have set up there somewhere.

10    Q    A personal laptop?

11    A    Yes, sir.

12    Q    Your own private laptop?

13    A    Yes, sir.

14    Q    Not something provided by the County?

15    A    Correct.  We also now have computer

16  terminals that are provided by the County that are

17  connected to the internet.  We didn't always.

18    Q    You didn't have computers connected to

19  the internet back in 2003?

20    A    It's hard to remember.  If we did, it was

21  on an extra-slow connection.

22    Q    All right.  Are you evaluated on an

23  annual basis?

24    A    Yes, sir.

25    Q    Who conducts your evaluations?

1      A     My supervisor, Norma Wise.

2      Q     Okay. Have you ever disagreed with one

3 of her performance evaluations of you?

4      A     As far as the total evaluation, I would

5 say no.

6      Q     Okay. How about any parts of it?

7      A     There was once or twice when there

8 were -- there might have been a particular line item

9 that I didn't necessarily agree with fully.

10     Q     Anything come to mind?

11     A     There's a section on the review form that

12 says something about accomplishments or yearly goals

13 or something like that, and I added some comments to

14 one of those one time that had been left out,

15 omitted.

16     Q     What types of things are you evaluated

17 on?

18     A     The communication skills and other things

19 that are part of the job duties and whether or not

20 there's been -- if there was any space for

21 improvement and if the improvement took place. I

22 don't really have a very strong recollection of all

23 the stuff that's on that form, because it's such a

24 routine and casual thing, the review, that I don't

25 pay a whole lot of attention to it.

1    Q    Okay.  Have you ever been counseled or

2  reprimanded for poor performance while employed at

3  the law library?

4    A    Never.

5    Q    Okay.  Ever received any discipline of

6  any type for any reason from your employer at the

7  law library?

8    A    No.

9    Q    Have you ever seen the law library rules?

10   A    Yes.

11   Q    In the 2003 time frame, were there law

12  library rules?

13   A    There was a document that said something

14  like "Rules of the Library" or "Law Library Rules,"

15  yes.

16   Q    Do you know who wrote those rules?

17   A    I don't know who the original author was.

18  As typed up and amended from time to time, I think

19  it would have been Norma Wise.

20   Q    Did you have any role in creating the

21  rules that were in effect in 2003?

22   A    No, sir.

23   Q    Did you ever have an occasion to tell

24  anyone affiliated with the law library that the law

25  library rules were insufficient for any reason?

1    A    I don't believe so.

2    Q    Okay.  Did anyone ever ask you your

3  thoughts on whether the law library rules were

4  sufficient?

5    A    No.

6    Q    To your knowledge, have the law library

7  rules ever changed?

8    A    Yes, I think they have.

9    Q    Did you have any role in any changes to

10  the rules?

11    A    No.

12    Q    Have you ever read any portion of the

13  United States Constitution?

14    A    Yes.

15    Q    What portions do you recall reading?

16    A    At one point or another, I believe I've

17  read the whole thing either in school or, you know,

18  various projects I was involved with.  In the

19  library, I have occasion to read clauses when I'm

20  trying to help the customers find specific things.

21    Q    All right.  And have you ever read the

22  First Amendment?

23    A    Yes, sir.

24    Q    Have you ever heard the term "due

25  process"?

1     A     Yes, sir.

2     Q     Do you understand what that phrase means?

3     A     Yes.

4     Q     Before you say "yes," there's a lot of us attorneys that have no idea what it means. So what is your understanding of what due process is?

7     A     My understanding is that when there's a prescribed method for handling a case, a protocol for all the ways that it is to be evaluated, that a person has a right to be evaluated as that prescription reads. You know, if there's steps to it, they need to go through all the steps. And due process is, I guess, the guarantee that they won't shortcut someone on their justice.

15     Q     Okay. You understood when you were hired that the actions that you'd be taking for the Hillsborough County Law Library would be actions taken as a government official, didn't you?

19     A     I'm not sure about the word "official," because that sounds a little higher than my station. But as a government employee or representative of the government, yes.

23     Q     Okay. Were you aware in 2003 that government employees are prohibited from violating individuals' constitutional rights?

A    In that sense of putting all of those ideas together in one sentence, I don't think I was specifically aware of that. But it makes sense.

Q    Did you ever have any training at the law library about what the limitations of your authority was as a law library employee?

A    No.

Q    Okay. When did you first meet Dennis Hunt?

A    I believe it was in the spring of 2003, I would say.

Q    How did you meet him?

A    I first recall seeing him as a customer or as a patron in the law library. We had some discussion at the front desk about CLE audiotapes.

Q    What discussion did you have about the CLE audiotapes?

A    He apparently had overheard a partial conversation between me and another patron who was asking about the materials. The other patron was an attorney either returning some or checking some out. And Dennis was interested in what those things were, what their purpose was, what our policy was about checking them out or letting people listen to them.

1    Q    Okay.  What was the policy about CLE

2 tapes that you explained to Mr. Hunt; in 2003, that

3 is?

4    A    CLE audiotapes at the time could be

5 checked out to an active member of the Florida Bar

6 who had a Hillsborough County address.  Other

7 patrons were welcome to listen to the materials, but

8 they couldn't take them out of the building.

9    Q    Now, was that part of the law library

10 rules?

11    A    I believe so.

12    Q    Okay.  And when I say that, I mean the

13 written rules.

14    A    I think so.

15    Q    Do you know why attorneys with

16 Hillsborough County addresses were given the

17 privilege of taking materials out of the library but

18 others were denied that privilege?

19    A    I'd say the audiotapes are there as a

20 courtesy.  The Hillsborough part is just so that we

21 have a more -- a higher likelihood of getting the

22 stuff back in a timely manner so that other people

23 can get access to it also.  Since non-lawyers don't

24 need CLE audio credit to continue their employment

25 licenses, it's not offered for checkout to them.

1     Q    Is there some specific experience that

2    you're aware of that led to the conclusion that the

3    law library is more likely to get the materials back

4    from an attorney as opposed to a non-attorney?

5    A    No.  If you're making reference to the

6    statement I just made, I was talking about the

7    address and the locality, how far away they were

8    from the library.

9    Q    I see.

10    A    Yeah.

11    Q    Okay.  These CLE collections were

12    materials that the law library acquired?

13    A    Yes, sir.

14    Q    And they were made available for people

15    to use?

16    A    Yes.

17    Q    So was it during this discussion of the

18    CLE materials that you learned Mr. Hunt's name?  Or

19    when did you know him by name?

20    A    I think it was later than that incident.

21    I think another time where we'd had a discussion and

22    Mr. Hunt was apparently unhappy with something, he

23    called in to complain about it.  And I was later

24    told about the complaint.  I think that's when I

25    first learned his name.

1    Q    Okay.  When you had the initial encounter

2  with Mr. Hunt that you recall over the CLE

3  materials, did you recognize him as someone you had

4  seen within the law library before, or in your mind

5  at the time was this the first occasion that you had

6  seen this gentleman?

7    A    To the best of my recollection, if I had

8  seen him prior to that time, it didn't stand out as

9  anything memorable.  Maybe I might have seen him a

10  couple of times the same week or around -- but it

11  was all very recent to that occasion.

12    Q    Okay.  How would you describe the

13  encounter you had with Mr. Hunt regarding the CLE

14  tapes?

15    A    It was memorable because Mr. Hunt seemed

16  unhappy with the policy.  He wanted to know the

17  director's name, and I just got the sense that it

18  was something that he was going to be following up

19  on in a manner that he was going to make a complaint

20  or ask for a change in the policy or something like

21  that.

22    Q    And how did you feel about that?

23    A    As far as the CLE stuff goes, I don't

24  have any particular emotion one way or the other

25  about the policy.  So if he were unhappy with it and

1    it were to be changed or something, it wouldn't

2    matter to me.  But as far as his attitude, it was a

3    little bit troubling.

4         Q    Why is that?

5         A    Just because he seemed agitated and

6    unhappy, and it didn't seem like there was a very

7    good reason for that, almost like he was just

8    seeking something to be conflicted about.

9         Q    He expressed to you that he would like to

10   check out the CLE materials?

11        A    I don't think he went so far as to say

12   that, but his reaction to the policy of it not being

13   available to non-lawyers was -- I could tell he

14   didn't like it.

15             MR. TODD:  Chris, can we take a break

16        when you have a --

17             MR. RODEMS:  Yeah.  Let's do it right

18        now.

19             (Recess from 10:26 a.m. to 10:34 a.m.)

20   BY MR. RODEMS:

21        Q    What was it about Mr. Hunt's unhappiness

22   with the policy and his request for the director's

23   name that seemed troubling to you?

24        A    Well, because we hadn't had very many

25   interactions.  I mean, we'd only been speaking to

1     each other for a couple of minutes when he seemed to

2     be unhappy with the state of affairs. And I just --

3     as someone who's worked in customer service for so

4     many years, that's just -- it's just not a good

5     thing when one of my customers is unhappy. So it

6     didn't seem like anything that had really brought it

7     about other than something within him.

8         Q     Did you form any opinions about Mr. Hunt,

9     based on that encounter?

10       A     I think I reserved opinion for, you know,

11     to see what future interactions with him might be

12     like.

13       Q     Okay. When he seemed unhappy and asked

14     for the director's name, did he use any profanity?

15       A     No.

16       Q     Did he yell?

17       A     No.

18       Q     Did he do anything that was unsettling

19     such as slamming his hand down on the desk or

20     anything that you would describe similar to that?

21       A     No, nothing like that.

22       Q     And how long do you think this encounter

23     between you and him lasted over the CLE materials?

24       A     Just a couple of minutes. Three to five

25     minutes, I'd say. Just enough time to discuss the

1  policy and him asking for the things he needed.

2      Q      Your personal opinion, do you think

3  attorneys should be given greater privileges than

4  the members of the general public in the law

5  library?

6      A      Generally speaking, I do not think so.

7      Q      Anything about the CLE tapes that you

8  thought should -- and, again, your personal

9  opinion -- that you thought attorneys should be

10  given a special privilege as opposed to

11  non-attorneys?

12      A      Well, as the policy has been expressed

13  and explained to me and the reasons for it, it seems

14  fairly reasonable to me that because it's required

15  for their licenses, that it's something that

16  wouldn't necessarily be available to, you know,

17  people who aren't in that field.  Especially since

18  we're allowing anyone who wants to listen to it

19  access to it in the library, it doesn't seem like

20  very much of a limitation.

21      Q      What does "CLE" stand for?

22      A      Continuing Legal Education.

23      Q      And these CLE materials are audiotapes?

24      A      At the time, they were.

25      Q      Okay.  And are these audiotapes of people

1  teaching or lecturing on areas of the law?

2      A     That is my understanding, yes, sir.

3      Q     Do you think that there's something

4  inherent about CLE tapes that members of the general

5  public should not have the same interest in them as

6  lawyers?

7      A     I think members of the general public

8  would find them excruciatingly boring.

9      Q     Well, I'll venture to say that some

10 members of the bar would find them excruciatingly

11 boring.  In fact, having been the voice on several

12 of those CLE tapes giving lectures, I'm sure that

13 people are quite bored with them.

14         Okay.  Did there come a time when you

15 observed Mr. Hunt in the law library using his own

16 personal photocopier?

17     A     Yes.

18     Q     Okay.  Was that before you -- well, it

19 couldn't have been before.  How long was that after

20 the CLE materials discussion you had with him?

21     A     Some number of weeks.

22     Q     And how did it come to your attention

23 that Mr. Hunt had a personal photocopier in the law

24 library?

25     A     I heard this loud beeping sound.  I was

in the back office, and I heard it from back there.

And I came out and kind of looked around to see if I

could see what it was. At first, I thought it was

somebody's cell phone or a pager going off. I

couldn't see anything, looked a little further out

into the library and couldn't see anything. After

it had been going for a couple of minutes, I finally

asked a patron if he knew what it was. And he said,

"No, I thought it was something you were doing back

there."

        So I eventually walked around the library

until I found the source of the noise, and it was

the portable fax machine, copy machine, that

Mr. Hunt had.

        Q       Okay. What did you do at that point?

        A       When I saw that he was using a portable

device to copy our materials, I said to him that it

was currently my understanding that we did not allow

that in the library and that therefore I'd have to

ask him to stop using it.

        Q       What was his response to that?

        A       Well, he said -- he wanted to know why.

He wanted to know why we didn't allow it. So we got

into a discussion about that. And at one point he

said that another staff member had told him that it

1  would be no problem to have it, to bring that in and

2  use it there.

3      Q    What was your understanding at the time

4  as to why you were telling Mr. Hunt he couldn't use

5  his personal copier?

6      A    It was my understanding that we did not

7  allow that.  It had come up in a discussion once

8  before.  And because of the limited amount of

9  self-generating revenue streams the library has,

10  copies being one of the primary ones, I think that

11  played some part in the policy.  But it wasn't

12  anything very, you know, formal or -- you know, it

13  rarely came up.  I mean, it only came up a couple of

14  times in all the 14 years I've been working there.

15  So it was not a matter of huge concern or focus.

16      Q    Was there a written rule that prohibited

17  the use of personal photocopiers?

18      A    Not that I'm aware of.

19      Q    Okay.  Did Mr. Hunt comply with your

20  order that he stop using it?

21      A    He did stop using it, yes.

22      Q    And I'm just referring to that particular

23  day.

24      A    Yes.

25      Q    Okay.  What authority did you have to

order Mr. Hunt, a private citizen, to stop using an electronic device in the library?

A    Well, I consider my authority to be to enforce the policies and the rules of the library, whatever they may be. If the rule said someone has to have shoes before they can come in, I would have enforced that rule. And since I understood that to be a policy that we didn't allow that, I was just enforcing it like anything else.

Q    If there had not been a policy against it but you just didn't like it, would you have had the authority to tell him to stop?

A    I don't think my personal preferences would enable me to modify someone's behavior in the library.

