1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENNIS HUNT,

        Plaintiff,             Case No.
v.                        8:07-cv-1168-T-30TBM

LAW LIBRARY BOARD,
  a Board created by
  Hillsborough County, Florida;

NORMA J. WISE,
  in her official capacity as
  Director of the James J.
  Lunsford Law Library, and
  individually; and,

DAVID L. PILVER,
  individually,

        Defendants.
_____/


DEPOSITION OF:    NORMA WISE

TAKEN BY:       Counsel for Plaintiff

DATE:           January 8, 2009

TIME:           12:40 p.m. to 1:24 p.m.

PLACE:         Richard Lee Reporting
                100 North Tampa Street
                Tampa, Florida

REPORTED BY:    Karen Kay Skeen, RPR
                Notary Public
                State of Florida at Large

**RICHARD LEE REPORTING**
(813) 229-1588
email: rlr@richardleereporting.com

TAMPA:
100 North Tampa Street, Suite 2060
Tampa, Florida 33602

ST. PETERSBURG:
535 Central Avenue
St. Petersburg, Florida 33701

Dockets.Justia.com

APPEARANCES:

> RYAN CHRISTOPHER RODEMS, ESQUIRE
> Barker, Rodems & Cook, P.A.
> 400 North Ashley Drive, Suite 2100
> Tampa, Florida 33602
> > Appeared for Plaintiff
>
> STEPHEN M. TODD, ESQUIRE
> Hillsborough County Attorney's Office
> Post Office Box 1110
> Tampa, Florida 33601-1110
> > Appeared for Defendants

## I N D E X

|  | PAGE |
|---|---|
| Examination by Mr. Rodems | 3 |

**EXHIBITS**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 10 | Letter dated 3-25-08 from Rodems to Wise | 9 |
| 11 | Letter dated 5-1-03 from Wise to Hunt | 11 |
| 12 | Internet Posting by Wise | 19 |
| 13 | Minutes of Law Library Board Meeting | 21 |
| 14 | Law Library Board Statement | 22 |
| 15 | Letter dated 11-12-03 from Campbell to Hunt | 23 |

1  The deposition, upon oral examination, of

2  NORMA WISE, taken on the 8th day of January, 2009,

3  at the offices of Richard Lee Reporting, 100 North

4  Tampa Street, Suite 2060, Tampa, Florida, beginning

5  at 12:40 p.m., before Karen Kay Skeen, Registered

6  Professional Reporter and Notary Public in and for

7  the State of Florida at Large.

8  * * * * * *

9  NORMA WISE,

10  being first duly sworn to testify the truth, the

11  whole truth, and nothing but the truth, was examined

12  and testified as follows:

13  EXAMINATION

14  BY MR. RODEMS:

15  Q  Hi.  Would you tell us your name,

16  please.

17  A  Norma Wise.

18  Q  Okay, Ms. Wise.  And as I understand it,

19  you're the director of the James J. Lunsford Law

20  Library?

21  A  Correct.

22  Q  Okay.  Have you ever given a deposition

23  before?

24  A  No, I haven't.

25  Q  Okay.  This is a question and answer

session.  You are under oath.  If there's any
questions that I ask you that are not clear or need
to be clarified, please let me know, and I'll try to
rephrase it so that it's more understandable.  And
if you need a break at any time, let me know.

A      Thank you.

Q      How long have you been the director?

A      It will be twelve years in April.  April
-- since April of 1997.  That makes it easier.

Q      And prior to April 1997, were you
employed by the law library?

A      Yes, I was.

Q      And I understand that the name changed at
some time around the turn of the century, and it
became the James J. Lunsford Law Library?

A      It was about 2001, uh-huh.

Q      Okay.  How long have you worked at the
law library overall?

A      It's about 22 years.  For a couple of
years before I was permanent, I worked for a
temporary service for two years -- about two years
before that.

Q      Okay.  And before you were director, what
was your title?

A      Administrative aide to the director.

1     Q     And who was the director?

2     A     William Bailey, B-a-i-l-e-y.

3     Q     Okay. And I understand that when

4 Mr. Bailey retired or left, that you became the

5 director?

6     A     Correct.

7     Q     And did anyone replace you?

8     A     There was just a shifting of people,

9 yeah.

10     Q     All right. What are the qualifications

11 that one must have to be the director? Is there any

12 educational requirements or --

13     A     No. We went through this at the time

14 that I was being considered for the promotion.

15 There's nothing in the rules or whatever that

16 specify any kind of educational level or any kind of

17 background. I was given the position because

18 Mr. Bailey for a couple of years before he retired

19 was out quite a bit. He had had a heart attack, and

20 he was out, you know, a lot of sick time. And I

21 was -- I had assumed his duties, and everything was

22 running smoothly, so they assumed that I was

23 competent to do the job.

24     Q     Okay. Well, can you tell me then what is

25 your educational background?

1     A      High school only.

2     Q      Okay.  Any college?

3     A      Some classes here and there, but not even

4  the two-year degree.

5     Q      And in the 22 years that you've been with

6  the Hillsborough County Law Library, have you taken

7  any courses or classes or seminars or anything

8  related to your job?

9     A      Through the Human Resources Department,

10 they run classes from time to time, and I've taken

11 several of those dealing with the public, that type

12 of thing.

13    Q      Okay.  Now, I know you know what we're

14 here about --

15    A      Yes.

16    Q      -- the lawsuit involving Mr. Hunt.  Let

17 me ask you, a few of the critical events occurred in

18 early July of 2003.  And we've just concluded

19 Mr. Pilver's deposition.  So I think we could

20 probably -- it will help me shorten up my deposition

21 to find out what your involvement was at that time.

22 Were you actively working during that time period of

23 the beginning of July of 2003, or were you out on

24 leave?

25    A      I was out on sick leave for the entire

1    month of June and started back with a few hours here

2    and there.   I had some outpatient therapy that I was

3    attending for a couple of weeks after that.