Q    Okay. And let me give you an extreme example. Let's suppose that a patron came in with green hair. Would you understand that you have the authority to ask a person to leave because they have green hair, even if it did not violate the law library policy?

A    If it didn't violate a policy, I don't think I would have that authority.

Q    Okay. Since it's come up so infrequently in the time that you've worked there, how did you

1    know on this particular day when you saw Mr. Hunt

2    using his own personal photocopier that law library

3    policy forbid him from doing that?

4         A    Could you repeat that?  I'm sorry.

5         Q    Yeah.  You saw him using his copier.

6    And, you know, for instance, you could have seen

7    somebody using a cell phone, you could have seen

8    somebody using a dictation machine, you could have

9    seen somebody using a laptop.  There was something

10   about, I gather, from the fact that he was using his

11   personal photocopier that led you to encounter him

12   and tell him it was a violation of policy.

13             What I'm trying to find out -- and I

14   apologize for the badly worded question -- is how

15   did you know when you saw Mr. Hunt using his

16   personal photocopier that that was something that

17   was not allowed?

18        A    Well, the sound is what guided me to his

19   location --

20        Q    Right.

21        A    -- and seeing he was using this thing.

22   And I knew that it was not allowed because I had

23   had -- at the time I thought I recalled having a

24   conversation about people bringing in their own

25   duplicating devices with the other employees at the

1    library.  And it was my understanding at that point

2    that it was something we didn't allow.

3        Q    Okay.  Did Mr. Hunt ask to see the

4    policies or the reasons that you were giving to him

5    for not allowing --

6        A    He did, yes.

7        Q    And tell me about that colloquy.

8        A    I tried to explain that, you know, I

9    didn't know -- I didn't think that it was a written

10   policy necessarily because so much of what governs

11   behavior in the library is not written, just normal

12   standards of, you know, quiet and not interrupting

13   other patrons and things like that.  I said, "If we

14   do have a copy of the rules, it's, you know, pretty

15   basic and only contains a few items."  But I was

16   perfectly willing to show him that, so I fetched a

17   copy and gave it to him.

18       Q    By the way, no other patrons had

19   complained to you about this, had they?

20       A    About --

21       Q    About him using his personal photocopier?

22       A    Other than the one gentleman who also was

23   wondering where the noise was coming from -- and for

24   him, it was a noise issue -- no one expressed any

25   complaints.

1    Q    Okay.  Well, he didn't seek -- this

2  person didn't seek you out and say, "I'm hearing a

3  noise.  Can you stop it," did he?

4    A    No, he didn't.

5    Q    Okay.  You asked him, "Hey, do you know

6  where that noise is coming from?"

7    A    Correct.

8    Q    And he said, "I thought it was you"?

9    A    Right.

10    Q    Meaning you, David Pilver?

11    A    Yes.

12    Q    Okay.  Now, following -- by the way, was

13  there anything that Mr. Hunt did in connection with

14  this encounter about the photocopier that in your

15  mind was inappropriate?

16    A    Not inappropriate.  His demeanor, I guess

17  I could have asked for a bit friendlier maybe, but

18  nothing that rose to the level of inappropriateness

19  at that time.

20    Q    He didn't yell?

21    A    No, sir.

22    Q    Didn't use profanity?

23    A    No.

24    Q    Didn't refuse to comply with your

25  directive?

1    A    No.

2    Q    Was it subsequent to that that you

3 learned who he was through whatever complaints he

4 had made?

5    A    I think so.  It's hard to recall.

6 There's been so many complaints from him that it's

7 hard to remember the precise order in which they

8 occurred.  So it's possible that I had already

9 received information about a complaint that he had

10 made prior to that.  So I may have known his name at

11 that point.  But if not, then that event would have

12 been the first time.

13    Q    Okay.  Are you aware as to whether

14 Mr. Hunt ever issued written complaints to Norma

15 Wise about anything going on at the law library?

16    A    Yes, he did.

17    Q    How did you become aware that Mr. Hunt

18 had written complaints to Norma Wise?

19    A    I was shown copies of, as far as I know,

20 everything that he sent.

21    (Exhibit 2 marked for identification.)

22    Q    All right.  Mr. Pilver, have you had a

23 chance to look at Exhibit 2?

24    A    Yes, sir.

25    Q    Have you ever seen it before?

1     A     Yes, sir.

2     Q     It appears to be a handwritten memo from

3 Dennis Hunt to Norma Wise.

4     A     Agreed.

5     Q     Do you know if you -- well, the date on

6 this is April 30th, 2003. Do you know if that is

7 the general time frame that you would have seen this

8 document?

9     A     Or shortly thereafter, yes.

10     Q     Okay. Do you know why Ms. -- well, did

11 Ms. Wise tell you why she was showing this to you?

12     A     Yes.

13     Q     And why was that?

14     A     She wanted me to be aware of everything

15 that was -- that concerned me. And in this case,

16 references to the desk clerk, I'm assuming, refer to

17 me. And she wanted me to be aware of anything that,

18 you know, could affect future interactions with the

19 customers.

20     Q     Other than to make you aware, did

21 Ms. Wise have any comments about this document that

22 you recall?

23     A     I'm not remembering anything specific.

24     Q     Okay. What was your reaction upon seeing

25 this?

1      A    Well, I thought it was -- I assumed after

2    him asking for the name of the director and a copy

3    of the rules and everything that such a complaint

4    was forthcoming.  So when I got to see a copy of it

5    and found out that such a thing had been filed, it

6    didn't surprise me at all.

7      Q    Were you unhappy with Mr. Hunt for

8    sending this to Ms. Wise?

9      A    It didn't really bother me.

10      Q    By this time now, you'd had two

11    encounters with him, one over the CLE materials and

12    one over the photocopy machine, and now his letter

13    to Norma Wise of April 30, 2003, asking for copies

14    of the policies and complaining about the policies.

15    By this time, had you formed an opinion of Mr. Hunt?

16      A    I was beginning to think of him in a

17    certain light, yes.

18      Q    And what was that?

19      A    I was beginning to think of him as

20    someone who seemed to -- I don't know -- maybe

21    thrive on conflict or -- it's hard to summarize it,

22    but just someone who's always in kind of, you know,

23    ask-for-the-supervisor mode, make-a-complaint mode.

24      Q    Based on your two in-person encounters

25    with Mr. Hunt at this point, did you have any

1  perception of his financial status?  Did he appear

2  to be a vagrant, homeless?  Did he appear to be

3  wealthy?  Did he appear to be -- did you -- was

4  there anything about his appearance that gave you

5  any impression of his financial circumstances?

6          A    No.  There was nothing overt about the

7  way he looked or anything that made me make any

8  assumptions one way or the other.

9          Q    Have you ever in your time at the

10  Hillsborough County Law Library had people come into

11  the law library that you looked at their manner of

12  grooming or appearance or whatever and reached a

13  conclusion that this could be a homeless or a

14  vagrant person?

15          A    Yes.

16          Q    Was there anything about Mr. Hunt's

17  appearance that gave you that impression about him?

18          A    No.

19          Q    Okay.  Did you and Mr. Hunt have any

20  discussion -- before this April 30, 2003, letter to

21  Norma Wise, which we've marked as Exhibit 2, did you

22  and Mr. Hunt have any discussion about why he wanted

23  to make his own photocopies with his own photocopy

24  machine?

25          A    Prior to him bringing in his own machine,

I don't think we had any such discussions. I'm positive that we did not.

Q   At the time that you had the encounter in which you asked him to stop using it and he complied, did you have any discussions about why it was that he wanted to use his own photocopier?

A   He may have stated or implied that the cost of our copies at 20 cents a page was exorbitant, and that's why he wanted to use his own machine. That's what I gathered, if he didn't say it expressly.

Q   Okay.  Did Ms. Wise ask you to do anything specific upon showing you this letter from Dennis Hunt dated April 30th, 2003?

A   I don't recall her asking me to do anything specific.  I think the idea of what our policy would be from then on was an open question at that point.

Q   Okay.  Do you know what Ms. Wise did about this letter from Dennis Hunt?

A   Eventually there was a board meeting called to set the policy one way or the other for final and good.

Q   Did you go to that board meeting?

A   No, sir.

1    Q    Okay.  Did anyone from the board talk

2  with you before that board meeting about the

3  photocopier policy?

4    A    I don't think so.

5    Q    Okay.  Do you --

6    A    Well, I guess Norma may technically be a

7  member of the board, in which case, her.

8    Q    Other than Norma Wise, was there anyone

9  at the law library that you would have discussed the

10  photocopier policy with before the board meeting on

11  it?

12    A    I may have discussed it with my

13  co-workers, just as a chatting point.

14    Q    Okay.  And do you know how it came about

15  that a board meeting got scheduled?  Or rather I

16  should say do you know how it came about that this

17  became an item on the agenda for the law library

18  board to consider?

19    A    No, I don't.  And I don't know if it was

20  a regularly scheduled meeting or if they called it

21  special for this.  I don't know.

22    Q    Are you aware as to whether or not

23  Ms. Wise wrote a response to Mr. Hunt about his

24  April 30th, 2003, letter?

25    A    I'm under the impression that some --

some response was given.  Whether it was written or verbal, I'm not sure.

Q     Did Ms. Wise ask you to assist her in preparing a response to Mr. Hunt?

A     No.

Q     Did she ask you to review a draft of her response to Mr. Hunt?

A     Not that I recall.

Q     Okay.  Do you recall having any input whatsoever on Ms. Wise's response to Mr. Hunt?

A     No.

Q     Did Ms. Wise give you a copy of her response to Mr. Hunt?

A     I think I saw a copy at some point.  But how soon in time or how recent in time to it being sent, I can't recall.

Q     Did there come a point when you became aware that Mr. Hunt had made a second written complaint to Ms. Wise?

A     Yes.

Q     Do you remember what the nature or what the topic or discussion was in the second complaint?

A     Well, again, because there were so many, trying to remember the specific order in which the complaints came is tough.  But --

1    Q    Well, let me do this then:  Let me mark

2    this as Exhibit 3.

3         (Exhibit 3 marked for identification.)

4    Q    Have you had a chance to read this?

5    A    I've skimmed it, yes, sir.

6    Q    Have you ever seen this before?

7    A    Yes, sir.

8    Q    Okay.  Do you know approximately when you

9    would have seen this for the first time?  Would it

10   have been close to the date on the letter of May 5,

11   2003?

12   A    That sounds reasonable, yes.

13   Q    Okay.  And this is a letter to Ms. Wise

14   from Dennis Hunt?

15   A    Agreed.

16   Q    Did Ms. Wise show this to you, or did you

17   happen to see it in some other way?

18   A    I think she showed it to me.

19   Q    When she showed it to you, what was her

20   comment?

21   A    If I recall correctly, this is the period

22   in which she told me about the phone conversation

23   she had had with Mr. Hunt and told me that Mr. Hunt

24   seemed quite focused on me personally in his

25   discussions of this problem he had about the copy

machines.  Apparently the conversation kept turning on things regarding me, and I couldn't figure out why at the time.  But that's what she wanted to tell me as somewhat of a warning, if I remember correctly.

Q    She wanted to give you a warning?

A    Yes, sir.

Q    A warning as to what?

A    That this individual seemed unnaturally preoccupied with me, seemed to be having a personality conflict with me and maybe was unhappy with me and, you know, just to be wary of interactions with him in the future.

Q    Wary in what way, did you understand?

A    I understood it to mean that I should be on my Ps and Qs and, you know, make sure that I was giving good customer service and everything at all times to avoid having any further reason for Mr. Hunt to complain about me.

Q    Can I direct your attention to the third paragraph, which begins, "I have questions of the coin deposits."  Take a look at that for a moment.

A    Okay.

Q    We're going to attach this to the deposition, so I don't need to read the whole thing

out. But to summarize what this paragraph is talking about, he's basically -- Mr. Hunt is basically saying there appears to be some cash coming into the library, and what steps or plans are in place so that the desk clerk doesn't steal those monies.

A    That sounds like a good summary of that paragraph.

Q    How did that make you feel when you read that?

A    I thought it was pretty audacious for someone to make a statement like that, and I thought it was kind of out of left field. It didn't seem like it had anything to do with the -- his portable fax machine. And I don't know where the idea came from for that comment to come out, so it was just weird.

Q    Okay. Was there ever any discussion in the law library between you and Norma Wise or anybody else about conducting an audit to see if the cash receipts matched up appropriately?

A    No.

Q    Were there any suggestions at any time by anyone that you had somehow taken money that belonged to the law library?

1     A     Could you repeat that, please?

2     Q     Yeah.  Were there ever any allegations at

3 any time by anyone that you had taken money that

4 belonged to the law library?

5     A     You mean other than this?

6     Q     Other than Mr. Hunt's letter.

7     A     No, sir.

8     Q     Okay.  Would you agree with me that he

9 doesn't accuse you of taking money in this letter?

10     A     He does not specifically accuse me.  It's

11 just implied.

12     Q     Okay.  That's how you read this

13 paragraph?

14     A     Yes, sir.

15     Q     Okay.  And how did that make you feel?

16     A     I didn't appreciate it.  But since I knew

17 it was completely baseless, I just kind of looked at

18 it as a quirk, a strange event.

19     Q     All right.  Did Ms. Wise ask you to do

20 anything and to respond -- did Ms. Wise ask you to

21 do anything after reviewing this letter?  Did she

22 say, "I want to you write up a summary of what

23 happened"?  Or did she say, "I want you to, you

24 know, help me write a response to Mr. Hunt"?  Was

25 there anything that she requested you to do?

1    A    No, I don't think so.

2    Q    Did Ms. Wise tell you what she was going

3 to do in response to this letter of May 5th, 2003,

4 which we've marked as Exhibit 3?

5    A    I believe she told me that there would be

6 discussions with the board about what the policy

7 would be and that the official final policy was

8 still pending.

9    Q    Just so that we're clear, when you just

10 referred to the policy, you're referring to the

11 photocopier and not any policies about how cash is

12 being handled?