4         Q      Okay.   Mr. Pilver testified earlier that

5    in terms of the direction or response that he was

6    given as to an encounter with Mr. Hunt was from

7    Ms. Kellaher, Sandra Kellaher, and that he also had

8    communications with Mr. Spradlin --

9         A      Correct.

10        Q      -- and that essentially -- and I'm

11   paraphrasing -- that Ms. Kellaher told him to use

12   his best judgment in how he needed to deal with

13   Mr. Hunt, and that gave him -- Mr. Pilver, that

14   is -- that gave Mr. Pilver the authority in his mind

15   to do what he did in terms of trespassing Mr. Hunt.

16             What I would like to find out is did you

17   have any role in telling Mr. Pilver how to handle

18   the circumstances with Mr. Hunt following the July

19   3rd, I believe it was, encounter between Mr. Hunt

20   and Mr. Pilver?

21        A      No.

22        Q      Okay.   So just a couple more questions on

23   this, and then we can move on to other things.

24        A      Uh-huh.   Sure.

25        Q      Would Mr. Pilver have ever asked you or

1  would you have ever told Mr. Pilver, "If you're
2  uncomfortable with Mr. Hunt, call security and have
3  him removed"?

4      A    In any other situation or in this
5  particular situation?

6      Q    In this particular situation.

7      A    No, I did not say anything like that to
8  him, to my recollection, although I understand
9  that's what happened with --

10     Q    Yes, ma'am.  But, I mean --

11     A    Me personally, no.

12     Q    All right.  Have you ever had any
13 in-person -- like we're here today in person --
14 in-person encounters with Mr. Hunt at any time?

15     A    The first -- to my recollection, the
16 first time I've ever seen him was at his deposition
17 here.  He may have been in the library before that,
18 but no interaction, or I don't remember him person
19 to person, no.

20     Q    Okay.  Did anyone at any time consult
21 with you as the director as to whether Dennis Hunt
22 should be trespassed from the library?

23     A    No.

24     Q    Okay.  Are you aware as to whether a
25 trespass warning was issued to Mr. Hunt?

1     A    By the police department --

2     Q    Yes.

3     A    -- it was, yes.

4     Q    Okay.  And do you know whether Mr. Pilver

5 advised the police department that Mr. Hunt was not

6 welcome in the law library?

7     A    Yeah, he asked for him to be removed.

8     Q    Okay.  Have you ever seen -- you have

9 some documents over there next to you.  And let me

10 just ask you if you have ever seen -- here's my

11 copy.  The very bottom one is marked No. 9.  Have

12 you ever seen that document before?

13    A    Yes.

14    Q    Okay.  To your knowledge, is this

15 document, this trespass warning -- is it still in

16 effect?

17    A    I have no idea.

18    Q    Okay.  Let me show you what we'll mark as

19 Exhibit 10.

20         (Exhibit 10 marked for identification.)

21    Q    This is a letter from me to you dated

22 March 25th of 2008.  Did you get this letter?

23    A    Yes, I did.

24    Q    Okay.  Did you ever respond to me?

25    A    No, I did not.  I turned it over to the

1   attorney.

2        Q    All right.  Well, let me just ask you the

3   question at the bottom then.  Is Mr. Hunt still

4   barred from entering the James J. Lunsford Law

5   Library?

6        A    That would not be a decision for me.

7   That would be a decision by my board.  With

8   concessions, I would suggest to them that my staff

9   felt comfortable with him coming back in.

10       Q    Okay.  Well, I appreciate what you're

11  saying, but since --

12       A    If he's still being barred --

13       Q    Yes, ma'am.

14       A    -- that would be a decision for the

15  board.

16       Q    Okay.

17       A    My law library board.

18       Q    Okay.  I asked Mr. Pilver had he ever

19  rescinded the trespass warning, and he said he had

20  not.  Do you know if the trespass warning is still

21  in effect, as far as the law library is concerned?

22       A    As far as I know -- I don't know how long

23  by law they go into effect or if they're in effect

24  until they're withdrawn.

25       Q    Okay.

1    A    If there is a requirement for it to be

2    withdrawn, it has not been withdrawn.

3    Q    Okay.  Very good.  Let me show you what

4    we'll mark as Exhibit 11.

5    (Exhibit 11 marked for identification.)

6    Q    If you'd just take a look at that and let

7    me -- it appears to be a letter from you to Mr. Hunt

8    dated May 1st, 2003, with two attachments.  And what

9    I want to find out is if you recognize it and if it

10    is, in fact, your signature on the letter.

11    A    I recognize the letter.  I assume it's

12    the one that I sent him.  It looks like it.

13    Q    Okay.

14    A    Although I didn't read it verbatim, but I

15    assume it is.

16    Q    Okay.  Just let me know when you've had a

17    chance to review that.

18    A    Yes, it appears to be my letter.

19    Q    And attached to it are two pages.  One is

20    what appears to be a series of nine paragraphs on

21    James J. Lunsford Law Library letterhead with "Norma

22    J. Wise, Director," at the top left-hand corner.

23    A    Correct.

24    Q    What is this document?

25    A    That's the rules of the library.  It's

1    the only rules in existence.

2         Q      Are these rules still in effect?

3         A      Yes.   I do have a copy of the current one

4    that was just -- it's exactly the same wording.

5    I've pulled it.   It's the one that we're giving away

6    as of today when people ask for them to set up an

7    account or whatever they need them for.

8         Q      All right.

9         A      The date at the bottom is different, but

10   I read it verbatim, and I think that it's just that

11   it was just reorganized a little bit as far as

12   margins.   But substantially it's the same, exact

13   same.

14        Q      Okay.   And how did these rules come into

15   existence, if you know?

16        A      They're original rules that have been

17   updated from time to time by our library board.

18        Q      Okay.   So did you have any role in

19   creating these rules?

20        A      The last -- yes, in the last change in

21   that quite a bit of it before had to do with book

22   circulation, and we don't circulate books anymore.

23   So I did present this draft to my board for their

24   approval, taking out anything to do with book

25   circulation.

1    Q    The most recent draft?

2    A    Yes.

3    Q    Okay.  But the original --

4    A    Oh, the original ones?  No, they've just

5 been changed little bits over time.  They're really

6 the same rules that have been in existence since the

7 library has.