13    A    Correct.  As far as I know, the whole

14 discussion of cash or anything began and ended with

15 this letter.

16    Q    All right.  Let me show you what we'll

17 mark as Exhibit 4, Mr. Pilver.  This is a letter

18 dated May 19th, 2003, to Ms. Wise from Mr. Hunt.

19 And after you've reviewed it, let me know.

20    A    Okay.

21    (Exhibit 4 marked for identification.)

22    Q    This is Exhibit No. 4.  Have you ever

23 seen this before?

24    A    Yes, sir.

25    Q    Do you know if you saw it around the time

1   frame that the letter is dated, around May 19th of

2   2003?

3       A       I'm sure that I did.

4       Q       Okay.  Mr. Hunt writes to Ms. Wise, "This

5   letter is to notify you of a condition, likely to be

6   injurious to myself, which your desk clerk David

7   Pilver had begun on Wednesday, May 14, 2003."

8       A       Yes.

9       Q       Did I read that correctly?

10      A       Yes, sir.

11      Q       Okay.  Did Ms. Wise show you this letter?

12      A       Yes.

13      Q       Before she showed you this letter, were

14  you aware that Mr. Hunt had some beef or

15  disagreement about the manner in which you had

16  handed books to him?

17      A       No, sir.

18      Q       Okay.  When you read this letter, did you

19  have an understanding of what Mr. Hunt's complaint

20  was?  Not whether it was true or not, but when you

21  read this letter, did you have an understanding of

22  what his complaint was about how he claims you were

23  handing the books to him?

24      A       My understanding is based purely on his

25  description, so I understand the picture he was

1  painting with this description, but it didn't have

2  any relation to reality.

3     Q    Before receiving this letter, was there

4  ever an encounter between you and Mr. Hunt in which

5  you handed him something and he said something to

6  let you know that he didn't think that was an

7  appropriate way to hand something to him?

8     A    No, no.

9     Q    Okay.  When Ms. Wise showed you this

10  letter, what was her comment to you?

11     A    I don't recall any specific comments.

12  The gist of it was "Here's another complaint.  Let's

13  go over it."

14     Q    So this is now the third complaint, at

15  least --

16     A    At least.

17     Q    -- that Mr. Hunt had placed in writing,

18  two of which directly involved complaints about you,

19  this time naming you personally?

20     A    Yes.

21     Q    How did you feel after you reviewed this

22  document about this situation with Mr. Hunt?

23     A    Well, I felt that it was a preposterous

24  allegation, and it really made me wonder about the

25  mind-set of the person who wrote the letter to

1   wonder how they could perceive something so

2   radically different from the way in which it had

3   actually happened.

4        Q    When you read the letter, in the third

5   paragraph Mr. Hunt specifically references a date of

6   the evening of May 14th when he requested four,

7   maybe five books.

8        A    Yes.

9        Q    Do you see that in the third paragraph?

10       A    Yes, sir.

11       Q    In reading that in the letter, did that

12   reference to that date remind you of an encounter

13   with him on that particular date so that you had a

14   reference point of what he was talking about?

15       A    Yes.

16       Q    Okay.  Not that you would necessarily

17   remember May 14th for any particular reason, but

18   this occasion, whatever it was, that he says, "I

19   asked for maybe four or five books," did you

20   remember what he was talking about?

21       A    Yes, sir.

22       Q    What do you recall about that encounter

23   with Mr. Hunt that he apparently is rendering his

24   version in Paragraph 3 of this Exhibit No. 4?

25       A    I do recall that he asked for several

volumes that are kept -- were kept behind the

counter at that location in what we call our reserve

area. They're -- if I remember correctly, they were

volumes from various Matthew Bender publications.

And whatever he asked for, I gave to him. And that

sounds about right, four or five different volumes.

Other than that, nothing about the interaction was

noteworthy.

    Q    Okay. Do you see the final sentence, "If

David Pilver does want to be disturbed while

watching his television programs, he should sit

inside your office with the television, and close

the door"?

    A    Yes.

    Q    Was there any occasion that you watched

TV while at work?

    A    Yes.

    Q    Okay. What would you watch on TV while

at work?

    A    Typically news.

    Q    And is there a television in the law

library?

    A    Yes.

    Q    And where -- in this time of 2003 that

Mr. Hunt is writing this letter, where is this

1    television located?

2         A     It would have been in what we called the

3    work room, behind the front desk.

4         Q     And you're allowed to watch that during

5    the workday?

6         A     Yes, sir.

7         Q     How do you get your job done if you're

8    watching TV?

9         A     Well, having the television on,

10   particularly for something like news, doesn't

11   necessarily mean having direct focus on it.  It

12   could be on in the background.  A lot of my job

13   involves filing, which is a really sort of an

14   automaton process, don't have to put a lot of

15   conscious thought into it.  So I'm certainly capable

16   of multitasking some things like that.

17              But additionally, on a good portion of my

18   day, especially during the week, I'm on the desk for

19   roughly half my shift.  And on the desk, if there's

20   no patrons asking for something at that particular

21   moment, I have, like we discussed before, a lot of

22   free time.

23        Q     Did Ms. Wise ask you any questions about

24   this letter as to whether what Mr. Hunt was alleging

25   was accurate or not?

1      A     No, I don't think she did.  I don't

2 recall anything, any questions.

3      Q     Did Ms. Wise ask you to do anything in

4 response to this letter of May 19th, 2003?

5      A     No.  Well, I'll have to backtrack there a

6 little bit.  Because it became clear that Mr. Hunt

7 was having an issue with his interactions with the

8 library staff, Ms. Wise consulted with the director

9 of the library board and decided temporarily, to

10 avoid any possible misconception or misconstrual of

11 the way in which we were handing books to people,

12 that we would stop handing them to people and only

13 put the books on the counter top.  So in that sense,

14 yes, she did ask me to do that.

15      Q     All right.  Did she talk to you at all

16 about your television watching habits while at work?

17      A     No.

18      Q     And how did you feel about Mr. Hunt,

19 having reviewed this letter?

20      A     It added to my previous conceptions of

21 him as someone who was really looking for conflict

22 of some sort and was not -- was not satisfied with

23 the levels of conflict that he had with us already

24 and was seeking more and different ways in which to

25 have conflict.  I was beginning to worry that this

1   was going to be an ongoing, constant thing with him.

2       Q       Okay.  Was dealing with this situation

3   with Mr. Hunt following this May 19th, 2003, letter

4   becoming an unpleasant experience for you?

5       A       Yeah, I would say it was beginning to be

6   unpleasant.

7       Q       Okay.  Would you have considered it to be

8   an annoyance?

9       A       That's a good word for it.

10      Q       You considered Mr. Hunt to be an

11  annoyance?

12      A       I considered his actions to be annoying.

13      Q       Now, you didn't know him outside of the

14  law library at all, did you?

15      A       No, I don't know him personally

16  whatsoever.

17      Q       Do you remember the date that the board

18  held a meeting to discuss the photocopier issue?

19      A       I remember the occasion, but I don't

20  remember what the date was.

21      Q       Okay.  Well, I have a document, and

22  just -- you know, we're not here to try to trick you

23  with dates or anything like that.  According to this

24  document, there was a board meeting on Monday, June

25  16th, 2003.  And then following that, there was

typed-up minutes of that meeting and signed by Bill Spradlin.

A    Okay.

Q    I'm just telling you that.  Have you ever seen the minutes, the typed-up minutes of that law library board meeting in which the photocopier use, the personal photocopier use, was discussed?

A    I can't recall if I saw the minutes or not.

Q    All right.  Whether you saw the minutes or not, did you become aware of the law library board's decision?

A    Yes, I did.

Q    Okay.  And would you have become aware of the law library board's decision within a day or two of the board meeting?

A    Yes, I think it was within half an hour of the board meeting finishing.

Q    Okay.  How did you find out within a half-hour of the board meeting finishing?

A    If I'm not mistaken, the board meeting took place in the library in our conference room.

Q    Oh.

A    And when they were done and the people were filing out, they told me what they had decided.

1    Q    When you say "they told me what they had

2  decided," who are you referring to specifically?

3    A    Norma and probably Sandra Kellaher.

4    Q    And Ms. Kellaher is an attorney who was a

5  member of the law library board at the time?

6    A    I think so, yes.

7    Q    Okay.  And what do you recall them

8  telling you?

9    A    That with the input from the -- I think

10  they were County attorneys, possibly, they had

11  decided to interpret a certain statute section about

12  public documents to mean that the policy should be

13  to allow people to bring in their own duplicating

14  devices if they wanted to.

15    Q    Okay.  And how would you describe

16  Ms. Wise's disposition or, you know, appearance when

17  she told you about the board's ruling?

18    A    Just informational, matter of fact.

19    Q    And upon finding out about this policy

20  decision, what was your reaction?

21    A    I didn't have any reaction.  I just took

22  it as information.

23    Q    Did it trouble you that the board took

24  Mr. Hunt's side instead of taking yours and the law

25  library board's -- or the law library's side?

1     A    No.  And I didn't see it in terms of

2  sides.  It was not a question of me versus him or

3  the library versus him.  It was a policy thing that

4  he wanted changed or clarified, and they did that.

5     Q    But by this time, you did have the sense

6  that Mr. Hunt perceived a personal problem with you?

7     A    Yes.

8     Q    Okay.  When you got this notification

9  from Ms. Wise that Mr. Hunt had written this letter

10  about how you handed books to him --

11     A    Yes.

12     Q    -- and Ms. Wise changed the policy about

13  how books were to be handed to patrons, did you feel

14  that that change in policy was necessary?

15     A    No.

16     Q    Okay.  Did you feel that the law library

17  was overreacting in reaction to Mr. Hunt's claim

18  that he could be injured by how you handed him

19  books?

20     A    To a degree, yes.

21     Q    Did you believe that Mr. Hunt was out to

22  get you at this point?

23     A    I began to wonder if he was out to get

24  me.

25     Q    Okay.  Were there any other problems or

1    issues or encounters between you and Mr. Hunt before

2    the events of early July in which you had problems

3    or perceived problems with his behavior or conduct?

4        A    Let's see.  We've covered the complaints

5    about the handing of books and the duplicating

6    device.  Yes, there was one other occasion that

7    stands out where he was dissatisfied with some of

8    his copies that he'd made on our machines.

9        Q    Would that have been before the board

10   changed the policy to allow him to bring in his own?

11       A    I don't remember.

12       Q    Okay.  What do you recall about the

13   occasion when he was dissatisfied with the copies?

14       A    I remember that it was closing time, and

15   he came up to the library to -- he came up to the

16   front desk of the library to turn in the copy

17   counter, which we had lent him, and pay for the

18   copies that he had made.  Normally the machines are

19   coin op, but the coin ops were not working that day.

20       Q    With a copy counter, somebody can take a

21   device over to the machine, input it in the machine,

22   make their copies, bring the counter back, and then

23   you can determine the number of photocopies that

24   were made and charge them the appropriate rate?

25       A    Exactly.

1    Q    Okay.

2    A    I had tallied up what the amount was and
3    told him what he owed for his copies.  And he just
4    kind of sat there staring at them and didn't make
5    any -- any move to pay for the copies or do
6    anything.  He was just standing there, and it was
7    weird.  This was getting towards probably, you know,
8    a couple of minutes after 8:00, closing time that
9    day.  And I was hoping he would hurry up and pay for
10   his copies and go.

11   And he then said, "Well, I've got this
12   batch of two or three here, which they're no good."
13   So I took a look at them and I agreed that on a
14   couple of them the quality that the machine had
15   produced was not readable, and I didn't think it was
16   fair to charge him for those.

17   So I said.  "Okay.  Well, we'll credit
18   you for those two and just charge you for the rest."

19   And I repeated how much the total would
20   now be.  And he still just stood there staring at
21   them for a few minutes.

22   And I said, you know, "So are you going
23   to pay for those?"

24   And he then said, "I don't want any of
25   them."  And he just threw them at me across the

desk.

Q    How far were you from him during this encounter?

A    About the same distance as we are right now.

Q    Which I would say is, what, three to four feet?

A    Yeah, that sounds about right.

Q    And you say that he took papers and threw them?

A    Yes, sir.

Q    And did they hit you?

A    I think so, yes.

Q    Anything like that ever happen to you before in the law library?

A    Not -- not to that extent, no.  I mean, we've had people not happy with the quality of their copies, but no one had ever thrown anything at me like that.

Q    So what did you do in response to that?

A    Well, I was just surprised.  And I thought that was a real overreaction for an issue about copy quality.  But he walked out the door, and there was no further interaction.

Q    So what did you do after that?

1    A    I didn't do anything.

2    Q    Do you remember when this occurred?

3    A    I'm thinking it was a little closer to

4 July. But other than that, I don't remember

5 specifically.

6    Q    Okay. Did you notify anyone about this

7 encounter?

8    A    I don't think so at the time, no. I

9 mean, since then and since all the rest of the stuff

10 has gone on, I think I have recounted the story to

11 other people.

12    Q    But at the time, you did not?

13    A    I don't think so.

14    MR. RODEMS: I tell you what: Can we

15    take a five-minute break? I probably have

16    about 15 minutes left -- some of it is just

17    going to be just identifying documents -- and

18    we'll be done.

19    (Recess from 11:25 a.m. to 11:29 a.m.)

20 BY MR. RODEMS:

21    Q    You have testified in two criminal trials

22 filed by the State Attorney against Mr. Hunt

23 regarding trespass?

24    A    Yes, sir.

25    Q    So I want to talk to you about the events

1   of July 5th and July 7th. Do you have a

2   recollection of those events?

3       A    July 5th, I think I do. July 7th, I'm

4   not so sure.

5       Q    Okay. Let me make sure I don't have my

6   dates incorrect. Let me show you -- I'll mark this

7   as 5.

8            (Exhibit 5 marked for identification.)

9       Q    Exhibit 5 is an email which I believe is

10  from you to several people with the law library

11  regarding an encounter with Mr. Hunt on July 7th.

12  And that was, according to your email, the date of

13  his arrest?