8    Q    All right.  To your understanding, were

9 the rules, the law library rules, required to be

10 approved by the law library board?

11   A    As far as I would say, yes, it is,

12 uh-huh.

13   Q    Okay.  And are there any other written

14 rules besides the ones that you've just identified?

15   A    No, no written rules.

16   Q    And then on --

17   A    I have no idea what that is.

18   Q    Okay.  So have you ever seen it before?

19   A    No.

20   Q    No?

21   A    Huh-uh.

22   Q    I don't see it referenced in your letter.

23   A    I've never seen that before.  I was

24 flipping through it.  I haven't seen that.  I don't

25 know where it came from.

1     MR. RODEMS:  Steve, with your

2  permission, can we take this last page off?

3     MR. TODD:  Yeah, let's do that.

4     MR. RODEMS:  Okay.  We're going to take

5  the last page of Exhibit 11 off, because that

6  was not part of the letter that Ms. Wise

7  originally sent out.  It's not referenced in

8  the letter, by the way.  I don't know how I

9  ended up with the three of them together.

10     THE WITNESS:  I've never seen it before.

11     MR. RODEMS:  Okay.  Thank you.

12 BY MR. RODEMS:

13   Q  This is not your handwriting on this

14 document, is it?

15   A  No, it's not.

16   Q  Okay.  I don't know why that would be

17 there.

18   A  And it says at the bottom, "Our copy" --

19   Q  Yeah.

20   A  I don't know whether that was something

21 that was created for Mr. Hunt while I was out.

22 That's a possibility.

23   Q  All right.

24   A  I might add I don't recognize that

25 handwriting either.  It's none of my employees'

handwriting either.

    THE REPORTER: It's not what?

    THE WITNESS: Oh, excuse me. It's none
of my employees' handwriting either.

  Q  Okay. If you could take a look next to
you at Exhibit No. 2. This is a handwritten -- it
appears to be a handwritten letter from Mr. Hunt to
you.

  A  Uh-huh.

  Q  Do you recognize it?

  A  This one in particular? There's so many
that we received. Actually, this is the letter that
my letter is in response to.

  Q  Okay. And you're saying your letter --

  A  It's --

  Q  -- Exhibit 3?

  A  No. The one that you just gave me, the
last one. Exhibit 11 --

  Q  Oh, okay.

  A  -- is in response to this one, Exhibit 2.

  Q  Okay. Very good.

  A  Yes, I recognize that.

  Q  All right. And then if you could just
flip over and look at Exhibit 3. This is a letter
to you from Mr. Hunt dated May 5th, 2003. Do you

1  know if you ever received that?

2      A    Yes, I did.

3      Q    Okay.  And let's see.  On this Exhibit 3,

4  if you look at the third paragraph where it says, "I

5  have questions of the coin deposits" --

6      A    Uh-huh.

7      Q    -- Mr. Hunt was asking for -- Mr. Hunt

8  was raising to the attention of you that with cash

9  being brought in, theft could go undetected and even

10 unsuspected.  "What policies or procedures prevent

11 this theft?"  Do you see that?

12     A    Uh-huh.

13     Q    Did you ever respond to him about those

14 sentiments or thoughts that he had placed in that

15 letter?

16     A    May I explain the sequence here?

17     Q    Yes, ma'am.

18     A    Okay.  After my response to his original

19 letter --

20     Q    Which is the April 30?

21     A    -- which is Exhibit 2 --

22     Q    Okay.

23     A    -- my board chair received copies of his

24 letter and my response.  She followed up with a

25 phone call to him and told me that any more requests

go directly to her and to the County Attorney's

Office. At this point, this came in after this, and

this was sent -- because it was a public records

request as far as my board chair was concerned --

and then it went to the County Attorney's Office as

far as a public records request.

Q    I see. Okay.

A    Okay?

Q    Yes, ma'am.

A    So if there was no response from me on

that, that was at direct instruction of my board

chair.

Q    I understand. Okay. Very good.

A    Uh-huh.

Q    Then if you'll take a look at Exhibit No.

4, Mr. Hunt wrote a letter to you dated May 19,

2003. Did you receive this letter?

A    I saw this letter, yes.

Q    Okay. By the way, when you were getting

these complaint letters from Mr. Hunt, were you

sharing them or showing them to Mr. Pilver?

A    May not have been showing them, but he

did know of their existence. I don't recall at the

time whether he was actually being shown copies of

them.

1    Q    Okay.  This May 19th letter from Mr. Hunt

2  to you expressly accuses Mr. Pilver of doing

3  something that Mr. Hunt felt would be injurious to

4  him.

5    A    Uh-huh.

6    Q    Did you have a discussion with Mr. Pilver

7  about this letter?

8    A    Certainly did.

9    Q    Okay.  What do you recall about that?

10    A    We discussed different ways that he might

11  be able to avoid any look of impropriety.  David's

12  an excellent employee and works well with the

13  public.  I was a little suspicious of this letter

14  because this isn't like Mr. Pilver to act like this

15  towards someone.  But we did discuss it and came to

16  the decision that he would put the books on the

17  counter and then Mr. Hunt could take the books off

18  the counter rather than him handing them directly to

19  him.

20    Q    Okay.  And how did Mr. Pilver receive

21  this change in policy?  Was he happy about it,

22  unhappy about it, angry about it?

23    A    We discussed all the different things

24  that were going on at the time.  I can't say he was

25  happy, angry or anything else.

1    Q    All right.  By this time, Mr. Hunt had

2  raised an issue about not being able to bring his

3  own personal photocopier into the library?

4    A    Correct.

5    Q    Okay.  And Mr. Pilfer informed him that

6  he could not do that?

7    A    Right.

8    Q    Was that a policy of the library that

9  Mr. Pilver -- that Mr. Hunt could not use his own

10  personal photocopier at that time?

11    A    Not that Mr. Hunt couldn't do it; no one

12  could bring in any of their own copiers or scanners.

13    Q    Okay.  And was that a written policy?

14    A    No, it wasn't.  It was just known.

15    Q    Okay.

16    A    It was unwritten rules.

17    Q    And what was the reason for that

18  unwritten rule?