14      A    Well, this was -- this piece of paper or

15  the original that this was copied from, only the

16  body was generated by me, the headers were not, and

17  so I think the dates may be wrong.

18      Q    I see. I see. So at the top where it

19  says "From: David," that's not your email address?

20      A    That was my email address at the time.

21  But what I'm saying is this would have been

22  generated from the -- it looks like the recipient of

23  the email, and I have no control over things that

24  appear in the heading like the date.

25      Q    Oh, okay.

1    A    I don't know why it would say 7/7. But

2    if it's referencing "today" and I'm talking about

3    Saturday, that should have been probably the 5th of

4    July. And I see down here lower in the document it

5    refers to "tomorrow (Sunday)" --

6    Q    Right.

7    A    -- which would have been the 6th of

8    July. So maybe the date only reflects the date when

9    it was printed. I don't know.

10    Q    All right. So you believe the date that

11    Mr. Hunt was arrested for trespass was July 5th?

12    A    I think so, yes, sir.

13    Q    All right. I want to back up then to the

14    incident that occurred before the date he was

15    arrested.

16    A    Okay.

17    Q    Was there at some point an encounter

18    between you and Mr. Hunt in which there was a

19    discussion about him being in the law library after

20    hours?

21    A    Yes.

22    Q    And you confronted him?

23    A    Yes.

24    Q    And was that a few days before he was

25    actually arrested for trespassing?

1     A     Yes, it was.

2     Q     Okay.  That's the one I want to focus on

3   then, that date when you confronted him about being

4   in the law library after closing time.  Tell me

5   about that day.  What do you recall?

6     A     Well, since you mentioned it, there was

7   more than one instance of discussing him being in

8   the library after closing time.  But only one of

9   those instances resulted in what I'd call a

10  confrontation.

11    Q     Okay.  On how many occasions was Mr. Hunt

12  in the library after closing time?

13    A     Several times.  Five, six maybe.

14    Q     And on those five or six occasions, did

15  you discuss with him that he was in the library

16  after closing time?

17    A     On one of them, I did.

18    Q     Okay.  And would that be in addition to

19  the date when you had the encounter with him?

20    A     Yes.

21    Q     All right.  By the way, is Mr. Hunt the

22  only patron that has ever not left the law library

23  exactly on time?

24    A     No.

25    Q     It happens often?

1     A     Not often, but it happens.

2     Q     Okay.  How does the law library work it

3 when it's closing time?  Is there an announcement,

4 "The library is closed.  Please leave"?

5     A     I think it depends on the employee who's

6 on duty at the time.  We each have our own style.

7     Q     All right.  What was your style?

8     A     My style would typically be to get a

9 sense of how many people were in the building and

10 where they were at so I would have kind of a visual

11 reference as they were leaving, keeping a mental

12 tally of who was still left.  If there was a number

13 of people, sometimes I would make an announcement

14 over the P.A. system that we had in that location

15 such as, "15 minutes, we'll be closing."  And the

16 time wasn't always consistent.  Sometimes I did it

17 at 5 minutes, sometimes at 10 minutes.

18     Q     There wasn't a formal rule about how to

19 notify patrons that the law library was closing?

20     A     Correct.  And if there weren't a number

21 of people, if there were just one or two

22 individuals, I would -- if it looked like they

23 weren't leaving on their own at closing time, I

24 would just walk around and mention to them, "It's

25 getting pretty close to that time," something like

that.

Q    Why make the announcement if there's a
lot of people but not make the announcement if
there's only one or two?

A    Well, the tendency was if there was -- if
there's several people in the library at the same
time around closing time, they seem to use each
other as kind of an excuse to stay a few minutes
longer.  And so an announcement is one way to just
get the message out to everybody all at the same
time.  Whereas if it's just a couple of people, I
can just, you know, mention it to them verbally,
face to face.  You know, they might be near the
front desk anyway, you know.  Or as I'm making a
round of the premises to get a full tally about
everybody who's there, I can just mention it to them
as I pass them or whatever.

Q    Okay.  And, of course, announcing it over
the loudspeaker is also a way to let everyone know
that it's about to be closing time without having to
personally encounter them?

A    Yes.  In that sense, it saves time.  You
know, if there's six or seven people, I don't have
to tell six or seven individuals the same thing.

Q    Right.  Okay.  So going back to this date

when you did have the encounter with Mr. Hunt, tell
us -- tell me what happened.

A     It would have been the second time that I
had mentioned to him about being in the library
after closing time.  It was -- I think it was a
Tuesday.  And the other customers had left, and
Mr. Hunt was the only one left in the building.
Closing time came and went, and he was still back
there somewhere.

I was aware that he was there and that he
had not left, and I was waiting for him to leave.
Because I had mentioned to him just a few days
before that that he had to be out of the library by
closing time, I was concerned that he was still
there.  Because I was wondering to myself, "Is this
going to be another conflict?  You know, is he going
to make more complaints now?"

So I sat there at the front, ticking off
the minutes on my watch and, you know, got through
another couple of minutes.  So by now, it was
probably seven or eight minutes after 8:00, and he
still wasn't leaving.  So I was like, "All right.  I
guess I've got to go have a chat with him."

So I went back to the back.  He was back
there shuffling some materials around.  I said,

1  "Mr. Hunt, it's well after closing time now. Why

2  are you still in the library?"

3  And I think he responded something about,

4  "Oh, you didn't make your announcement" or "You

5  didn't give me an announcement."

6  And I had, in fact, made an announcement

7  that day, if I remember correctly, at, I think, the

8  15-minute mark. And I replied to him something

9  along the lines of, "You know, I think that I made

10  an announcement. But even if I didn't and even if I

11  don't, as I mentioned to you the other day, it's

12  your responsibility to be out of this building by

13  closing time."

14  And at that point, he just exploded. He

15  got very angry, very irate, started yelling at me

16  and cursing at me. It was somewhat startling to see

17  someone get that mad that quickly.

18  Q    And what do you recall about what he was

19  saying?

20  A    Well, he said -- I'm paraphrasing to the

21  best of my recollection, but it was something like,

22  "Goddammit. What the fuck do you think you're

23  doing? You don't know who you're fucking messing

24  with. You're messing with the wrong guy."

25  And at that point when he started using

that language, I said, "Mr. Hunt, that's completely
unacceptable. You need to leave."

And at that stage, he got very
belligerent, and he said, "What are you going to do
if I don't? What are you going to do about it?"
And he just kept saying that over and over again,
several times. As he was saying it, he was
gesturing like he was daring me to do something. He
was like -- like "What are you going to do about
it? Huh? What are you going to do if I don't
leave?" And he seemed to be really agitating for a
physical confrontation. It was very -- it was very
clear that he was just escalating. And I really had
some safety concerns at that point.

He seemed like if he couldn't goad me
into some action, that he might attack me. And I
really thought that there was a pretty good chance
that that might happen.

I took my glasses off, just to be safe.
I told him a few more times that he just needed to
go, you know, he needed to get out of there. And in
response to his asking, "What if I don't go," I
said, "Well, if you're in the library deliberately
after the operating hours and you know that we're
closed, then I think that's trespassing. And, you

1  know, that's -- you need to stop arguing with me and

2  leave."

3  Q  So how long did this back and forth

4  between you and him go on?

5  A  I'd say a good 30, 45 seconds.  A couple

6  of minutes at max.

7  Q  And did Mr. Hunt have anything with him

8  that day?

9  A  He had a -- I don't know what you'd call

10 it -- a cart or a trolley or -- it looked kind of

11 like portable luggage with a handle and wheels.

12 Q  Was it packed up by the time you had

13 encountered him?

14 A  It didn't seem to be.  I didn't pay -- I

15 didn't focus that intently on that item, so I

16 couldn't say for sure.

17 Q  Okay.  So obviously he did leave?

18 A  Finally, after some more discussions on

19 the way to the front door, he -- I mean, he at one

20 point said, "Well, you're blocking me.  I can't

21 leave because you're standing in my way."  And I

22 clearly was not blocking him.  I was nowhere near

23 him.  I didn't want to be anywhere close to him in

24 that violent state he was in.

25 But just to make it exceptionally clear

that I was not blocking him, I took another two or

three steps away and, you know, said, "You know, you

need to go." And then he had tons of space. And at

that point, he finally did start to move towards the

front door.

Q    So he told you you were blocking his way,

you moved out of the way to make it perfectly clear

that you were not, and then he proceeded out?

A    Yes, he started walking up towards the

front. He was making some comments as he went. As

he got to the front, he said something along the

lines of, "Next time, will you bring your gun?" or

"Next time will you lead me out at gunpoint?" or

something like that, something about a gun.

And when he said that, I thought to

myself, "If it doesn't look like he's going to go

out the door, I'm going to have to decide whether to

grab for the phone and call 911 or take some

emergency measures." But he did continue forward

towards the door.

The last thing he did before he went out,

the call bell that I mentioned earlier that's

sitting on the front counter, he rang it three or

four times, and he yelled out, "Someone come get

this ding-a-ling out of here." And then he just

1  laughed crazily and finally went out.  And that was

2  the end of my direct interaction with him on that

3  night.

4      Q      And so you closed the library?

5      A      Yes, sir.

6      Q      Okay.  And what is the next thing that

7  you did about this situation, if anything?

8      A      I waited until he was not near the

9  premises anymore, and then I walked directly across

10 Morgan Street to the County Center where there's a

11 detachment of the county security officers on the

12 ground floor, and I went and consulted with one of

13 them about the incident and told them what had

14 happened in an informal way -- in an informal way.

15 I wasn't filing a complaint at that point, but I was

16 just discussing it with them and asking about any

17 suggestions they had for handling a situation like

18 that.

19         They told me basically anytime I need

20 them to help remove someone who's acting anywhere

21 near like that, just give them a call, and they

22 would be happy to take care of the situation.

23     Q      Now, who -- besides you and Dennis

24 Hunt -- can give us a version of what happened

25 between you and Mr. Hunt on this evening?

1    A    Nobody.  We were the only two individuals

2    in the library.

3    Q    Now, had Mr. Hunt been talking to any

4    attorneys that evening in the law library?

5    A    I don't know.

6    Q    Was there anyone else that had stayed

7    over closing time that evening?

8    A    Not that I recall.

9    Q    Okay.  So you went and saw the security

10   people, they told you, "If you've got any problems

11   in the future, give us a call," and then you did

12   what?

13   A    Then I went home.

14   Q    Okay.  And did you take any further

15   action about this encounter with Mr. Hunt?

16   A    I think that I may have left a note for

17   the day staff.  I know I somehow communicated with

18   them.  I don't remember if it was a handwritten note

19   or if I left an email somewhere.  I don't think it

20   was a phone call.  I think it was a handwritten note

21   that I left that said something along the lines of

22   "Before you draw any conclusions about anything you

23   might hear about an incident that happened, wait

24   until you hear all sides of the story."

25   Q    That's what you left for the day staff?

1     A     Yes.

2     Q     Why did you leave that note for the day

3 staff?

4     A     Because my expectation was that Mr. Hunt

5 would be complaining or filing stuff the very next

6 day before I had a chance to talk to people.

7 Because my shift doesn't start until noon.

8     Q     Why did you expect him to file a

9 complaint?

10     A     Based on his previous pattern.  He had

11 filed complaints about every little thing and

12 non-existent things.  So it seemed natural that

13 having had a real escalation of the situation, that

14 that would be his next move.

15     Q     Okay.  And did you save a copy of this

16 note or email that you're referring to?

17     A     I have not seen it since that time, so I

18 don't think it has been saved.

19     Q     And you're not sure if it was handwritten

20 note or an email?

21     A     Right.

22     Q     Okay.  And so you left that note for the

23 day staff.  And then when did this issue come up

24 again with anybody at the law library?

25     A     The next day when I showed up for work at

1   noontime, I discussed it with them.   And sure

2   enough, I think there had been a complaint already

3   by that point from Mr. Hunt.

4        Q     Did you ever get a chance to see

5   Mr. Hunt's complaint?

6        A     Yes, I think I did.   It was written.

7              (Exhibit 6 marked for identification.)

8        Q     We'll mark this as Exhibit 6.   This is a

9   letter to Norma Wise from Mr. Hunt -- oh, I'm

10  sorry.   Let me give you this one --

11       A     Okay.

12       Q     -- dated July 3rd, 2003.   All right.

13  Have you ever seen this before?

14       A     Yes.

15       Q     Okay.   Did Ms. Wise give you a copy of it

16  or show it to you?

17       A     Yes.

18       Q     All right.   And what was her comment when

19  she showed it to you?

20       A     I'm not entirely sure it was Ms. Wise.

21  It may have been Bill.   I can't recall specifically.

22  But whoever it was that showed it to me was

23  basically like, you know, "This is what we expected.

24  Here it is."

25       Q     Well, by the time that they showed this

1  to you, had you already told your version of events

2  to anyone, beyond the note you referenced a few

3  moments ago?

4      A      I don't recall if they immediately showed

5  this to me as soon as I got to work or if I had a

6  chance to discuss things verbally and told them my

7  side before they showed this to me.  I don't

8  remember the order in which those things happened.

9      Q      Okay.  Well --

10     A      And this is dated the 3rd.  I don't

11 recall if this was the very thing that they'd heard

12 from him or if they'd actually gotten a phone call

13 from him on the 2nd.  I'm not sure.

14     Q      Okay.  And so Mr. Hunt is claiming that

15 the encounter occurred on July 1st of 2003 and that

16 that was a Tuesday.  Do you believe that his

17 recollection of the date is accurate?

18     A      That sounds correct, Tuesday, yeah.

19     Q      Okay.  And this letter is dated July 3rd,

20 so that's two days later.  So his letter must have

21 been -- if it was faxed, it must have been faxed on

22 a Thursday?

23     A      If the date that's on the letter is

24 correct.

25     Q      Now, you would have been scheduled to

1    work on Wednesday, July 2nd. Correct?