19    A    Because a lot of our revenue comes from

20  self-generated funds.

21    Q    Okay.  I show you what we'll mark as

22  Exhibit 12.

23        (Exhibit 12 marked for identification.)

24    Q    Do you recall sending an internet message

25  board posting to the University of California

1 Davis --

2     A    It's the LAWLIB LISTSERV, yes.

3     Q    Oh, okay.

4     A    It's a LISTSERV for LAWLIB, called

5 "LAWLIB."

6     Q    Okay.  Do you recall sending this?

7     A    Yes, I did.

8     Q    Okay.  And were you at the board meeting

9 that was held on Monday, June 16th, 2003?

10     A    No, I was not.

11     Q    No?

12     A    No.

13     Q    Okay.  Did you become aware that the

14 board was going to hold a meeting --

15     A    Yes.

16     Q    -- and that one of the agenda items would

17 be discussion of whether the patrons can use their

18 personal copiers?

19     A    Yes.  That came right before I was -- I

20 went into the hospital.  And my board chair told me

21 to have Mr. Hunt discuss any problems he had with

22 the law library at that board meeting.  There's some

23 correspondence somewhere that states that.

24     Q    Okay.  And did you learn the outcome of

25 the board's consideration of this matter?

1      A     Not that night.  But, yes, within a few

2  days or so, I was called and told about it, uh-huh.

3      Q     Okay.  Did you ever see the minutes of

4  that meeting?

5      A     Yes, uh-huh.

6      Q     Let me just -- we'll mark those then.

7  This is being marked as Exhibit 13.

8             (Exhibit 13 marked for identification.)

9      Q     Have you seen this document before?

10     A     Yes.

11     Q     All right.  Were you -- did you ever have

12  any discussion with Mr. Pilver about the law library

13  board's decision regarding --

14     A     Me personally, no.  Well, not at the

15  time.  You know, over time, we have, yes, but not

16  right when it happened.

17     Q     All right.  What was your -- what was

18  your feeling about the law library board's

19  decision?  Did you agree with it or disagree with

20  it?

21     A     No feeling one way or the other.

22     Q     Okay.  You weren't concerned about losing

23  revenue any longer?

24     A     I couldn't picture everyone bringing in

25  copy machines.  I didn't think it was going to have

1  that much of an effect for one person to do that.

2      Q      Okay.  Let me show you -- we'll mark this

3  as 14.  Have you ever seen this document before?

4          (Exhibit 14 marked for identification.)

5          MR. RODEMS:  Sorry, Steve.

6      A      No.  Who's it from?  Oh, the County

7  website?  Oh, perhaps so, but not in this format

8  maybe.

9      Q      Okay.  You believe this comes from the

10  County website?

11      A      It looks like the County website, yes,

12  from the web address that's at the top.  It looks

13  like the County website printout, yeah.

14      Q      All right.  This document says, "The

15  purpose of this board is to collect, maintain and

16  make available legal research material not generally

17  attainable elsewhere in the County for use by the

18  bench, bar, students and the general public."

19      A      Basically our mission statement, correct.

20      Q      You agree that that is the purpose?

21      A      Yes.  Uh-huh.

22      Q      All right.  And the law library is open

23  to the general public?

24      A      Yes, it is.  It's our first rule,

25  actually.

1    Q    Okay.  Do you need some water?

2    A    Yes.  Sorry about that.  Thank you.

3    Q    Oh, no problem.  Let me show you what

4    we'll mark as Exhibit 15.

5         (Exhibit 15 marked for identification.)

6    Q    This is a letter from Mary Helen

7    Campbell, General Counsel with the office of the

8    County Attorney, to Dennis Hunt dated November 12th,

9    2003.  And it shows at the bottom that a copy went

10   to you.  Did you receive a copy of this letter?

11   A    I recognize it, yes.

12   Q    Okay.  Now, I don't want to know about

13   any communications you may have ever had with any of

14   the attorneys.  I don't care to get into that, and

15   that's not my purpose.  But what I would like to ask

16   you about is the first sentence of this letter which

17   states, "This letter is in response to your public

18   records request dated November 7, 2003.  The law

19   library has no written or non-written policies

20   concerning 'trespass warnings' or 'enforcement of

21   trespass warnings.'  These are criminal matters and

22   are handled by law enforcement."

23   A    Uh-huh.

24   Q    Does that statement that I've just read

25   to you comport with your understanding?

1    A    I would think they're criminal matters

2  handled by the police as well.

3    Q    Okay.  Well, maybe that part I shouldn't

4  have read.  The portion about "The law library has

5  no written or non-written policies" --

6    A    Oh, correct.  Correct.

7    Q    -- that part is correct?

8    A    Yes, sir.

9    Q    Okay.  If I'm clear then, if Mr. Pilver

10  and Mr. Hunt had some sort of an encounter on

11  July -- I don't know why I'm having so much trouble

12  with this date -- July 3rd --

13         MR. TODD:  7th, I believe.

14    A    The 5th or 7th.  I can never remember

15  either.  There was something that went on on the

16  7th.  I'm not sure if it was --

17    Q    If they had some sort of encounter on

18  July 3rd in which Mr. Hunt was in the library after

19  hours or after closing time and Mr. Pilver

20  approached him and a dispute arose between the two

21  of them, would that have been something that you

22  would have discussed about Mr. Pilver at that time,

23  or were you still out of the loop because of your --

24    A    I was out of the loop --

25    Q    -- your convalescence?

1   A       -- because of the convalescence.

2   Q       Okay.  All right.  So --

3   A       Personally, I was.  He did speak with

4   people.

5   Q       So then your knowledge or awareness of

6   whatever happened between the two of them occurred

7   at a later date?

8   A       Correct.

9   Q       Would it have occurred after Mr. Hunt had

10  already been arrested for trespass?