2    A    Correct.

3    Q    And when you reported to work, would you

4    have had a discussion with anyone about the events

5    of the previous evening?

6    A    Yeah. I'm sure that was the very first

7    thing I started talking about as soon as I got

8    there.

9    Q    All right. Now, by Thursday, July 3rd,

10    this letter comes in, and Mr. Hunt's version is

11    dramatically different than your version of events.

12    Would you agree?

13    A    Maybe not dramatically. I mean, he

14    references several of the same things. Obviously,

15    his perspective is reflected in statements like "He

16    blocked my way." I don't think I was blocking his

17    way. I'm sure that I was not. But I don't know if

18    that counts as a dramatic difference or not.

19    Q    Okay. Well, he doesn't mention in here

20    yelling at you or cursing at you or ringing the bell

21    or any of those things, does he?

22    A    He certainly omits all of that stuff,

23    yes.

24    Q    Okay. But he does say that he asked you

25    to move out of the way so he could exit?

1    A    Yes.

2    Q    And you do acknowledge that there was a

3    discussion about that?  You deny that you were

4    blocking his way, but you do acknowledge there was a

5    discussion about that?

6    A    Correct.

7    Q    Okay.  And he does allege that you said

8    he was trespassing or that the word "trespassing" at

9    least was used.  You disagree with the context, I

10    presume, and the way it's phrased by Mr. Hunt?

11    A    Yes.

12    Q    Okay.  But clearly he alleges that

13    "trespassing" as a word was mentioned, and you

14    concur that it was mentioned?

15    A    Yes.

16    Q    Okay.  He says that you kept repeating to

17    him, "Mr. Hunt, are you announcing that you are

18    refusing to leave the library?"  Did you say that or

19    something similar to that to him?

20    A    I think I did say something along those

21    lines, but I don't think I said it more than once.

22    Q    Okay.  And then Mr. Hunt says he asked

23    you if you were going to bring in a gun next time

24    and order him out at gunpoint.  Mr. Hunt says that

25    in his letter, and you agree that some sort of

1  statement like that was made by Mr. Hunt to you?

2      A    Yes, some reference to a gun and "next

3  time."

4      Q    Okay.  And Mr. Hunt says he exited

5  library at 8:02 p.m.

6      A    He does say that in his letter.

7      Q    You do not agree with that?

8      A    I totally disagree with that time.

9      Q    Okay.  He says he noticed you in the

10  County Center Building talking to deputies, and you

11  agree that you went to the County Center and talked

12  to some security personnel?

13      A    Yes.

14      Q    Were they deputies?

15      A    My understanding is that the County

16  security guards, although their uniforms look

17  similar --

18      Q    Right.

19      A    -- are not sheriff's deputies.

20      Q    So you contend you went and spoke to

21  them, and he agrees that he saw you speaking to

22  somebody that he described as deputies.  But in any

23  event, he says he went and talked to the same

24  people.  Were you aware that he had done that?

25      A    I was not aware that he had done that

1    until I saw it in print in this document.

2        Q    Okay.  Did you have any further

3    discussions with the security people about what they

4    said to Mr. Hunt or what he may have said to them?

5        A    No, I did not.

6        Q    Okay.  When this letter came in and

7    Ms. Wise showed it to you, did she ask you whether

8    Mr. Hunt's account of events was accurate?  Was

9    there any discussion about that?

10       A    I don't think it was necessary to have

11   such a statement or a question, because I had

12   already made very clear what my side of the events

13   were.  And whoever I was speaking to just took it

14   at -- as a given that, you know, I was describing

15   things accurately.

16       Q    And who was it that you were speaking to

17   that took it as a given that you were describing

18   things accurately?

19       A    I think it was -- for sure I discussed it

20   with Bill.

21       Q    Spradlin?

22       A    Yes, sir.

23       Q    Okay.

24       A    And I don't recall how much or if any

25   interaction I had with Ms. Wise at the time.  There

was some periods in this general vicinity where she

was not -- not working, she was out on leave.  So

I'm not sure exactly how all the different -- but

the discussion was happening a lot with more than

one person.  And it came up with both Bill, and he

interacted with the director of the board, and so I

discussed things with her at least once.

Q    And that was Sandra Kellaher?

A    Yes, sir.

Q    And when you spoke to Ms. Kellaher, what

did she tell you?

A    By the time I spoke to her personally,

she had agreed with me that I needed the flexibility

to use my best judgment about the safety concerns

posed by Mr. Hunt or anybody else and to handle

things as I saw fit to protect myself or the other

patrons in the library from potentially violent

behavior.

Q    That is your understanding of what

Ms. Kellaher told you?

A    Yes, sir.

Q    Okay.  Did you have -- now, what was

Mr. Spradlin's position?

A    I believe he was acting mostly as an

intermediary between me and Ms. Wise -- who was, I

1    think, absent -- and Ms. Kellaher about what our

2    official -- you know, what we would do about this.

3        Q     What was his job at the library,

4    Mr. Spradlin?

5        A     Mr. Spradlin's job title is paralegal

6    specialist.  And he often, because of his seniority,

7    I guess, or tenure or whatever you might want to

8    call it, the length of time that he's been working

9    there, he often acts sort of as an assistant to

10   Ms. Wise.  And while Ms. Wise was out on leave, he

11   was acting as the director, I'd say.

12       Q     So Ms. Kellaher told you to use your best

13   judgment in how to handle things as you saw fit in

14   connection with Mr. Hunt?

15       A     Yes.

16       Q     Did Mr. Spradlin give you any directions

17   on what you should do?

18       A     No.  I think we discussed the possibility

19   of me filing official documents with security.  But

20   other than that, I don't think he suggested any

21   course of action or told me anything to do.

22       Q     So with Ms. Kellaher, she clearly said,

23   "Use your judgment.  You know, use your best

24   judgment, and handle things as you see fit with

25   Mr. Hunt"?

1    A    Yes.

2    Q    And what did you understand that to give

3    you the authority to do?

4    A    I understood that to give me the

5    authority to take any action that I thought was

6    necessary based on my sense of safety and any

7    perceived threat that he posed.

8    Q    Okay.  And did you have a similar

9    discussion with Mr. Spradlin about what you should

10    do if you perceived a threat to your safety?  Did he

11    give you any direction?

12    A    I did have a similar discussion.  But

13    because he had been acting as the intermediary

14    between me and the board and specifically

15    Ms. Kellaher, he already knew what she had told me.

16    So --

17    Q    He did know that?

18    A    Yes.  And we didn't have a lot of further

19    discussion about it.  He just accepted that what she

20    told me was going to be the bottom line.

21    Q    Okay.  When you had this conversation

22    with Ms. Kellaher, was Mr. Spradlin present?

23    A    If I recall correctly, I spoke with

24    Ms. Kellaher over the phone.  And Bill Spradlin was

25    working at the library at that time, and I think he

took the call and alerted me that she needed to speak to me. I came and took the call from her, and I think I gave the phone back to him. I think that's how it went down.

Q But in terms of when she gave you the specific directive about how to handle the situation, was he on the phone lines so that he could hear her say those words?

A No.

Q Okay. So how did Mr. Spradlin become aware of what Ms. Kellaher had told you, by you telling him or by her telling him?

A I'm under the impression that it was from her telling him, but I don't remember specifically.

Q Did you have a direct conversation with Mr. Spradlin about what Ms. Kellaher had told you you should do if there was a problem with Mr. Hunt that you perceived?

A Well, the conversation tended to be about this topic for most of that day. So, yes, I'd say we discussed it further.

Q Now, did Mr. Hunt come in that day?

A That was a Wednesday, and I did not see him that day.

Q Did he come in -- did you work on

Thursday?

    A     I was out on Thursday and Friday.

    Q     Do you know if he came in on Thursday or Friday?

    A     I have heard later that he may have, but I wasn't present for it, and I didn't see it with my own eyes. So I just don't know for sure.

    Q     Okay. When did you next see Mr. Hunt?

    A     The next time I saw him was Saturday, which should be the 5th of July, I think.

    Q     Okay.

    A     It would have been in the afternoon. We'd already been open, I think, for a couple of hours by the time he came in. So we'll put that around two to three o'clock p.m.

    Q     How did you happen to see him on that day?

    A     I saw him approaching the front door. We had glass windows and glass doors, so I saw him coming. And as soon as I saw him coming, I went and called security.

    Q     Why?

    A     I was not comfortable with him being around after his explosion of anger and, you know, violent demeanor a couple of days before.

Q    Had he made an entry into the library before you called security?

A    He had not stepped through the doorway at that point. He was probably a couple of feet away from the door when I reached for the phone.

Q    Okay. So just the sight of him caused you to pick up the phone and call security?

A    Yes, sir.

Q    So he didn't -- he didn't yell at you to cause you to pick up the phone and call security?

A    Correct. We had no interaction whatsoever on that day.

Q    All right. So what was it that he did that was inappropriate on Saturday, July 5th, that led you to believe that he should not be in the library?

A    It wasn't anything that he had done on that day that caused me to think that.

Q    Okay. So as far as you were concerned, Mr. Hunt was banned from the library as of the time that Ms. Kellaher gave you the authority to do what you felt was best?

        MR. TODD: Object to the form.

A    Not necessarily.

Q    Okay. Why do you say "not necessarily"?

A    It really all depended on the circumstances. If there had been a greater period of time between the confrontation and when he next came in, I might not have felt so threatened.

Q    I see.

A    But the fact that he had shown a continuing pattern of escalational confrontational attitude and that a mere three to four days after this really unsettling experience he was there back again in the afternoon, which meant he was going to be probably there at closing time again, and just -- I didn't want to mess with it at all.

Q    So before he even walked in the door, you were anticipating another encounter, and you wished to avoid that, and that's why you called security?

A    Yes.

Q    Okay. And if I understand what you're saying, he was not necessarily banned in your mind, but you felt because Saturday was so close to your previous encounter with him, that if he came in the library under any circumstances, it was appropriate for you to call security and have him removed?

A    I don't think I had gone so far as to formulate that expression that way in my head of the way things were going to be. I didn't really try to

ponder what was going to happen in the future or what my response would be. I just took the circumstances as they came.

Q    Okay. But the mere sight of Mr. Hunt approaching the library on July 5th is what caused you to call security?

A    Yes, sir.

Q    Okay. It was nothing about what he did?

A    Correct.

Q    He wasn't carrying an axe in his hand?

A    No, sir.

Q    He wasn't pointing at you and saying, "I'm going to get you"?

A    No, sir.

Q    There was nothing that he did that you said, "I'm scared because of what he's doing right now, so I'm going to call security"?

A    Correct.

Q    Your fear, your being scared, was based on your perception of events on July 1st?

A    Yes. It was all based on our previous experiences, yes.

Q    The previous experiences?

A    In totality.

Q    All right. So you called security?

1      A     Yes, sir.

2      Q     Okay.  And did security come over?

3      A     Yes.

4      Q     And, by the way, when Mr. Hunt came

5 through the library door, were you on the phone with

6 security, or had you --

7      A     I believe so.

8      Q     Okay.  Did you tell Mr. Hunt when he

9 walked in the door, "You're not allowed in here"?

10     A     No.

11     Q     Why not?

12     A     I didn't want to have any interaction

13 with him whatsoever until there was a security guard

14 present and even not then if I could avoid it.

15     Q     All right.  So once Mr. Hunt came through

16 the door, where did he go?

17     A     He proceeded towards the same area of the

18 library where I had last seen him on the previous

19 Tuesday.  We'll use the easy terms of "the front of

20 the library" and "the back of the library."

21     Q     Okay.

22     A     He headed towards the back.

23     Q     When you completed your call with

24 security, how far away from you was he in feet?

25     A     He was beyond my line of sight.

1    Q    Okay.  So you couldn't even see him?

2    A    Right.

3    Q    Okay.  Could you hear anything that he

4    was doing?

5    A    No.

6    Q    Were there other people in the library?

7    A    Yes.

8    Q    How many?

9    A    A handful, maybe four or five.  I can't

10   say for sure.

11   Q    Okay.  And how long did it take for

12   security to arrive?

13   A    They were there almost immediately.  They

14   were just across the street.

15   Q    Okay.  Was there anything that occurred

16   after you hung the phone and before security arrived

17   between you and Mr. Hunt?  Was there anything that

18   occurred?

19   A    Nothing.

20   Q    Okay.  And when security arrived, what

21   happened then, as you observed it?

22   A    As I observed it, a single security guard

23   showed up first, told Mr. Hunt that he would need to

24   leave.  I don't recall for sure if he prefaced it

25   with saying it was because of this or because of

that or if he just said, "You need to go."  I can't really remember for sure.

Q    Were you in proximity when this occurred?

A    I was at least within hearing proximity, and I might have been witnessing visually this exchange between them, too.

Q    Okay.  Did you observe Mr. Hunt's reaction?

A    I heard that he -- yes.  I heard that he was basically questioning why he had to leave at that point and not following the security officer's directions.

Q    Was Mr. Hunt yelling?

A    I don't think he raised his voice.

Q    Okay.  Was he doing anything that was inappropriate other than what you perceived to be him not following the command of the security person?

A    Not that I was aware of.

Q    Okay.  So since he would not -- what happened next?

A    The security officer didn't have any luck convincing Mr. Hunt to go.  Eventually, a few more security officers arrived.  I don't know if they had to be called specifically by the officer that was

already there or if they had been on their way
anyway.  But ultimately there was probably four to
five County security personnel in the library.
Apparently, Mr. Hunt still refused to go, because
they were back there kind of clustered around,
making sure things didn't get out of hand, I
assume.  But he still didn't go, so they had to
resort to other measures to solve this situation.

    Q     What other measures?

    A     They called in Tampa Police Department,
and an officer from TPD arrived a few minutes later.

    Q     Did you speak with the officer with TPD?

    A     Yes, sir.

    Q     Okay.  What did you tell him?

    A     I don't recall if we had a conversation
as he first came in.  I don't think we did.  I think
the officer was met at the door by one of the
security personnel.  They discussed what was going
on.  It was really kind of out of my hands at that
point anyway.