11  A       Mr. Spradlin, who was acting director,

12  did call me after he spoke with the board chair

13  about the incident where Mr. Hunt was in the library

14  after closing.  But I don't remember if that was

15  before or after the actual trespass had taken

16  place.  But I was informed by Mr. Spradlin that

17  Ms. Kellaher had given him permission to do what he

18  felt was best, you know, for when Mr. Hunt had come

19  back in the library.  But I don't remember the exact

20  sequence.  I'm sorry.

21  Q       Okay.  So then it -- correct me if I'm

22  wrong.  Your knowledge of what Ms. Kellaher had told

23  Mr. Pilver to do had come from your conversation

24  with Mr. Spradlin?

25  A       I believe it did, the first instance of

1    it.  The first time I heard of it, it came from

2    Mr. Spradlin.  It may have come from Dave Pilver,

3    but I think I didn't speak to him until a week or so

4    later.

5        Q    Do you ever recall having any direct

6    conversations with Ms. Kellaher about --

7        A    Not about this instance.  About the

8    original instance about the copier, yes, back in

9    May.  I did speak with her about that.

10       Q    Okay.

11       A    But during this situation, no.

12       Q    At any time have you had a conversation

13   with Ms. Kellaher in which she confirmed for you

14   that she told Mr. Pilver --

15       A    Oh, yes.  Yes, well after this point when

16   it looked like it was going to be a problem.  When

17   he started sending public information requests and

18   things, she and I spoke, and she, you know,

19   confirmed that to me personally.

20       Q    What did she confirm to you personally?

21       A    She confirmed to me that she had told him

22   to do what he was comfortable with that next time he

23   came in.

24       Q    Did that include, to your knowledge,

25   having Mr. Pilver issued a trespass warning?

1    A    As far as I knew, he was able to have the

2    security -- County security have him removed from

3    the library.  Now, the fact that they called the

4    Tampa Police and he was trespassed, I would think

5    that was a -- that would be a police matter.

6    Q    Okay.  Could you take a look at Exhibit

7    6.

8    A    Sure.

9    Q    This is letter dated July 3rd, 2003, to

10   you from Mr. Hunt.

11   A    Yes.

12   Q    Did you ever receive this?

13   A    I have seen it.  I did not receive it

14   during that time.  In fact, I think this was one of

15   the faxes that he sent.  My copies of them have this

16   fax number across the top.

17   Q    Okay.

18   A    Anything that came in during that June

19   and July time when I wasn't there, Mr. Spradlin was

20   just sending them directly over to Ms. Kellaher.

21   Q    Okay.  You know, I didn't know all of

22   this until today.

23   A    Oh.

24   Q    I was under the impression that you were

25   involved in this process through this July period.

1    A    No.  I'm sorry.

2    Q    No.  I'm sorry.  Let me ask you this:

3    Mr. -- would you agree that what Mr. Hunt does in

4    this letter of July 3rd, 2003, is attempt to give

5    his version of the events of July 3rd -- I'm

6    sorry -- of July 1st, 2003?

7    A    That's what I would understand it to be,

8    correct.

9    Q    Okay.  And you know from speaking with

10   Mr. Pilver that Mr. Pilver has a very different --

11   well, strike that.  You have talked with Mr. Pilver

12   about this event on July 1st, 2003?

13   A    And it differs, yes, sir.

14   Q    It does differ?

15   A    (Witness moves head up and down.)

16   Q    Okay.  Yes?

17   A    Yes.

18   Q    Okay.  I'm sorry.  I saw you nodding your

19   head --

20   A    Oh, I'm sorry.

21   Q    -- and I forget that she's taking

22   everything down you say.  So --

23   A    I'm sorry.  I forget.  I'm sorry.

24   Q    That's okay.  Did you at any time ever

25   suggest that there be some process to determine

1   whether Mr. Pilver's version of events on July 1st,

2   2003, was accurate or whether Mr. Hunt's version of

3   events on July 1st, 2003, were accurate?

4        A    I don't recall any conversations that

5   anyone had concerning deciding who was telling the

6   truth.  Having -- see, now, we never really got

7   into -- back on the copier -- sorry to bring that

8   back up -- but I had telephone conversations with

9   Mr. Hunt, and he was not the most polite gentleman

10  I've ever spoken to on the telephone.

11       Q    Okay.

12       A    So having had first experience with this

13  person myself and him being rude to me, I tended to

14  lean a little more towards Mr. Pilver's personally.

15  Now, as far as what Ms. Kellaher thought or

16  whatever, we never had an open discussion or anyone

17  sitting down and saying, "Okay.  David, you said

18  this, and Mr. Hunt is saying this.  What's going on

19  here?"

20       Q    Okay.  Was there any process that you

21  knew of where something like that could occur?

22       A    In my conversations and in finding out

23  from David his side of the story, I kind of dropped

24  it at that point as far as what Mr. Hunt had said

25  because of David's background.  He had worked for me

1   for eight or nine years at that point.

2       Q    Okay.

3       A    You know, I had complete trust in the

4   gentleman.

5       Q    And I understand that.  That's -- there

6   is, of course -- I'm not here to criticize you for

7   that --

8       A    I understand.

9       Q    -- I'm just trying to find out.  But so

10  that I am clear on it, based on your interaction

11  with Mr. Hunt by telephone, and based on your

12  knowledge of Mr. Pilver through working with him,

13  having heard Mr. Pilver's version of the events and

14  having read Mr. Hunt's version of the events, you

15  gave more credibility to Mr. Pilver?  Is that

16  accurate?

17      A    Personally, yes, I did.

18      Q    Okay.

19      A    Right or wrong, I did.

20      Q    I don't see in the law library rules

21  anything that would allow someone who had been

22  removed from the library to challenge that as it

23  being appropriate or not appropriate.  Is there any

24  process?

25      A    It's never been addressed because it's

1    never been done before.

2        Q       Okay.  After you returned to what I'll

3    describe as full duties --

4        A       Correct.

5        Q       -- from your convalescence in -- I guess

6    it was sometime in the month of July --

7        A       About mid-July, yes.

8        Q       -- about mid-July, so after Mr. Hunt had

9    been arrested and trespassed out of the library, did

10   this matter involving Mr. Hunt come up as an issue

11   for you again until the lawsuit was filed?  And when

12   I say "the lawsuit," I mean the lawsuit we're here

13   on.