    Q     Did anybody ask you -- whether it was
security or TPD, did anybody ask you, "Has he done
something inappropriate today?"

    A     I don't think anyone did.  And they
didn't really need to because security had been made

1    aware of the issue with Mr. Hunt prior to that. So

2    they knew why I was asking for him to leave when I

3    had called up to tell them, "He's here, and I don't

4    want him to be here." And I said, "The guy we've

5    discussed with you guys before is back, the guy who

6    gave me a problem a couple of nights ago." So they

7    knew what it was all about.

8        Q    So you didn't have a restraining order

9    issued by a circuit court judge preventing Mr. Hunt

10   from being within so many feet of you, did you?

11       A    No.

12       Q    Nothing like that happened --

13       A    No.

14       Q    -- in the intervening days? Okay. So

15   what was your authority to have Mr. Hunt removed

16   from the law library?

17       A    Well, my authority was to maintain a safe

18   work environment for myself and for the other

19   patrons of the library. And based on the

20   interactions I'd had with Mr. Hunt in the immediate

21   past, I didn't think that it was safe for him to be

22   in the building.

23       Q    Okay.

24       A    So the authority was take whatever action

25   I thought was necessary, and that's the action I

1    took.

2        Q    But just so that we're crystal clear, on

3    this Saturday that he was arrested for trespassing,

4    he hadn't done anything inappropriate?

5        A    That's correct.

6        (Exhibit 7 marked for identification.)

7        Q    Okay.  Let me show you a document we'll

8    mark as Exhibit 7 and ask you if this is a document

9    you recognize and if it's your signature on the

10   third page of it.

11       A    Yes, sir, I recognize it, and that is my

12   signature.

13       Q    Okay.  What is this document?

14       A    This is something that I typed up, I'd

15   say probably within a week of having Mr. Hunt --

16   having called security to ask him to leave on that

17   Saturday.

18       Q    Okay.

19       A    It was an attempt to document everything

20   so I wouldn't forget any pertinent details and in

21   case anyone needed to reference it later.

22       Q    And did anybody ask you to do this?

23       A    I don't think so.

24       Q    You did this on your own?

25       A    Yeah, I think it was spontaneous.

1    Q      And I see that it's not dated.  How was

2  it typed up, a typewriter, a computer?

3    A      Yeah, it would have been typed on a word

4  processing software on my computer.

5    Q      Okay.  Do you know what date you typed it

6  up?

7    A      Not specifically.  But like I said, it

8  was within a week or so of these events.

9    Q      Do you still have that computer that this

10  was typed on?

11    A      No.

12    Q      Do you know if this document is still

13  stored or saved by you anywhere, on the computer,

14  that is?

15    A      I don't think so.  I haven't really

16  researched that.

17    Q      Okay.  I'm just trying to find out if we

18  can get a date that this document was created in

19  some way, either by looking on your --

20    A      I see.

21    Q      Do you know of any way that we can figure

22  out exactly --

23    A      If I do have a copy of it saved and it's

24  unmodified since I drafted it, it would have

25  probably the attribute of the date that it was

created, and I might be able to figure that out.

(Exhibit 8 marked for identification.)

Q     All right.  This is the last document for you.  I show you what we'll mark as Exhibit 8 and ask you if that's your signature on Page 3 of this document.

A     Yes, sir.

Q     Okay.  Did you create this document?

A     Yes, I think I did.

Q     Okay.  This is a letter to Mark Ober, the State Attorney for Hillsborough County.

A     Agreed.

Q     Okay.  And on the last page, it shows a cc is going to N. Lopez?

A     Yes.

Q     Who is N. Lopez?

A     I don't recall what the N stands for, but I think she was a supervisor at the Victim Notification Department of the State Attorney's Office.  That's my best recollection.

Q     All right.  And underneath your signature, you've put an email address, "pilverd@hillsboroughcounty.org."  Is that your email address issued to you by the James J. Lunsford Law Library?

1    A    Yes, sir.

2    Q    Okay.  Did you send this document to

3 Mr. Ober by mail or by email?  Or do you know?

4    A    It was not an email document because my

5 signature is not typewritten.

6    Q    Okay.

7    A    And although it's possible to scan in a

8 signature, I have not been in the habit of doing

9 that.  So I must have printed it out and signed it

10 and given a hard copy.

11    Q    Okay.  On July 5th when the Tampa Police

12 Department came, did you accompany a police officer

13 into the presence of Mr. Hunt and tell Mr. Hunt that

14 he was no longer welcome at the law library and that

15 he should leave or words to that effect?

16    A    Words to that effect were spoken by me to

17 Mr. Hunt but not -- not necessarily with the police

18 officer going back to Mr. Hunt.  It was later when

19 Mr. Hunt was being escorted towards the door that I

20 made that clear at the officer's suggestion.

21    Q    Okay.  That's the point I'm getting to.

22    A    Yes.

23    Q    Did the Tampa Police Department officer

24 tell you that in order to remove Mr. Hunt for

25 trespassing, you needed to make it clear to Mr. Hunt

1  in the officer's presence that he was required to
2  leave?

3    A    That was my understanding of why it was
4  being done that way.  And he said that I needed to
5  express to Mr. Hunt that I didn't want him there at
6  that time.

7    Q    And you did do that?

8    A    Yes, I did.

9    Q    And you did that as the person who was in
10  charge of the James J. Lunsford Law Library on that
11  particular day at that particular hour?

12    A    I guess so.

13    Q    I mean, you did it with your authority as
14  the senior library assistant at the James J.
15  Lunsford Law Library.  Correct?

16    A    Well, I just did it.  I didn't have any
17  thought in mind as to what capacity I was acting
18  in.

19    Q    Well, you wouldn't call the police to
20  this court reporter's office and tell them to remove
21  me for trespassing here, because you have no
22  authority to do that.  Right?

23    A    That sounds right.  However, I'm not the
24  one who called the Tampa Police Department.  It was
25  the security officers that called the Tampa Police

Department. And I had never really asked
specifically for trespass. I mean, I'm not even
sure I understood the full nature of the legal
definition of trespass at that point anyway. I had
just called security and said, "I want this guy to
go." They took it upon themselves to handle it the
way they thought was best, apparently. And that to
them meant calling TPD and asking for a trespass.

I would assume that the fact that
Mr. Hunt was refusing to go is what escalated it to
that point.

Q       Could in your mind -- I'm asking how
you're viewing things, because I'm trying to
understand your answer to the previous questions --
in your mind, could Mr. Hunt have called the police
and told them that you needed to be removed from the
law library?

A       I would say that would be impossible,
because -- he could have called, but I don't think
they would have complied because he does not hold
any position of responsibility with the County over
those premises.

Q       So would you agree with me then that it
was your position of responsibility over the
premises that gave you the authority to tell the

1  police that Mr. Hunt was not welcome and to have the

2  police remove Mr. Hunt?

3      A    Yeah, I think that's fair to say.

4      Q    All right.  Let me just check through my

5  stuff real quick.  I think I'm just about done.

6          I have with me a trespass warning that

7  the City of Tampa Police Department apparently

8  issued to Mr. Hunt.  Would you have been given a

9  copy of that?

10     A    I was handed a copy at the time it was

11 generated, and I believe I then left it for my

12 co-workers and my boss to look at.

13     Q    We'll take a look at this then.  And

14 we'll mark this as Exhibit 9.  Have you seen this

15 document before?

16     A    Yes.

17          (Exhibit 9 marked for identification.)

18     Q    Okay.  That's the trespass warning?

19     A    Yes.

20     Q    And do you see where it says,

21 "Complainant's Name David L. Pilver"?  It's in the

22 middle of the page.

23     A    Yes.

24     Q    Okay.  And the time issued, if we can go

25 by military time at the top, it looks like it was

1   around 3:40 p.m.

2        A    That looks right.

3        Q    And July 5th, 2003?

4        A    Yes.

5        Q    So all of that seems correct to you?

6        A    Yes.

7        Q    Okay.  Have you ever rescinded this

8   trespass warning?

9        A    No.

10       Q    As of this date, your opinion -- not your

11  opinion, but your understanding is the trespass

12  warning is still in effect?

13       A    To my understanding, it would still be in

14  effect.

15       Q    It would still be in effect?

16       A    Yes, sir.

17       Q    Okay.  So it has not expired, it's still

18  effective?

19       A    I wouldn't know if it had expired,

20  because I don't -- do they have built-in expiration

21  dates?

22       Q    I'm just wondering -- I'm only asking --

23       A    Right.

24       Q    -- in your mind if you still think it's

25  in effect.  And I just want to make sure that we're

1  clear on that.

2       A    Yes, for certain, as far as I'm concerned

3  or aware, it's still in effect.

4       Q    Okay.  Did Mr. Hunt ever return to the

5  law library after that?

6       A    Yes.

7       Q    While you were there?

8       A    Yes.

9       Q    Okay.  When was that?

10       A    Some weeks, possibly months, later.  He

11  did not enter the premises, he didn't cross the

12  threshold.

13       Q    Well, where did you see him then?

14       A    I turned around, and there he was outside

15  the window taking photographs.

16       Q    Okay.  Was he on the sidewalk outside the

17  building?

18       A    Yes, sir, somewhat into the atrium

19  portion of that building.

20       Q    I'm familiar with that.

21       A    So somewhat off the sidewalk, yeah.

22       Q    Okay.  Were you able to tell what he was

23  taking pictures of?  Was he taking pictures of you

24  specifically, or was he just taking pictures of the

25  library?  Or do you know?

1 A I couldn't tell specifically. At the

2 point when I turned around and saw him, he appeared

3 to see me seeing him, and then he proceeded around

4 the front of the building and then across the

5 street. At that point, he wasn't pointing the

6 camera in my direction anymore. So, no, I don't

7 know if he was specifically taking pictures of me or

8 not, although it's unsettling to think that he might

9 have been.

10 Q All right. But in any event, after July

11 5th of 2003, did he ever enter the James J. Lunsford

12 Law Library again while you were present?

13 A Not that I'm -- no.

14 Q Okay. Have you had any encounters with

15 Mr. Hunt -- not including this lawsuit and not

16 including the criminal trials in which you would

17 have been in the same room with him -- but have you

18 had any encounters with Mr. Hunt outside of the

19 James J. Lunsford Law Library not in connection with

20 either the criminal matters or this lawsuit with

21 Mr. Hunt?

22 A Yes.

23 Q Okay. How many occasions?

24 A Once.

25 Q And where was that?

A     It was at the County courthouse.

Q     And where at the County courthouse?

A     In one of the trial rooms, one of the courtrooms.

Q     Do you know which one?

A     I think it's 206 or 306.  It's Judge Anderson's courtroom.

Q     And Judge Anderson was handling one of the cases that you had pending?

A     It was, yes, my personal litigation with my landlord.

Q     All right.  Tell me about that encounter with Mr. Hunt.  Where were you?  Where was he?  How did you notice him?

A     I was at the -- one of the parties' tables, the defendant's table, I guess you would call it.  He was in the gallery.  I don't remember exactly how I happened to turn around -- but maybe when I heard the door open, because I was waiting for my opponent to show up -- and he -- Mr. Hunt came in and sat down in the gallery.

Q     How far away from you was he?

A     Maybe 8 feet.

Q     Did he greet you or acknowledge you in any way?

1    A    He didn't make any acknowledgement of me
2    specifically, no.
3    Q    Did you greet him or acknowledge him?
4    A    No.   I was looking to see what he was
5    going to do.   And that's when he sat down and
6    didn't -- specifically didn't look in my direction.
7    I just thought, "Okay, well, that's lovely."
8    Q    And did your hearing proceed?
9    A    Yes.
10   Q    Do you know if Mr. Hunt stayed for the
11   duration of the hearing?
12   A    I think he did.
13   Q    Okay.   When the hearing concluded, did
14   you leave the courtroom?
15   A    Yes, I did.
16   Q    Was Mr. Hunt still in the courtroom?
17   A    I believe so.
18   Q    Okay.   When you left the courtroom, did
19   you ever see him again after that on that same day
20   or same time?   In other words, did you get down to
21   the outside of the courthouse and there he is on the
22   bench next to you or anything like that?
23   A    No.
24   Q    Okay.   Other than that occasion -- and,
25   again, not including the criminal trials or anything

1  involving this lawsuit -- have you had any

2  encounters in person with Mr. Hunt?

3      A    No.

4      Q    And have you been under any medical care

5  by a psychiatrist at any time?

6      A    No.

7      Q    A psychologist?

8      A    No.

9      Q    Okay.  Have you been under the care of

10  any medical doctor or other health care practitioner

11  as a result of your encounters with Mr. Hunt?

12      A    No.

13      Q    Okay.  So you haven't gone to the doctor

14  to say, "I'm terrified of this man, Dennis Hunt.  He

15  yelled at me and cursed me and" --

16      A    No.

17      Q    No.  Okay.  Have you in your adult

18  lifetime -- so since the age of 18 -- ever been in a

19  physical altercation with another person?

20      A    Yes.

21      Q    On how many occasions?

22      A    I would say probably once where I was

23  actively participating, meaning defending myself,

24  and a few more where I was just a happenstance

25  victim of something going on near me.

1    Q     So how many occasions total?

2    A     I think three.

3    Q     The one where you were defending

4    yourself, what was the context?  What was going on?

5    A     A college roommate and I got into an

6    argument, and it escalated into a shoving match.

7    Q     Okay.  Did you sustain any injury?

8    A     Yes.

9    Q     What kind of injury?

10   A     I pulled a muscle in my back and

11   shoulder.

12   Q     Did you have to get medical treatment?

13   A     That might have been a good idea, but I

14   didn't.

15   Q     Okay.  Now, you mentioned that there may

16   have been two other occasions where you were a

17   victim of -- I think you said happenstance?