14       A       Only in that day after day after day for

15   a few months, we were getting public records

16   requests from him.  And I was just sending them on

17   to the County Attorney's Office.  But, no, it wasn't

18   an issue for me, no.

19       Q       Okay.  And you never had to testify at

20   either of the two criminal trials that occurred?

21       A       No.

22       Q       All right.  As for the events of July

23   1st, 2003, which was the encounter between

24   Mr. Pilver and Mr. Hunt when Mr. Hunt was allegedly

25   in the law library after closing hours or --

1    A    Okay.  The first instance, okay.

2    Q    Yes.  -- and in regards to the trespass

3    arrest and those types of things, who would have

4    more knowledge about the actual events that

5    occurred, you or Mr. Spradlin?

6    A    Between Dave and Sandra Kellaher and

7    that --

8    Q    Just --

9    A    Or everything --

10    Q    I'm just trying to -- what I'm trying to

11    do -- let me just lay it out for you.

12    A    Okay.  Sure.

13    Q    I'm trying to establish that Mr. Spradlin

14    was there on a daily basis during that time period

15    but you were not.  So, in other words, he would know

16    more about this situation than you would.  And,

17    unfortunately --

18    A    The day-to-day, yes.

19    Q    Yes.  Unfortunately, lawyers have to try

20    to ask these questions in a manner that makes sense

21    both to the person they're asking the question of

22    and for the court reporter and the attorney and the

23    court.  So sometimes it's hard.  But --

24    A    Yes, he was the acting director while I

25    was out, yes.

1    Q    Okay.  So as for what happened between

2  Mr. Pilver and Mr. Hunt during that week of -- first

3  week of July, 2003, Mr. Spradlin was at work every

4  day, and you were not necessarily at work every

5  day?

6    A    Correct.

7    Q    Okay.  So as for what was being discussed

8  or what was being done about these events during

9  that week, Mr. Spradlin would have been more

10  involved than you would have?

11    A    Correct.

12    Q    And you would have been involved only on

13  maybe an advisory basis of, "Hey, this is what's

14  going on"?

15    A    Correct.  I received a couple of phone

16  calls, and then I was in one of the days or two of

17  the days when we talked about it.  But the entire

18  situation, no, only what I know of what they told

19  me.

20    Q    Just so I'm clear, if Mr. Pilver felt

21  that he was given permission to have Mr. Hunt

22  removed, this did not come from you, it must have

23  come from Ms. Kellaher or someone else.  Correct?

24    A    Correct.

25    Q    And as far as whether Mr. Hunt is allowed

1  to return to the law library or not, it's your

2  testimony that that would be the law library board's

3  area of responsibility and not yours as the

4  director?

5  A  Correct.

6  Q  Okay. Would you have the authority to

7  rescind the trespass warning that has been attached

8  as Exhibit No. 9 on behalf of the law library?

9  A  In this particular case, I would say no.

10  Q  Okay. Who would have the authority?

11  A  It would have to be the board, the

12  board's decision.

13  Q  Okay. And who is the current chair of

14  the board?

15  A  Horace Knowlton. Want me to spell that

16  for you?

17  Q  Yes, ma'am.

18  A  Horace, regular H-o-r-a-c-e. And last

19  name Knowlton, K-n-o-w-l-t-o-n.

20  Q  Okay. What is the scope of your duties

21  and responsibilities at the law library?

22  A  I take care of the day-to-day operations

23  in the library, supervise the employees, make book

24  decisions on what's being purchased, what's being

25  discontinued, pay the bills, budgeting. Just about

anything an administrator would do.

Q       Policy decisions about what hours you should be open, do you have --

A       That's by the board.

Q       Okay.  Policy decisions about what rules should be --

A       That would be a board decision.

Q       Okay.

A       They handle policy and direction of the library.  I just handle the day-to-day grind.  I guess that's the easiest way to explain it.

Q       I think that's a fair way to put it.

MR. RODEMS:  All right.  I'll tell you what:  Why don't we take a two-minute break. And, Steve, can I talk to you outside for just a second?

MR. TODD:  Sure.

(Recess from 1:21 p.m. to 1:23 p.m.)

MR. RODEMS:  Okay.  I do not have any more questions.  I thank you for coming down today.

THE WITNESS:  You're welcome.

MR. TODD:  You have a right to read this if it's typed up.  And you can certainly waive that right and rely on the professionalism of

our very good court reporter. But you need to

say on the record that you want to read it if

it's typed up or that you waive your right. I

recommend that you waive.

THE WITNESS: I'll waive my right.

(At 1:24 p.m., no further questions were

propounded to the witness.)

# CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF HILLSBOROUGH:

I, Karen Kay Skeen, Notary Public in and for the State of Florida at Large, do hereby certify that I reported in shorthand the foregoing proceedings at the time and place therein designated; that the witness herein was duly sworn by me; that my shorthand notes were thereafter reduced to typewriting under my supervision; and that the foregoing pages are a true and correct, verbatim record of the aforesaid proceedings.

Witness my hand and seal January 14, 2009, in the City of Tampa, County of Hillsborough, State of Florida.

Karen Kay Skeen
Notary Public
State of Florida at Large



KAREN KAY SKEEN
MY COMMISSION # DD 842560
EXPIRES: December 16, 2012
Bonded Thru Budget Notary Services

# BARKER, RODEMS & COOK

PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

CHRIS A. BARKER
RYAN CHRISTOPHER RODEMS
WILLIAM J. COOK

400 North Ashley Drive, Suite 2100
Tampa, Florida 33602

Telephone 813/489-1001
Facsimile 813/489-1008

March 25, 2008

Norma Wise, Director
James J. Lunsford Law Library
501 East Kennedy Boulevard, Suite 100
Tampa, Florida 33602

> Re:   **Dennis Hunt**
>        **Our File No. 2008.5595**

Dear Ms. Wise:

Our law firm represents Dennis Hunt, who several years ago was issued a trespass warning and told he was not permitted to return to the James J. Lunsford Law Library. I write today to inquire as to whether this trespass warning remains in effect or whether it has been revoked.