18   A     Yes.

19   Q     Tell me about those two occasions.

20   A     I remember once when I was out on a date

21   at a bar and two of the bar patrons got into some

22   kind of fisticuffs and fists started flying.  And I

23   was standing very close, and I got jostled.  I

24   didn't get hit squarely, but they bumped into me as

25   they were trying to get at each other.

1    Q    Did that happen here in the Tampa area?

2    A    Dunedin, I think.

3    Q    All right.   That was one occasion.   Was

4    there another occasion that you can think of?

5    A    There's been, yeah, I would say occasions

6    where I was, for instance, at a concert where stuff

7    not involving me just happened to, you know,

8    similarly jostle me or bump into me as two other

9    people were fighting with each other.

10    Q    Okay.   Any physical altercation, whether

11    you were directly involved or just got caught in the

12    fray, which caused you an injury severe enough where

13    you needed to go get medical treatment?

14    A    No.

15    Q    All right.   Ever been accused by anyone

16    of battery --

17    A    No.

18    Q    -- hitting them or taking a swing at

19    them, which is referred to as assault or something,

20    the intent to commit a battery?

21    A    No.

22    Q    Ever had anyone file a domestic violence

23    injunction against you or a domestic violence

24    complaint against you?

25    A    Never.

Q    All right.  Have you had any problems
with any other patrons at the law library since 2003
where the patron has filed a verbal or written
complaint about your actions?

A    No.

Q    Okay.

MR. RODEMS:  Is Mr. Pilver going to have
direct knowledge of how the Answer to the
Complaint was rendered, what allegations were
admitted or were denied?

MR. TODD:  No.

MR. RODEMS:  Okay.  That short-circuits
that.  I believe that's it then.  That's all
the questions I have.  Thanks.

THE WITNESS:  Okay.

MR. TODD:  You have a right to read
this, or you can waive your right.  Karen is
one of the best in the business.  You can rely
upon her professionalism and waive your right,
but you must say on the record whether you
want to read it or you want to waive it.

THE WITNESS:  The record that was made
of what we just did?

MR. TODD:  Correct.

THE WITNESS:  If I wanted to read it,

what would that involve?

MR. TODD:  A lengthy sitting session reading a voluminous transcript.

THE WITNESS:  Okay.  Yeah, I'm not concerned about any errors, other than possible spelling stuff, which I'm sure is easily dealt with.  So I agree that I don't need to read it.

MR. RODEMS:  Okay.  Very good.  Thank you.

(At 12:39 p.m., no further questions were propounded to the witness.)

# CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:


I, Karen Kay Skeen, Notary Public in and for the State of Florida at Large, do hereby certify that I reported in shorthand the foregoing proceedings at the time and place therein designated; that the witness herein was duly sworn by me; that my shorthand notes were thereafter reduced to typewriting under my supervision; and that the foregoing pages are a true and correct, verbatim record of the aforesaid proceedings.

Witness my hand and seal January 14, 2009, in the City of Tampa, County of Hillsborough, State of Florida.

Karen Kay Skeen
Notary Public
State of Florida at Large



KAREN KAY SKEEN
MY COMMISSION # DD 842560
EXPIRES: December 18, 2012
Bonded Thru Budget Notary Services

**LIBRARY ASSISTANT**       **Class Code 3812**

**MAJOR FUNCTION:**       Performs clerical library duties.

**DISTINGUISHING FEATURES:** Employees in this class perform duties of routine difficulty requiring some initiative and independent judgment under general supervision.

**MAJOR DUTIES:**
**NOTE:** The following duties are illustrative and not exhaustive. The omission of specific statements of duties does not exclude them from the position if the work is similar, related, or a logical assignment to the position. Depending on assigned area of responsibility, incumbents in the position may perform some or all of the activities described below.
- Checks library materials in and out, issues library cards, collects fines, and performs other tasks related to the circulation desk.
- Sorts, shelves, distributes, arranges, locates and makes minor repairs to library books and materials.
- Responds to inquiries from the general public regarding circulation matters.
- Inputs data in computer terminal and prints reports, lists and other documents.
- Performs general office duties, such as typing or word processing, filing, receiving and verifying shipments.
- Operates and performs minor adjustments to library and office equipment.
- Performs other related duties as required.

**KNOWLEDGE, SKILLS, AND ABILITIES:**
- Working knowledge of basic mathematical functions including counting money.
- Working knowledge of correct grammar, punctuation and spelling.
- Skill in keyboarding.
- Ability to work effectively with others.
- Ability to communicate effectively.
- Ability to use a computer terminal to accurately enter data.
- Ability to learn and use various classification and filing schemes.
- Ability to follow written and oral instructions.
- Ability to accurately sort, file, and retrieve material using alphabetical, numerical and chronological systems.
- Ability to lift, push or handle library materials weighing up to 20 pounds.
- Ability to stand, bend, and kneel.
- Willingness to work at other locations.



**MINIMUM QUALIFICATIONS (MUST BE ATTAINED BEFORE THE RECRUITMENT ENDING DATE):**
Graduation from high school or possession of a GED Certificate; and One year of clerical experience; and A passing score on a written test; and A passing score on a data entry test at 75 gross keystrokes per minute with 90% accuracy; and Possession of a current Driver License. OR An Associate's or higher degree from an accredited college or university; and A passing score on a written test; and A passing score on a data entry test at 75 gross keystrokes per minute with 90% accuracy; and Possession of a current Driver License.

**SUBSTITUTION**

**APPOINTING AUTHORITY MAY REQUIRE:**

Hillsborough County is an Equal Opportunity/Affirmative Action Employer
------------------------------------------------------------------------

|  |  | **Pay Grade: AD** | **HOURLY** | **ANNUAL** |
|---|---|---|---|---|
| Minimum | $9.16 | $19052.80 | | |
| First Quartile | $10.31 | $21444.80 | | |
| Mid Point | $11.45 | $23816.00 | | |
| Maximum | $13.74 | $28579.20 | | |

===============================================================================

| **JOB TITLE** | **JOB CODE** | **PAY GRADE** | **JOB CAT.** | **O.T. CODE** | **CLASS TYPE** | **W.C. CODE** |
|---|---|---|---|---|---|---|
| LIBRARIAN | A3821 | AM | C | 0 | Y | 8810 |
| LIBRARY AIDE | A3810 | AA | C | 0 | N | 8810 |
| LIBRARY ASSISTANT | A3812 | AD | C | 0 | N | 8810 |
| LIBRARY SERVICES SPECIALIST | A3816 | AK | C | 0 | N | 8810 |
| LIBRARY SVCS SPECIALIST SUPV | A3817 | AM | C | 0 | N | 8810 |
| LIBRARY TECHNICAL ASSISTANT | A3815 | AI | C | 0 | N | 8810 |

FROM: DENNIS HUNT
14111 MOSSY GLEN LANE, #203
TAMPA, FL. 33613
TELE.: (813) 975-0050

TO: NORMA WISE, DIRECTOR
JAMES J. LUNSFORD LAW LIBRARY
501 E. KENNEDY BLVD., SUITE 100
TAMPA, FL 33602
TELE.: (813) 272-5818


EXHIBIT
Pilven
#2
1-8-09  bks

DATE: APRIL 30, 2003

RE: LIBRARY POLICIES MANUAL AND POLICY
ON COPY OF MATERIALS.

DEAR MS. WISE:

This is a public information request
to view and/or obtain the policies of the
library. This is to include public use
of the library and copying of library
materials for RESEARCH and litigation
preparation. I had been advised by the
desk clerk that I cannot copy library
materials with a fax copy machine of
my own. If there is such a prohibitive
policy I would like to know REASON(S)
for this.

I continuously find missing pages and sometimes entire chapters of material from loose leaf binder materials. With a prohibitive policy of copying and in-house copy machines costed for profit generation, I can easily understand why materials are simply taken from the library.

Although I do not think indigency equates to thieft of materials, there are those of the public who may not have the wealth of attornies and law firms.

I understand attornies and law firms being of wealth have special privileges not available to the general public and most certainly not available to the indigent, to borrow material and take them out free of cost!

Sincerely

Dennis Hunt

Dennis Hunt

Dennis Hunt
14111 Mossy Glen Lane, #203
Tampa, FL 33613

Tele: (813) 975-0050

May 5, 2003

Norma J. Wise, Director
James J. Lunsford Law Library
501 E. Kennedy Boulevard – Suite 100
Tampa, FL 33602

Re: <u>Your letter of May 1, 2003</u>

Dear Ms. Wise:

Your letter of May 1, 2003 has clarified to me that there is no specific policy which forbids any patron of the library from bringing in a personal copy device to make copies. Your speaking with Sandra Kellaher, and at her suggestion this matter being put on the agenda for the next Board meeting, further clarifies to me that there is no specific policy which forbids any patron of the library from bringing in a personal copy device to make copies.

As I had told you on the telephone, I am not looking for an individual exception. I resent your having implied such of me. Your argumentative attitude over the telephone causes me to question your motives. Your blanket "can do no wrong" attitude of your desk clerk causes a raising of my eyelids! Your conclusions about reduced revenue and book/subscription cutbacks are unsubstantiated, and just made up by you!

I have questions of the coin deposits made by library patrons into the copy machines. You have alerted me to have concern about accounting for the deposits of this cash. Do you or your desk clerks collect the cash from the copy machines? I ask this because you have impressed on me that the cash generated by the copy machines is immense. With such a lucrative flow of cash monies, substantial amounts of theft could go undetected and even unsuspected. What policies or procedures prevent this theft. How would the Library Board know if cash is being pocketed from the copy machines?

Please provide me with answers to my questions in a written letter. I have a genuine concern about how public funds are being utilized and wasted at the law library. Is that pay for cable television that your desk clerk watches while working the desk?

Sincerely,

*Dennis Hunt*

Dennis Hunt

Cc: Sandra M. Kellaher


EXHIBIT B, Ivew
#3
1-8-09

Dennis Hunt
14111 Mossy Glen Lane, #203
Tampa, FL 33613

Tele: (813) 975-0050

May 19, 2003

Norma J. Wise, Director
James J. Lunsford Law Library
501 E. Kennedy Boulevard – Suite 100
Tampa, FL 33602

Fax:  (813) 272-5226
Tele: (813) 272-5818

Re: Your Evening Desk Clerk David Pilver

Dear Ms. Wise:

This letter is to notify you of a condition, likely to be injurious to myself, which your desk clerk David Pilver had begun on Wednesday May 14, 2003. I have worry of being injured by this condition. My written notice to you here, is an attempt to cause a ceasing of this condition.

David Pilver has begun to hand to me the books I request to view from behind the front desk, in a manner which could likely be injurious to myself. These books are thick in pages, have metal binders, and are heavy in weight. David Pilver stretches one arm out, with the book in one hand, at a level of height of my forehead or above.

I had requested 4, maybe 5 books at different times on the evening of May 14th. All of these books were handed to me by David Pilver, in the same injurious manner. I will not allow myself to be placed in this injurious condition on future visits. I will be vocal about this condition, if it persists. I will continue to use the library, and I will request any book I wish to view from behind the front desk.

If David Pilver does not want to be disturbed while watching his television programs, he should sit inside your office with the television, and close the door.

Sincerely,

*Dennis Hunt*

Dennis Hunt

cc: Sandra M. Kellaher

684-1911

Care of: Micheal Ginsberg
Fax: 884-0911

EXHIBIT
Pilver
# 4
1-8-09  lsho

**From:** David <rataxes@mindspring.com>
**To:** <badsprad@aol.com>, <spradlinb@hillsboroughcounty.org>
**Date:** 7/7/03 8:19AM
**Subject:** today at the library ...

Dennis Hunt came into the library today some time after 3:00. I called county security and explained that the person I'd filed an incident report about was back and could they please escort him from the building. They sent one guy over and Mr. Hunt refused to leave, so the security guy used his radio to ask the dispatch desk to call TPD. Four more security guys came over and he still refused to leave, so they hovered around him until TPD arrived to give him a trespass warning. He still refused to leave for the police officer that arrived, announcing his intention to sue me and complaining that they should all check with Norma and the Board to verify that he had several complaints against me and that I should be the one who had to leave; so basically he insisted on being arrested. The cop had me ask Mr. Hunt to leave so that it would be on the record that I had asked him to go and he wouldn't, then they handcuffed him and put him in the squad car. The cop took all the info down and filled out the trespass warning.

During his stint in the back of the squad car Mr. Hunt told of his intention to come back to the library tomorrow (Sunday) and so the cop came in and told me just to call TPD as soon as he showed up and show them the previous paperwork so they would be properly informed of the situation. So it looks like we get at least one more day of mild drama. I put our copy of the trespass warning in the accordian file on Norma's credenza.

--Pilver

rataxes@mindspring.com
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
"And I caught some blessing on the wind ..." --T.O.T.D.

EXHIBIT
Pilven
# 5
1-8-09

Dennis Hunt
14111 Mossy Glen Lane, #203
Tampa, FL 33613

Tele: (813) 975-0050

July 3, 2003

Norma J. Wise, Director                     Fax:  (813) 272-5226
James J. Lunsford Law Library               Tele: (813) 272-5818
501 E. Kennedy Boulevard – Suite 100
Tampa, FL 33602

Re: <u>Your Evening Desk Clerk David Pilver</u>

Dear Ms. Wise:

This letter is to advise you of the confrontational behavior of your desk clerk David Pilver on <u>Tuesday July 1, 2003.</u> Mr. Pilver confronted me just prior to my exiting the library that evening. He blocked my way and demanded: "Mr. Hunt, what are you doing in the Library after 8 PM!" I told him that it was obvious that I was on my way out.

Mr. Pilver insisted on continuing argument with me. I asked him to move out of my way so that I could exit. He said that I was trespassing and kept repeating: "Mr. Hunt, are you announcing that you are refusing to leave the library?" I asked Mr. Pilver if he was going to bring in a gun next time and order me out at gun point. I exited the library at 8:02 PM.