Would you please advise me as to whether Mr. Hunt is still barred from entering the James J. Lunsford Law Library?

Sincerely,

Ryan Christopher Rodems

RCR/so



**EXHIBIT**

Wise
1 c
1-8-09

# JAMES J. LUNSFORD LAW LIBRARY
## Hillsborough County
### 501 E. KENNEDY BOULEVARD - SUITE 100
### TAMPA, FLORIDA 33602

NORMA J. WISE, Director

(813) 272-5818
FAX (813) 272-5226

May 1, 2003

Mr. Dennis Hunt
14111 Mossy Glen Lane, #203
Tampa, FL 33613

Re:  Library Policies

Dear Mr. Hunt:

Thank you for your letter of April 30, 2003, as requested attached is a copy of the Law Library Rules.

Although not specifically addressed in the Law Library Rules, I would like to try to clarify for you why we do not allow anyone to bring in their own copy machines and/or other devices (e.g. scanners). The Law Library is an Agency under Hillsborough County and, as such, is not in the business of making a profit. We receive revenues from court filing fees, attorneys occupational licenses, County General Fund and self-generated revenues. All money received for services provided goes back into the operation of the Library. The money received from the copiers, together with the other revenue is put back into the purchase of books and other associated operating costs thus reducing the amount of money needed from the County's General Fund. We believe the cost per copy ($.20) is a fair price and has not been increased since 1988.

All policies apply to every patron of the Law Library. Attorneys and Judges get the same privileges that any patron of the Library gets. Attorneys are required by The Florida Bar to keep current on legal topics, and we keep a small number of audio tape courses available for them provided by The Florida Bar. They may check these tapes out for overnight use if they have an office in Hillsborough County. If a non-attorney or an attorney from another county wants to listen to the tapes, they may if they listen to them in the library.

I would like to reiterate that the policies of the Library apply to all patrons. If we were to make an exception for you, or any person, that would have to apply to all patrons. In that case our copy revenue could be reduced, and we would have to apply more book/subscription cutbacks. This is something we have struggled with for years and have felt it to be appropriate under the circumstances.

I have spoken with Sandra Kellaher, Chair of the Law Library Board, and at her suggestion this matter will be put on the agenda for the next Board meeting. I will inform you of the date and time of that meeting as soon as it is set.

Please let me know if I can be of any further service to you.

Sincerely,

Norma J. Wise,
Director

Attachments

CC: Sandra M. Kellaher, Esq.



# JAMES J. LUNSFORD LAW LIBRARY

### Hillsborough County
### 501 E. KENNEDY BOULEVARD - SUITE 100
### TAMPA, FLORIDA 33602

NORMA J. WISE, Director

(813) 272-5818
FAX (813) 272-5226

1. The Library is available for use by the public.

2. Accounts maintained by the library for individuals or firms must be kept as a positive balance due to the fact that the library cannot extend credit (Fla. Const. Art. VII S 10). If an account goes into the negative, services provided by the library will be suspended until such time as the account is replenished. Accounts in the negative on the 1st day of each month will be sent a statement outlining the current charges. Payment of this negative balance is due on receipt of statement. A separate charge of $3.00 will be made for the preparation of each statement detailing these charges.

3. No book shall be removed from the Library

4. CLE tapes are available for check out by members of the Florida Bar in good standing, with their principal offices in Hillsborough County, or by a person acting on behalf of the member.

5. A late charge of $1.00 (ONE DOLLAR) per day per tape will be assessed against the holder of record of any overdue tape. The Law Library Director may at any time request in writing the return of any tape. If it is not returned within one week from the date of such notification, the holder of record of such tape will be charged for the replacement cost of such tape plus a service charge of $10.00 (TEN DOLLARS). All late and service charges are to be paid promptly.

6. It is the responsibility of the attorney borrowing a tape to see that he/she is properly credited when it is returned. Loss of any tape charged to an attorney will result in such attorney being billed for the replacement cost, plus $10.00 (TEN DOLLARS) service charge.

7. If any tape becomes damaged while checked out, the cost of repair shall be determined by the Law Librarian and shall be paid by the attorney for which it was removed from the Library. If the Law Librarian determines that the tape cannot be repaired, then the replacement cost of the tape, plus $10.00 service charge, shall be assessed against the attorney for whom it was removed.

8. Failure to comply with these rules will result in the suspension of library privileges of the offending attorney's firm. In addition, any attorney who ignores written correspondence from the Law Library Director and who fails to return tapes will be referred to The Florida Bar for appropriate disciplinary action.

9. Library hours are as follows:

| | | |
|---|---|---|
| Monday through Thursday: | 8:00am | - 8:00pm |
| Friday: | 8:00am | - 5:00pm |
| Saturday: | 12:00noon | - 5:00pm |
| Sunday | 12:00noon | - 5:00pm |
| All holidays: | Closed | |

**Internet message board posting found at: <ins>http://lawlibrary.ucdavis.edu/LAWLIB/May03/0265.html</ins>**

## Public Access Libraries - Copiers

**From:** Norma Wise (*WiseN@hillsboroughcounty.org*)
**Date:** 05/19/03

- **Next message:** <ins>Jackson, Lisa Mecklenberg: "WestPac grant winner"</ins>
- **Previous message:** <ins>Momsen Elaine: "Need J. of Workers' Compensation article"</ins>
- **Messages sorted by:** [ <ins>date</ins> ] [ <ins>thread</ins> ] [ <ins>subject</ins> ] [ <ins>author</ins> ]

We have a situation where a patron wants to bring in his own copier/scanner, instead of using our coin operated machines. Revenue from our copiers is a significant part of our budget, and we've had an unwritten policy to not allow this.

I was wondering if any other public access libraries have a policy on this (written or otherwise). If so, I would appreciate you sending it to me off list. Also, please let me know if copy revenue played a part in the decision to allow or not allow it.