As I drove from parking space I noticed Mr. Pilver in the front of the County Center building talking to sheriff deputies. I parked and went in the County Center lobby as Mr. Pilver was heading back towards the library. I spoke with the sheriff deputies' and told them of my having past problems with Mr. Pilver and of making past complaint of him. One deputy said that Mr. Pilver wanted to know what to do about someone in the library that was refusing to leave. I told the deputy of my encounter with him.

I do believe that David Pilver is ill suited for the position of desk clerk at the law library. Mr. Pilver does not want to be disturbed while watching his television programs. I would suggest that he may do better and be happier working in a video rental store. That way, he could always rewind, after having to bother with the annoying customers.

Sincerely,

*Dennis Hunt*

Dennis Hunt

cc: Sandra M. Kellaher      fax: 684-1911

*Care of: Micheal Ginsberg*
    *Fax: 884-0911*

EXHIBIT
Pilver
#6
1-8-09  ffb

This document is an attempt to recount my experiences with Dennis Hunt to the best of my recollection and as accurately as possible.

The first time I remember seeing Mr. Hunt was in the afternoon/evening hours after my coworker Donna Barnes had left for the day, probably in late March or early April of 2003. He made himself known to me by asking about CLE audio tapes that he had overheard me discussing with another patron. Mr. Hunt wanted to know about the check-out policies for the audio tapes; it was explained that the audio tapes were kept in the collection for the purpose of attorneys attaining their required CLE credit and that only attorneys with Hillsborough County business addresses could check them out of the library. Mr. Hunt seemed to immediately frame the issue in terms of a grievance by asking for the director's full name and job title and implying he was going to complain about non-attorneys being unable to check out CLE tapes. When I explained that he was welcome to listen to the tapes within the confines of the library if he wanted to bring playback equipment (a walkman or other tape player) he seemed somewhat mollified. The whole episode illustrates my impression of him as someone who is searching for something to be offended by and/or to complain and eventually litigate about.

I saw Mr. Hunt in the library perhaps two more times after that before the next incident, answering questions he had and retrieving books from the "reserve" area behind the front counter when he wanted them just as for any other patron. Then came an evening in late April where I kept hearing a loud beeping noise coming from somewhere. At first I thought one of the patrons had a cell phone that was ringing, but the beeping kept repeating intermittantly. I finally started asking patrons what the noise was so I could locate the source, and eventually I came upon Mr. Hunt at a study carrol near the front of the library. He had a fax machine set up on the desktop and was copying pages from the library's collection of Matthew Bender volumes using the fax machine. At the time we had a working policy not to allow personal duplicating devices to be brought into the library, and so I explained this to Mr. Hunt and asked him to stop using his machine. I was very cordial in explaining the policy. Mr. Hunt asserted that another desk clerk had told him it would be "no problem" for him to bring such a device for use in the library. Although in subsequent discussions with my coworkers we have determined that in fact no staff member ever told him such a thing (and thus Mr. Hunt lied to my face), I took him at his word and explained that if he had been told so that the person who said it was either mistaken or had knowledge of a policy change that I was not privy to. I went so far as to apologize if he had received some bad information, and told him that I would discuss the matter with my boss and have a correct answer on the policy ready when I saw him next. Again Mr. Hunt seemed to be angling for something to be confrontational about, asking to see a copy of the "policy manual" and again demanding to know the director's full name and job title, etc.

It was after this incident that Ms. Wise made me aware that in followup to a written complaint about the duplicating device policy Mr. Hunt became very accusatorial in a phone conversation, focusing several times on allegations against me personally. I feel the accusations, as relayed to me by Ms. Wise, were not only false but nonsensical, and I



EXHIBIT
# 7
Pilven
1-8-09

found it curious that Mr. Hunt had apparently made me the center of his negativity when I had been very reasonable towards him. Not long after, Ms. Wise made me aware of yet another complaint about me by Mr. Hunt, this time in a letter that accused me of handing him books at the level of his forehead. This accusation is absurd and absolutely untrue. Ms. Wise alerted me that it was now clear that Mr. Hunt had settled on me as the focus for his negative and confrontational attitude. The only reason I can imagine for this attention is that it was unfortuanately I who originally asked him to desist from using his own copy device in the library, and perhaps he now has a vendetta.

The next incident of note occurred when the coin-op mechanisms on the copy machines in the library were not functioning. This was maybe in late May or early June. Instead of using change, the patrons in the library were lent a copy counter (an activation device for the machine) and the tally was then paid for after the counter was returned. I gave Mr. Hunt a counter near the end of the evening and he brought it back to the front desk a little after 8 pm. [This was the first of several known instances of Mr. Hunt remaining in the building after closing time. See the separate description of the Tuesday, 1 July 2003 incident.] I checked the quantity of copies made and told Mr. Hunt what the total cost due would be. At this point Mr. Hunt began to intensively study the copies he had just made, as if reading them; he made no move to pay for the copies or otherwise conclude our business. After waiting in expectant silence for a few moments I asked if there were some reason for the delay. Mr. Hunt simply replied "yes" and continued to stare intently at his copied pages. I waited another few moments before asking for the reason. Mr. Hunt expressed a dissatisfaction with the quality of the copies and said he didn't want to pay for some of them. I looked them over and agreed that two of the three pages he was unhappy with had some blurry spots but that the third was readable and therefore I would charge him for two copies less than the original total; I attempted to explain that it would be better in the future for him to ask for assistance at the front desk if he had any problems with the operation of the machines or the quality of the copies BEFORE he made multiple copies that he was unhappy with, but without letting me finish Mr. Hunt interjected angrily "I don't want any of them" or something to that effect and threw the copies over the counter to/at me. Then he left the building in a huff.

On several occasions after that Mr. Hunt was still in the library after closing time, with several minutes elapsing while he shuffled books and papers around. Although I found this annoying, I resisted saying anything to him upon the first transgressions because of the history of confrontational behavior that Mr. Hunt had presented by this time. On Sunday, 29 June 2003, after more than 5 minutes had elapsed from the time when the last patron had left, and significantly more than that since the closing time of five o'clock, I found Mr. Hunt still at the back of the library. I told him that the library was closed and he had to go, and that he had to be out of the building by closing time from then on (this is essentially the same I thing I have said to a few patrons through the years who showed a pattern of not wanting to leave at closing time). Although I am sure he heard me and I ended my sentence with "okay?" he made no reply and walked past me out the door with his cart full of stuff.

On Monday, 30 June 2003 Mr. Hunt was again in the library after closing time, but only by two or three minutes. I resisted saying anything to him about his tardiness on that occasion. Another incident occurred the next day. [See the separate description of the events of 1 July 2003 and 5 July 2003.]

David Pilver

Mark Ober, State Attorney for Hillsborough County

Dear Mr. Ober,

I am writing to you today to inform you of some lapses of professional responsibility in your office and to ask for your assistance in rectifying them. I know you are busy doing important work so I will keep this as brief as possible.

I am an employee of the Hillsborough County Law Library. I saw you in the library many times over the years before you became State Attorney. In July of 2003 while I was on duty in the evening I had an unfortunate confrontation with a library patron who did not want to leave when the library closed. Mr. Dennis Hunt became enraged, cussed me out, challenged my authority to ask him to leave, and ranted about guns and violence before finally exiting the facility. I consulted with the management staff here and filed a report with the Sheriff's office asking to have him prosecuted under County Code 26-1. The next time I saw him enter the library I called security and he was eventually removed by the police for trespassing.

In the prosecution of Mr. Hunt by your office I was contacted by the Victim Assistance Program in writing several times. These included separate victim impact statements for the trespass charge (03-18502) and for the harassment of a county employee charge (03-25436). The case was assigned to Ms. Barbara Coleman. For the harassment charge I hand delivered the victim impact statement with supporting documents to Ms. Coleman to ensure that she would have all relevant information. Eventually I received correspondence indicating the time and place of the hearing for the trespass charge, for which I would be called as a witness, and later received a subpoena. That trial took place in mid-October and Mr. Hunt was found guilty. At no time during those proceedings was the other charge of harassment brought up that I am aware of. Ms. Coleman did not discuss it with me; I did not witness any discussion with the judge about it. After that trial a few weeks passed with no further correspondence regarding the harassment charge. I began to wonder why that issue had not been addressed yet. I called Rhonda Noblitt, the Victim Notification Specialist assigned to me, to inquire. I was assured by Ms. Noblitt's office that if I had received no word then nothing had happened. I did not tape-record the conversation and so cannot swear to the exact words used, but the gist of the message was "don't worry, you will be kept informed of any developments." I accepted this answer and waited. Weeks and then months went by. I began to receive notices that there were to be more hearings on the trespass issue. I found this puzzling since Mr. Hunt had already been found guilty.

I contacted Victim Assistance again, inquiring about both charges. This time I was shocked to be informed that the harassment charge was no longer pending. When I asked for an explanation I was told that I would have to get the details straight from Ms. Coleman. I called Ms. Coleman who said she seemed to recall that the harassment charge had been dropped and that it had all been handled at the first hearing on the trespassing issue. She seemed to be under the impression it was something obvious that I should have been aware of. When I explained my dismay at having not been contacted or consulted, reminded her that we had never discussed it and pressed for details about why the harassment charge had been dropped she became unsure and said she'd



EXHIBIT

P.lven

#8

1-8-09    bbs

tabbies

have to check her files to verify her answer and get the whole story. Some days later I was told I would have to talk to the lawyer who had "inherited" the Dennis Hunt cases, Ms. Leah Roberts. I contacted Ms. Roberts immediately and spoke to her about all of this, explaining that I wanted to know all about why the harassment charge was dropped and what was happening in the trespass charge that required more disposition hearings. Ms. Roberts explained she was not familiar with the case(s) and would have to "pull the file" to find the answers for me. She asked me to call her back a few days later. I did exactly that but have not spoken directly to Ms. Roberts again. Each time I tried to contact her office she was out and I could only leave a message with her assistant or voicemail. When I left messages (several) I explicitly told Ms. Roberts when I would next be in the office and available to talk. Although Ms. Roberts returned my calls twice, she called at times other than when I had said I would be there and so did not reach me. Eventually even this level of response disappeared as all my subsequent messages to her voicemail and office assistant went unanswered.

Since I was not getting anywhere with the attorneys I contacted Victim Assistance again and talked to Ms. Noblitt. I inquired why, if the charge had indeed been dropped, I had never been informed of this outcome as I had been assured I would be. Ms. Noblitt indicated that the attorney on the case was somehow responsible for informing me. I questioned the logic in using a title of "notification specialist" and then denying being a party responsible for notifying me. She could not answer this conundrum to my satisfaction. I asked for a supervisor and was transferred to Ms. Aragon. In a lengthy discussion Ms. Aragon wavered back and forth between saying it was a mistake not to have notified me (but without being able to tell me who had made the mistake or why) and denying any duty to inform me of anything. She repeatedly indicated she would have to "check the file" for more details but, of course, she never followed up with the courtesy of a return call despite my request for one. Neither Ms. Noblitt nor Ms. Aragon seemed in any way apologetic or even concerned that I was not informed about critical developments in these cases.

As a next-to-last resort I finally called attorney Roberts' office again and asked her assistant for Ms. Roberts' work address. I wrote a concise letter indicating my frustration and again asked for the story on why the harassment charge against Mr. Hunt was dropped, as well as what the status of the trespass case was. I did not receive a reply. I wrote one more email to remind her I was waiting for a response. That was on March 23, 2004. To date I have received no reply whatsoever.

By this time I am fairly disgusted with the whole process. The so-called Victim Assistance Program has, in my opinion, failed me. The bottom line is that I still do not know if, why, or how the charge of harassing a county employee has been dropped. If it has been dropped I think it was an error to do so, and gives the impression that verbal abuse and implied physical threat against county employees will be tolerated. Was some sort of plea deal arranged for that charge when I was sequestered during the trespass trial? Was there something lacking in my impact statement that was needed to prove the case? Was the lack of witnesses a crucial factor? Or did someone somewhere just make a determination that I did not qualify for the protection afforded by the anti-harassment ordinance? I believe I have made an exhaustive effort to get the proper answers to these questions from appropriate departments, to no avail.

I would appreciate it if you could look into this for me with two goals: to help me get some

answers regarding the status of the charges against Mr. Hunt and to evaluate the efficacy of your department's victim assistance methods. I realize that the charges involved here are relatively minor compared to the truly horrible crimes that you must prosecute every day, but I think that problems with Victim Assistance could be fundamental to the whole range of situations that are assigned to them. If they are screwing up on the little stuff then how can we be confident they are not screwing up on the big stuff?

I look forward to your reply.

Sincerely,

David L. Pilver

<pilverd@hillsboroughcounty.org>

James J. Lunsford Law Library
501 E. Kennedy Blvd. -- Suite 100
Tampa, FL 33602

813/272-5818

cc: N. Lopez

*called Mr Pilver - called & left message*

| TRESPASS WARNING<br>City of Tampa Police Department | Date Issued<br>07/05/03 | Time Issued<br>1540 | Expires<br>_____ |
|---|---|---|---|

**Issued To:**

| Name: | Last<br>HUNT | First<br>DENNIS | Middle<br>B | AKA |
|---|---|---|---|---|

Address
14111 MOSSY GLEN LN. #203 TAMPA FL 33613

| Race<br>W | Sex<br>M | DOB<br>01/13/55 | Height<br>5-9 | Weight<br>215 | Eyes<br>BLU | Hair<br>GRY |
|---|---|---|---|---|---|---|

**Location When Warned:**

501 KENNEDY BLVD E.

**Restricted From:**

Address
501 KENNEDY BLVD E.

Business Name
JAMES J. LUNSFORD LAW LIBRARY

**Authority:**

Complainant's Name
DAVID L. PILVER

☐ Owner     ☐ Manager     ☐ Security     ☐ Agent

☒ Other (Explain):     SR. LIBRARY ASST.

**Officer Issuing Warning:**

| Name<br>CA HATHCOX | Badge Number<br>985 | Division<br>I |
|---|---|---|

TPD 709 (2/97)

**EXHIBIT**
PILVER
# 9
1-8-09   bbs