Thanks in advance for your input.
Norma J. Wise, Director
James J. Lunsford Law Library
Hillsborough County
501 E. Kennedy Blvd - Suite 100
Tampa, FL 33602
email: wisen@hillsboroughcounty.org
phone: (813) 272-5818
fax: (813) 272-5226

- **Next message:** <ins>Jackson, Lisa Mecklenberg: "WestPac grant winner"</ins>
- **Previous message:** <ins>Momsen Elaine: "Need J. of Workers' Compensation article"</ins>
- **Messages sorted by:** [ <ins>date</ins> ] [ <ins>thread</ins> ] [ <ins>subject</ins> ] [ <ins>author</ins> ]

*This archive was generated by <ins>hypermail 2b29</ins> : 06/02/03 PDT*



EXHIBIT _Wise_
12
1-8-09  _bhs_

17

# JAMES J. LUNSFORD LAW LIBRARY

**Hillsborough County**
501 E. KENNEDY BOULEVARD - SUITE 100
TAMPA, FLORIDA 33602

NORMA J. WISE, Director

(813) 272-5818
FAX (813) 272-5226

### Minutes of the James J. Lunsford (Hillsborough County)
### Law Library Board Meeting

Pursuant to notice duly given, The James J. Lunsford (Hillsborough County) Law Library Board ("Board") met on Monday, June 16, 2003, at 5:00 pm at the Law Library. Members present were Sandra Kellaher, Theodore Taylor, Carlos Pazos, and Thomas Parnell. Michael Ginsberg was unable to attend, Bill Spradlin, acting Director, acted as the Secretary of the meeting. Also present were Jim Lynch & Rudy Haidermota from the County Attorney's office and Mr. Dennis Hunt, a patron concerned about being allowed to bring in his own scanning device.

The Board was advised that not only did our pending legislation die in committee, but that the amendment to Article V passed in a special session (S.B. 113A) which takes away all funding that the Library received from ourt filing fees. Options as far as our funding are being researched, but at this time we are not sure where we stand. There will be a budget workshop July 17, at which time we should know if the County will to continue to fund the Library.

Rudy Haidermota from the County Attorney advised the Board & Mr. Hunt that pursuant to section 119.08 Florida Statutes, patrons are allowed to bring in their own duplicating devices. The same section allows for a charge to be levied, but at this time the Board has decided not to pursue this.

There being no further business to come before the meeting, the same was, upon motion duly made, seconded and passed adjourned at 6:00 pm.

_Bill C. Spradlin_
Bill C. Spradlin

Acting Ex Officio Secretary to the Board



EXHIBIT
Wise
13
1-8-09  bbs

# Law Library Board

http://www.hillsboroughcounty.org/bds_coun/committees.cfm?BoardName=Law_Library_Board

**Purpose:**

The purpose of this Board is to collect, maintain and make available legal research material not generally obtainable elsewhere in the County for use by the bench, bar, students and the general public.

Members Appointed by:       Board of County Commissioners The Hillsborough County Bar Association shall submit a minium of three nominees for each appointment to be made and shall be reflective of the diversity of our community.

Maximum Membership:       Five appointed voting directors, and the County Attorney or his designee serves as an ex-officio, non-voting director. Of the five appointed directors: -- One director shall be engaged in a solo law practice or as part of a small law firm containing no more than three (3) principals; and -- One director shall have a demonstrated interest in assisting pro se litigants.

Length of Terms:          Five year terms, commencing on the 1st of July.
Authority:                Hillsborough County Ordinance No. 01-16
Meeting Time and Place:   Annually and at call of the Chairman.
Special Requirements:     Directors shall be Members of the Hillsborough County bar
                          in good professional standing and of high moral character.

**Contact Person:**
          Norma Wise, Director
          Law Library
          501 E. Kennedy Blvd.
          Suite 100
          Tampa, FL 33602

# Law Library Board Members

| Name | Term |
|------|------|
| Mr. Michael Ginsberg, Esq. - | 06/30/03 |
| Ms. Sandra M. Kellaher, Esq. - | 06/30/02 |
| Mr. Jim Lynch, Esq. - | |
| Mr. Thomas E. Parnell, Esq. - | 06/30/03 |
| Mr. Carlos A. Pazos, Esq. - | 06/30/01 |
| Mr. Theodore Taylor, Esq. - | 06/30/04 |

Boards and Councils



Emeline C. Acton, *County Attorney*

Christine M. Beck, *Chief Assistant*

Donald R. Odom, *Chief Assistant*

James J. Porter, *Chief Assistant*

Jennie Granahan Tarr, *Chief Assistant*

Frances (Beth) Novak, *Legal Office Administrator*



### Hillsborough County
### Florida

County Center
601 E. Kennedy Blvd. -- 27th Floor

Mailing Address:
P.O. Box 1110
Tampa, Florida 33601
(813) 272-5670
Fax (813) 272-5231

November 12, 2003

Mr. Dennis Hunt
14111 Mossy Glen Lane
#203
Tampa, Florida 33613

Re:  Public Records Requests
     James J. Lunsford (Hillsborough County) Law Library

Dear Mr. Hunt;

This letter is in response to your public records request dated November 7, 2003. The Law Library has no written or non-written policies concerning "trespass warnings" or "enforcement of trespass warnings". These are criminal matters and are handled by law enforcement. Regarding the computer diskette, I informed you when you came to my office several months ago that the disk would be available for pick up the following Wednesday. I still have the diskette in my office – please let me know if you prefer me to mail it to you (there is a $10.00 charge for the diskette).

I have requested the Payroll Department and Human Resources for a copy of the names and titles of Law Library employees and the information concerning days and time periods the employees worked at the Law Library during the time period you specified. The Law Library employees abide by the general policies and procedures that apply to all county employees. The Civil Service Rules contain 136 pages, for a cost of $20.40. The Human Resources Policies and Procedures are 217 pages in length, for a cost of $32.55. Please let me know if you want a copy of these documents.

Sincerely,

*Mary Helen Campbell*

Mary Helen Campbell, General Counsel

Cc:  Donald R. Odom, Interim County Attorney
     Norma J. Wise, Director,
         James J. Lunsford (Hillsborough County) Law Library



EXHIBIT

tabbies

1 S Wise

1-8-09